Jessica C.K. Boelter (IL SBN 6277801)
Thomas A. Labuda, Jr. (IL SBN 6225401)
Matthew G. Martinez (IL SBN 6297132)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Donald A. Lattin (NV SBN 693)
Christopher D. Jaime (NV SBN 4640)
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>RODEO CREEK GOLD INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company<br>☐ Affects Antler Peak Gold Inc. | Chapter 11<br><br>Case No. BK-13-_____ (___)<br><br>Joint Administration Requested<br><br>**MOTION FOR AN INTERIM AND FINAL ORDER (I) AUTHORIZING DEBTORS TO PAY CERTAIN PREPETITION EMPLOYEE OBLIGATIONS, (II) AUTHORIZING THE DEBTORS TO REIMBURSE BUSINESS EXPENSES, (III) AUTHORIZING DEBTORS TO MAINTAIN AND CONTINUE EMPLOYEE BENEFITS AND PROGRAMS IN THEIR ORDINARY COURSE, (IV) AUTHORIZING AND DIRECTING APPLICABLE BANKS TO HONOR ALL CHECKS AND TRANSFERS DRAWN ON THE DEBTORS' ACCOUNTS, AND (V) GRANTING RELATED RELIEF**<br><br>Hearing Date: February __, 2013<br>Hearing Time: _____ (PT)<br>Place: 300 Booth Street<br>Reno, NV 89509 |

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Rodeo Creek Gold Inc. ("Rodeo Creek") and its affiliated debtors and debtors in possession (each a "Debtor" and collectively, the "Debtors")[1] in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), hereby submit this motion (the "Motion"), for entry of an interim order (the "Interim Order"), substantially in the form attached hereto as Exhibit A, and a final order (the "Final Order"), substantially in the form attached hereto as Exhibit B, pursuant to sections 105, 363 and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), (A) authorizing the Debtors, in accordance with their existing plans, programs and policies, to (i) pay prepetition wages, salaries and other compensation to the Debtors' employees (the "Employee Compensation"); (ii) reimburse all prepetition business expenses to employees; (iii) continue to pay and honor obligations relating to employee medical, insurance and other benefit programs (the "Employee Benefits"); (iv) make payments relating to all Deductions and Withholdings (as defined below); and (v) make all payments to third parties relating to the foregoing payments and contributions (collectively, the "Employee Obligations"), and (B) scheduling a final hearing (the "Final Hearing") on the relief requested herein and entry of the Final Order. Further, the Debtors request that the Court authorize and direct the applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments. In support hereof, the Debtors respectfully state as follows:

## I. Status of the Case and Jurisdiction

1. On February 25, 2013 (the "Petition Date"), each of the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy

---

[1] The Debtors in these chapter 11 cases are Rodeo Creek Gold Inc., Antler Peak Gold Inc., Hollister Venture Corporation and Touchstone Resources Company.

2

Code.  Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

2. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The Debtors consent to the entry of a final order on this matter.

## II. Background of the Debtors

3. The Debtors are part of an international mining company (the "GBG Group") engaged in the exploration, development and operation of high-quality gold properties.  The GBG Group operates through more than twenty (20) subsidiaries of Great Basin Gold Ltd., a Canadian entity, incorporated in various jurisdictions, including but not limited to British Columbia, South Africa and Nevada.

4. The GBG Group is currently focused on its two emerging flagship mines in rich gold-producing regions: the Burnstone gold mine located in South Africa (the "Burnstone Property") and the Hollister gold mine in Nevada (the "Hollister Trial-Mine").  In connection with operations at the Hollister Trial-Mine, the GBG Group also owns the Esmeralda Mill, to where ore is transported for milling and processing.  The Debtors are four (4) U.S. entities that own and operate the Hollister Trial-Mine, the Esmeralda Mill and their associated operations (collectively, the "Nevada Operations").

5. Additional information regarding the Debtors, their affiliates, their respective assets and operations and these chapter 11 cases is set forth in the Declaration of Raymond E. Dombrowski, Jr. in Support of the Debtors' Chapter 11 Petitions and First Day Motions (the "Dombrowski Declaration"), which is incorporated herein by reference.

