# EXHIBIT I

## Asset Purchase Agreement

**GBG DRAFT**

ASSET PURCHASE AGREEMENT

dated as of [_____], 2013

by and among

RODEO CREEK GOLD INC.,

ANTLER PEAK GOLD INC.,

HOLLISTER VENTURE CORP.,

TOUCHSTONE RESOURCES COMPANY

and

[BUYER]

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS.................................................................................... 1
    1.1    Defined Terms ..................................................................1
    1.2    Interpretation....................................................................7

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES ..................... 9
    2.1    Assets to be Acquired .......................................................9
    2.2    Excluded Assets.............................................................10
    2.3    Liabilities to be Assumed by the Buyer ...............................11
    2.4    Excluded Liabilities .......................................................11
    2.5    Rejection of Assumed Contracts.........................................12

ARTICLE 3 CLOSING; PURCHASE PRICE ........................................................ 12
    3.1    Closing; Transfer of Possession; Certain Deliveries ...............12
    3.2    Purchase Price...............................................................13
    3.3    Allocation of Purchase Price..............................................13

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS............................ 14
    4.1    Organization.................................................................14
    4.2    Due Authorization, Execution and Delivery; Enforceability.......14
    4.3    Consents.....................................................................14
    4.4    No Conflicts.................................................................14
    4.5    Title to Acquired Assets...................................................14
    4.6    Title to Real Property......................................................14
    4.7    Financial Advisors .........................................................15

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 15
    5.1    Organization.................................................................15
    5.2    Due Authorization, Execution and Delivery; Enforceability.......15
    5.3    Consents.....................................................................15
    5.4    No Conflicts.................................................................15
    5.5    Financial Capability........................................................16
    5.6    Solvency.....................................................................16
    5.7    Financial Advisors .........................................................16
    5.8    Opportunity for Independent Investigation............................16

ARTICLE 6 COVENANTS OF THE PARTIES ........................................................ 17
    6.1    Conduct of Business Pending the Closing.............................17
    6.2    Access.......................................................................17
    6.3    Public Announcements ....................................................17
    6.4    Tax Matters .................................................................18
    6.5    Regulatory Approvals .....................................................18

6.6    Employee Matters ....................................................................................19
6.7    Confidentiality .........................................................................................20
6.8    Further Assurances...................................................................................20
6.9    Sale Order ................................................................................................21
6.10   Buyer's Acknowledgements; Nature of Representations ........................21
6.11   Replacement Credit Support and Reclamation Requirements .................23
6.12   Insurance ..................................................................................................23
6.13   Intellectual Property.................................................................................23

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ...................................... 24
7.1    Conditions Precedent to Obligations of the Buyer ..................................24
7.2    Conditions Precedent to the Obligations of the Sellers ..........................24

ARTICLE 8 TERMINATION ................................................................................................... 25
8.1    Termination of Agreement........................................................................25
8.2    Consequences of Termination...................................................................26

ARTICLE 9 MISCELLANEOUS .............................................................................................. 26
9.1    Expenses ...................................................................................................26
9.2    Assignment ...............................................................................................26
9.3    Parties in Interest......................................................................................26
9.4    Notices ......................................................................................................27
9.5    Choice of Law; Jurisdiction and Venue...................................................27
9.6    Entire Agreement; Amendments and Waivers .........................................28
9.7    Schedules; Supplementation and Amendment of Schedules ...................28
9.8    Counterparts; Facsimile and Electronic Signatures .................................28
9.9    Retention of Deposit Not Penalty ............................................................28
9.10   Severability ..............................................................................................28
9.11   Specific Performance ...............................................................................29
9.12   WAIVER OF RIGHT TO TRIAL BY JURY...........................................29
9.13   NO CONSEQUENTIAL DAMAGES.......................................................29
9.14   Survival ....................................................................................................29
9.15   Non-Recourse ...........................................................................................29

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of [_____], 2013 (the "***Effective Date***"), by and among RODEO CREEK GOLD INC., a Nevada corporation, ANTLER PEAK GOLD INC., a Nevada corporation, HOLLISTER VENTURE CORP., a Nevada corporation, and TOUCHSTONE RESOURCES COMPANY, a Nevada corporation (each a "***Seller***" and, collectively, the "***Sellers***"), and [BUYER], a [_____] (the "***Buyer***"). The Sellers and the Buyer are each referred to herein as a "***Party***" and, collectively, as the "***Parties***."

WHEREAS, the Sellers will, as of the Closing, hold and/or operate substantially all of the assets, permits, contracts and other rights currently used or held for use in operating the Business;

WHEREAS, on September 19, 2012, Great Basin Gold Ltd., a Canadian corporation and the direct or indirect parent of each Seller, applied for protection from its creditors (thereby commencing the "***CCAA Proceedings***") before the Supreme Court of British Columbia (the "***CCAA Court***") pursuant to the *Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36*, as amended;

WHEREAS, on [DATE], the Sellers filed voluntary petitions ("***Petitions***") for relief (commencing the "***Chapter 11 Cases***") under chapter 11 of title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Nevada (the "***Bankruptcy Court***"); and

WHEREAS, upon the terms and subject to the conditions contained in this Agreement, and subject to the approval of the Bankruptcy Court in the Chapter 11 Cases, the Sellers wish to sell to the Buyer and the Buyer wishes to purchase from the Sellers all of the right, title and interest of the Sellers as of the Closing Date in the Acquired Assets and to assume from the Sellers the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises, representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and, intending to be legally bound hereby, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1     <u>Defined Terms</u>.  As used herein, the terms below shall mean the following:

"***Acquired Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Acquired Permits***" has the meaning set forth in <u>Section 2.1(f)</u>.

"***Affiliate***" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power

1

to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

"*Agreement*" means this Asset Purchase Agreement, together with all exhibits hereto and the Schedules.

"*Allocation*" has the meaning set forth in <u>Section 3.3</u>.

"*Assignment and Assumption of Mining Leases*" means an assignment and assumption of mining leases to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"*Assumed Contracts*" has the meaning set forth in <u>Section 2.1(e)</u>.

"*Assumed Liabilities*" has the meaning set forth in <u>Section 2.3</u>.

"*Assumption Agreement*" means an assumption agreement to be delivered by the Buyer at Closing, in form and substance reasonably acceptable to the Sellers.

"*Bankruptcy Code*" has the meaning set forth in the recitals.

"*Bankruptcy Court*" has the meaning set forth in the recitals.

"*Benefit Plan*" means any employee benefit plan (as defined in section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, incentive compensation, disability, death benefit, hospitalization, medical, dental, life, severance, vacation, sick leave, fringe benefit, or welfare plan, program, policy, practice or arrangement, whether or not subject to ERISA, or any employment, retention, consulting, change in control, termination or severance plan, program, policy, practice, arrangement or agreement sponsored, maintained or contributed to, or required to be maintained or contributed to, by the Sellers for the benefit of any present or former officer, employee or director, retiree or spouse, dependent or other beneficiary of any of the Sellers.

