Jessica C.K. Boelter (IL SBN 6277801)
Thomas A. Labuda, Jr. (IL SBN 6225401)
Matthew G. Martinez (IL SBN 6297132)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Donald A. Lattin (NV SBN 693)
Christopher D. Jaime (NV SBN 4640)
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>RODEO CREEK GOLD INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Antler Peak Gold Inc.<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company | Chapter 11<br><br>Case No. BK-13-50301 (MKN)<br><br>Joint Administration Requested<br><br>**DECLARATION OF MICHAEL D. KANG IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**<br><br>Hearing Date: February 28, 2013<br>Hearing Time: 1:30 (PT)<br>Place: 300 Booth Street<br>Reno, NV 89509 |

MICHAEL D. KANG, under penalty of perjury, declares as follows:

1.    I am the Chief Financial Officer and Chief Restructuring Officer of Rodeo Creek Gold Inc. ("Rodeo"), Antler Peak Gold Inc. ("Antler"), Hollister Venture Corp. ("Hollister Venture") and Touchstone Resources Company ("Touchstone"), each of which is a debtor and debtor-in-possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors"). Each of the Debtors is a Nevada corporation.

1            2.        On February 25, 2013, the Debtors filed the *Declaration of Raymond E.*

2    *Dombrowski, Jr. in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket

3    No. 4] (the "Dombrowski Declaration"), a copy of which is attached hereto as Exhibit 1.  I

4    understand that, due to family medical reasons, Mr. Dombrowski will be unable to attend the

5    Debtors' hearing on certain "first-day" motions, which will occur on February 28, 2013 at 1:30

6    p.m. (PT).

7            3.        I am generally familiar with the Debtors' operations, business affairs, and

8    books and records.  Further, I have read and am familiar with the matters discussed in the

9    Dombrowski Declaration, and I agree with the statements contained therein.  If called upon to

10    testify, I would testify to the facts as set forth in the Dombrowksi Declaration.

11

12

13                              [Signature page to follow]

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2          I declare under penalty of perjury under the laws of the United States of America that the

3    foregoing is true and correct.

4          Dated: February 27, 2013

5

6

7          MICHAEL D. KANG
           Chief Financial Officer and Chief
8          Restructuring Officer
           Rodeo Creek Gold Inc.
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28          *SIGNATURE PAGE TO DECLARATION OF MICHAEL KANG IN SUPPORT OF THE*
            *DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS*

# Exhibit 1

Jessica C.K. Boelter (IL SBN 6277801)
Thomas A. Labuda, Jr. (IL SBN 6225401)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Proposed Reorganization Counsel for
Debtors and Debtors in Possession

Donald A. Lattin (NV SBN 693)
Christopher D. Jaime (NV SBN 4640)
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Proposed Local Reorganization Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>RODEO CREEK GOLD INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company<br>☐ Affects Antler Peak Gold Inc. | Chapter 11<br><br>Case No. BK-13-_____ (___)<br><br>Joint Administration Requested<br><br>**DECLARATION OF RAYMOND E. DOMBROWSKI, JR. IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**<br><br>Hearing Date: February __, 2013<br>Hearing Time: _____ (PT)<br>Place: 300 Booth Street<br>Reno, NV 89509 |

RAYMOND E. DOMBROWSKI, JR., under penalty of perjury, declares as follows:

1.      I am the Chief Executive Officer of Rodeo Creek Gold Inc. ("Rodeo"), Antler Peak Gold Inc. ("Antler"), Hollister Venture Corp. ("Hollister Venture"), and Touchstone Resources Company ("Touchstone"), each of which is a debtor and debtor-in-possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors"). Each of the Debtors is a Nevada corporation.

2.     I am generally familiar with the Debtors' operations, business affairs, and books and records.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information supplied to me by other members of the Debtors' management team and/or professionals retained by the Debtors, and my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial affairs.  I am over the age of 18 and authorized to submit this Declaration on behalf of each of the Debtors.  If called upon to testify, I would testify to the facts set forth herein.

3.     On the date hereof (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

4.     To enable the Debtors to minimize the adverse effects of the commencement of these chapter 11 cases (the "Chapter 11 Cases") on their business operations, the Debtors have requested various types of relief in the form of certain first day motions (each a "First Day Motion" and collectively, the "First Day Motions"), described further below.  The First Day Motions seek relief aimed at, among other goals: (a) maintaining vendor confidence and employee morale; (b) ensuring the continuation of the Debtors' cash management systems and other business operations; and (c) facilitating a smooth transition into, and uninterrupted operations at the outset of, the chapter 11 process.  The achievement of these goals will be critical to the success of these Chapter 11 Cases.

5.     I submit this declaration (the "Declaration") in support of the First Day Motions.  I am familiar with the contents of each First Day Motion (including the exhibits attached thereto) and believe that the relief sought in the First Day Motions (i) is necessary to preserve the value and productivity of the Debtors' operations, (ii) is integral to the Debtors' ability to function without interruption during the early stages of these Chapter 11 Cases, and (iii) serves the best interest of the Debtors, the Debtors' estates, and creditors.

6.     Part I of this Declaration describes the Debtors' business operations and corporate history, prepetition capital and debt structure, and the circumstances surrounding the

2

commencement of these Chapter 11 Cases.  Part II sets forth the relevant facts in support of each First Day Motion.

PART I

A.    <u>Overview of the Debtors' Business Operations</u>

7.    The Debtors are United States entities and are part of an international mining company (the "<u>GBG Group</u>" or the "<u>Company</u>") engaged in the exploration, development, and operation of high-quality gold properties.  The GBG Group operates through more than twenty (20) subsidiaries of the ultimate parent corporation, Great Basin Gold Ltd. ("<u>GBGL</u>"), a British Columbia, Canada entity.  These subsidiaries are incorporated in various jurisdictions, including but not limited to British Columbia, South Africa, and Nevada.

8.    At the time of the CCAA filing (discussed below), the GBG Group was focused on two projects, namely a trial mine and a recently constructed start-up mine, both of which are located in rich gold-producing regions: the Hollister trial mine in Nevada (the "<u>Hollister Trial-Mine</u>") and the Burnstone start-up mine in South Africa (the "<u>Burnstone Start-up Mine</u>").  While the GBG Group holds interests in early-stage mineral prospects located in Canada and Mozambique, the Burnstone Start-up Mine and Hollister Trial-Mine are its only material properties and together constitute substantially all of the GBG Group's business operations.  The Burnstone Start-up Mine ceased production after only a few months of operations and was placed on care and maintenance in late 2012.

9.    The Hollister Trial-Mine is owned through a subsidiary of Great Basin Gold Inc. ("<u>GBGI</u>"), which is not a debtor in these Chapter 11 Cases.  GBGI is a Nevada corporation and the direct or indirect parent company of each of the Debtors.  The Hollister Trial-Mine is owned and operated through Rodeo.  A chart depicting the Company's corporate structure is attached hereto as <u>Exhibit A</u>.

10.    The Hollister Trial-Mine is part of a group of mining claims (collectively,

3

the "Hollister Property"), all of which are located in Elko County, Nevada.  The Hollister Property consists of a total of 950 unpatented federal mining claims, covering over forty-two (42) square miles and situated on the Carlin Trend gold belt.  Approximately 255 individuals are employed by the Debtors in connection with the operation of the Hollister Property.

**B.    Recent Operations**

11.    As stated above, the Debtors' primary focus at the Hollister Property has been the Hollister Trial-Mine, which is located in an area known as the Hollister Development Block (the "HDB"), an area covering approximately 5% of the Hollister Property.  The Hollister Trial-Mine has not been permitted for long-term operation because the Debtors have not yet completed an Environmental Impact Statement ("EIS") in accordance with U.S. law.  The Debtors have been actively engaged in completing the government-mandated EIS, which is a prerequisite for full production permits.

12.    In addition to the Hollister Property, the Debtors own the Esmeralda Mill, which is located in Mineral County, Nevada.  The Debtors can mill and process ore at the Esmeralda Mill, which is approximately 290 miles by road from the HDB, with approximately 80% of that distance travelled on paved interstate roads.  The transportation costs from the HDB to the Esmeralda Mill are a significant expense of the Debtors' gold-producing operations.

**C.    Summary of Debtors' Prepetition Indebtedness**

13.    The Debtors funded their operations through a series of prepetition credit facilities, swap agreements, letters of credit, and intercompany transactions.  The Debtors' funded prepetition indebtedness and other indebtedness is as follows:

**a.    Prepetition Secured Indebtedness**

14.    The Debtors' prepetition secured debt structure is comprised of two main components: (a) the Existing Hollister Credit Facility and (b) the Canadian DIP Facility and the related Intra-Group Loan Agreement (as defined below).