## III. Relief Requested

6. By this Motion, the Debtors seek the entry of an order pursuant to sections 105, 363 and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (A) authorizing the Debtors, in accordance with their existing plans, programs and policies, to (i) pay the Employee Compensation; (ii) continue to pay and honor all Employee Benefits; (iii) reimburse

all prepetition business expenses to employees; (iv) make payments relating to all Deductions and Withholdings (as defined below); and (v) make all payments to third parties relating to Employee Obligations, and (B) scheduling the Final Hearing on the relief requested herein and entry of the Final Order. Further, the Debtors request that the Court authorize and direct the applicable banks and other financial institutions to honor and pay all checks and transfers drawn on the Debtors' payroll accounts to make the foregoing payments.

## IV. Prepetition Employee Obligations

7. The Debtors collectively employ approximately 255 U.S. employees (each an "Employee," and, collectively, the "Employees"). The Employees are employed directly by Debtor Rodeo Creek Gold Inc. Each Employee is classified as either a full-time employee (the "Full-Time Employees"), of which there are currently approximately 245, a part-time employee (the "Part-Time Employees"), of which there are currently approximately 5, or a temporary/seasonal employee (the "Temporary Employees"), of which there are currently approximately 5. Each Employee gets paid either through a salary (the "Salaried Employees") or based on number of hours worked (the "Hourly Employees"). Approximately 45-50 Employees are salaried, while approximately 200-205 Employees are hourly. The Debtors do not utilize the services of any independent contractors. The expertise and experience developed by the Employees is a critical component of the Debtors' ability to operate the Hollister Trial-Mine.

### A. Employee Compensation

8. The Debtors' compensation policy is designed to be competitive, based on job responsibilities and to recognize individual and team contributions. The Debtors' average gross monthly compensation for their Employees, including wages, salaries, commissions and other compensation, is approximately $2 million. Hourly Employees are paid on a biweekly basis every other Wednesday. Salaried Employees are paid on a semi-monthly basis on the 15th and final day of each month. Employees may choose to have their paychecks directly deposited into their bank accounts through the Debtors' direct deposit program or to receive paychecks at work during their scheduled work shift.

4

9.      As of the Petition Date, the aggregate amount of unpaid base wages (including base salary but excluding certain deductions and withholdings, each as discussed below) earned prior to the Petition Date that remain unpaid to the Employees is approximately $750,000 (the "Unpaid Wages"). By this Motion, the Debtors request the authority to pay all such Unpaid Wages to their Employees in the ordinary course of business. The Debtors believe that if the Motion were granted, no Employee would be paid more than $11,725 for any such Unpaid Wages.

**B.    Reimbursable Business Expenses**

10.     Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, and other business-related expenses. The Reimbursable Expenses are incurred by Employees on behalf of the Debtors through use of personal funds or credit cards. After submission and approval of expense reports, such Employees are reimbursed through the regular payroll process.

11.     The Reimbursable Expenses were all incurred on the Debtors' behalf and with the understanding that they would be reimbursed. To avoid harming the individual Employees who incurred the Reimbursable Expenses, the Debtors request authority to reimburse the Employees for Reimbursable Expenses that were incurred prepetition. The Debtors estimate that, as of the Petition Date, the aggregate amount of unpaid Reimbursable Expenses was *de minimis* and, in any event, less than $15,000.

**C.    Employee Benefits**

12.     The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with the Employee Benefits, including, but not limited to: (i) a broad range of medical and health care programs; (ii) vacation, sick, holiday and leave, and similar benefits; (iii) certain savings and pension plans; and (iv) a number of other specific employee benefits, described in greater detail below. By this Motion, the Debtors seek authority, but not direction, to continue to honor their obligations relating to the Employee Benefits, and to pay all

5

prepetition amounts due under the Employee Benefit programs as and when such amounts come due in the ordinary course of business.