"*Bid Procedures*" means the bidding procedures approved by the Bid Procedures Order, as such procedures may be amended or modified in accordance with the Bid Procedures Order.

"*Bid Procedures Order*" means the Order of the Bankruptcy Court, dated [DATE], as such order may be amended or modified from time to time.

"*Bill of Sale*" means a bill of sale for the Acquired Assets to be delivered by the Sellers to the Buyer at Closing, in form and substance reasonably acceptable to the Buyer.

"*Business*" means the operation of the Hollister gold mining facility located in Elko County, Nevada and the Esmeralda mill facility located in Mineral County, Nevada.

"*Business Day*" means any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"***Buyer***" has the meaning set forth in the preamble.

"***CCAA Court***" has the meaning set forth in the recitals.

"***CCAA Proceedings***" has the meaning set forth in the recitals.

"***Chapter 11 Cases***" has the meaning set forth in the recitals.

"***Closing***" has the meaning set forth in Section 3.1(a).

"***Closing Date***" has the meaning set forth in Section 3.1(a).

"***Code***" means the Internal Revenue Code of 1986.

"***Confidentiality Agreement***" has the meaning set forth in Section 6.7.

"***Consent***" has the meaning set forth in Section 4.3.

"***Contract***" means any written contract, lease, license, purchase order, sales order or other agreement, arrangement, understanding or commitment that is binding upon a Person or its property.

"***Credit Support/Reclamation Arrangements***" has the meaning set forth in Section 6.11.

"***Deposit***" means $[_____].[1]

"***Effective Date***" has the meaning set forth in the preamble.

"***Employees***" has the meaning set forth in Section 6.6(a).

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***ERISA Affiliate***" means any Person that, by reason of its relationship with the Sellers, is required to be aggregated with the Sellers under section 414(b), (c) or (m) of the Code.

"***Excluded Assets***" has the meaning set forth in Section 2.2.

"***Excluded Liabilities***" has the meaning set forth in Section 2.4.

"***Filing***" has the meaning set forth in Section 4.3.

"***GAAP***" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"***Governmental Entity***" means any federal, state, provincial, local, municipal, foreign or other (a) government; (b) governmental or quasi-governmental authority of any nature (including

---

[1] Deposit amount to be 10% of the gross purchase price.

3

any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"***Interim Period***" has the meaning set forth in <u>Section 6.1</u>.

"***Inventory***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***IT Assets***" means computers, software (to the extent transferable), servers, workstations, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by the Sellers and used in the Business.

"***Law***" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, Order, principle of common law, judgment or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity or other requirement or rule of law.

"***Leased Machinery and Equipment***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Liabilities***" means, as to any Person, adverse claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"***Lien***" means any claim, pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, restriction on transferability or other similar restriction.

"***Machinery and Equipment***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Material Adverse Effect***" means any effect that is materially adverse to the Acquired Assets, the Sellers or the Business or results of operations of the Business or materially adverse to the Sellers' ability to perform its obligations under this Agreement or to consummate the transactions contemplated hereby, but shall exclude any effect resulting or arising from: (a) any circumstance generally affecting the international, national or regional mining industry; (b) any change in economic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities, or changes imposed by a Governmental Entity associated with additional security; (c) changes or prospective changes in Law, GAAP or official interpretations of the foregoing; (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Buyer unreasonably refused consent under this Agreement; (e) the transactions contemplated hereby or any announcement hereof or the identity of the Buyer, including any loss, diminution or disruption, whether actual or threatened, of existing or prospective customer, distributor, supplier or other relationships resulting therefrom; (f) the failure by any Seller to meet any projections or estimates, including internal projections or estimates of revenue, earnings or performance; (g) the pendency of the CCAA Proceedings or Chapter 11 Cases and any action approved by, or motion made before, the Bankruptcy Court or CCAA Court; or (h) the pendency of the business rescue

4

proceedings commenced by Southgold Exploration (Pty) Ltd. and any action or inaction relating thereto.

"**Non-Party Affiliates**" has the meaning set forth in <u>Section 9.15</u>.

"**Notices**" has the meaning set forth in <u>Section 9.4</u>.

"**Operating Records**" means all data, information, agreements, files, books, operating records, operating, safety and maintenance manuals, engineering and design plans, blueprints and as-built plans, specifications, drawings, reports, procedures, facility compliance plans, test records and results, other records and filings made with regulatory agencies regarding operations of the Business, environmental procedures and similar records and employee records for the Employees to the limited extent necessary for the Buyer to comply with applicable Law after the Closing Date. Except as otherwise expressly provided herein, the foregoing does not include (a) accounting books and records of any Seller or any of their respective Affiliates, (b) items proprietary to third parties that are not freely transferable in connection with the sale of the Business, (c) SEC or SEDAR filings that are publicly available or other publicly available information or records, (d) records relating to internal project approvals, (e) records not in the possession and control of any Seller or any Affiliate of any Seller and (f) records not permitted by law to be transferred from any Seller or any Affiliate of any Seller to the Buyer.

"**Order**" means any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity.

"**Ordinary Course of Business**" means actions that are taken in the ordinary course of the normal day-to-day operations of a Person consistent with the past practices of such Person. For the avoidance of doubt, no Seller nor any Affiliate of any Seller shall have an obligation to seek additional funding or make any capital contributions or loans in order to continue operations of the Business or otherwise after the date of this Agreement.

"**Outside Date**" has the meaning set forth in <u>Section 8.1(b)</u>.

"**Owned Machinery and Equipment**" has the meaning set forth in <u>Section 2.1(b)</u>.

"**Owned Real Property**" has the meaning set forth in <u>Section 4.6(a)</u>.

"**Party**" has the meaning set forth in the preamble.

"**Permits**" means permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"**Permitted Liens**" means: (a) all defects, exceptions, restrictions, easements, rights of way and encumbrances disclosed in policies of title insurance or title opinions or reports; (b) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (c) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (d) environmental regulations by any Governmental Entity; (e) title of a lessor under a capital or operating lease; (f) terms and conditions of any Assumed

Contract; (g) all covenants, conditions, restrictions, easements, charges, rights-of-way, other encumbrances on title and similar matters filed of record in the real property records to which they relate or affect or the Nevada State Office of the Bureau of Land Management or the Nevada Division of Water Resources; (h) such Liens, imperfections in title, charges, easements, restrictions, encumbrances or other matters that are due to zoning or subdivision, entitlement, and other land use Laws or regulations; (i) Liens or encumbrances that arise by reason of acts of or with the approval of the Buyer; (j) Liens not created by the Sellers that affect the underlying fee interest of any mineral claims or water rights; (k) any set of facts an accurate up-to-date survey would show; or (l) orders or rulings of the Nevada State Office of the Bureau of Land Management or the Nevada Division of Water Resources.

"*Person*" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"*Petition Date*" means the date on which the Petitions are filed with the Bankruptcy Court in the Chapter 11 Cases.

"*Petitions*" has the meaning set forth in the recitals.

"*Proceeding*" means any claim, action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases or CCAA Proceedings, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"*Properties*" has the meaning set forth in Section 2.1(a).