4

*The Existing Hollister Credit Facility*

15.     Rodeo and Antler are borrowers under that certain Credit Agreement, dated as of February 23, 2011, with Credit Suisse AG ("Credit Suisse") and other financial institutions as lenders (the "Existing Hollister Lenders") (as amended, restated, or modified from time to time, the "Existing Hollister Credit Facility"), which facility provided for up to $80 million of available funds for Rodeo and Antler.[1]  Rodeo and Antler are indebted to Credit Suisse in the amount of approximately $52.5 million as of December 31, 2012.  The Existing Hollister Credit Facility includes certain hedge arrangements having a total exposure of an incremental approximately $7.8 million as of December 31, 2012.  GBGL, GBGI, Hollister Venture, and Touchstone are guarantors under the Existing Hollister Credit Facility, and the Existing Hollister Credit Facility is secured by substantially all of the assets of the Debtors.[2]

*The Canadian DIP Facility*

16.     On September 19, 2012, the Supreme Court of British Columbia Vancouver Registry (the "Canadian Court") entered the Order Made After Application (the "Canadian First Day Order") which, *inter alia*, approved GBGL's entry into a debtor-in-possession financing facility (the "Canadian DIP Facility").  The Canadian Court approved the Canadian DIP Facility on the basis of a term sheet (the "Canadian DIP Term Sheet"), with definitive documentation to follow.  Definitive documentation for the Canadian DIP Facility, including, *inter alia*, the Debtor-in-Possession Loan Facility Agreement (the "Canadian DIP Loan Agreement"), was executed on October 3, 2012 and most recently amended effective Friday, February 22, 2013.

---

[1] Initially, the Existing Hollister Credit Facility Provided for $60 million of available funds to Rodeo and Antler.  The Existing Hollister Credit Facility was amended (i) on March 8, 2011 to increase the facility to $70 million and (ii) on January 23, 2013 to increase the facility to $80 million.  Rodeo and Antler made an additional borrowing of approximately $750,000 from the Existing Hollister Credit Facility following the January 23, 2013 amendment.

[2] GBGL and GBGI also pledged certain assets to secure the Existing Hollister Credit Facility.

17.    The Canadian DIP Facility was originally a $35 million secured facility but was very recently increased to a $51 million secured facility. GBGL is the sole borrower under the Canadian DIP Facility, with Credit Suisse and Standard Chartered Bank as lenders (Credit Suisse and Standard Chartered Bank, in such capacity, the "Canadian DIP Lenders"). Prior to the February 22, 2013 amendment, GBGL had no remaining availability under the Canadian DIP Facility. Currently, the obligations under the Canadian DIP Facility are cross-guaranteed by certain of GBGL's subsidiaries, including Rodeo, Antler, Hollister Venture, and Touchstone. The Canadian DIP Facility is secured by superpriority priming liens and claims as to all assets of GBGL and first-ranking liens and claims as to all assets of the guarantors of the Canadian DIP Facility, subject to certain exceptions which include, in relevant part, that the Canadian DIP Facility is secured by second-ranking liens and claims as to the collateral behind the liens and claims granted under the Existing Hollister Credit Facility (the "Hollister Collateral").

18.    Of the original $35 million amount available under the Canadian DIP Facility, $10 million was made available to GBGL's Nevada subsidiaries (the "Nevada Subsidiaries"), including the Debtors in these Chapter 11 Cases, for purposes of paying creditors and other agreed requirements pursuant to the Approved Budget (as defined in the Canadian DIP Term Sheet). Up to $25 million of the original Canadian DIP Facility was made available to GBGL and GBGL's South African subsidiaries for certain corporate purposes along with certain operational expenses. The $10 million proceeds of the Canadian DIP Facility made available to Rodeo and Antler were made available through an intercompany loan agreement (the "Intra-Group Loan Agreement") among GBGL, Rodeo, and Antler. As of the Petition Date, Rodeo and Antler had fully drawn the authorized drawings under the Intra-Group Loan Agreement. No further amounts beyond the original $10 million advanced to Rodeo and Antler are available to

6

Rodeo and Antler under the recently upsized Canadian DIP Facility.

19. In addition to the Existing Hollister Facility and the Canadian DIP Facility, and in connection with a restructuring agreement pertaining to Rodeo's gold sale and purchase agreement with RK Mine Finance Trust I, Rodeo issued a promissory note (the "Rodeo Note") to GBG Rusaf Gold Ltd. ("Rusaf"), a subsidiary of GBGL, in the amount of $8,833,324.50, which Rodeo Note is secured by a third-priority lien on Rodeo's assets. Rusaf subsequently assigned the Rodeo Note to GBGL as a partial offset reduction of the amounts it owed to GBGL.

### b. Trade Debt

20. Prior to the Petition Date, the Debtors generally paid their trade debt in the ordinary course of business. As of the Petition Date, the Company had approximately $13.5 million in trade debt outstanding.

### c. Intercompany Obligations

21. GBGL has acted as the central funds coordinator for the GBG Group in connection with monies raised through the public markets and proceeds of certain loans which it manages through the use of the Company's Cash Management System (as defined below). GBGL advances funds to members of the GBG Group primarily down two corporate chains: one leading to the Burnstone Start-up Mine and the other leading to the Hollister Property. The books and records of the Nevada Subsidiaries, which include the Debtors, indicate that the Nevada Subsidiaries owe GBGL, in the aggregate, $197 million as of December 31, 2012.

### D.    Summary of Capital Structure

22. None of the Debtors are publicly traded companies. The common shares of the Debtors' ultimate corporate parent, GBGL, were previously listed on the Toronto Stock Exchange ("the TSX") (TSX: GBG) and the Johannesburg Stock Exchange (JSE: GBG) and

inter-listed on the New York Stock Exchange Amex (the "NYSE") (NYSE MKT: GBG).  GBGL

also had a class of unsecured convertible debentures listed on the TSX (TSX: GBG: CB) and

warrants listed on the TSX (TSX: GBG: WT).   GBGL's authorized share capital consists of an

unlimited number of common shares without par value.  On October 25, 2012, GBGL's

securities were delisted from the TSX.  On or about February 4, 2013, GBGL's common shares

were delisted from the NYSE, and an application has been made to delist GBGL's common

shares from the JSE.

**E.**      **The South African and Canadian Proceedings**

23.      On September 18, 2012, the GBG Group's primary South African

operating subsidiary and owner of the Burnstone Start-up Mine, Southgold Exploration (Pty)

Ltd., commenced business rescue proceedings under chapter 6 of the *South African Companies*

*Act, 2008* (the "South African Proceedings").  On September 19, 2012, GBGL, the Debtors'

ultimate parent company, applied for protection from its creditors in Canada pursuant to the

*Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36* (the "Canadian Proceeding" or the

"CCAA Insolvency Proceeding") in the Canadian Court.  On such date, the Canadian Court

entered the Canadian First Day Order, which, *inter alia*, imposed a stay of all proceedings

against GBGL and its property in Canada.

**G.**      **Circumstances Leading to the Commencement of these Chapter 11 Cases**

24.      By the spring of 2012, the GBG Group found itself faced with a liquidity

crisis as a result of technical, infrastructure, and resulting underperformance issues at both the

Burnstone Start-up Mine and Hollister Trial-Mine.  These operational and liquidity issues are

discussed in detail in the Lourens Van Vuuren affidavit submitted in the connection with the

Canadian Proceeding and which is attached hereto as Exhibit B.

25.      In response to these liquidity issues, the Company implemented an

aggressive cost reduction program and commenced the consideration of multiple strategic alternatives, including, without limitation, a sale of some or all of the Company's assets (including the Hollister Trial-Mine), in order to maximize value for the Company and its stakeholders.  Van Vuuren Affidavit at ¶ 9.  Notwithstanding the cost reduction program, however, the Company's liquidity issues continued throughout the summer of 2012, and, as discussed above, GBGL was required to commence the CCAA Insolvency Proceeding in September 2012 in order to obtain the necessary financing to continue operations while the Company continued to investigate and explore its strategic options.  Id. at ¶ 11.

26.       Upon the commencement of the CCAA Insolvency Proceeding, GBGL worked to stabilize its business and garner support from GBGL's creditor constituencies for a sale process.  In connection with GBGL's efforts to sell the Nevada operations, namely the Hollister Property and the Esmeralda Mill (together, the "Nevada Operations"), on October 25, 2012, the Canadian Court approved the engagement of CIBC World Markets Inc. ("CIBC") to act as financial advisor in connection with the sale of the Nevada Operations, among other things.  The marketing and sale process is set forth in more detail in the Declaration of Michael Stewart in Support of the Sale Motion, attached to the Sale Motion as Exhibit B (the "Stewart Sale Procedures Declaration").

27.       As discussed in the Stewart Sale Procedures Declaration, after several discussions with the GBG Group's principal constituencies, in late December 2012 CIBC launched a pre-marketing process for the sale of the Nevada Operations.  Based upon early favorable feedback from certain key potential acquirers, in early January 2013 CIBC commenced a broader process to identify a stalking horse bidder for the Nevada Operations.  In connection therewith, CIBC contacted twenty-two (22) potential acquirers, fifteen (15) of which signed confidentiality agreements and performed various levels of due diligence.  Seven (7) of the

parties conducted site visits.