### *Health Care Programs*

13. The Debtors' employee benefits program offers eligible Employees a competitive range of benefit plans, which are aimed to enhance an Employee's compensation and quality of life. The Debtors offer several health and welfare programs to Employees, including medical, prescription drug, dental and vision care coverage, whether through third party insurers or otherwise (the "Health Care Benefits").[2]

14. The Rodeo Creek Gold, Inc. Health Care Benefits Plan (the "Rodeo Creek Health Plan") is administered by Debtor Rodeo Creek Gold Inc. ("Rodeo"), with Hometown Health Providers as the contract and claims administrator, and provides Employees with a number of individual and family PPO and non-PPO health plan options.[3] The Rodeo Creek Health Plan also provides prescription drug coverage to Employees. Such prescription drug coverage is provided through separate agreement(s) between Rodeo and a prescription drug vendor. In order to comply with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), the Rodeo Creek Health Care Plan includes a continuation of coverage option, which is available to covered Employees whose healthcare coverage under the Rodeo Creek Health Plan would otherwise terminate.

15. The Debtors also offer their Employees a dental insurance plan (the "Dental Plan") through Principal Life Insurance Company. The Dental Plan is a PPO plan and provides a number of key dental benefits to the Employees. The Dental Plan also has a COBRA

---

[2] Prior to employment with the Debtors, a prospective employee undergoes a pre-employment medical examination at a local medical center. The Debtors believe that such medical examinations are an important part of discharging the Debtors' safety requirements to ensure a prospective employee is physically able to undertake the demands required by the Debtors' operations. The Debtors incur *de minimis* costs, payable directly to the healthcare provider, on account of such examinations. The Debtors consider such costs to be part of the Health Care Benefits subject of this Motion.

[3] In connection with the Rodeo Creek Health Plan, Rodeo maintains stop loss insurance through HM Life Insurance Company, with Hometown Health Partners as the third party administrator. Rodeo pays an average of $38,443.52 per month under such stop loss insurance.

continuation component. The Debtors also provide vision coverage to Employees through the Group Vision Care Plan (the "Vision Plan") provided by Vision Service Plan, Inc.

16. On average, the Debtors pay approximately $392,000 per month for the Health Care Benefits. In addition, the Debtors' average monthly administrative fees currently paid in connection with all Health Care Benefits total approximately $10,766.

17. By this Motion, the Debtors seek authority, but not direction, to (a) continue to provide the Health Care Benefits for their Employees in the ordinary course of business, (b) continue to honor obligations under such Health Care Benefits, including any premiums and administrative fees related to the Rodeo Creek Health Plan, the Dental Plan and the Vision Plan, and (c) pay all such amounts owed under the Health Care Benefits to the extent that they remain unpaid as of the Petition Date.

***Life and Accidental Death & Dismemberment Insurance***

18. The Debtors provide primary life and accidental death and dismemberment insurance coverage (the "Life and AD&D Insurance") through Prudential at no cost to Employees.[4] The Life and AD&D Insurance coverage costs the Debtors approximately $8,284 per month. As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the Life and AD&D Insurance to be approximately $6,903.

***Long and Short Term Disability***

19. The Debtors provide eligible Employees with short-term disability benefits (the "Short-Term Disability Program") and long-term disability benefits (the "Long-Term Disability Program" and together with the Short-Term Disability Program, the "Disability Benefits Programs") through the Lincoln Financial Group, at no cost to the Employees. The Short-Term Disability Program is intended to protect an Employee's income for a short duration in the event the Employee becomes ill or injured. The Short-Term Disability Program provides an Employee up to 60% of his or her weekly salary, up to $1,400 per week for up to 26 weeks.

---

[4] The Debtors also offer to all eligible Employees the option to purchase additional term Life and AD&D Insurance. The Debtors only provide access to this benefit and do not pay any of the costs associated therewith.

7

The Long-Term Disability Program is intended to protect an Employee's income for a longer duration after it has depleted coverage under the Short-Term Disability Program or the Debtors' sick leave policy. The Long-Term Disability Program provides an Employee up to 60% of his or her weekly salary up to $6,000 per month, with differing benefit limitations depending on the Employee's illness.

20. The Disability Benefits Programs cost the Debtors approximately $9,145 per month. As of the Petition Date, the Debtors estimate the amount of accrued and outstanding prepetition obligations with respect to the Disability Benefits Programs to be approximately $7,621.