"*Purchase Price*" means an amount equal to $[_____].

"*Quit Claim Deeds*" means quit claim deeds to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"*Reclamation Obligation*" means any and all actions required during, or following cessation of, any exploration, mining or processing activities conducted by or in connection with the Business, or required at or on property utilized by the Business, that is required either by Law or by Permit.

"*Representative*" means, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"*Sale Hearing*" has the meaning specified in the Bid Procedures Order.

"*Sale Order*" means an Order or Orders of the Bankruptcy Court, substantially in the form attached hereto as Exhibit A, authorizing and approving, without limitation, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and

conditions of this Agreement and authorizing the Sellers to consummate the transactions contemplated hereby.

"***Schedules***" means the disclosure schedules delivered in connection with the execution of this Agreement.

"***Sellers***" has the meaning set forth in the preamble.

"***Seller Trademarks and Logos***" has the meaning set forth in <u>Section 6.13</u>.

"***Tax***" means any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, unclaimed property liabilities, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, stamp duty reserve, estimated or other similar tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"***Tax Authority***" means any taxing or other authority (whether within or outside the United States) competent to impose Tax.

"***Tax Return***" means any and all returns, declarations, reports, documents, claims for refund, or information returns, statements or filings that are required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"***Transfer Tax***" means any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect thereto including, without limitation, any filing fees to be paid to the Bureau of Land Management, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"***WARN Act***" means the Worker Adjustment and Restraining Notification Act.

"***Water Rights Quit Claim Deeds***" means water rights quit claim deeds to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

1.2    <u>Interpretation</u>.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

7

(b)      Words denoting any gender shall include all genders.

(c)      A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)      A reference to any legislation or to any provision of any legislation shall include any amendment, modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)      All references to "$" and dollars shall be deemed to refer to United States currency.

(f)      All references to any financial or accounting terms shall be defined in accordance with GAAP, unless otherwise defined herein.

(g)      The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement, unless otherwise specified.  All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement, as they may be modified by the Schedules, unless otherwise specified.

(h)      The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)      When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(j)      If a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(k)      A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended, restated, supplemented or otherwise modified from time to time, except to the extent prohibited by this Agreement or that other agreement or document.

(l)      Exhibits, Schedules, annexes and other documents referred to as part of this Agreement are hereby incorporated herein and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any exhibit, Schedule or annex but not otherwise defined therein shall be defined as set forth in this Agreement.

(m)      The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and shall not be a part of, or affect the meaning or interpretation of, this Agreement.

(n)    This Agreement is the result of the joint efforts of the Sellers and the Buyer, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

## ARTICLE 2
### TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Acquired</u>.  Subject to the terms and conditions of this Agreement and the entry of the Sale Order, at the Closing, the Sellers shall sell, convey, assign, transfer and deliver to the Buyer, and the Buyer shall purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in each and all of the Acquired Assets.  "***Acquired Assets***" means all properties, assets and rights of every nature, tangible and intangible, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of the Sellers as the same shall exist on the Closing Date that are (a) owned by any Seller, (b) used or held in connection with the ownership, lease, use or operation of the Business and (c) not Excluded Assets, including, as limited by the preceding limitations:

(a)    the real property, mining claims and water rights, whether owned or leased, in each case used or held for use in the operation of the Business, listed on <u>Schedule 4.6</u> (the "***Properties***");

(b)    all of (i) the Sellers' owned equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), materials, furniture, fixtures, improvements, tooling and other tangible property used or held for use in the operation of the Business (the "***Owned Machinery and Equipment***"), (ii) the Sellers' rights to any equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), materials, furniture, fixtures, improvements, tooling and other tangible property used or held for use in the operation of the Business, which are leased pursuant to an Assumed Contract (the "***Leased Machinery and Equipment***" and, collectively with the Owned Machinery and Equipment, the "***Machinery and Equipment***") and (iii) the rights of the Sellers to any warranties, express or implied, and licenses received from manufacturers and sellers of the Machinery and Equipment;

(c)    other than those used or sold prior to Closing, all inventories, in each case, used or held for use in connection with the Business (collectively, "***Inventory***");

(d)    all right, title and interest of the Sellers in and to the IT Assets used or held for use in the operation of the Business, to the extent freely transferrable by the Sellers;

(e)    all Contracts entered into by any Seller that are executory and unexpired as of the Closing Date and that will be assumed by the Sellers and assigned to the Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code in connection with the transactions contemplated in this Agreement, in each case that are related to the Business, including those Contracts listed on <u>Schedule 2.1(e)</u>, that the Buyer elects to assume by Notice to the Sellers prior to the Closing Date pursuant to <u>Section 2.5</u> (collectively, the "***Assumed Contracts***");

9

(f)    all Permits used or required for the ownership or operation of the Business, but only to the extent that such Permits are transferable by the Sellers to the Buyer by assignment or otherwise (including those that will pass to the Buyer as successor in title to the Acquired Assets by operation of Law) (the "*Acquired Permits*");

(g)    except as set forth in Section 2.2(e), and subject to the right of the Sellers to retain copies for its use, the Operating Records; and

(h)    all rights, claims, actions, refunds, causes of action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guaranties, indemnities and other contractual claims, in each case, to the extent related primarily to the other assets set forth in this Section 2.1 or the Assumed Liabilities and, with respect to any employees and any vendors with whom any of the Sellers have conducted business in the year prior to the Closing and with whom Buyer will continue to engage in connection with the operation of the Business following the Closing (including, for the avoidance of doubt, any vendor that is a party to an Assumed Contract), all preference or avoidance claims and actions of any of the Sellers related thereto, including any such claims and actions arising under sections 544, 547, 548, 549, and 550 of the Bankruptcy Code.

2.2    Excluded Assets.  The Buyer does not assume and shall have no right to any asset of the Sellers that is not expressly assumed by the Buyer as an Acquired Asset (collectively, the "*Excluded Assets*"), which Excluded Assets include, for the avoidance of doubt:

(a)    all cash and cash equivalents, marketable securities, security entitlements, instruments and other investments and all bank accounts and securities accounts, including any cash collateral that is collateralizing any letters of credit, or any obligation with respect thereto or which secures any Reclamation Obligation;

(b)    any prepayments made with regard to insurance policies not assumed by the Buyer and security deposits, prepaid expenses or prepayments to the extent made in connection with any other Excluded Asset or Excluded Liability;

(c)    the Seller Trademarks and Logos;

(d)    any Contract other than the Assumed Contracts;

(e)    any Operating Records that the any Seller is required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings and all Operating Records related to Taxes paid or payable by any Seller or any of their respective Affiliates; and

(f)    all rights, claims, actions, refunds, causes of action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all

warranties, representations, guaranties, indemnities and other contractual claims, in each case, other than those set forth in <u>Section 2.1(h)</u>.