28.    Firm bids for the stalking horse position were due on February 15, 2013. Although multiple bids were received by the deadline, neither the Debtors nor Credit Suisse—the agent for the Existing Hollister Credit Facility and Canadian DIP Facility (in both capacities, the "Existing Facility Agent")—believed that the bids were sufficient to warrant a stalking horse designation and related stalking horse bid protections. The Debtors, in consultation with the Existing Facility Agent, therefore decided to proceed with an open auction of the Nevada Operations.

29.    Concurrently with the foregoing sale process, the Debtors attempted to resolve myriad ongoing and additional liquidity issues. Although many of the Debtors' efforts were successful, the efforts were ultimately insufficient to overcome severe gold production shortfalls resulting in part from uncharacteristically low temperatures at the Hollister Trial-Mine in December 2012 and January 2013, coupled with declining high-grade ore access due to insufficient sustaining capital investments in additional drilling at the Hollister Trial-Mine and maintenance at the Esmeralda Mill. In addition, the recent drop in commodity prices of nearly $100/ounce over the past ten (10) days exacerbated these issues. The gold production shortfalls required the Debtors to seek substantial additional funding to continue to operate the Hollister Trial-Mine through the conclusion of the sale process. It was believed that the Nevada Operations would secure the highest available price if they could be sold as a going concern. In light of the results of the Debtors' stalking horse process described above, however, the Debtors were unable to secure funding outside of a chapter 11 proceeding. Consequently, in order to effectuate an auction and sale of the Nevada Operations and to fund the ongoing trial mining and ore milling operations through the conclusion of a sale process, the Debtors commenced these Chapter 11 Cases.

## PART II

30.     Concurrently with the filing of these Chapter 11 Cases, the Debtors have filed a number of First Day Motions, consisting of administrative motions and motions seeking substantive relief relating to the Debtors' business operations.  The Debtors believe that approval of each First Day Motion is an important element of their reorganization efforts and is necessary to ensure a smooth transition into chapter 11 with minimal disruption to the Debtors' business operations, which is of heightened importance as the Debtors embark upon a sale of the Nevada Operations.  I have reviewed each of the First Day Motions, including the exhibits thereto, and I believe that the relief requested therein is critical to the success of these Chapter 11 Cases. Factual information with respect to each First Day Motion is provided below and in each First Day Motion.  Capitalized terms, to the extent not defined herein, have the meaning as ascribed to them in the respective First Day Motions.

**A.      Administrative Motions**

**a.      Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Local Rule 1015 (the "Joint Administration Motion")**

31.     Given the provisions of the Bankruptcy Code and the Bankruptcy Rules, as well as the Debtors' affiliation, joint administration of the Chapter 11 Cases is warranted. Joint administration will avoid the preparation, replication, service, and filing, as applicable, of duplicative notices, applications, and orders, thereby saving the Debtors expenses and resources. The relief requested will not adversely affect creditors' rights, as the Joint Administration Motion requests only the administrative, not the substantive, consolidation of the estates.  In fact, the reduced costs that will result from the joint administration of the Chapter 11 Cases will inure to the benefit of all creditors.  The relief requested will also relieve the Court of the burden of entering duplicative orders and maintaining duplicative files, as well as simplify supervision of

the administrative aspects of the Chapter 11 Cases by the U.S. Trustee.

32.     For these reasons, and for the reasons discussed in the Joint Administration Motion, the Debtors believe that the relief requested in the Joint Administration Motion should be granted.

    **b.**    **Motion for Entry of an Order Shortening Time for Hearing on Debtors' First Day Motions (the "Motion to Shorten Time")**

33.     As set forth in detail below, the First Day Motions, among other things, seek to stabilize the Debtors' operations by honoring obligations to employees, paying necessary amounts to taxing authorities, insurers, lien claimants, and essential vendors, entering into postpetition debtor-in-possession financing, authorizing the continuation of the Debtors' Cash Management System (as defined below), setting procedures which will enable the Debtors to continue using utilities, and setting the parameters of the imminent sale process.

34.     The Debtors believe that having the First Day Motions heard on shortened time will accommodate the Debtors' need to maintain the status quo with its employees, to maintain its Cash Management System in order to receive and process postpetition receipts and payments without disruption, and to allow the Debtors to operate their property through the consensual use of Cash Collateral in order to avoid the termination of its operations and further decline in the value of their property.  I believe that the Debtors will suffer immediate and irreparable harm without an expedited hearing, as the Debtors require an immediate infusion of debtor-in-possession financing to continue their Nevada Operations.  Continuation of the Nevada Operations is in the best interests of the Debtors and their estates, as it will enhance the value of the business by seamlessly transitioning the Debtors into bankruptcy, which will provide an orderly auction process that will, in turn, maximize the value of the Debtors' estates.

35.     For these reasons, and for the reasons discussed in the Motion to Shorten Time, the Debtors believe that the relief requested in the Motion to Shorten Time should be

1  granted.

2         **c.**    **Motion for Authority to File Consolidated List of the Debtors' Twenty**
3                **Largest Unsecured Creditors (the "Consolidated List Motion")**

4         36.     The Debtors believe that filing a consolidated list of top twenty (20)

5  unsecured creditors is appropriate in these cases.  As is customary in many chapter 11 cases, the

6  Debtors anticipate that the top twenty (20) list of unsecured creditors will be included in the

7  noticing of most pleadings filed in the chapter 11 cases.  The top twenty (20) list of unsecured

8  creditors will likely also be used by the office of the United States Trustee in evaluating the

9  largest claims asserted against the Debtors' estates and potentially forming a single creditors'

10  committee.  The Debtors believe that a consolidated list will be much more efficient for purposes

11  of noticing pleadings and more meaningful for the United States Trustee's review and

12  assessment of the largest unsecured creditor body.

13

14         37.     For these reasons, and for the reasons discussed in the Consolidated List

15  Motion, the Debtors believe that the relief requested in the Consolidated List Motion should be

16  granted.

17         **d.**    **Motion for an Order Extending the Debtors' Time to File Schedules and**
18                **Statements of Financial Affairs ("Schedules Motion")**

19         38.     To prepare their Schedules and Statements, the Debtors will have to

20  compile information from books, records, and documents relating to thousands of claims, assets,

21  and contracts from each of the Debtors.  Accordingly, collection of the necessary information

22  will require a significant expenditure of time and effort on the part of the Debtors and their

23  employees.  Additionally, because numerous invoices related to prepetition goods and services

24  have not yet been received and entered into the Debtors' accounting system, it may be some time

25  before the Debtors have access to all of the required information to prepare the Schedules and

26  Statements.  Indeed, the Debtors' business operations are complex, and preparing the Schedules

27

28

13

1   and Statements accurately and in appropriate detail will require significant attention from the

2   Debtors' personnel and the Debtors' advisors, which would distract attention from the Debtors'

3   business operations at a critical juncture

4           39.     Therefore, I believe that the relief requested in the Schedules Motion—

5   6   granting the Debtors an extension of sixteen (16) days to file their statements of financial affairs

7   and schedules of assets and liabilities, current income and expenditures, and executory contracts

8   and unexpired leases—is in the best interest of the Debtors' estates, their creditors, and all other

9   parties in interest, and will enable the Debtors to continue to operate their businesses in chapter

10  11 without disruptions.

11          40.     For these reasons, and for the reasons discussed in the Schedules Motion,

12  13  the Debtors believe that the relief requested in the Schedules Motion should be granted.

14  **e.    Application for an Order Authorizing the Debtors and Debtors in Possession to Retain and Employ GCG, Inc. as Claims, Noticing and Balloting Agent Pursuant to 28 U.S.C. § 156(C) and Rule 2002 of the Federal Rules of Bankruptcy Procedure as of the Petition Date (the "GCG Retention Application")**

17          41.     In consideration of the number of parties-in-interest, the nature of the

18  Debtors' business, and the scope of the tasks for which the Debtors will require the assistance of

19  a claims, noticing, and balloting agent, the Debtors believe that the appointment of GCG, Inc.

20  ("GCG") is in the best interest of the Debtors' estates, their creditors, parties-in-interest, and this

21  Court.  The Debtors wish to engage GCG to send out certain designated notices and to maintain

22  claims files and a claims and voting register.  The Debtors believe that such services will

23  expedite the service of notices, streamline the claims administration process and the

24  administration of the Debtors' Chapter 11 Cases, and permit the Debtors to focus on the sale

25  process and reorganization efforts.  Based on GCG's considerable experience in providing

26  similar services in large chapter 11 cases, the Debtors believe that GCG is well qualified to

27  provide the Debtors with experienced noticing, claims, and balloting services in connection with

28  these Chapter 11 Cases.  A detailed description of the services that GCG has agreed to render

and the compensation and other terms of the engagement are provided in the GCG Retention

Application, the Bankruptcy Administration Agreement, and the Declaration of Emily Gottlieb

in Support of the Application of the Debtors and Debtors in Possession for an Order Under 28

U.S.C. § 156(c) Authorizing the Retention of GCG, Inc. as the Claims, Noticing, and Balloting

Agent and Approving Related Agreement (the "Gottlieb Declaration"). I have reviewed the

terms of the engagement and believe that the Debtors' estates, creditors, parties-in-interest, and

this Court will benefit as a result of GCG's experience and services.