*Vacation, Holiday and Leave Benefits*

21. The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time varies based on the Employee's amount of time employed by the Debtors. Vacation time ranges from 80 annual hours of paid vacation for Employees with one year of service to 240 annual hours of paid vacation for Employees with ten or more years of service. Employees are paid for Vacation Time at their regular base rate of pay, based on a 40 hour work week. Except for Employees with less than a year of service, the vacation year extends from January 1 through December 31. The majority of an Employee's vacation hours must be taken during the year in which they are earned. A maximum of 40 hours of vacation are allowed to be carried over and must be used in the first quarter of a new year. In certain limited circumstances, more than 40 hours of vacation time may be carried over with the written approval of an Employee's General Manager. Hours left over at the end of the year may also be paid out with management approval. Vacation Time is paid at a prorated amount if an Employee leaves the company, and upon separation, the Employee receives his or her base wages for unused, accrued vacation time in his or her final check. Conversely, any vacation time taken, but not accrued, is deducted from an Employee's final check upon separation. Those Employees reaching certain anniversary milestones, at which time an additional week of vacation is granted, receive a pro-rated amount of newly earned vacation time for the remainder of the calendar year and the full amount in the following year,

and thereafter.  Finally, Vacation Time does not accrue during any type of leave of absence or disability.  Unused Vacation Time is paid to employees on leave of absence each pay period until the available time is exhausted.

22. The Debtors also observe eight holidays for Employees after 30 days of employment.  Although the Debtors ordinarily observe such holidays on their appointed days (i.e., the Christmas holiday on December 25), business requirements may require that an alternate day be designated for holiday observation.  All Full-Time Employees may qualify to receive holiday pay ("Holiday Pay").  Part-Time Employees and Temporary Employees are not entitled to receive Holiday Pay.

23. Employees are eligible to receive benefits for eligible absences from work under certain leave policies ("Leave"). The Debtors' numerous Leave policies include the following: (i) up to three days of paid bereavement leave for the death of a member of an Employee's immediate family; (ii) up to 10 days of paid leave (up to 8-10 hours per day for Hourly Employees depending on work schedules) for jury duty; (iii) unpaid time off to be a witness in a judicial or administrative proceeding in accordance with Nevada law; (iv) unpaid time off relating to school events of an Employee's child who is enrolled in public or private school in accordance with Nevada law; (v) unpaid time off to vote in accordance with Nevada law; and (vi) unpaid military leave in accordance with the 1994 Uniformed Services Employment and Reemployment Act and the Veterans' Reemployment Act of 1940.

24. The Debtors' Leave policies also include family medical leave ("FML") in accordance with state and federal laws.  The Debtors generally grant 12 weeks of FML to eligible Employees, which FML may be paid, unpaid or a combination of both.  To be eligible for FML, an Employee must have been employed by the Debtors for at least 12 months, have worked at least 1,250 hours during the 12 month period immediately before the date when FML would begin and work in an office or worksite where 50 or more employees are employed within 75 miles of that worksite.  An eligible Employee is entitled to take FML for one of the following reasons during a rolling year: (i) incapacity due to pregnancy, prenatal medical care or child birth; (ii) to care for the Employee's child after birth, or placement for adoption or foster care;

(iii) to care for a spouse, child or parent with a serious health condition; or (iv) a serious health condition of the Employee.

25. By this Motion, the Debtors request authority, but not direction, to continue to honor their Vacation Time, Holiday Pay and Leave policies in the ordinary course of business and to honor all prepetition obligations related thereto.

*Workers' Compensation*

26. Under the laws of Nevada, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors (the "Workers' Compensation Programs"). The Debtors maintain their coverage through the National Union Fire Insurance Company of Pittsburgh, PA. The Debtors pay approximately $1,354,047 in premiums on an annual basis on account of such coverage, and are currently fully up to date on all premiums due as of the Petition Date under the Workers' Compensation Programs.

27. As of the Petition Date, there were approximately 22 workers compensation claims (the "Workers' Compensation Claims") open against the Debtors arising out of alleged injuries incurred by Employees during the course of their employment with the Debtors, which the Debtors expect to continue to resolve in the ordinary course of business. The Debtors expect to continue to resolve any Workers' Compensation Claims in the ordinary course of business in accordance with applicable Nevada state law.

28. Because the Workers' Compensation Programs are required for the continued operation of the Debtors' businesses under the laws of Nevada, the Debtors request authority to pay any and all prepetition amounts due or that may become due with respect to the Workers' Compensation Programs. The Debtors further seek authority to maintain and continue their prepetition practices with respect to the Workers' Compensation Programs, including, among other things, allowing workers' compensation claimants, to the extent they hold valid claims, to proceed with their claims under the applicable Workers' Compensation Programs.