2.3    <u>Liabilities to be Assumed by the Buyer</u>.  Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, the Sellers shall assign to the Buyer and the Buyer shall assume from the Sellers and pay when due, perform and discharge, in due course, without duplication, the following Liabilities of any Seller or any Affiliate of any Seller (collectively, the "***Assumed Liabilities***"), whether such Liabilities and obligations arose or will arise prior to, on or after the Closing Date, including:

(a)    any Liabilities for or related to Taxes relating to the Business and the Acquired Assets (other than income Taxes of the Sellers and their respective Affiliates);

(b)    any Liabilities and obligations arising from or relating to accounts payable, environmental matters, Reclamation Obligations or permits or other authorizations relating to the ownership or operation of the Business or the Acquired Assets;

(c)    all Liabilities arising out of or relating to the Buyer's operation of the Business or its ownership or operation of the Acquired Assets;

(d)    all Liabilities for Transfer Taxes, if any;

(e)    Liabilities and obligations relating to current or former employees or other service providers whose employment or services related to the maintenance and operation of the Business, including Liabilities arising out of Buyer's obligations set forth in <u>Section 6.6</u>, any Benefit Plans or that may arise under the WARN Act or similar applicable Law; and

(f)    all Liabilities of any Seller or any Affiliate of any Seller under each of the Assumed Contracts.

2.4    <u>Excluded Liabilities</u>.  The Buyer does not assume any Liability of the Sellers relating to or arising out of any of the following, which shall be retained and remain Liabilities of the Sellers (collectively, the "***Excluded Liabilities***"):

(a)    any indebtedness for borrowed money of the Sellers to the extent not expressly assumed hereunder as part of the Assumed Liabilities;

(b)    except as set forth in <u>Section 6.5</u>, all costs and expenses incurred or to be incurred by the Sellers in connection with this Agreement and the consummation of the transactions contemplated hereby; and

(c)    any Liabilities to the extent relating to the Excluded Assets; and

(d)    any Liabilities that are not Assumed Liabilities.

2.5    Rejection of Assumed Contracts.  From the date hereof until two (2) Business Days prior to the Sale Hearing, the Buyer shall have the right, upon Notice to the Sellers, to exclude any Contract from the Assumed Contracts, for any reason.  Any Contract so excluded by the Buyer shall be deemed to no longer be an Assumed Contract, shall be deemed to be an Excluded Asset.  Any Schedules hereto shall be amended to reflect any changed made pursuant to this Section 2.5.  For the avoidance of doubt, any exclusion of any Assumed Contract shall not result in a change to the Purchase Price.

**ARTICLE 3**
**CLOSING; PURCHASE PRICE**

3.1    Closing; Transfer of Possession; Certain Deliveries.

(a)    The consummation of the transactions contemplated herein (the "***Closing***") shall take place on the second (2nd) Business Day after all of the conditions set forth in Article 7, other than those conditions that by their nature are to be satisfied at the Closing, have been either satisfied or waived by the Party entitled to waive such condition or on such other date as the Parties shall mutually agree.  The Closing shall be held at the offices of Sidley Austin LLP at 787 7th Ave in New York, New York, at 10:00 a.m., local time, unless the Parties otherwise agree.  The actual date of the Closing is the "***Closing Date***."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. on the Closing Date.

(b)    At the Closing, the Sellers shall deliver to the Buyer:

(i)    a true and correct copy of the Sale Order;

(ii)    a duly executed Bill of Sale;

(iii)    the certificate contemplated by Section 7.1(c);

(iv)    duly executed Quit Claim Deeds for each parcel of Owned Real Property;

(v)    duly executed Quit Claim Deeds for each mining claim listed on Schedule 4.6(c);

(vi)    a duly executed Assignment and Assumption of Mining Leases for each mining claim listed on Schedule 4.6(d);

(vii)    duly executed Water Rights Quit Claim Deeds for each water right listed on Schedule 4.6(e);

(viii)    duly executed affidavits of the Sellers, prepared in accordance with U.S. Treasury Regulations section 1.1445-2(b), certifying as to the Sellers' non-foreign status;

(ix)    a true and complete copy, certified by the Secretary or an Assistant or Attesting Secretary of each Seller, of the resolutions duly and validly adopted by the sole

12

equityholder of such Seller evidencing the authorization of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby; and

      (x)    such other documents, instruments and certificates as the Buyer may reasonably request.

    (c)    At the Closing, the Buyer shall deliver to the Sellers:

      (i)    the Purchase Price less the amount of the Deposit;

      (ii)    a duly executed Assumption Agreement;

      (iii)    a duly executed Assignment and Assumption of Mining Leases for each mining claim listed on Schedule 4.6(d);

      (iv)    the certificate contemplated by Section 7.2(c);

      (v)    a true and complete copy, certified by the Secretary or an Assistant or Attesting Secretary of Buyer, of the resolutions duly and validly adopted by the [stockholders] of Buyer evidencing its authorization of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby; and

      (vi)    such other documents, instruments and certificates as the Sellers may reasonably request.

    3.2    Purchase Price.  In consideration for the Acquired Assets and subject to the terms and conditions of this Agreement, the Buyer shall at the Closing assume the Assumed Liabilities as provided in Section 2.3 and pay to the Sellers by wire transfer in immediately available funds an amount equal to the Purchase Price less the amount of the Deposit.  Subject to Section 8.2(b), the Sellers are entitled to retain the Deposit, which shall be credited as part of the Purchase Price.

    3.3    Allocation of Purchase Price.  The sum of the Purchase Price and the value of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with section 1060 of the Code and the U.S. Treasury Regulations promulgated thereunder (and any similar provision of state or local Law, as appropriate).  The allocation shall be delivered by the Sellers to the Buyer within sixty (60) days after the Closing Date, which allocation shall constitute the "*Allocation*." Each of the Parties shall (a) file all Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation, (b) provide the other Party with any information required to complete Internal Revenue Service Form 8594 within fourteen (14) days of the request for such information, (c) notify and provide the other Party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes regarding the Allocation. Notwithstanding the preceding sentence, the Parties may settle any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither the Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Notwithstanding anything in this Agreement to the

contrary, this Section **Error! Reference source not found.** shall survive the Closing Date without limitation.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth on the Schedules, the Seller represents and warrants to the Buyer as follows:

4.1     Organization. Each Seller is duly organized, validly existing and in good standing under the Laws of the State of Nevada.  Each Seller has all necessary power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the date of this Agreement.

4.2     Due Authorization, Execution and Delivery; Enforceability.  Subject to the Sale Order having been entered by the Bankruptcy Court, each Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  Subject to the Sale Order having been entered by the Bankruptcy Court, this Agreement constitutes the legally valid and binding obligation of each Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

4.3     Consents.  Subject to the Sale Order having been entered by the Bankruptcy Court and any required approvals of the CCAA Court, none of the execution, delivery or performance of this Agreement by any Seller will require any consent, approval, license, permit, Order or authorization (each, a "***Consent***") of or from, or registration, notice, declaration or filing (each, a "***Filing***") with or to, any Governmental Entity, except as would not result in a Material Adverse Effect.