   42. For these reasons, and for the reasons set forth in the GCG Retention

Application and the Gottlieb Declaration, the Debtors believe that the relief requested in the

GCG Retention Application should be granted.

**B.** **Motions Relating to Business Operations**

  **a.** **Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 552 and Fed. R. Bankr. P. Rule 4001(b) and (c) (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, (B) Use of Cash Collateral, and (C) Grant Liens, Including Priming Liens, and Superpriority Claims, (II) Granting Adequate Protection, (III) Scheduling a Final Hearing and (IV) Granting Related Relief (the "Post-Petition Financing Motion")**

  **The Need for Post-Petition Financing and Use of Cash Collateral**

   43. The Debtors' ability to obtain post-petition financing and use Cash

Collateral is critical to the Debtors' ability to continue as a going concern during the course of

these Chapter 11 Cases and throughout the proposed auction and sale process in order to

maximize value for the Debtors and their estates. The Debtors will suffer immediate and

irreparable harm if authority to use cash collateral and obtain DIP financing is not obtained on an

interim basis on shortened notice. The Debtors do not have sufficient available sources of

working capital, including Cash Collateral, to operate their business in the ordinary course of

business without the use of the Prepetition Collateral, including Cash Collateral, and the

financing requested in the Post-Petition Financing Motion. The Debtors have an immediate need

to obtain the DIP Loans and use the Prepetition Collateral, including Cash Collateral on an

interim basis, in order to, among other things, permit the orderly continuation of their business, preserve their going-concern value, and make payroll, pay trade and other creditors, and satisfy their other working capital and general corporate needs (including the costs of administration of the Chapter 11 Cases).

44.    Without additional financing on an interim basis, the Debtors' liquidity crisis would like result in an uncontrolled shut-down of the mine on the Hollister Property, because the Debtors' would not have funds to maintain operations and would not even have the funds necessary to conduct an orderly shut-down of the Hollister Trial-Mine to put the Hollister Trial-Mine on care and maintenance.  The failure to place properly the Hollister Trial-Mine on care and maintenance and the resulting immediate shut down of the Hollister Trial-Mine would have a material negative impact on the value of the Hollister Property, potentially jeopardize the sale process, and would potentially be a breach of U.S. law.  Thus, it is critical for the Debtors' to obtain post-petition financing to maintain their operations and avoid an uncontrolled shut-down of the Hollister Trial-Mine.

**Negotiation of the DIP Facility**

45.    In view of the deterioration of the Debtors' liquidity position and in connection with the GBG Group's consideration of strategic alternatives, in June 2012 the Company engaged CIBC to evaluate potential sale options and in September 2012 CIBC was tasked with evaluating other strategic alternatives, including debt financing.  The evaluation process and its results are set forth in more detail in the Declaration of Michael Stewart In Support of the Debtors' Post-Petition Financing Motion, attached to the Post-Petition Financing Motion as Exhibit B (the "Stewart Post-Petition Financing Declaration").

46.    In December 2012 and January 2013, the Debtors underwent a process with Alvarez & Marsal Holdings, LLC to forecast cash receipts and disbursements on a weekly

basis to determine the amount of funding required to continue operations of the Hollister

Property during a restructuring and/or sale process. The result of this process showed that the

Debtors required additional liquidity in addition to the proposed use of Cash Collateral.

47.    In consultation with CIBC, the Debtors' decided to accept secured

postpetition financing (the "Priority Term Facility") proposed by Credit Suisse (Credit Suisse, in

such capacity, the "DIP Agent"). This decision was influenced by several factors. First, the

Debtors believe that the DIP Agent proposal, on the whole, offered the most favorable terms

available to the Debtors. Further, no third-party lender was prepared to advance funds without

priming liens or in an amount sufficient to provide the liquidity required by the Debtors.[3] In

addition, due to the overlap in lenders among the Priority Term Facility, the Existing Hollister

Credit Facility, and the Canadian DIP Facility, the Debtors believed that priming liens provided

pursuant to the Priority Term Facility proposed by the DIP Agent would be consensual.

48.    After carefully considering the limited alternatives that were available, the

Debtors concluded that the Priority Term Facility was the best alternative for the Debtors

because, *inter alia*, it (i) would afford the Debtors sufficient liquidity to continue their operations

while they conducted the auction and sale process and restructured under the Bankruptcy Code,

(ii) would avoid a priming fight, and (iii) has pricing, in the opinion of the Debtors' financial

advisors, that is at market. The negotiations on the Priority Term Facility culminated in an

agreement with the DIP Lenders to provide the Debtors up to $9 million of secured postpetition

financing on the terms and subject to the conditions set forth in the DIP Agreement.

49.    Given the Debtors' circumstances, and based on the advice of CIBC, the

Debtors believe that the terms of the Priority Term Facility are fair, reasonable, and adequate

---

[3] CIBC also had discussions with the Noteholders, who were not willing to make an alternative, viable
financial proposal.

under the circumstances.  The Debtors understand that the Existing Hollister Lenders and the Canadian DIP Lenders will consent to have their liens primed by the Priority Term Facility, so long as the Court authorizes the grant of adequate protection set forth in the proposed Order approving the DIP Agreement. The Debtors further believe that the protections to be provided to the Existing Hollister Lenders and the Canadian DIP Lenders are fair and reasonable.

**Approval of the DIP Facility is in the Best Interests of the Debtors' Estates**

50.    The preservation of the Debtors' business and the Debtors' ability to obtain the best price in the proposed auction depend heavily upon the expeditious approval of the Priority Term Facility and the use of Cash Collateral for general working capital purposes. Denial of the Debtors' requested relief will cause immediate and irreparable harm to the Debtors and their estates, and will also have a detrimental effect on the collateral.  I believe that the Priority Term Facility and the use of the Prepetition Collateral are necessary to permit the orderly continuation of the Debtors' business operations, minimize the disruption of the business operations, and preserve and maximize the value of the Debtors' estates while the Debtors conduct the proposed auction and sale process.  Absent access to the DIP Facility and the use of Cash Collateral, the Debtors would have no ability to meet their ongoing obligations to suppliers, venders, employees and other creditors.  If the Debtors are unable to pay their ongoing obligations, they will not be able to operate and may have to immediately shut down the Hollister Trial-Mine, which would have a material negative impact on the value of the Hollister Property.   In contrast, the Debtors' access to the Priority Term Facility and continued use of Cash Collateral will ensure that the "going concern" value of their assets are preserved, a value that the Debtors believe is greater than the value which would be realized from a piecemeal liquidation of those assets if the Debtors were forced to cease operations immediately.

51.    For these reasons, and for the reasons set forth in the Post-Petition

Financing Motion and the Stewart Post-Petition Financing Declaration, the Debtors have determined that the relief requested in the Post-Petition Financing Motion is in the best interest of the Debtors and their estates.

        **b.**    **Motion for Interim and Final Orders (I) Approving Cash Management System (II) Authorizing Use of Prepetition Bank Accounts and Business Forms, (III) Waiving the Requirements of Section 345(b) of the Bankruptcy Code, and (IV) Granting Administrative Priority to Intercompany Claims (the "Cash Management Motion")**

        52.    In the ordinary course of the Debtors' businesses, the Debtors use a cash management system to collect funds from their operations and to pay operating and administrative expenses in connection therewith (the "Cash Management System"). The Cash Management Motion seeks approval of the Debtors' continued use of such Cash Management System. The Cash Management System is similar to those used by other large companies to collect, concentrate, and disburse funds generated by operating entities in a cost-effective and efficient manner.

        53.    The Cash Management System is carefully managed through oversight procedures and controls implemented by the individuals employed by the Debtors. Of all the Debtors in these Chapter 11 Cases, only Rodeo has active bank accounts in the United States. A schematic depicting the operation of the Cash Management System and a list of substantially all of the Debtors' bank accounts utilized in the Cash Management System is attached to the Cash Management Motion as Exhibit A. The Cash Management System operates primarily through bank accounts maintained at Bank of America ("BOA") and a single account at Credit Suisse. First, in general, receipts from gold sales are deposited in the Credit Suisse account, in the name of Rodeo. Funds are then transferred from the Credit Suisse account to the general account at BOA, in the name of Rodeo. The funds in the general account are used for the Debtors' general operations. Two other accounts at BOA are zero-balance accounts (whereby a balance of zero is

maintained by automatically transferring funds from the general account in an amount large

enough only to cover checks presented) for payroll and accounts payable.

### Benefits of Maintaining the Centralized Cash Management System

54.    The Cash Management System uses the Debtors' bank accounts to

effectively and efficiently collect, concentrate, and disburse funds as needed.  The Cash

Management System provides significant benefits to the Debtors, including the ability to: (i)

closely track, and thus control, all corporate funds through the provision of regular status reports

on the location and amount of all funds, (ii) ensure cash availability, and (iii) reduce

administrative expenses by facilitating the movement of funds and the development of timely

and accurate account balance and presentment information.  A disruption in the Cash

Management System would likely cause delays in the collection and disbursement of funds, thus

impeding the Debtors' ability to carry out their normal business operations, to the detriment of

employees and suppliers.