*Savings and Employee Benefit Plans*

29. The Debtors have established a 401(k) retirement savings plan (the "401(k) Plan") to provide employees the potential for future financial security for retirement. Employees are automatically enrolled at the 6% level into the 401(k) Plan the beginning of the pay period following 60 days of employment. The Debtors also contribute a matching amount of 100% up to 6% of Employee contributions. All of the approximately 250 Employees currently participate in the 401(k) Plan, and they contributed approximately $1,359,494 of their own funds into the 401(k) Plan during 2012. Matching contributions made on behalf of Employees during 2012 to these 401(k) Plan were approximately $903,985. By this Motion, the Debtors seek authority to pay all amounts owed under the 401(k) Plan and continue to perform their obligations under the 401(k) Plan.

30. In addition to the 401(k) Plan, prior to the Petition Date, Rodeo provided the Rodeo Creek Gold Inc. Retirement Plan (the "Rodeo Creek Retirement Plan"). The Debtors provided all contributions for amounts needed to provide benefits to eligible Employees under the Rodeo Creek Retirement Plan. The plan has been frozen and the Debtors are terminating the Rodeo Creek Retirement Plan. The Debtors estimate the Rodeo Creek Retirement Plan is currently underfunded as of the Petition Date in the amount of approximately $1,500,000. The Debtors are not seeking authority at this time to make any payments under the Rodeo Creek Retirement Plan.

*Other Benefits Plans and Programs*

31. The Debtors have an Employee Recruitment Bonus Policy that provides remuneration to Employees who recommend prospective employees to the Debtors' Human Resources Department who are subsequently hired and retained for a period of one year. Under the Employee Recruitment Bonus Policy, an Employee receives $1,500 for the successful hiring of an experienced underground miner that they recommend and/or are responsible for coming to work at the Hollister Trial-Mine. The Debtors estimate that, as of the Petition Date, the aggregate amount of unpaid bonuses pursuant to the Employee Recruitment Bonus Policy was *de minimis* (the "Unpaid Recruitment Bonuses"), and in any event, less than $10,000. By this

11

Motion, the Debtors seek authority to pay the Unpaid Recruitment Bonuses, to continue to maintain the Employee Recruitment Bonus Policy and to meet all obligations thereunder.

32. The Debtors provide a Salary Retention Bonus Policy and an Hourly Retention Bonus Policy, the purpose of which is to attract and retain valuable experienced professionals that will allow the Debtors' Nevada operations to operate in a sustainable manner. Under the Salary Retention Bonus Policy, an Employee receives an annual retention bonus of 10% of the Employee's base salary, and applies only to Salaried Employees. To qualify for such retention bonus, the Employee must be a current Employee and be employed for one continuous year from the effective date (June 1, 2012). The Hourly Retention Bonus Policy provides for year one and year two bonuses ranging from $3,000 to $6,500 depending on Employee classification. To qualify for the year one bonus, an Employee must be a current Employee employed for one continuous year from the June 1, 2012 effective date.

33. Finally, the Debtors also maintain a performance bonus program (the "Performance Bonus Program") which Salaried Employees are allowed to participate in. In total, approximately 50 Employees participate in the Performance Program. Calculation of the bonus under the Performance Bonus Program (such bonus, the "Performance Bonus") is based 80% on the performance of the Hollister Trial-Mine and 20% on the eligible Employee meeting specific goals determined at the outset of the year. The 80% portion is calculated based on a number of performance factors such as gold sales, gold prices, profits, Employee safety and waste reduction. The Performance Bonus is paid quarterly, with the Performance Bonus set to be paid at the end of March 2013.

34. The Debtors estimate that, as of the Petition Date, the aggregate amount of unpaid bonuses pursuant to the Salary Retention Bonus Policy, the Hourly Retention Bonus Policy and the Performance Bonus Program was approximately $300,000.