4.4     No Conflicts.  Subject to the Sale Order having been entered by the Bankruptcy Court, the execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby does not and will not conflict with or result in any breach of any provision of the articles of incorporation or bylaws or similar organizational documents of such Seller, except as would not result in a Material Adverse Effect.

4.5     Title to Acquired Assets.  The Sellers have good and valid title to the Acquired Assets, free and clear of all Liens, other than Permitted Liens.

4.6     Title to Real Property.

(a)     Schedule 4.6(a) sets forth a true and complete list in all material respects of all real property used in connection with the operation of the Business ("***Owned Real Property***").

(b)     The Sellers do not lease any real property used in connection with the operation of the Business.

(c)     <u>Schedule 4.6(c)</u> sets forth a true and complete list in all material respects of all material owned mining claims used in connection with the operation of the Business.

(d)     <u>Schedule 4.6(d)</u> sets forth a true and complete list in all material respects of all material leased, subleased or licensed mining claims used in connection with the operation of the Business.

(e)     <u>Schedule 4.6(e)</u> sets forth a true and complete list in all material respects of all material owned water rights used in connection with the operation of the Business.

4.7     <u>Financial Advisors</u>.  No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Sellers in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth on the Schedules, the Buyer represents and warrants to the Sellers as follows:

5.1     <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.   The Buyer has all necessary [_____] power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the date of this Agreement.

5.2     <u>Due Authorization, Execution and Delivery; Enforceability</u>.  The Buyer has the requisite [_____] power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and thereunder and has taken all necessary [_____] action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  This Agreement constitutes the legally valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     <u>Consents</u>.  None of the execution, delivery or performance of this Agreement by the Buyer will require any Consent of or from, or Filing with or to, any Governmental Entity.

5.4     <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in any breach of any provision of its [_____] or [_____], except as would not result in a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

5.5    <u>Financial Capability</u>. The Buyer (a) has, and at the Closing will have, sufficient internal funds (without giving effect to any unfunded financing regardless of whether any such financing is committed) available to pay the Purchase Price and any expenses incurred by the Buyer in connection with the transactions contemplated by this Agreement, (b) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) has not incurred any obligation, commitment, restriction or liability of any kind, which would impair or adversely affect such resources and capabilities.

5.6    <u>Solvency</u>.

(a)    Immediately after giving effect to the acquisition of the Acquired Assets and the consummation of the other transactions contemplated by this Agreement:

(i)    the fair saleable value (determined on a going concern basis) of the assets of the Buyer shall be greater than the total amount of its liabilities (including all liabilities, whether or not reflected in a balance sheet prepared in accordance with GAAP, and whether direct or indirect, fixed or contingent, secured or unsecured, disputed or undisputed);

(ii)    the Buyer shall be able to pay its debts and obligations in the Ordinary Course of Business as they become due; and

(iii)    the Buyer shall have adequate capital to carry on its businesses and all businesses in which it is, or following to the acquisition of the Acquired Assets will be, engaged.

(b)    In completing the transactions contemplated by this Agreement, the Buyer does not intend to hinder, delay or defraud any present or future creditors of the Buyer.

5.7    <u>Financial Advisors</u>. No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Buyer in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers or any of their respective Affiliates.

5.8    <u>Opportunity for Independent Investigation</u>.  Prior to its execution of this Agreement, the Buyer has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Sellers, the Business and the Assumed Contracts.  The Buyer is, and has been, assisted by advisors, consultants and legal counsel, knowledgeable and experienced in businesses similar to the Business and in purchasing and operating mining facilities similar to the Business with respect to analyzing and evaluating the merits and risks of entering into this Agreement and the transactions contemplated hereby.  In making its decision to execute this Agreement and undertake the obligations set forth herein, the Buyer has relied and will rely solely upon the advice of its advisors, consultants and legal counsel and the results of its independent investigation and verification.  The Buyer acknowledges and affirms that all materials and information requested by the Buyer have been provided to the Buyer to the Buyer's reasonable satisfaction.  The Buyer has completed its investigation, verification, analysis, review and evaluation of the Sellers, the Business and otherwise as the Buyer has deemed necessary or appropriate.

16

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Business Pending the Closing</u>.  During the period from the Effective Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing (the "***Interim Period***"), except as may be required by applicable Law, the Bankruptcy Court or the CCAA Court or as expressly permitted or authorized hereby, the Sellers shall not, without the prior written consent of the Buyer (not to be unreasonably withheld, delayed or conditioned):

(a)    transfer, issue, sell or dispose of any of the material Acquired Assets, other than in the Ordinary Course of Business;

(b)    enter into any Contract that is material to the operation of the Business outside the Ordinary Course of Business; or

(c)    agree to do anything prohibited by this <u>Section 6.1</u>.

6.2    <u>Access</u>.  Subject to applicable Law, during the Interim Period, the Sellers shall (a) give the Buyer and its Representatives reasonable access during normal business hours to the offices, properties, employees, books and records of the Sellers, (b) furnish to the Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as the Buyer and its Representatives reasonably request, and (c) cooperate reasonably with the Buyer in its investigation of the Business.  All inspections shall be conducted so as not to interfere unreasonably with the operation of the Business by the Sellers and no environmental testing shall be performed without Sellers' prior consent which shall not be unreasonably withheld.  The Buyer agrees to indemnify and hold the Sellers and their respective Affiliates and Representatives harmless of and from all actions, suits, claims, investigations, fines, judgments, damages, losses, deficiencies, liabilities, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to damage or injuries arising from the Buyer's or any of its Representatives' inspection of the Business and, notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement.

6.3    <u>Public Announcements</u>.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the transactions contemplated hereby, and no Party shall issue any such press release or public announcement without the prior approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court or CCAA Court) or obligations pursuant to the rules and regulations of, and any listing agreement with, any national securities exchange, on condition that if a Party is required to make any such announcement, the disclosing Party shall promptly before the announcement is made deliver Notice to the other Party thereof where practicable and lawful to do so, and the disclosing Party shall use its commercially reasonable efforts to agree upon the text of any such announcement with the other Party prior to the release of the announcement.  The Parties shall cause their respective Affiliates and Representatives to comply with this <u>Section 6.3</u>.

6.4    Tax Matters.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Buyer. The Parties shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. The Buyer and the Sellers, as required by applicable Law, shall file all necessary documentation and returns with respect to such Transfer Taxes when due and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Party. The Buyer shall pay all such Transfer Taxes when due.

(b)    The Buyer, on the one hand, and the Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns relating to Tax periods that began prior to the Closing Date, including any claim for exemption or exclusion from the application or imposition of any Taxes with respect to such periods, the preparation for any audit by any Tax Authority with respect to such periods, and the prosecution or defense of any Proceeding relating to any Tax Return with respect to such periods. The obligations of the Parties pursuant to the immediately preceding sentence with respect to any Tax period shall expire upon the expiration of the applicable statute of limitations with respect to such period.