55.    The Cash Management System enables the Debtors to trace the movement

of funds and to ensure that all transactions are adequately documented and readily ascertainable.

The Debtors will continue to maintain detailed records reflecting all funds transfers.  Further, the

Debtors' reorganization efforts will be facilitated by preserving a "business-as-usual"

atmosphere and avoiding the distractions that would inevitably be associated with a disruption in

the Cash Management System.  Accordingly, the Debtors believe that the continued use of the

Cash Management System is essential to the Debtors' business operations.

### Benefits of Maintaining Existing Bank Accounts, Check, and Business Forms

56.    In the normal course of their businesses, the Debtors use preprinted

business forms (the "Business Forms") such as checks, invoices, stationary, letterhead, purchase

orders, invoices, and other similar items.  I am informed that the United States Trustee's

Operating Guidelines mandate, among other things, the closure of the Debtors' prepetition bank accounts and the opening of new accounts. If the Debtors were required to comply with these guidelines, their operations would immediately be harmed by the disruption, confusion, delay, and cost that would most certainly result therefrom. The Debtors believe that, due to the Debtors' financial controls, the goals of the Guidelines can be addressed in a less disruptive manner.

**Benefits of Affording Intercompany Claims Administrative Priority**

57.    In the ordinary course of their business operations, the Debtors engage in various intercompany transactions due to their centralized Cash Management System. As of any given date, there are numerous intercompany claims (the "Intercompany Claims") that reflect intercompany receivables and payables made in the ordinary course between and among the Debtors (the "Intercompany Transactions"). For example, funds are paid by Rodeo on behalf of Antler to pay for overhead and operating expenses. These costs are then allocated among the legal entities, resulting in Intercompany Claims. In connection with the daily operation of the Cash Management System there may be, at any time, Intercompany Claims owing by one Debtor to another Debtor in connection with the disbursement of funds. The Debtors track all fund transfers electronically in their accounting system and can ascertain, trace, and account for Intercompany Transactions. I believe that, to ensure that each Debtor will not permanently fund, at the expense of its creditors, the operations of an affiliated entity, all Intercompany Claims against a Debtor by another Debtor should be afforded administrative expense status. If Intercompany Claims are afforded administrative expense status, each entity will continue to bear ultimate repayment responsibility for such ordinary-course transactions.

**Cause Exists to Approve the Debtors' Use of Depository Accounts**

58.    As set forth in detail in the Cash Management Motion, the Debtors believe

that the Debtors should be permitted to use a depository account with Credit Suisse that is not included on the U.S. Trustee's List of Authorized Depositories (the "Credit Suisse Depository Account"). I believe that Credit Suisse's practices provide sufficient protection for the Debtors' assets and that it is in the best interest of the Debtors' estates and creditors for the Debtors to continue to use the Credit Suisse Depository Account.

59. For these reasons, and for the reasons discussed in the Cash Management Motion, the Debtors believe that the relief requested in the Cash Management Motion should be granted.

c. **Motion for an Interim and Final Order (I) Authorizing Debtors to Pay Certain Prepetition Employee Obligations, (II) Authorizing the Debtors to Reimburse Business Expenses, (III) Authorizing Debtors to Maintain and Continue Employee Benefits and Programs in their Ordinary Course, (IV) Authorizing and Directing Applicable Banks to Honor all Checks and Transfers Drawn on the Debtors' Accounts, and (IV) Granting Related Relief (the "Employee Wages/Benefits Motion")**

60. The Debtors employ approximately 255 U.S. employees (each an "Employee" and, collectively, the "Employees"). The Employees are employed directly by Rodeo. Each Employee is classified as either a full-time employee (the "Full-Time Employees"), of which there are currently approximately 245, a part-time employee (the "Part-Time Employees"), of which there are currently approximately five (5), or a temporary/seasonal employee (the "Temporary Employees"), of which there are currently approximately five (5). Each Employee gets paid either through a salary (the "Salaried Employees") or based on the Employee's number of hours worked (the "Hourly Employees"). Approximately 45-50 Employees are salaried, while approximately 200-205 Employees are hourly. The Debtors do not utilize the services of any independent contractors. The expertise and experience developed by the Employees is a critical component of the Debtors' ability to operate the Hollister Trial-Mine.

22

**Employee Compensation**

61.     The Debtors' average gross monthly compensation for their Employees, including wages, salaries, commissions, and other compensation, is approximately $2 million. Hourly Employees are paid on a biweekly basis every other Wednesday. Salaried Employees are paid on a semi-monthly basis on the 15th and final day of each month. Employees may choose to have their paychecks directly deposited into their bank accounts through the Debtors' direct deposit program or to receive paychecks at work during their scheduled work shift.

62.     As of the Petition Date, the aggregate amount of unpaid base wages (including base salary but excluding certain deductions and withholdings, each as discussed below) earned prior to the Petition Date that remain unpaid to the Employees is approximately $750,000 (the "Unpaid Wages"). Upon information and belief, if the Employee Wages/Benefits Motion were granted, Unpaid Wages would not exceed $11,725 on account of any individual Employee.

**Reimbursable Business Expenses**

63.     Prior to the Petition Date, and in the ordinary course of their businesses, the Debtors reimbursed Employees for certain expenses incurred on behalf of the Debtors in the scope of their employment (the "Reimbursable Expenses"). The Reimbursable Expenses are expenses for air travel, lodging, ground transportation, meals, and other business-related expenses. The Reimbursable Expenses are incurred by Employees on behalf of the Debtors through use of personal funds or credit cards. After submission and approval of expense reports, such Employees are reimbursed through the regular payroll process. The Reimburseable Expenses were all incurred on the Debtors' behalf and with Employees' understanding that they would be reimbursed. I believe that, in order to avoid harming the individual Employees who incurred the Reimbursable Expenses, the Debtors should be authorized to reimburse the

23

Employees for Reimbursable Expenses that were incurred prior to the Petition Date. The Debtors estimate that, as of the Petition Date, the aggregate amount of unpaid Reimbursable Expenses was *de minimis* and, in any event, less than $15,000.

**Employee Benefits**

64.    The Debtors provide their Employees, directly or indirectly, and in the ordinary course of business, with Employee benefits, including, but not limited to: (i) a broad range of medical and health care programs; (ii) vacation, sick, holiday, leave, and similar benefits; (iii) certain savings and pension plans; and (iv) a number of other specific Employee benefits, described in greater detail below.

*Health Care Programs*

65.    The Debtors offer several health and welfare programs to Employees, including medical, prescription drug, dental, and vision care coverage, whether through third-party insurers or otherwise (the "Health Care Benefits").[4]

66.    The Rodeo Creek Gold, Inc. Health Care Benefits Plan (the "Rodeo Creek Health Plan") is administered by Rodeo, with Hometown Health Providers as the contract and claims administrator, and provides Employees with a number of individual and family PPO and non-PPO health plan options. The Rodeo Creek Health Plan also provides prescription drug coverage to Employees. Such prescription drug coverage is provided through separate agreement(s) between Rodeo and a prescription drug vendor. In order to comply with the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"), the Rodeo Creek Health Plan includes a continuation of coverage option, which is available to covered Employees whose

---

[4] Prior to employment with the Debtors, a prospective employee undergoes a pre-employment medical examination at a local medical center. The Debtors believe that such medical examinations are an important part of discharging the Debtors' safety requirements to ensure a prospective employee is physically able to undertake the demands required by the Debtors' operations. The Debtors incur *de minimis* costs, payable directly to the healthcare provider, on account of such examinations. The Debtors consider such costs to be part of the Health Care Benefits subject of this Motion.

healthcare coverage under the Rodeo Creek Health Plan would otherwise terminate.

67.     The Debtors also offer their Employees a dental insurance plan (the "Dental Plan") through Principal Life Insurance Company.  The Dental Plan is a PPO plan and provides a number of key dental benefits to the Employees.  The Dental Plan also has a COBRA continuation component.  The Debtors also provide vision coverage to Employees through the Group Vision Care Plan (the "Vision Plan") provided by Vision Service Plan, Inc.

68.     On average, the Debtors pay approximately $392,000 per month for the Health Care Benefits.  The Debtors' average monthly administrative fees currently paid in connection with all Health Care Benefits total approximately $10,766.  The Debtors also maintain stop-loss insurance through HM Life Insurance Company, with Hometown Health Partners as a third party administrator.  Rodeo pays an average of $38,443.52 per month in connection with its stop-loss insurance policy.

### Life and Accidental Death & Dismemberment Insurance

69.     The Debtors provide primary life and accidental death and dismemberment insurance coverage (the "Life and AD&D Insurance") through Prudential at no cost to Employees.[5]  The Life and AD&D Insurance coverage costs the Debtors approximately $8,284 per month.  The estimated amount of accrued and outstanding prepetition obligations with respect to the Life and AD&D Insurance is approximately $6,903.