35. By this Motion, the Debtors seek authority to maintain the Salary Retention Bonus Policy, the Hourly Retention Bonus Policy and the Performance Bonus Program and to meet all obligations thereunder as they become payable during the postpetition

period.[5] However, the Debtors do not seek to make any payments pursuant to the Salary Retention Bonus Policy, the Hourly Retention Bonus Policy or the Performance Bonus Program during the interim period until entry of the Final Order. The Debtors intend for these three programs to be approved in connection with the Final Order.

**D.  Deductions and Withholdings**

36. During each applicable pay period, the Debtors routinely deduct certain amounts from their Employees' paychecks, including: (a) garnishments, child support and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to various Employee Benefits (as described more fully herein, and including, among other things, medical, dental and vision benefits, insurance premiums, and 401(k) contributions and loans) (collectively, the "Deductions"). The Debtors then forward the Deductions to various third party recipients. Due to the Debtors' commencement of these Chapter 11 Cases, Deductions from Employees' earnings may not have been subsequently forwarded to the appropriate third party recipients prior to the Petition Date.

37. Accordingly, the Debtors seek authority, in their sole discretion, but not direction, to continue to forward these prepetition Deductions to the applicable third party on a post-petition basis, in the ordinary course of business, as the Debtors routinely did prior to the Petition Date. The Debtors estimate that there are no amounts in Deductions that were taken prior to the Petition Date that have not yet been forwarded to the appropriate third parties.

38. Further, the Debtors are required by law to withhold from each Employee's wages amounts related to, among other things, federal, state and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Withholdings"), for later remittance to the appropriate federal, state or local taxing authorities. The Debtors must then match with their own funds amounts for Social Security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Withholdings, the "Debtors' Payroll Taxes").

---

[5] The Debtors reserve the right to file motions during these Chapter 11 Cases seeking Court approval of additional benefits plans and programs.

39.     The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state or local taxing authority at the same time the Employees' payroll checks are disbursed.  By this Motion, the Debtors seek authority, but not direction, to honor and process the prepetition obligations with respect to the Debtors' Payroll Taxes, including the forwarding of the Withholdings to the appropriate taxing authorities.

**E.     Third Party Compensation**

40.     The Debtors request authority to pay all expenses incident to, among other things, the Employee Compensation, Employee Benefits and Deductions and Withholdings, including other processing costs or administration costs ("Prepetition Administration Costs"). The Debtors estimate that the aggregate amount of Prepetition Administration Costs accrued but unpaid as of the Petition Date constitutes a *de minimis* amount.  Payment of the Prepetition Administration Costs is justified because the failure to pay any such amounts might disrupt third party providers' services with respect to the Employee Compensation, Employee Benefits and Deduction and Withholdings discussed herein.

## V.     Authority for Banks to Honor Checks

41.     The Debtors further request that all applicable banks and other financial institutions be authorized to receive, process, honor and pay any and all checks and transfers drawn on the Debtors' payroll accounts, whether such checks or transfers were presented before, or are presented after, the Petition Date.  Accordingly, by this Motion, the Debtors seek: (i) authorization for, direction for, and/or ratification of, their banks' honoring of prepetition payroll and employee benefit checks and transfers on or after the Petition Date; (ii) authorization and direction for their banks to process and honor all other checks issued for payments approved by this Motion; and (iii) authorization to reissue checks for payments approved by this Motion where the applicable check is dishonored.

## VI.     Justification for Relief Requested

42.     The Debtors seek the relief requested herein because any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described herein could severely disrupt the Debtors' relationship with their Employees and dedicated non-

14

Employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence and cooperation are most critical. The Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay their Employees. At this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Compensation and Employee Benefits in the ordinary course of their businesses.

43. If the relief requested herein is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since these monies are needed to enable them to meet their personal obligations. In addition, without the requested relief, the Debtors' stability would be undermined by the potential threat that otherwise loyal Employees at all levels would seek other employment.

### VII. Basis for Relief Requested

44. Pursuant to section 507(a)(4)(A) of the Bankruptcy Code, employee claims for "wages, salaries, or commissions, including vacation, severance, and sick leave pay" earned within 180 days before the Petition Date are afforded priority unsecured status to the extent of $11,725 per Employee. Similarly, section 507(a)(5) of the Bankruptcy Code provides that Employees' claims for contributions to certain employee benefit plans also are afforded priority unsecured status to the extent of $11,725 per Employee covered by such plan, less any amount paid pursuant to section 507(a)(4) of the Bankruptcy Code.