6.5    Regulatory Approvals.

(a)    The Buyer shall use its reasonable best efforts, and shall cause its Affiliates to use their respective reasonable best efforts, to (i) promptly obtain all authorizations, consents, Permits and approvals of all Governmental Entities that may be, or become, necessary for its execution and delivery of, performance of its obligations pursuant to, and consummation of the transactions contemplated by, this Agreement, (ii) take all such actions as may be requested by any such Governmental Entity to obtain such authorizations, consents, Permits and approvals and (iii) avoid the entry of, or effect the dissolution of, any Order that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement. The Parties shall reasonably cooperate in connection with any filings or notifications required in connection therewith, and neither Sellers nor the Buyer nor their respective Affiliates shall take any action that would reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents, Permits or approvals.

(b)    Each Party to this Agreement shall promptly notify the other Party of any substantive oral or written communication it receives from any Governmental Entity relating to the matters that are the subject of this Agreement, permit the other Party to review in advance any substantive communication proposed to be made by such Party to any Governmental Entity and provide the other Party with copies of all correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand. No Party to this Agreement shall agree to participate in any meeting or discussion with any Governmental Entity in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent

18

permitted by such Governmental Entity and applicable Law, gives the other Party the opportunity to attend and participate in such meeting.  Subject to the Confidentiality Agreement, the Parties to this Agreement will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing or to secure all necessary authorizations, consents, Permits and approvals for Buyer's ownership of the Acquired Assets and operation of the Business after the Closing.

(c)     If any Governmental Entity shall seek, or shall have indicated that it may seek, the enactment, entry, enforcement or promulgation of any Law or Order restraining or prohibiting the transactions contemplated by this Agreement, the Buyer shall, if necessary to prevent the taking of such action or the enactment, entry, enforcement or promulgation of any such Law or Order, offer to accept an Order to (i) divest such of the assets of the Business, (ii) hold separate such assets of the Business pending such divestiture, (iii) impose limitations on the Buyer and Affiliates of the Buyer with respect to how they own, retain, conduct or operate all or a material portion of their respective businesses or assets, or (iv) require the Buyer or Affiliates of the Buyer to grant any right or commercial or other accommodation to, or enter into any material commercial contractual or other commercial relationship with, any third party, in each case as may be necessary to forestall or prevent any such action by any such Governmental Entity.  The Buyer and each Seller shall use its reasonable best efforts to resolve all objections, if any, as may be asserted by any Governmental Entity with respect to the transactions contemplated by this Agreement under any antitrust, competition, foreign investment or any similar Law in any relevant jurisdiction.

(d)     Notwithstanding anything in this Agreement to the contrary, the Buyer acknowledges on behalf of itself and its Affiliates and its and their Representatives, successors and assigns, that the operation of the Business shall remain in the dominion and control of Sellers until the Closing and that none of the Buyer, any of its Affiliates or its or their respective successors or assigns will provide, directly or indirectly, any directions, orders, advice, aid, assistance or information to any director, officer or employee of Sellers, except as specifically contemplated or permitted by this Article 6 or as otherwise consented to in writing in advance by an executive officer of a Seller.

6.6     Employee Matters.

(a)     Not later than 15 days prior to the Closing Date, the Buyer or an Affiliate of the Buyer shall make offers of employment to each employee whose employment is related to the maintenance and operation of the Business, including such individuals who are not actively at work on account of illness, disability or leave of absence (collectively, the "*Employees*"). Such offers of employment shall be effective as of, and contingent upon, the Closing, and shall be on terms that are (x) generally comparable to such Employee's current employment terms with respect to salary, hourly wage rate, and base hours and (y) generally comparable in the aggregate with respect to bonus programs and benefits (including medical, retirement, severance benefits, vacation and other paid time off) in which the Employee participated immediately prior to the Closing Date (with credit, to the extent applicable, for any existing payments toward deductibles and other employee paid costs under similar plans maintained by the Sellers and their respective Affiliates).

(b)     Nothing herein express or implied by this Agreement shall confer upon any Person, including any Employee, or any other current or former employee of any Seller, or any beneficiary or legal Representative thereof, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

(c)     The Buyer shall assume sponsorship of, or cause its Affiliates to assume sponsorship of, and shall be liable for all benefits payable under any and all Benefit Plans, programs, policies, arrangements or employment agreements and any and all compensation, bonuses, vacation benefits or any other benefit or compensation earned by any Employee or former employee whether as an employee of the Sellers and their respective Affiliates or of Buyer and its Affiliates, and Sellers and their respective Affiliates shall not be liable for any of such liability, including all severance or similar payments under any and all Benefits Plans or otherwise. In addition, the Buyer shall administer and assume liability for, or cause its Affiliates to administer and be liable for, all employment-related claims, including all workers' compensation claims brought on or after the Closing Date, without regard to whether the alleged events giving rise to the claim occurred before or after the Closing Date.

(d)     With respect to employment losses occurring before, on or after the Closing Date, the Buyer and its Affiliates shall bear any and all obligations and liability under the WARN Act or any other applicable Law relating to a plant closing, mass layoff, workforce reduction or other reduction in force.

(e)     The Buyer and its Affiliates shall provide COBRA continuation coverage (within the meaning of section 4980B of the Code and the U.S. Treasury Regulations thereunder) to all individuals who are M&A qualified beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation 54.4980B-9) with respect to the transactions contemplated by this Agreement for the duration of the period to which such individuals are entitled to such coverage.

6.7     Confidentiality. Until the Closing, the confidentiality of any data or information received by the Buyer regarding the Business, Properties, Acquired Assets, or any of the Sellers (including any information obtained pursuant to Section 6.2) shall be maintained by the Buyer and its Affiliates and Representatives in accordance with the confidentiality agreement between the Buyer and Great Basin Gold Inc. dated [_____] (the "*Confidentiality Agreement*"), the terms of which are incorporated herein by reference. Notwithstanding any other provision in this Agreement or in the Confidentiality Agreement to the contrary, the terms of the Confidentiality Agreement shall continue in full force and effect for two (2) years after the Effective Date.

6.8     Further Assurances.   Subject to the terms and conditions herein provided, following the Closing Date, the Sellers shall execute and deliver to the Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to the Buyer, and take such additional actions as the Buyer may reasonably request, to vest in the Buyer all of the Sellers' right, title and interest in and to the Acquired Assets.

6.9    <u>Sale Order</u>.

(a)    The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order.

(b)    The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)    the Acquired Assets shall be sold to the Buyer free and clear of all Liens (except for Permitted Liens and Assumed Liabilities);

(ii)    the transactions contemplated by this Agreement were negotiated at arm's length, that the Buyer acted in good faith in all respects and the Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iii)    the terms and conditions of the sale of the Acquired Assets to the Buyer as set forth herein are approved;

(iv)    the Sellers are authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(v)    the Buyer and the Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; and

(vi)    the Sale Order is binding upon any successors to the Sellers, including any trustees in respect of the Sellers or the Acquired Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code.

(c)    In the event the Sale Order is appealed, the Buyer and the Sellers shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(d)    The Sellers further covenant and agree that the terms of any plan of reorganization or liquidation submitted to the Bankruptcy Court by the Sellers shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

6.10    <u>Buyer's Acknowledgements; Nature of Representations</u>.