### Long and Short Term Disability

70.     The Debtors provide eligible Employees with short-term disability benefits (the "Short-Term Disability Program") and long-term disability benefits (the "Long-Term Disability Program" and, together with the Short-Term Disability Program, the "Disability Benefits Programs") through the Lincoln Financial Group, at no cost to the Employees.  The

---

[5] The Debtors also offer to all eligible Employees the option to purchase additional term Life and AD&D Insurance. The Debtors only provide access to this benefit and do not pay any of the costs associated therewith.

Short-Term Disability Program is intended to protect an Employee's income for a short duration in the event the Employee becomes ill or injured. The Short-Term Disability Program provides an Employee up to 60% of his or her weekly salary, up to $1,400 per week for up to twenty-six (26) weeks. The Long-Term Disability Program is intended to protect an Employee's income for a longer duration after it has depleted coverage under the Short-Term Disability Program or the Debtors' sick leave policy. The Long-Term Disability Program provides an Employee up to 60% of his or her weekly salary up to $6,000 per month, with differing benefit limitations depending on the Employee's illness.

71.     The Disability Benefits Programs cost the Debtors approximately $9,145 per month. As of the Petition Date, the Debtors estimate that the amount of accrued and outstanding prepetition obligations with respect to the Disability Benefits Programs is approximately $7,621.

*Vacation, Holiday and Leave Benefits*

72.     The Debtors provide vacation time to their Employees as a paid time-off benefit (the "Vacation Time"). The amount of Vacation Time varies based on the Employee's amount of time employed by the Debtors. Vacation time ranges from eighty (80) annual hours of paid vacation for Employees with one year of service to 240 annual hours of paid vacation for Employees with ten or more years of service. Employees are paid for Vacation Time at their regular base rate of pay, based on a forty (40) hour work week. Except for Employees with less than one year of service, the vacation year extends from January 1 through December 31. The majority of an Employee's vacation hours must be taken during the year in which they are earned. A maximum of forty (40) hours of vacation are allowed to be carried over and must be used in the first quarter of a new year. In certain limited circumstances, more than forty (40) hours of vacation time may be carried over with the written approval of an Employee's General

Manager. Hours left over at the end of the year may also be paid out with management approval. Vacation Time is paid at a prorated amount if an Employee leaves the company, and upon separation, the Employee receives his or her base wages for unused, accrued vacation time in his or her final check. Conversely, any vacation time taken, but not accrued, is deducted from an Employee's final check upon separation. Those Employees who reach certain anniversary milestones, at which time an additional week of vacation is granted, receive a pro-rated amount of newly earned vacation time for the remainder of the calendar year and the full amount in the following year, and thereafter. Finally, Vacation Time does not accrue during any type of leave of absence or disability. Unused Vacation Time is paid to Employees on leave of absence each pay period until the available time is exhausted.

73.     The Debtors also observe eight holidays for Employees after thirty (30) days of employment. Although the Debtors ordinarily observe such holidays on their appointed days (*e.g.*, the Christmas holiday on December 25), business requirements may require that an alternate day be designated for holiday observation. All Full-Time Employees may qualify to receive holiday pay ("Holiday Pay"). Part-Time Employees and Temporary Employees are not entitled to receive Holiday Pay.

74.     Employees are eligible to receive benefits for eligible absences from work under certain leave policies ("Leave"). The Debtors' numerous Leave policies include the following: (i) up to three (3) days of paid bereavement leave for the death of a member of an Employee's immediate family; (ii) up to ten (10) days of paid leave (up to 8-10 hours per day for Hourly Employees depending on work schedules) for jury duty; (iii) unpaid time off to be a witness in a judicial or administrative proceeding in accordance with Nevada law; (iv) unpaid time off relating to school events of an Employee's child who is enrolled in public or private school in accordance with Nevada law; (v) unpaid time off to vote in accordance with Nevada

law; and (vi) unpaid military leave in accordance with the 1994 Uniformed Services Employment and Reemployment Act and the Veterans' Reemployment Act of 1940.

75.     The Debtors' Leave policies also include family medical leave ("FML") in accordance with state and federal laws.  The Debtors generally grant twelve (12) weeks of FML to eligible Employees, which FML may be paid, unpaid or a combination of both.  To be eligible for FML, an Employee must have been employed by the Debtors for at least twelve (12) months, have worked at least 1,250 hours during the twelve (12) month period immediately before the date when FML would begin and work in an office or worksite where fifty (50) or more Employees are employed within seventy-five (75) miles of that worksite.  An eligible Employee is entitled to take FML for one of the following reasons during a rolling year: (i) incapacity due to pregnancy, prenatal medical care or child birth; (ii) to care for the Employee's child after birth, or placement for adoption or foster care; (iii) to care for a spouse, child or parent with a serious health condition; or (iv) a serious health condition of the Employee.

### *Workers' Compensation*

76.     Under the laws of Nevada, the Debtors are required to maintain workers' compensation policies and programs to provide their Employees with compensation for injuries arising from or related to their employment with the Debtors (the "Workers' Compensation Programs").  The Debtors maintain their coverage through the National Union Fire Insurance Company of Pittsburgh, PA.  The Debtors pay approximately $1,354,047 in premiums on an annual basis on account of such coverage, and are currently fully up to date on all premiums due as of the Petition Date under the Workers' Compensation Programs.

77.     As of the Petition Date, there were approximately twenty-two (22) workers' compensation claims (the "Workers' Compensation Claims") open against the Debtors arising out of alleged injuries incurred by Employees during the course of their employment with

the Debtors, which the Debtors expect to continue to resolve in the ordinary course of business. The Debtors expect to continue to resolve any Workers' Compensation Claims in the ordinary course of business in accordance with applicable Nevada state law.

### *Savings and Employee Benefit Plans*

78.      The Debtors have established a 401(k) retirement savings plan (the "401(k) Plan") to provide employees the potential for future financial security for retirement. Employees are automatically enrolled at the 6% level into the 401(k) Plan the beginning of the pay period following sixty (60) days of employment. The Debtors also contribute a matching amount of 100% up to 6% of Employee contributions. All of the approximately 255 Employees currently participate in the 401(k) Plan, and they contributed approximately $1,359,494 of their own funds into the 401(k) Plan during 2012. Matching contributions made on behalf of Employees during 2012 to these 401(k) Plan were approximately $903,985.

79.      In addition to the 401(k) Plan, prior to the Petition Date, Rodeo provided the Rodeo Creek Gold Inc. Retirement Plan (the "Rodeo Creek Retirement Plan"). The Debtors provided all contributions for amounts needed to provide benefits to eligible Employees under the Rodeo Creek Retirement Plan. The plan has been frozen and the Debtors are terminating the Rodeo Creek Retirement Plan. The Debtors estimate the Rodeo Creek Retirement Plan is currently underfunded as of the Petition Date in the amount of approximately $1,500,000.

### *Other Benefits Plans and Programs*

80.      The Debtors have an Employee Recruitment Bonus Policy that provides remuneration to Employees who recommend prospective employees to the Debtors' Human Resources Department who are subsequently hired and retained for a period of at least one year. Under the Employee Recruitment Bonus Policy, an Employee receives $1,500 for the successful hiring of an experienced underground miner that they recommend and/or are responsible for

coming to work at the Hollister Trial-Mine.  The Debtors estimate that, as of the Petition Date, the aggregate amount of unpaid bonuses pursuant to the Employee Recruitment Bonus Policy was *de minimis* (the "Unpaid Recruitment Bonuses"), and in any event, less than $10,000.

81.    The Debtors provide a Salary Retention Bonus Policy and an Hourly Retention Bonus Policy, the purpose of which is to attract and retain valuable experienced professionals that will allow the Debtors' Nevada Operations to operate in a sustainable manner. Under the Salary Retention Bonus Policy, which applies only to Salaried Employees, an Employee receives an annual retention bonus of 10% of the Employee's base salary.  To qualify for such retention bonus, the Employee must be a current Employee and be employed for one continuous year from the effective date (June 1, 2012).  Upon information and belief, no payments under the Salary Retention Bonus Policy are made to "insiders" as that term is defined in section 101(31) of the Bankruptcy Code.  The Hourly Retention Bonus Policy provides for year-one and year-two bonuses ranging from $3,000 to $6,500, depending on Employee classification.  To qualify for the year-one bonus, an Employee must be a current Employee employed for one continuous year from the June 1, 2012 effective date.

82.    The Debtors also maintain a performance bonus program (the "Performance Bonus Program") in which Salaried Employees are allowed to participate.  In total, approximately fifty (50) Employees participate in the Performance Program.  Calculation of the bonus under the Performance Bonus Program (such bonus, the "Performance Bonus") is based 80% on the performance of the Hollister Trial-Mine and 20% on the eligible Employee meeting specific goals determined at the outset of the year.  The 80% portion is calculated based on a number of performance factors such as gold sales, gold prices, profits, Employee safety, and waste reduction.  The Performance Bonus is paid quarterly, with the Performance Bonus set to be paid at the end of March 2013.  The Debtors estimate that, as of the Petition Date, the

aggregate amount of unpaid bonuses pursuant to the Salary Retention Bonus Policy, the Hourly Retention Bonus Policy, and the Performance Bonus Program is approximately $300,000.