45. Furthermore, section 363(b)(1) of the Bankruptcy Code provides, in pertinent part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Section 105(a) of the Bankruptcy Code further provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

46. The Debtors believe that a substantial majority of the Employee Obligations relating to the period prior to the Petition Date constitute priority claims under sections 507(a)(4) and (5) of the Bankruptcy Code. As priority claims, the Employee Obligations must be paid in full before any general unsecured obligations of the Debtors may be satisfied, and the Debtors would need to pay these claims in full in order to confirm a plan of reorganization. See 11 U.S.C. § 1129(a)(9)(B). Accordingly, the relief requested herein will likely affect only the timing, and not the amount, of the payment of these priority obligations, and would not prejudice the rights of general unsecured creditors or other parties in interest.

47. Indeed, as of the Petition Date, the Debtors believe that no Employees are owed in excess of $11,725 per employee on account of prepetition wages. However, the Debtors submit that, to the extent any Employee is, in fact, owed in excess of $11,725, satisfaction and payment of such amount is necessary and appropriate, and may be authorized under sections 105(a) and 363(b) of the Bankruptcy Code.

48. The Debtors believe that the relief requested in this Motion is necessary for the Debtors' to operate at the Hollister Trial-Mine and the Esmeralda Mill in compliance with all applicable federal and state regulations and laws. The Debtors' Employees rely on their full compensation in order to continue to pay their daily living expenses, and these Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor their existing Employee Obligations. Any delay or failure to pay wages, salaries, benefits and other similar items would irreparably impair the Employees' morale, dedication, confidence, and cooperation, and would adversely impact the Debtors' relationship with the Employees at a time when the Employees' support is critical.

49. In a worst-case scenario, the Debtors could face a mass departure of Employees, which would essentially cripple the Debtors' Nevada Operations. For example, if the Debtors are unable to continue the compensation and benefit programs described herein and the Employees decided to quit *en masse*, the Debtors believe they would be unable to hire knowledgeable, skilled, replacement workers in a timely manner. If the Debtors are required to

operate with a depleted workforce, or an unskilled replacement workforce, they believe that the health and safety of all Employees will be jeopardized and their ability to operate at their mines will be compromised. This would be especially detrimental at a time when the Debtors are seeking to maintain, and maximize, asset value for their estates through a sale of the Nevada Operations. Finally, the Debtors also believe that this situation could cause their estates to incur penalties for failing to comply with applicable law, harm which would substantially outweigh the cost of the relief sought in this Motion. As such, the relief sought herein is entirely consistent with the intent of section 105(a) of the Bankruptcy Code and represents the exercise of sound business judgment.

50. With respect to the Salary Retention Bonus Policy, the Debtors believe that continuing such policy and making any and all payments thereunder complies with section 503(c) of the Bankruptcy Code, which essentially provides that retention inducement payments cannot be made to "insiders" unless certain conditions are met. As a gating matter, the Debtors believe that no payments under the Salary Retention Bonus Policy are made to "insiders" as that term is defined in section 101(31) of the Bankruptcy Code. Accordingly, section 503(c) is inapplicable. If any payments under the policy would be considered payments to insiders, the policy is nonetheless compliant with section 503(c). First, despite the policy's name, it is not truly a policy to induce Employees to stay with the Debtors, but rather can be better characterized as part of the Employees' uniformly built-in salary structure. Second, the uniformity and universal application of the pay increases across the Employees ensures that it does not violate the amount restrictions of 503(c)(1)(C).

51. With respect to the Debtors' obligations regarding Payroll Taxes, the payment of such taxes will not prejudice other creditors of the Debtors' estates, as the relevant taxing authorities generally would hold priority claims under section 507(a)(8) of the Bankruptcy Code in respect of such obligations. Moreover, the portion of the payroll taxes withheld from an Employee's wages on behalf of the applicable taxing authority is held in trust by the Debtors. As such, these employee withholding taxes are not property of the Debtors' estates under section 541 of the Bankruptcy Code. See, e.g., Begier v. IRS, 496 U.S. 53 (1990) (withholding taxes are

property held by a debtor in trust for another and, as such, are not property of the debtor's estate).