(a)    Except for the specific representations and warranties expressly made by the Sellers in <u>Article 4</u>, the Buyer acknowledges and agrees that:

(i)    None of (A) the Sellers, (B) any Non-Party Affiliate, or (C) any Affiliate of the foregoing is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of the Sellers or their respective businesses, assets,

liabilities, operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the Business, the effectiveness or the success of any operations or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Sellers furnished to the Buyer or its Representatives or made available to the Buyer and its Representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of, or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; and

(ii)    no Representative of any Seller or any Affiliate of any Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement.

(b)    In connection with the Buyer's investigation of the Business, the Buyer has received from the Sellers, certain Non-Party Affiliates and their respective Affiliates and Representatives certain projections and other forecasts, including certain business plan information of the Business.  The Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to it, and that the Buyer and its Affiliates and Representatives shall have no claim against any Person with respect thereto.  Accordingly, the Buyer acknowledges that none of the Sellers, such Non-Party Affiliates or their respective Representatives or Affiliates have made any representation or warranty with respect to such projections and other forecasts and plans.

(c)    Except for the specific representations and warranties expressly made by the Sellers in <u>Article 4</u>, the Buyer specifically disclaims (i) that it is relying upon or has relied upon any information or statements that may have been made by any Person, and acknowledges and agrees that the Sellers have specifically disclaimed and do hereby specifically disclaim any such other information or statement made by any Person; and (ii) any obligation or duty by the Sellers to make any disclosures of fact or circumstances not required to be disclosed pursuant to the specific representations and warranties set forth in <u>Article 4</u>.

(d)    The Buyer is acquiring the Acquired Assets subject only to the specific representations and warranties set forth in <u>Article 4</u>.  The Buyer acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and the Acquired Assets and, in making the determination to proceed with the transactions contemplated by this Agreement, the Buyer has relied on the results of its own independent investigation. The Buyer is not aware of any facts, events or circumstances that would cause any of the representations or warranties of the Sellers set forth in <u>Article 4</u> to be untrue or incorrect in any respect.

(e)    The Sellers are selling the Acquired Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the representations and warranties contained in <u>Article 4</u>, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title,

22

quality, merchantability or their fitness for the Buyer's intended use or a particular purpose or any use or purpose whatsoever.

6.11    Replacement Credit Support and Reclamation Requirements. Prior to Closing, the Buyer shall deliver to the applicable beneficiary or counterparty duly executed replacement or substitute guaranties, letters of credit, bonds, security deposits, and other surety obligations and evidence of financial capacity, in each case acceptable to the relevant beneficiary or counterparty, in replacement of those credit support arrangements and Reclamation Obligation assurances set forth in Schedule 6.11 (the "*Credit Support/Reclamation Arrangements*"), and the Buyer shall cause the full and unconditional release as of Closing of the Sellers and their respective Affiliates from all obligations relating to the Credit Support/Reclamation Arrangements and any liabilities related thereto.

6.12    Insurance.

(a)    All insurance policies maintained by or for the benefit of the Acquired Assets not held directly by the Sellers shall cease to apply thereto from and after Closing and the Buyer acknowledges and agrees that it shall not have any right or interest in or to any insurance awards or proceeds payable under any of the Sellers' other insurance policies relating to any damage, destruction or casualty loss with respect to the Acquired Assets on or prior to the Closing Date and shall not have or claim any interest therein. The Buyer shall be solely responsible for providing insurance with respect to the Business for any event or occurrence of any kind whatsoever first occurring after Closing.

(b)    In the event that any Seller makes or pursues any claim arising under any insurance policy not held directly by the Sellers during the period prior to the Closing, including any claim under the Sellers' property and business interruption insurance policies for damage to the Acquired Assets discovered after Closing but the occurrence giving rise to such damage occurred before Closing, the Buyer shall cooperate as necessary with the Sellers and their respective Affiliates with respect to such claims and provide any necessary assistance requested by the Sellers or their respective Affiliates to assist the Sellers or their respective Affiliates in making or pursuing any such claims (it being understood that any assistance or documentation required by the Sellers' or their respective Affiliates' insurance underwriters shall be deemed "necessary" as such term is used in this Section 6.12).

6.13    Intellectual Property. It is expressly agreed that the Buyer is not purchasing, acquiring or otherwise obtaining any right, title or interest in the name "Great Basin Gold" or any derivative thereof, or any trade names, trademarks, identifying logos or service marks related thereto or employing the word "Great Basin Gold" or any part or variation of any of the foregoing or any confusingly similar trade names, trademarks, logos or service marks (collectively, the "*Seller Trademarks and Logos*"). Neither the Buyer nor any of its Affiliates shall make any use of the Seller Trademarks and Logos from and after the Closing, including through the use of stationery or letterhead. The Buyer shall, at its own cost and within thirty (30) days after the Closing Date, remove, or cause to be removed, from the Acquired Assets any and all of the Seller Trademarks and Logos.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1    <u>Conditions Precedent to Obligations of the Buyer</u>.  The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Buyer in the Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Each of the representations and warranties of the Sellers contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such specified date; *provided*, *however*, that the failure of any such representations or warranties to be true and correct in all material respects on and as of the Closing Date shall not constitute a basis for the Buyer to refuse to consummate the transactions contemplated hereby unless such failure has resulted a Material Adverse Effect.

(b)    The Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)    The Buyer shall have received certificates, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in <u>Section 7.1(a)</u> and <u>Section 7.1(b)</u> have been fulfilled.

(d)    There shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)    The Bankruptcy Court shall have entered the Sale Order and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(f)    The parties set forth on <u>Schedule 7.1(f)</u> shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

7.2    <u>Conditions Precedent to the Obligations of the Sellers</u>.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Sellers in the Sellers' sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Each of the representations and warranties of the Buyer contained herein shall be true and correct in all material respects on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct in all material respects as of such specified date; *provided*, *however*, that the failure of any such representations or warranties to be true and correct in all material respects on and as of

the Closing Date shall not constitute a basis for the Sellers to refuse to consummate the transactions contemplated hereby unless such failure has resulted in a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

(b)    The Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)    The Sellers shall have received a certificate, dated the Closing Date, of an executive officer of the Buyer to the effect that the conditions specified in Section 7.2(a) and Section 7.2(b) have been fulfilled.

(d)    There shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)    The Bankruptcy Court shall have entered the Bid Procedures Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Bid Procedures Order shall be in effect on the Closing Date.

(f)    The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(g)    The parties set forth on Schedule 7.1(f) shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

(h)    The Sellers shall have received evidence of the full and unconditional release of the Sellers and their respective Affiliates from all obligations relating to the Credit Support/Reclamation Arrangements and any liabilities related thereto in accordance with Section 6.11.

(i)    The CCAA Court shall have entered an Order authorizing and approving the transactions contemplated by this Agreement, which Order shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending such Order of the CCAA Court shall be in effect on the Closing Date.