**Deductions and Withholdings**

83.     During each applicable pay period, the Debtors routinely deduct certain amounts from their Employees' paychecks, including: (a) garnishments, child support, and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to various Employee Benefits (as described more fully in the Employee Wages/Benefits Motion, and including, among other things, medical, dental and vision benefits, insurance premiums, and 401(k) contributions and loans) (collectively, the "Deductions"). The Debtors then forward the Deductions to various third-party recipients. Due to the Debtors' commencement of these Chapter 11 Cases, Deductions from Employees' earnings may not have been forwarded to the appropriate third-party recipients prior to the Petition Date.

84.     The Debtors estimate that there are no amounts in Deductions that were taken prior to the Petition Date that have not yet been forwarded to the appropriate third parties.

85.     Further, the Debtors are required by law to withhold from each Employee's wages amounts related to, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Witholdings"), for later remittance to the appropriate federal, state, or local taxing authorities. The Debtors must then match with their own funds amounts for Social Security and Medicare taxes and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (together with the Withholdings, the "Debtors' Payroll Taxes").

86.     The Debtors' Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time the Employees' payroll checks are disbursed.

31

**Third Party Compensation**

87.     The Debtors estimate that the aggregate amount of expenses incident to, among other things, the Employee Compensation, Employee Benefits and Deductions and Withholdings, including other processing costs or administration costs ("Prepetition Administration Costs") accrued but unpaid as of the Petition Date constitutes a *de minimis* amount.  The Debtors believe that payment of the Prepetition Administration Costs is justified because the failure to pay any such amounts might disrupt third party providers' services with respect to the Employee Compensation, Employee Benefits and Deduction and Withholdings.

**Basis for Relief**

88.     The Debtors believe that any delay in paying any of the Employee-related wages, deductions, reimbursements and benefits described in the Employee Wages/Benefits Motion (collectively, the "Employee Obligations") could severely disrupt the Debtors' relationship with their Employees and dedicated non-Employee personnel and irreparably impair the Employees' morale at the very time that their dedication, confidence, and cooperation are most critical.  Moreover, the Debtors face the risk that their operations may be severely impaired if the Debtors are not immediately granted authority to pay their Employees.  I believe that at this critical stage, the Debtors simply cannot risk the substantial disruption of their business operations that would attend any decline in workforce morale attributable to the Debtors' failure to pay the Employee Obligations in the ordinary course of their businesses.

89.     I believe that if the relief requested in the Employee Wages/Benefits Motion is not granted, the Employees would suffer hardship and, in many instances, financial difficulties, since the monies provided by the Employee Compensation and Employee Benefits are needed to enable them to meet their personal obligations.  In addition, without the requested relief, I believe that the Debtors' stability would be undermined by the potential threat that

otherwise loyal Employees at all levels would seek other employment.

90.     The Debtors believe that the relief requested in the Employee Wages/Benefits Motion is necessary for the Debtors' to operate at the Hollister Trial-Mine in compliance with all applicable federal and state regulations and laws.  In a worst-case scenario, the Debtors could face a mass departure of Employees, which would essentially cripple the Debtors' Nevada Operations.  For example, if the Debtors are unable to meet the Employee Obligations described in the Employee Wages/Benefits Motion and the Employees decided to quit en masse, the Debtors believe that they would be unable to hire knowledgeable, skilled, replacement workers in a timely manner.  If the Debtors are required to operate with a depleted workforce, or an unskilled replacement workforce, they believe that the health and safety of all Employees will be jeopardized and their ability to operate at their mines will be compromised. This would be especially detrimental at a time when the Debtors are seeking to maintain, and maximize, asset value for their estates through a sale of the Nevada Operations.  Additionally, the Debtors believe that this situation could cause the Debtors' estates to incur penalties for failing to comply with applicable law, harm which would substantially outweigh the cost of the relief sought in the Employee Wages/Benefits Motion.

91.     Finally, the Debtors believe that it is necessary to continue payment of administrative fees to the various vendors that administer the Debtors' various benefit plans. Without the continued services of these administrators the Debtors will be unable to continue to honor their Employee Obligations and related Employee Benefits in an efficient and cost-effective manner.

92.     Payment of Employee Obligations as requested in the Employee Wages/Benefits Motion and in accordance with the Debtors' prepetition business practices is in the best interest of the Debtors' estates, their creditors, and all other parties in interest, and will

33

enable the Debtors to continue to operate their businesses in an economic and efficient manner, and without disruption. Moreover, the amounts sought to be paid in the Employee Wages/Benefits Motion are relatively modest compared with the importance of the Employees in the operation of the Debtors' Nevada Operations.

93.     For the foregoing reasons, the Debtors have determined that the relief sought through the Employee Wages/Benefits Motion is in the best interest of the Debtors and their estates.

**d.      Motion for the Entry of Interim and Final Orders Pursuant To Sections 105(a) and 366 of the Bankruptcy Code (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Services, (II) Determining Utility Providers Are Adequately Assured of Future Performance, and (III) Approving Proposed Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion")**

94.     In connection with the Debtors' Nevada Operations, the Debtors incur utility expenses in the ordinary course of business for, among other things, electricity, local and long-distance telecom service, data service, waste disposal, and other similar services (the "Utility Services"). The Utility Services subject to this motion are provided by approximately six (6) utility providers (each, a "Utility Provider" and collectively, the "Utility Providers"), with which one or more of the Debtors may have multiple utility accounts. A non-exhaustive list of the Utility Providers is attached to the Utilities Motion as Exhibit A. On a monthly basis, the Debtors spend approximately $102,100 for the various Utility Services.

95.     Uninterrupted Utility Services are essential to the Debtors' Nevada Operations and the success of the Debtors' reorganization efforts. A disruption of the Utility Services at any of the Debtors' facilities would likely be costly to the Debtors and harmful to their businesses, as the Debtors would be forced from the outset of these Chapter 11 Cases to focus on finding replacement Utility Providers and services, and addressing the complications from such disruptions, rather than focusing on the operation and restructuring of their businesses.

34

1    Such disruptions would be detrimental to the Debtors' estates, creditors, and employees.  It is

2    therefore critical that all Utility Services to the Debtors continue uninterrupted.

3              96.    The Debtors intend to pay all postpetition obligations to the Utility

4    Providers in a timely manner, consistent with the ordinary course of operating their businesses

5
     postpetition.  The Debtors also propose to deposit a sum equal to 50% of the Debtors' estimated
6
     average monthly cost of Utility Services, as such monthly cost is reduced by the average monthly
7
8    costs payable to Utility Providers for which security deposits were posted prepetition (the

9    "Adequate Assurance Deposit") into an interest-bearing, newly created, segregated account (the

10   "Adequate Assurance Account") within twenty (20) days of the Petition Date, pending further

11   order of this Court.  Because the Debtors' approximate monthly spending on Utility Services is

12
     $102,100, the Adequate Assurance Deposit will be approximately $51,050.
13
              97.    The Debtors propose to maintain the Adequate Assurance Account with a
14
15   minimum balance equal to the amount of the Adequate Assurance Deposit, which may be

16   adjusted by the Debtors to account for: (i) the termination of Utility Services by the Debtors

17   regardless of any Additional Assurance Requests (as defined in the Utilities Motion), (ii)

18   agreements with Utility Providers, and (iii) to remove from the monthly spending figure

19
     (discussed above) any amount spent on Utility Services from Utility Providers that already hold
20
     deposits from the Debtors for such Utility Services.
21
22            98.    The Debtors submit that the Adequate Assurance Deposit, taken together

23   with the facts and circumstances of these Chapter 11 Cases (together, the "Proposed Adequate

24   Assurance"), constitutes more than sufficient adequate assurance to the Utility Providers.  These

25   protections ensure that all Utility Providers will have adequate assurance of payment throughout

26   these Chapter 11 Cases, and the Debtors believe that no other or further assurance is necessary.

27            99.    Because the Proposed Adequate Assurance provides more than sufficient

28

adequate assurance to the Utility Providers, and for the reasons discussed elsewhere in the

Utilities Motion, the Debtors believe that the relief requested in the Utilities Motion should be

granted.

  e. **Motion for the Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Pay Certain Necessary Prepetition Amounts Owing With Respect to (A) Shippers and Lien Claimants, (B) Insurance Programs, (C) Taxes, and (D) Essential Vendors and (II) Authorizing and Directing Financial Institutions to Receive, Process, Honor and Pay All Checks Issued and Electronic Payment Requests Made Relating to the Foregoing at the Debtors' Direction (the "Necessary Payments Motion")**

  100. The importance to the Debtors of meeting their obligations with respect to

their suppliers of essential services and goods is difficult to overstate. The Debtors believe that

the failure to meet these obligations would have a material adverse impact on the day-to-day

operations of the Debtors' businesses and would severely undermine their ability to accomplish a

successful reorganization.

      **Shippers and Lien Claimants**

  101. The Debtors's Nevada Operations utilize a tremendous amount of heavy

machinery and transportation services, including the transportation of ore from the HDB to the

Esmeralda Mill. The Debtors rely heavily upon reputable third-party common carriers and

truckers (each a "Shipper" and collectively, "Shippers") to directly and indirectly transport,

store, and deliver materials to and from the Debtors' Nevada Operations.

  102. Additionally, in connection with the Debtors' Nevada Operations, the

Debtors routinely transact business with a number of third-parties (each a "Lien Claimant" and

collectively, the "Lien Claimants") that, under applicable state law, have the potential to assert

liens against the Debtors and their property or other assets if the Debtors fail to pay for services

or goods rendered prior to the Petition Date. The Lien Claimants perform certain highly

specialized services for the Debtors, including (i) exploratory and extractive drilling, (ii)

refining, (iii) custom industrial fabrication, (iv) construction, electrical and plumbing upgrades, and (v) essential vehicle and equipment repairs at the Hollister Trial-Mine.

103.    I believe that in order to maintain a reliable, efficient, and smooth transportation system, and to induce Shippers to continue meeting the Debtors' unique transportation needs, it is imperative that certain of the prepetition amounts owing to Shippers be paid. Similarly, in order to prevent the assertion of statutory liens on the Debtors' assets, certain Lien Claimants should be paid. Accordingly, the Debtors seek authority to immediately pay those Shippers who, in the Debtors' business judgment, could exercise rights under applicable state law that would unduly disrupt the Debtors' Nevada Operations. Similarly, the Debtors seek authority to pay, on a case-by-case basis and in their discretion, prepetition amounts that are due to Lien Claimants, to the extent that such amounts could give rise to a statutory lien against the Debtors' property, equipment, or other assets. The Debtors have determined that payment of prepetition amounts owing to Lien Claimants is absolutely necessary.

**Insurance Programs**

104.    In connection with the day-to-day operations of their businesses, the Debtors maintain and finance certain insurance programs through several different carriers (each an "Insurance Provider" and collectively, the "Insurance Providers"), including Workers' Compensation Programs, directors' and officers' liability (the "D & O Program"), and various other liability, vehicle, stop-loss, and property insurance programs (collectively, the "Liability Programs" and, together with the Workers' Compensation Programs and the D & O Program, the "Insurance Programs"). The Insurance Programs include coverage for, among other things, liabilities and losses related to Workers' Compensation Claims, breach of officers' and directors' duties, personal injury, operation of vehicles, and various other property-related liabilities. In the ordinary course of the Debtors' business operations, the Debtors finance the premiums on certain

policies (collectively, the "Financed Policies") pursuant to a premium finance agreement (the "Premium Finance Agreement") with CAFO, Inc. ("CAFO"). Rodeo executed a Premium Finance Agreement on behalf of the Debtors with CAFO for their Financed Policies effective on October 1, 2012, a copy of which is attached to the Necessary Payments Motion as Exhibit A. Under the Premium Finance Agreement, Rodeo Creek paid $291,764.00 in upfront insurance premiums and fees to the Insurance Providers for each of the underlying Financed Policies. The Debtors will pay nine (9) monthly installments of $186,006.83 at an annual interest rate of 2.99% to CAFO as provided in the Premium Finance Agreement.

105.    The Debtors believe that maintaining the Insurance Programs and paying the Premium Finance Agreement on an ongoing and uninterrupted basis is crucial to the continued operation of the Debtors' businesses and their efforts to reorganize. The insurance coverage provided under the Insurance Programs is essential for preserving the value of the Debtors' assets and, in many cases, such coverage is required by various regulations, laws and contracts that govern the Debtors' Nevada Operations.

**Taxes**

106.    In the ordinary course of business, the Debtors incur certain sales, use, real and personal property, franchise, and other taxes and governmental charges, including permitting and licensing fees (collectively, the "Taxes") that are payable directly to various federal, state, and local taxing authorities (collectively, the "Taxing Authorities"). Many of the Debtors' obligations to the Taxing Authorities are paid periodically and in arrears. As a result, there is frequently a lag between the date on which the Debtors incur an obligation to pay Taxes and the date on which such Taxes actually become due and payable. Various Taxing Authorities may therefore hold claims against the Debtors for Taxes that have accrued but remain unpaid as of the Petition Date, and for other Taxes that will come due during the pendency of these cases but

relate to the prepetition period.  Avoiding tax liens and penalties is essential for preserving the Debtors' businesses, property, and assets, and, in many cases, such coverage is required by various regulations, laws, and contracts that govern the Debtors' business, and by the Debtors' applicable credit agreements with their prepetition and postpetition lenders.  The Debtors have concluded that payments of amounts owing to Taxing Authorities is crucial to the viability of the Debtors' operations and restructuring goals.

**Essential Vendors**

107.    Certain vendors (the "Essential Vendors") may have claims against the Debtors for providing (i) essential goods to the Debtors that were received by the Debtors before the Petition Date and/or (ii) essential services that were rendered to, or on behalf of, the Debtors before the Petition Date.  The Debtors believe that payment of amounts owing to Essential Vendors is vital to the Debtors' reorganization efforts because the Essential Vendors are one of either a very limited source or sole source suppliers from which the Debtors can procure certain goods and services within a time frame and at a price that will permit the Debtors to continue their operations.  Importantly, the Debtors *do not* seek to pay all prepetition amounts owed to critical venders.  The operational circumstances of the Hollister Trial-Mine require specialized service providers, complex machinery and related maintenance, and limited-source raw and industrial materials.  A failure to pay amounts owing to Essential Vendors would likely result in many of the Essential Vendors refusing to provide such goods and services to the Debtors postpetition, and may force the Debtors to obtain such goods and services elsewhere at a higher price or not of the quantity or quality required by the Debtors.  Moreover, I am informed that if certain of the Essential Vendors' prepetition claims are not satisfied under this motion, they would be able to demand administrative payment under section 503(b)(9) of the Bankruptcy Code.  If such claims, then, are not paid, there would be no benefit to the estate, as the Essential

1    Vendors would simply assert administrative claims. Not allowing the payment of such Essential

2    Vendors under this Motion simply increases the expense to the Debtors and limits payout to the

3    Debtors' creditors. The Debtors have thus concluded that payment of some amounts owing to

4    Essential Vendors is crucial to the viability of the Debtors' operations and restructuring goals.

5
            108.    For these reasons, and for the reasons discussed in the Necessary
6
     Payments Motion, the Debtors believe that the relief requested in the Necessary Payments
7
8    Motion should be granted.

9        f.    **Motion for: (I) an Order (A) Scheduling a Hearing to Consider the Proposed
               Sale of the Debtors' Assets and Approving the Form and Manner of Notice
10             Thereof, (B) Establishing Bidding Procedures Relating to the Sale and the
               Assumption and Assignment of Certain Executory Contracts and Unexpired
11             Leases, Including Notice of Proposed Cure Amounts, and (C) Granting
               Certain Related Relief; and (II) an Order (A) Approving the Sale, (B)
12             Authorizing the Sale, Assumption and Assignment of Certain Executory
               Contracts and Unexpired Leases, and (C) Granting Certain Related Relief (the
13             "Sale Motion")**

14

15           109.    I believe that launching the pre-marketing process, and continuing the sale

16   process as proposed in the Sale Motion was, and is, an exercise of the management's sound

17   business judgment. An expeditious sale of the Acquired Assets is an exercise of the Debtors' sound

18   business judgment. Indeed, the Debtors' main motivation in these Chapter 11 Cases is to receive the

19   greatest potential value for the Nevada Operations; the sale process and attendant Bidding Procedures

20   are designed specifically to achieve that goal. In light of the Debtors' ongoing liquidity concerns, the

21   inability to invest sufficient capital in the Hollister Trial-Mine and the need to insure continuity of

22   employment for the Debtors' Employees, it is critical that the Debtors pursue the sale of the Nevada

23   Operations expeditiously in order to preserve the going concern value of their business. While the

24   Debtors believe that the Nevada Operations can ultimately be profitable, the Debtors simply are not

25   in a position to realize additional value from their operations without a capital investment, which I

26   understand is unavailable to them. To avoid incurring substantial additional indebtedness (and

27   thereby further depleting value available for creditor recoveries), the Debtors have determined, in
28

their business judgment, that in order to achieve the best outcome for their creditors they must implement a fast and orderly sale process. Based on my discussions with the Debtors' legal advisors, I understand that the failure to expeditiously sell the Debtors' assets as a going concern will result in a default of the Debtors' debtor-in-possession financing facility and may ultimately lead to a termination of the Debtors' operations. This would be detrimental to the interests of all the Debtors' creditors.

110.    For these reasons, the reasons set forth elsewhere in the Sale Motion and in the Stewart Sale Procedures Declaration, I believe that selling the Nevada Operations (and specifically, the Acquired Assets) is a sound exercise of the Debtors' business judgment. Accordingly, I believe that the Sale Motion should be approved.

[Signature page to follow]

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3        Dated: February 25, 2013

4

5

6        RAYMOND E. DOMBROWSKI JR.
         Chief Executive Officer
7        Rodeo Creek Gold Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26    *SIGNATURE PAGE TO DECLARATION OF RAYMOND E. DOMBROWSKI, JR. IN*
      *SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS*
27

28