52.     In addition, the Debtors believe it is necessary to continue payment of administrative fees to the various vendors that administer the Debtors' various benefit plans. Without the continued services of these administrators the Debtors will be unable to continue to honor their Employee Obligations and related Employee Benefits in an efficient and cost-effective manner.

53.     The Debtors do not seek to alter their compensation, vacation, or other benefit plans, programs or policies at this time.[6] This Motion is intended only to permit the Debtors, in their discretion, to make payments consistent with the Debtors' existing policies to the extent that, without the benefit of an order approving this Motion, such payments may be inconsistent with the relevant provisions of the Bankruptcy Code, and to permit the Debtors, in their discretion, to continue to honor their plans, practices, programs, and policies with respect to the Employees, as such plans, practices, programs, and policies were in effect as of the Petition date.[7] Payment of Employee Obligations as requested herein and in accordance with the Debtors' prepetition business practices is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in an economic and efficient manner, and without disruption. Moreover, the amounts sought to be paid herein are relatively modest compared with the importance of the Employees in the operation of the Debtors' Nevada operations.

54.     Courts in this district and others have approved the payment of prepetition claims of employees for wages, salaries, expenses, and benefits on the grounds that such payment is necessary to the benefit of the estates. See, e.g., In re Ahern Rentals, Inc., Case No. 11-53860 (BTB) (Bankr. D. Nev. Dec. 23, 2011 (interim order), Feb. 1, 2012 (final order))

---

[6] The Debtors do, however, reserve their right to modify their compensation, vacation or other benefit plans, programs and policies in a manner consistent with their rights under the plans, programs and policies currently in place.
[7] The Debtors believe that continuation and payment of the Employee Obligations is consistent with their prepetition practices and policies is within the ordinary course of their business.

18

[Docket Nos. 34 and 336]; In re Black Gaming, LLC, Case No. 10-13301 (BAM) (Bankr. D. Nev. March 5, 2010 (interim order), Apr. 9, 2010 (final order)) [Docket Nos. 78 and 204]; In re Stations Casinos, Inc., Case No. 09-52477 (GWZ) (Bankr. D. Nev. July 30, 2009 (interim order), Nov. 24, 2009 (final order)) [Docket Nos. 24 and 620].[8]

### VIII. Deemed Compliance and/or Waiver with Applicable Bankruptcy Rules

55. The Debtors submit that they have satisfied the requirements of Bankruptcy Rule 6003 and accordingly, the Court should grant the relief requested herein.

56. To implement the requested relief immediately, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

### IX. Notice

57. Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Nevada, (ii) the United States Securities and Exchange Commission, (iii) the Office of the United States Attorney for the District of Nevada, (iv) the Internal Revenue Service, (v) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, (vi) counsel the agent for the Debtors' pre-petition credit facility, and (vii) counsel to the agent for the Debtors' post-petition credit facility. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

### X. Conclusion

WHEREFORE, the Debtors respectfully request the entry of the Interim Order (A) authorizing the Debtors, in accordance with their existing plans, programs and policies, to (i) pay the Employee Compensation; (ii) pay the Reimbursable Expenses; (iii) continue to pay and honor all Employee Benefits; (iv) make payments relating to all Deductions and Withholdings; and (v) make all payments to third parties relating to Employee Obligations, (B) scheduling the Final Hearing on the relief requested herein and entry of the Final Order, (C) authorizing and directing the applicable banks and other financial institutions to honor and pay all checks and

---

[8] Because of the voluminous nature of the unreported orders cited herein, such orders are not annexed to the Motion. Copies of these orders are available upon request made to Debtors' counsel.

19

transfers drawn on the Debtors' payroll accounts to make the foregoing payments, and (D) granting such other and further relief as the Court may deem just and proper.

DATED: February 25, 2013    Respectfully submitted,

By   /s/ Christopher D. Jaime
Donald A. Lattin, NV State Bar #693
Christopher D. Jaime, NV State Bar #4640
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519

Proposed Local Reorganization Counsel
For Debtors and Debtors in Possession

Jessica C.K. Boelter, IL State Bar #6277801
Thomas A. Labuda, Jr., IL State Bar #6225401
Mathew G. Martinez, IL State Bar #6297132
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603

Proposed Reorganization Counsel for
Debtors and Debtors in Possession