## ARTICLE 8
## TERMINATION

8.1    Termination of Agreement. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by written agreement of the Sellers and the Buyer;

(b)    by the Sellers or the Buyer if the Closing does not occur on or before the date that is three (3) months after the Effective Date (the "***Outside Date***"); provided, however, that the failure of the Closing to occur on or prior to the Outside Date is not a result of or caused

by the terminating party's material breach of any of its representations and warranties contained in this Agreement and such terminating party has not failed in any material respect to perform any of its material obligations hereunder; or

(c)     by the Sellers or the Buyer if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining the Buyer or the Sellers from consummating the transactions contemplated hereby is entered and such Order shall become final.

8.2     Consequences of Termination.

(a)     In the event of any termination of this Agreement by any Party pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Party, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than the last sentence of Section 6.2, and all of Section 6.3, Section 6.7, this Section 8.2 and Article 9 and, to the extent applicable in respect of such Sections and Article, Article 1), and the transactions contemplated hereby shall be abandoned without further action of the Parties, except that such termination shall not relieve any Party of any liability for any prior breach of this Agreement.

(b)     The Deposit shall only be refundable to the Buyer in the event that the Closing does not occur due to a failure of any of the conditions to Closing in Section 7.1 to have been satisfied. If the Closing does not occur for any other reason, the Sellers shall be entitled to retain the Deposit and to recover from the Buyer all other damages in law or equity to which the Sellers are entitled.  All such recoveries of the Sellers shall be held for the benefit of the creditors of the Sellers.

**ARTICLE 9**
**MISCELLANEOUS**

9.1     Expenses.   Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the transactions contemplated hereby.

9.2     Assignment.   Neither this Agreement nor any of the rights or obligations hereunder may be assigned by the Sellers without the prior written consent of the Buyer, or by the Buyer without the prior written consent of the Sellers.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

9.3     Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of the Buyer and the Sellers, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, except as expressly set forth herein, including, for the avoidance of doubt, the intended third-party beneficiaries contemplated by Section 6.10 and Section 9.15.

26

9.4    Notices.    All notices, demands, requests, consents, approvals or other communications (collectively, "**Notices**") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be deemed given on the date personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail with confirmation of receipt, addressed as set forth below, or to such other address as such Party shall have specified most recently by Notice; *provided*, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m., New York time, Notice shall be deemed given on the next Business Day.

| | |
|---|---|
| If to Sellers: | Rodeo Creek Gold Inc. |
| | [_____] |
| | [_____] |
| | Attention:    [_____] |
| | Email:    [_____] |
| With a copy to: | Sidley Austin LLP |
| | One South Dearborn |
| | Chicago, IL 60603 |
| | Attention:    Jessica C.K. Boelter |
| | Matthew G. McQueen |
| | Email:    jboelter@sidley.com |
| | mmcqueen@sidley.com |
| | |
| If to the Buyer: | [_____] |
| | [_____] |
| | [_____] |
| | Attention:    [_____] |
| | Email:    [_____] |
| | |
| With a copy to: | [_____] |
| | [_____] |
| | [_____] |
| | Attention:    [_____] |
| | Email:    [_____] |

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5    Choice of Law; Jurisdiction and Venue.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the

27

parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

      9.6   <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by the Sellers and the Buyer, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

      9.7   <u>Schedules; Supplementation and Amendment of Schedules</u>.  The Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement.  Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the entire Agreement and not just such section.  From time to time prior to the Closing, the Sellers shall have the right to supplement or amend the Schedules with respect to any matter hereafter arising or discovered after the delivery of the Schedules pursuant to this Agreement, and any such amendment shall modify this Agreement for all purposes.

      9.8   <u>Counterparts; Facsimile and Electronic Signatures</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

      9.9   <u>Retention of Deposit Not Penalty</u>.  Retention of the Deposit by the Sellers represents an agreed liquidated damage that is a reasonable approximation of the actual damages that the Sellers would suffer for the delay in consummating the transactions contemplated by this Agreement and does not represent either a penalty or compensation for the transaction costs of the transactions contemplated by this Agreement.

      9.10   <u>Severability</u>.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.11   <u>Specific Performance</u>.  The Parties acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Buyer in accordance with the specific terms contained herein or were otherwise breached by the Buyer, and the Sellers shall therefore be entitled to an injunction or injunctions to prevent breaches or termination of this Agreement by the Buyer and to enforce specifically the terms and provisions of this Agreement. The Buyer shall not be entitled to an injunction or injunctions to prevent breaches or termination of this Agreement by the Sellers or to enforce specifically the terms and provisions of this Agreement.

9.12   <u>WAIVER OF RIGHT TO TRIAL BY JURY</u>.  THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.13   <u>NO CONSEQUENTIAL DAMAGES</u>. IN NO EVENT SHALL ANY PARTY BE LIABLE UNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY OR INCIDENTAL DAMAGES, LOST PROFITS OR COSTS OF ANY OTHER PARTY OR ITS AFFILIATES, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), WARRANTY OR OTHERWISE, AND ALL SUCH INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY AND INCIDENTAL DAMAGES, LOST PROFITS AND COSTS ARE HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVED, RELEASED AND DISCHARGED.

9.14   <u>Survival</u>.  Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement (other than the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the Parties following the Closing) shall expire and be of no further force and effect as of the Closing and no Party shall thereafter have any liability whatsoever with respect thereto.

9.15   <u>Non-Recourse</u>.  All claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or any other document, certificate or instrument delivered pursuant hereto, or the negotiation, execution, performance or non-performance of this Agreement or any other document, certificate or instrument delivered pursuant hereto (including any representation or warranty made in or in connection with this Agreement or any other document, certificate or instrument delivered pursuant hereto or as an inducement to enter into this Agreement and the other documents delivered pursuant hereto) may be made only against the Person or Persons that are expressly identified as parties hereto or thereto.  In no event shall any Party, or party to the other documents delivered pursuant hereto, have any shared or vicarious liability for the actions or omissions of any other Person.  No Person who is not a named party to this Agreement or the other documents delivered pursuant hereto, including any past, present or future director, manager, officer, employee, incorporator, member, partner, equity holder, Affiliate, agent, attorney or Representative of any Party ("***Non-Party Affiliates***"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose

liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or any other document, certificate or instrument delivered pursuant hereto or for any claim based on, in respect of, or by reason of this Agreement or any other document, certificate or instrument delivered pursuant hereto or its negotiation or execution; and each party hereto or thereto waives and releases all such liabilities, claims and obligations against any such Non-Party Affiliates.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of <u>Section 6.10</u> and this <u>Section 9.15</u>.

[<em>Signatures Follow</em>]

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers and the Buyer as of the date first above written.

**<u>SELLERS</u>**:

RODEO CREEK GOLD INC.

By: _____
    Name:
    Title:

ANTLER PEAK GOLD INC.

By: _____
    Name:
    Title:

HOLLISTER VENTURE CORP.

By: _____
    Name:
    Title:

TOUCHSTONE RESOURCES COMPANY

By: _____
    Name:
    Title:

**<u>BUYER</u>**:

[BUYER]

By: _____
     Name:
     Title: