1

2

3
Honorable Mike K. Nakagawa
United States Bankruptcy Judge

4

**Entered on Docket**
5 **April 08, 2013**

Jessica C.K. Boelter (IL SBN 6277801)         Christopher D. Jaime (NV SBN 4640)

6 Thomas A. Labuda, Jr. (IL SBN 6225401)         Donald A. Lattin (NV SBN 693)
SIDLEY AUSTIN LLP                              MAUPIN, COX & LEGOY, P.C.
One South Dearborn Street                      4785 Caughlin Parkway
7 Chicago, Illinois 60603                        Reno, Nevada 89519
Telephone: (312) 853-7000                      Telephone: (775) 827-2000
8 Facsimile: (312) 853-7036                      Facsimile: (775) 827-2185
cjaime@mclrenolaw.com
9                                                dlattin@mclrenolaw.com

10
Reorganization Counsel for                     Local Reorganization Counsel for
Debtors and Debtors in Possession              Debtors and Debtors in Possession
11

12              **UNITED STATES BANKRUPTCY COURT**
                        **DISTRICT OF NEVADA**
13

14    In re:

15    RODEO CREEK GOLD INC.                         Chapter 11

16    ☐ Affects this Debtor                          Case No. BK-13-50301 (MKN)
      ☒ Affects all Debtors                          Joint Administration Requested
17    ☐ Affects Antler Peak Gold Inc.
18    ☐ Affects Hollister Venture Corporation        **FINAL ORDER PURSUANT TO**
      ☐ Affects Touchstone Resources Company         **11 U.S.C. §§ 105, 361, 362, 363, 364**
                                                     **AND 552 AND FED. R. BANKR.**
19                                                   **P. RULE 4001(b) AND (c) (I)**
                                                     **AUTHORIZING DEBTORS TO**
20                                                   **(A) OBTAIN POSTPETITION**
                                                     **FINANCING; AND (B) USE CASH**
21                                                   **COLLATERAL; (II) GRANTING**
                                                     **LIENS, INCLUDING PRIMING**
22                                                   **LIENS, AND SUPERPRIORITY**
                                                     **CLAIMS, (III) GRANTING**
23                                                   **ADEQUATE PROTECTION,**
                                                     **AND (IV) GRANTING RELATED**
24                                                   **RELIEF**
25

26                                                   Date:    April 5, 2013
                                                     Time:    10:00 a.m.
27                                                   Place:   300 Las Vegas Blvd. So.
                                                              Las Vegas, NV 89101
28

Upon consideration of the motion (the "Motion")[1], dated February 25, 2013, of the debtors and debtors-in-possession (the "Debtors") in the above-captioned cases (the "Chapter 11 Cases") pursuant to sections 105, 361, 362, 363, 364 and 552 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Rules for the United States Bankruptcy Court for the District of Nevada (the "Court"), seeking, among other things:

(i) authorization for Rodeo Creek Gold Inc. ("Rodeo") and Antler Peak Gold Inc. ("Antler," and together with Rodeo, the "DIP Borrowers") to incur, and for Hollister Venture Corp. ("HVC") and Touchstone Resources Company ("TRC," and, together with HVC, the "DIP Guarantors," and together with the DIP Borrowers, the "Debtors") to guarantee, financing (the "DIP Loans") under a postpetition term credit facility (the "Priority Term Facility") on the terms and conditions set forth in (A) this Order (the "Final Order"); (B) the Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement (substantially in the form annexed hereto as Exhibit A and, as it may be amended, supplemented or otherwise modified from time to time, the "DIP Agreement" among the DIP Borrowers, the DIP Guarantors, the lending institutions party thereto (the "DIP Lenders"), and Credit Suisse AG, as administrative agent and collateral agent (in such capacities, the "DIP Agent"); and (C) all other agreements, documents and instruments executed and delivered in connection therewith (as each may be amended, supplemented or otherwise modified from time to time, the "DIP Documents");

(ii) authorization for the DIP Borrowers to incur, and the DIP Guarantors to guarantee the DIP Loans under the DIP Documents in the aggregate principal amount of up to $9 million outstanding at any time (including the $3.6 million made available under this

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion or the DIP Agreement, as applicable.

2

Court's order dated February 27, 2013 (the "Interim Order")) on the terms and conditions set forth in this Final Order and the DIP Documents;

(iii)    authorization for each Debtor to grant to the DIP Agent and the DIP Lenders, as security for the prompt payment and performance of any and all obligations at any time outstanding under the DIP Documents (the "DIP Obligations"), effective upon the date of entry of the Interim Order, certain security interests and liens (the "DIP Liens") on their respective assets, subject and subordinate only to the Carve-Out (as defined in paragraph 7(b) below;

(iv)    authorization for each Debtor to grant to the DIP Agent and the DIP Lenders allowed administrative expense claims on account of the DIP Obligations (the "Superpriority Claims") with priority over any and all administrative expenses, adequate protection claims and all other claims against any of the Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 364(c)(1), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment, subject solely to the Carve-Out and the GUC Trust Fund (as defined in paragraph 29(a) below);

(v)    authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(vi)    authorization for the Debtors to use Cash Collateral (as defined in paragraph 17 below), subject to and in accordance with the Approved Budget (as defined in paragraph 5 below), pursuant to section 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined in paragraph 4(B)(c) below), and, in connection therewith, to provide adequate protection to (a) the lenders under that certain Credit Agreement (as amended, supplemented or otherwise modified from time to time, the "Existing Hollister Credit

Facility" and, together with all related documents, the "Existing Hollister Documents"), dated as of February 23, 2011, among, among others, Credit Suisse AG, as administrative agent and collateral agent (in such capacities, the "Existing Hollister Agent"), the DIP Borrowers, and the lenders party thereto (the "Existing Hollister Lenders"); and (b) the lenders under that certain Debtor-In-Possession Loan Facility Agreement (as amended, supplemented or otherwise modified form time to time, the "Canadian DIP Credit Facility" and, together will all related documents, the "Canadian DIP Documents," and together with the Existing Hollister Documents, the "Existing Loan Documents"), dated as of October 3, 2012, among, among others, Great Basin Gold Ltd. ("GBGL"), as borrower, Credit Suisse AG, as facility agent and security agent (in such capacities, the "Canadian DIP Agent"), and Credit Suisse AG and Standard Chartered Bank, as lenders (the "Canadian DIP Lenders," and together with the Existing Hollister Lenders, the "Existing Lenders");

(vii)    authorization for the DIP Agent and the DIP Lenders to exercise remedies under the DIP Documents upon the occurrence and during the continuance of an Event of Default (as defined in the DIP Agreement) as provided in this Final Order and the DIP Documents;

(viii)    authorization for the Debtors to waive their right to seek to surcharge the DIP Collateral (as defined below) or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code as provided in this Final Order and the DIP Documents; and

(ix)    modification of the automatic stay to the extent set forth herein.

The Court having considered the Motion, the Declaration of Raymond E. Dombrowski, Jr. in Support of the Debtors' Chapter 11 Petitions and First Day Motions and the exhibits attached thereto [ECF No. 4], the Declaration of Michael Stewart in Support of the Debtor-in-Possession Financing Motion attached to the Motion; and the Interim Order authorizing the relief requested in the Motion on an interim basis having been entered by this Court on February 27, 2013; and upon the record made by the Debtors at the hearing held on April 5, 2013 (the "Final Hearing"); and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS HEREBY FOUND, DETERMINED, ORDERED AND ADJUDGED**, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Notice of the Motion, the relief requested therein and the Final Hearing was served by the Debtors on (i) their twenty largest unsecured creditors (on a consolidated basis); (ii) counsel for the Existing Hollister Agent, (iii) counsel for the Canadian DIP Agent; (iv) the Office of the United States Trustee for the District of Nevada (the "U.S. Trustee"); (v) the Securities and Exchange Commission; (vi) the Internal Revenue Service; (vii) all relevant taxing and environmental authorities; (viii) any lessor of real property to the Debtors; (ix) counsel for KPMG Inc., in its capacity as the monitor (the "Monitor") appointed by the Supreme Court of British Columbia in an insolvency proceeding (the "Canadian Proceeding"), commenced under Canada's *Companies Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended, concerning GBGL (the "Canadian Debtor"); and (x) all parties holding security interests in any of the Debtors' assets.  On March 8, 2013, the U.S. Trustee appointed the Official Committee of Unsecured Creditors in the Chapter 11 Cases (the "Committee").  Counsel for the Committee and counsel for the Monitor have each been provided with a form of this Final Order.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Final Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), and Local Rule 4001(e) and no further notice of the relief sought at the Interim Hearing is necessary or required.

3.      *Approval of Motion*.  The relief requested in the Motion is granted on an final basis as described herein.  Except as otherwise expressly provided in this Final Order, any objection to the entry of this Final Order that has not been withdrawn, waived, resolved or settled is hereby denied and overruled on the merits.

4.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but subject to the limitations contained in paragraph 24), the Debtors admit, stipulate, acknowledge and agree that:

(A)      Existing Hollister Obligations.  (a) As of the Petition Date, the Debtors were truly and justly indebted to the Existing Hollister Lenders under the Existing Hollister Documents, without defense, counterclaim or offset of any kind, in the aggregate amount of not less than $49,414,337.90, consisting of (i) term loans in the aggregate outstanding principal amount of $45,987,157.53; (ii) hedging obligations in the aggregate amount of $3,427,180.37, (iii) accrued and unpaid interest on the foregoing, including, but not limited to, interest accrued as of the Petition Date at the Default Rate (as defined in the Existing Hollister Credit Facility); and (iv) cash management obligations, fees and expenses (including fees and expenses of attorneys and advisors), in each case, as provided in the Existing Hollister Documents (all of the foregoing, the "Existing Hollister Obligations");

(b) (i) the Existing Hollister Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors; (ii) no portion of the Existing Hollister Obligations is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (iii) the Debtors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or setoff rights whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Existing Hollister Agent and any of the Existing Hollister Lenders, and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case in connection with any matter related to the Existing Hollister Obligations, the Existing Hollister

Documents, the transactions contemplated thereby, or the Prepetition Hollister Collateral (as defined below) and the Existing Hollister Agent's liens, claims or security interests therein; and

(c) the liens and security interests granted by the Debtors to the Existing Hollister Agent (for the ratable benefit of the Existing Hollister Lenders) to secure the Existing Hollister Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the Existing Hollister Credit Facility) liens on and security interests in the Debtors' personal and real property, and all proceeds thereof constituting "Collateral" under, and as defined in, the Existing Hollister Credit Facility (the "Prepetition Hollister Collateral"); (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law; and (iii) subject and subordinate only to (A) after giving effect to this Final Order, the DIP Liens, the Carve-Out, and the Existing Hollister Adequate Protection Obligations (as defined in paragraph 18 below), and (B) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) permitted under the Existing Hollister Documents to the extent such permitted liens are senior to the liens securing the Existing Hollister Obligations.

(B)    Canadian DIP Obligations.  (a) As of the Petition Date, the Debtors were truly and justly indebted to the Canadian DIP Lenders under the Canadian DIP Documents, without defense, counterclaim or offset of any kind, in the approximate aggregate principal amount of not less than $34,987,093, plus accrued and unpaid interest thereon and fees and expenses (including fees and expenses of attorneys and advisors), and other amounts constituting "Obligations" under, and as defined in, the Canadian DIP Documents (collectively, the "Canadian DIP Obligations");

(b) the Canadian DIP Obligations (i) constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of the Debtors; (ii) no portion of the Canadian DIP Obligations is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) the Debtors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or setoff rights whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the

Canadian DIP Agent and any of the Canadian DIP Lenders, and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors, in each case in connection with any matter related to the Canadian DIP Obligations, the Canadian DIP Documents, the transactions contemplated thereby, or the Prepetition Canadian DIP Collateral (as defined below) and the Canadian DIP Agent's liens, claims or security interests therein;

(c) the liens and security interests granted by the Debtors to the Canadian DIP Agent (for the ratable benefit of the Canadian DIP Lenders) to secure the Canadian DIP Obligations are (i) valid, binding, perfected, enforceable second priority (subject to permitted exceptions under the Canadian DIP Documents) liens on and security interests in the Debtors' personal and real property constituting "Collateral" under, and as defined in, the Canadian DIP Documents (the "Canadian DIP Collateral" and, together with the Prepetition Hollister Collateral, the "Prepetition Collateral"); (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (iii) subject and subordinate only to (x) the liens securing the Existing Hollister Obligations, (y) after giving effect to this Final Order, the DIP Liens, the Carve-Out and the GUC Trust Fund, the Existing Hollister Adequate Protection Liens (as defined in paragraph 18(a) below), and the Canadian DIP Adequate Protection Liens (as defined in paragraph 20 below); and (z) other valid and unavoidable liens perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code) permitted under the Canadian DIP Documents to the extent such permitted liens are senior to the liens securing the Canadian DIP Obligations.

(C)    Intercreditor Agreement.  In connection with the execution and delivery of the Canadian DIP Documents and the Existing Hollister Documents, the DIP Borrowers, the Canadian DIP Agent, and the Existing Hollister Agent, among other parties, entered into that certain Second Amended and Restated Intercreditor Agreement, dated as of November 27, 2012 (as amended, supplemented or otherwise modified from time to time, the "Intercreditor Agreement"), which sets forth the relative lien and claim priorities and other rights and remedies of the Existing Lenders with respect to, among other things, the Prepetition Collateral.

5. *Findings Regarding the DIP Loans*.

(a)    Good cause has been shown for the entry of this Final Order.

(b)    The Debtors do not have sufficient available sources of working capital to operate their business in the ordinary course without the use of the Prepetition Collateral, including Cash Collateral, and the financing requested by the Motion.  The Debtors have a need to obtain the DIP Loans and to use the Prepetition Collateral, including Cash Collateral, in order to, among other things, be able to continue their business operations, preserve their going-concern value, make payroll, pay trade and other ordinary course creditors, and satisfy their other working capital and general corporate needs (including the costs of administration of the Chapter 11 Cases).

(c)    Given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or secured financing from sources other than the DIP Lenders or on terms more favorable than those set forth in the DIP Documents.  Specifically, the DIP Borrowers are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code and, thus, must grant priming liens under section 364(d)(1) of the Bankruptcy Code and the Superpriority Claims on the terms and conditions set forth in this Final Order and the DIP Documents.

(d)    The terms of the DIP Loans and the use of the Prepetition Collateral (including Cash Collateral) pursuant to this Final Order and the DIP Documents are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)    The DIP Documents and the use of the Prepetition Collateral (including Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's-length among the Debtors, the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Canadian DIP Agent, and the Existing Lenders; the DIP Loans have been extended by the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and the DIP Agent and the DIP Lenders

are entitled to the full protection of sections 363(m) and 364(e) of the Bankruptcy Code in the event that this Final Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)     The incurrence of the DIP Loans and the use of the Prepetition Collateral (including Cash Collateral) in accordance with the Final Order and the DIP Documents are, therefore, necessary in order to permit the orderly continuation of the Debtors' business operations, minimize the disruption of their business operations, and preserve and maximize the value of the Debtors' estates in order to maximize the recovery by their creditors.

(g)     The Debtors have prepared and delivered to the DIP Agent and the Committee a 13-week cash flow, a copy of which was attached as Exhibit B to the Interim Order (as updated from time to time in accordance with the provisions of the DIP Agreement, the "Approved Budget").  Under currently known circumstances, the Debtors anticipate that the Approved Budget will be adequate to pay all administrative expenses due and payable during the period covered by the Approved Budget (but is without prejudice to amounts covered by the Carve-Out and other unpaid post-petition administrative expenses that may accrue during such period).

6.     *Authorization of the DIP Loans and the DIP Documents.*

(a)     The Debtors are hereby authorized to enter into and perform under the DIP Documents and to borrow (or guarantee, as applicable) up to an aggregate principal amount of $9.0 million (including the $3.6 million made available under the Interim Order), in such amounts as may be made available to the Debtors by the DIP Lenders in accordance with all of the lending formulae, sublimits, terms and conditions set forth in this Final Order, the DIP Agreement and the other DIP Documents, for working capital and other general corporate purposes in accordance with the Approved Budget, including without limitation, to pay interest, fees and expenses (including the reasonable fees and expenses of the DIP Agent's counsel and financial advisor) in connection with the DIP Loans.

(b)     In furtherance of the foregoing and without further approval of this Court, the Debtors are authorized to perform all acts and to execute and deliver all instruments and

documents that the DIP Agent determines to be reasonably required or necessary for the Debtors'

performance of their respective obligations under the DIP Documents, including without

limitation: (i) the execution, delivery and performance of the DIP Documents; (ii) the execution,

delivery and performance of one or more amendments, waivers, consents or other modifications

to and under any of the DIP Documents, in each case in accordance with the terms of the

applicable DIP Documents and in such form that is not material[2]; and (iii) the non-refundable

payment to the DIP Agent and any of the DIP Lenders, as the case may be, of any upfront and

commitment fees set forth in the DIP Documents.

   (c) Upon the execution thereof, the DIP Documents shall constitute valid and

binding obligations of the Debtors, enforceable against the Debtors in accordance with the terms

of this Final Order and the DIP Documents.  No obligation, payment, transfer or grant of security

by the Debtors under the DIP Documents, the Interim Order, or this Final Order shall be

voidable, avoidable or recoverable under the Bankruptcy Code or any applicable nonbankruptcy

law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under

any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or

similar statute or common law), or subject to any defense, reduction, setoff, recoupment or

counterclaim.

   7. *Superpriority Claims*.

   (a) Pursuant to section 364(c)(1) of the Bankruptcy Code, and subject solely

to the Carve-Out and the GUC Trust Fund, all of the DIP Obligations shall constitute the

Superpriority Claims against each Debtor, provided that such Superpriority Claims shall not be

---

[2] For purposes hereof, a "material" amendment, waiver, consent or modification shall mean any amendment that operates to increase the interest rate payable on or the maximum permitted outstanding principal amount of the DIP Loans, shortens the maturity of the DIP Loans, adds new "Events of Default" under the DIP Documents or otherwise modifies any terms and conditions of any DIP Documents in a manner materially adverse to the Debtors or the DIP Lenders.  A copy of any amendment, waiver, consent or other modification of the DIP Documents shall be filed by the Debtors with this Court and served on the U.S. Trustee and counsel to the Committee and shall not go into effect for a period of three (3) business days thereafter; *provided* that any material amendment, waiver, consent or modification to the DIP Documents shall not be effective unless the Court has approved such amendment, waiver, consent or modification after appropriate notice to parties in interest and a hearing.

payable from the proceeds of Avoidance Actions (as defined below) except as otherwise set forth in paragraph 29(f) below;

(b)     The "Carve-Out" shall mean the sum of (i) accrued but unpaid professional fees, costs, expenses and disbursements (the "Professional Fees") incurred by the Debtors and the Committee at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice (as defined below), whether allowed by this Court prior to or after such delivery; (ii) the Professional Fees accrued after delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed by the Court and not exceeding an aggregate amount of $50,000, of which the Professional Fees of the Committee shall not exceed $20,000; and (iii) the U.S. Trustee's fees, pursuant to 28 U.S.C. § 1930; *provided, however*, that nothing herein shall be construed to impair the ability of any party to object to any Professional Fees incurred at any time in the Chapter 11 Cases.  The "Carve-Out Trigger Notice" shall mean a written notice of the occurrence of an Event of Default under the DIP Agreement delivered by the DIP Agent to the Debtors and their counsel, the U.S. Trustee, counsel to the Existing Lenders, and counsel to the Committee.

8.     *DIP Liens*.  As security for the prompt payment and performance of any and all DIP Obligations, effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, intellectual property filings, notations on certificates of title, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the DIP Agent, for itself and for the ratable benefit of the DIP Lenders, is granted the following DIP Liens on all property of the Debtors identified in clauses (a), (b) and (c) below (collectively, the "DIP Collateral"), subject and subordinate only to the Carve-Out and the GUC Trust Fund:

(a)     First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to either (i) valid,

perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date, or (ii) a valid lien perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (collectively, the "Unencumbered Property"); *provided* that the Unencumbered Property shall not include (a) the Debtors' claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (the "Avoidance Actions") or the proceeds thereof (except as otherwise set forth in paragraph 29 below);

(b)     Liens Junior to Certain Existing Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in, all tangible and intangible property of the Debtors, whether existing on or as of the Petition Date or thereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, other than the property described in paragraph 8(c) below (as to which the DIP Liens shall have the priority described in such paragraph) (collectively, the "Non-Primed Liens").

(c)     Liens Priming Existing Hollister Lenders' and Canadian DIP Lenders' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral, which shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of (i) the Existing Hollister Agent and the Existing Hollister Lenders (including, without limitation, the Existing Hollister Lenders' Adequate Protection Liens); and (ii) the Canadian DIP Agent and the Canadian DIP Lenders (including, without limitation, the Canadian DIP Lenders' Adequate Protection Liens (collectively, the "Priming Liens").

9.     *Relief from the Automatic Stay*.  The automatic stay in effect pursuant to section 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated, to the extent necessary, without further notice, application or order of the Court to the extent necessary to permit the DIP Agent and the

DIP Lenders to perform any act authorized or permitted under or by virtue of this Final Order or the DIP Documents, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Final Order and pursuant to the terms of the DIP Documents; (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the DIP Collateral; and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the DIP Obligations, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Documents, and apply such payments to the DIP Obligations pursuant to the DIP Documents and this Final Order.

10.    *Remedies After Event of Default*.  Without limiting the effect of paragraph 9 of this Final Order, the automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (a) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the DIP Documents, including, without limitation, accelerating the DIP Obligations and declaring all DIP Obligations immediately due and payable, and ceasing to extend DIP Loans, other than those rights and remedies against the DIP Collateral as provided in clause (b) below; and (b) upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtors (with a copy to counsel to the Debtors, the U.S. Trustee, counsel to the Committee, counsel to the Existing Lenders, and counsel to the Monitor), all rights and remedies against the DIP Collateral provided for in the DIP Documents and this Final Order (including, without limitation, the right to set off monies of any of the Debtors' in accounts maintained with the DIP Agent or any DIP Lender). In the event the Debtors contest the declaration of an Event of Default, they shall have the right to seek an order shortening time for a hearing before this Court. During such five-day period, the Debtors shall be stayed from any further use of the DIP Lenders' or the Existing Lenders' cash collateral, other than to meet payroll obligations and pay expenses critical to the preservation of the Debtors' assets in accordance with the Approved Budget, as agreed by the DIP Agent, in its sole discretion after consultation with the Monitor.

11.    *No Marshaling*.  Subject to the limitations set forth in paragraph 29(c)

below as to the Canadian DIP Obligations, in no event shall the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral; *provided, however*, that to the extent there is included in this Court's Order (the "Sale Order") authorizing the sale of substantially all of the Debtors' assets (the "Hollister Sale") a provision applying any such doctrine to any of the foregoing entities, such doctrine shall apply to the extent provided to such entity, the DIP Collateral, and this Order.  The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Final Order shall not constitute a waiver of the DIP Agent's or any DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Agreement.

12.    *Limitation on Charging Expenses Against Collateral*.  Except to the extent of the Carve-Out and subject to the funding requirements under paragraphs 28 and 29 below, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation or other proceeding under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Canadian DIP Agent, or the Existing Lenders, as applicable, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Canadian DIP Agent, or the Existing Lenders.

13.    *Limitations under Section 552(b) of the Bankruptcy Code*.  The Existing Lenders, the Existing Hollister Agent, and the Canadian DIP Agent, shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of them with respect to (i) any proceeds, products, offspring or profits of any of the Prepetition Collateral or (ii) the extension of the Adequate Protection Liens to the proceeds of the Prepetition Collateral.

14.    *Collateral Rights.*  Until all of the DIP Obligations and the Adequate

15

Protection Obligations (as defined below) shall have been indefeasibly paid and satisfied in full (i) no other party, including, without limitation, the Existing Hollister Agent, any Existing Hollister Lender, the Canadian DIP Agent, or any Canadian DIP Lender shall foreclose or otherwise seek to enforce any junior lien on any DIP Collateral or any Prepetition Collateral; and (ii) upon and after the occurrence of an Event of Default, and subject to the DIP Collateral Agent obtaining relief from the automatic stay as provided for herein, in connection with a liquidation of any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of the Debtors, to use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of the Debtors, which are owned by or subject to a lien of any third party and which are used by the Debtors in their business.  The DIP Agent shall be responsible for the payment of any applicable fees, royalties or other amounts due such lessor or licensor for the period of time that the DIP Agent actually uses such intellectual property or assets (but in no event for any accrued and unpaid fees, royalties or other amounts due for any period prior to the date that DIP Agent actually uses such intellectual property or assets).

15.    *Payments Free and Clear.*  Any and all payments or proceeds remitted to the DIP Agent, on behalf of the DIP Lenders, or to the Existing Hollister Agent and Canadian DIP Agent, on behalf of the applicable Existing Lenders, respectively, pursuant to the provisions of this Final Order or any subsequent order of this Court shall, subject to the Carve-Out, be received free and clear of any claim, interest, charge, assessment or other liability.

16.    *Intercreditor Agreement.*  Nothing in this Interim Order shall amend or otherwise modify or interpret the terms or enforceability of the Intercreditor Agreement, including without limitation, the turnover provisions contained therein, and the Intercreditor Agreement shall remain in full force and effect.  The rights, benefits and privileges of the Existing Lenders hereunder shall at all times remain subject to the Intercreditor Agreement.

17.    *Use of Prepetition Collateral.*  Substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any account or accounts with any Existing Hollister Lender or Canadian DIP Lender and any

cash proceeds of any Prepetition Collateral, constitute cash collateral of the Existing Hollister Lenders and, subject to the Intercreditor Agreement, the Canadian DIP Lenders within the meaning of section 363(a) of the Bankruptcy Code ("Cash Collateral"). The Debtors are hereby authorized to use the Prepetition Collateral, including Cash Collateral, during the period from the Petition Date through and including the Termination Date (as defined in the DIP Agreement) for working capital and general corporate purposes in accordance with the terms and conditions of this Final Order and the Approved Budget, *provided* that, (a) the Existing Lenders are granted adequate protection in connection with such use, as hereinafter set forth; and (b) except on the terms of this Final Order and the Approved Budget, the Debtors shall be enjoined and prohibited from using the Prepetition Collateral, including Cash Collateral, at any time.

18. *Adequate Protection for the Existing Hollister Lenders*. Pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, the Existing Hollister Agent and the Existing Hollister Lenders are entitled to adequate protection on account of any diminution in the value of their interests in the Prepetition Collateral, including Cash Collateral, including that resulting from the sale, lease or use by the Debtors of the Prepetition Collateral (including Cash Collateral), the granting of the Priming Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Existing Hollister Adequate Protection Obligations"). As adequate protection, and as security for the payment of the Existing Hollister Adequate Protection Obligations, the Existing Hollister Agent and the Existing Hollister Lenders are hereby granted the following:

(a) Existing Hollister Adequate Protection Liens. Effective and perfected upon the date of the Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, notations on certificates of title, financing statements, intellectual property filings or other agreements, a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Existing Hollister Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, and (iii) the applicable Non-Primed Liens;

(b)     Existing Hollister Section 507(b) Claims.  Superpriority claims under section 507(b) of the Bankruptcy Code (the "Existing Hollister 507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out and (ii) the Superpriority Claims; provided, however, that such Superpriority Claims shall not be payable from the proceeds of Avoidance Actions (except as otherwise set forth in paragraph 29(f) below);

(c)     Interest, Fees and Expenses.  (i) Solely to the extent that the value of the DIP Collateral exceeds the amount necessary to satisfy the DIP Obligations and the outstanding principal balance under the Existing Hollister Facility, accrual, for the benefit of the Existing Hollister Agent and the Existing Hollister Lenders, (A) on the first business day of each calendar month after the entry of the Interim Order, an amount equal to all interest, fees or charges unpaid during the preceding month on the Existing Hollister Obligations at the applicable non-default contract rate set forth in the Existing Hollister Documents; and (B) all reasonable fees and expenses payable to the Existing Hollister Agent and the Existing Hollister Lenders, as applicable, under the Existing Hollister Documents, whether arising prior or subsequent to the Petition Date, including without limitation, the reasonable fees and disbursements of primary counsel, Nevada counsel, and financial advisors to the Existing Hollister Agent and the Existing Hollister Lenders.

(ii)     None of the interest, fees and expense accrued pursuant to this sub-paragraph 18(c) (the "Hollister Adequate Protection Payments") will be paid until consummation of the Hollister Sale and will be paid, at that time, only to the extent of available Hollister Sale Proceeds (as defined below).

(iii)     When and if payable, (i) none of the fees and expenses payable pursuant to clause (i)(B) of this sub-paragraph 18(c) shall be subject to separate approval by this Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto; and (ii) such fees and expenses shall only be paid by the Debtors within ten

(10) business days after receipt of reasonably detailed invoices therefor, copies of which the Debtors shall promptly provide to the U.S. Trustee and counsel to the Committee.  In the event that within ten (10) business days from receipt of such invoices the Debtors or the U.S. Trustee notifies counsel for the Existing Hollister Agent, in writing, of an objection to a particular invoice, and the parties are unable to resolve the dispute regarding the fees, costs or expenses included in such invoices, the Court shall hear and determine such dispute.

   (iv) <u>Information</u>.  Delivery to the Existing Hollister Agent, within five (5) business days of request therefor, of any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders under the DIP Documents, with copies to be provided contemporaneously to the Committee.

   19. *Reservation of Rights of Existing Hollister Lenders*.  Notwithstanding any other provision hereof, the grant of adequate protection to the Existing Hollister Agent and the Existing Hollister Lenders pursuant hereto is without prejudice to the rights of the Existing Hollister Agent and/or the Existing Hollister Lenders to seek modification of the grant of such adequate protection or to seek different or additional adequate protection.

   20. *Adequate Protection for the Canadian DIP Lenders*.  The Canadian DIP Lenders are entitled, pursuant to sections 361, 363(c)(2), 363(e) and 364(d)(1) of the Bankruptcy Code, subject to the Intercreditor Agreement, to adequate protection of their interests in the Prepetition Collateral, including Cash Collateral, in an amount equal to the aggregate diminution in the value of their interests in the Prepetition Collateral, including, without limitation, any such diminution resulting from the sale, lease or use by the Debtors of the Cash Collateral and any other Prepetition Collateral, the imposition of the Priming Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "<u>Canadian DIP Adequate Protection Obligations</u>" and, together with the Existing Hollister Adequate Protection Obligations, the "<u>Adequate Protection Obligations</u>").  As adequate protection and security for the payment of the Canadian DIP Adequate Protection Obligations, Canadian DIP Agent (for itself and for the benefit of the Canadian DIP Lenders) is hereby granted the following:

(a)     Canadian DIP Adequate Protection Liens.  Effective and perfected upon the date of the Interim Order and without the necessity of the execution and/or filing by the Debtors of security agreements, pledge agreements, intellectual property filings, mortgages, financing statements or other agreements), a valid, perfected replacement security interest in and lien on all of the DIP Collateral (the "Canadian DIP Lien Adequate Protection Liens" and, together with the Existing Hollister Adequate Protection Liens, the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Liens, (ii) the Carve-Out, (iii) the Existing Hollister Adequate Protection Liens, (iv) the liens securing the Existing Hollister Obligations, and (v) the Non-Primed Liens;

(b)     Canadian DIP 507(b) Claims.  Superpriority claims under section 507(b) of the Bankruptcy Code (the "Canadian DIP 507(b) Claims" and, together with the Existing Hollister 507(b) Claims, the "507(b) Claims"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve-Out, (ii) the Superpriority Claims and (iii) the Existing Hollister 507(b) Claims; provided, however, that such Superpriority Claims shall not be payable from the proceeds of Avoidance Actions (except as otherwise set forth in paragraph 29(f) below).  Except as expressly set forth herein, the Canadian DIP Agent and the Canadian DIP Lenders shall not receive or retain any payments, property or other amounts in respect of the Canadian DIP 507(b) Claims unless and until all DIP Obligations, the Existing Hollister Adequate Protection Obligations and the Existing Hollister Obligations shall have indefeasibly been paid in full in cash.

(c)     Interest, Fees and Expenses.  Solely to the extent that the value of the DIP Collateral exceeds the amount necessary to satisfy the DIP Obligations, the Existing Hollister Obligations, and the outstanding principal balance under the Canadian DIP Credit Facility, (i) accrual, for the benefit of the Canadian DIP Agent and the Canadian DIP Lenders, (A) on the first business day of each calendar month after the entry of the Interim Order, an amount equal to all interest, fees or charges unpaid during the preceding month on the Canadian DIP Obligations

at the applicable non-default contract rate set forth in the Canadian DIP Documents; and (B) all reasonable fees and expenses payable to the Canadian DIP Agent and the Canadian DIP Lenders, as applicable, under the Canadian DIP Documents, whether arising prior or subsequent to the Petition Date, including without limitation, the reasonable fees and disbursements of primary counsel, Nevada counsel, and financial advisors to the Canadian DIP Agent and the Canadian DIP Lenders.

(ii)    None of the interest, fees and expenses accrued pursuant to this sub-paragraph 20(c) (the "Canadian DIP Adequate Protection Payments") will be paid until consummation of the Hollister Sale and will be paid, at that time, only to the extent of available Hollister Sale Proceeds.

(iii)    When and if payable, (i) none of the fees and expenses payable pursuant to clause (i)(B) of this sub-paragraph 20(c) shall be subject to separate approval by this Court, and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto; and (ii) such fees and expenses shall only be paid by the Debtors within ten (10) business days after receipt of reasonably detailed invoices therefor, copies of which the Debtors shall promptly provide to the U.S. Trustee and counsel to the Committee.  In the event that within ten (10) business days from receipt of such invoices the Debtors or the U.S. Trustee notifies counsel for the Canadian DIP Agent, in writing, of an objection to a particular invoice, and the parties are unable to resolve the dispute regarding the fees, costs or expenses included in such invoices, the Court shall hear and determine such dispute.

(iii)    If any Canadian DIP Lender receives any Canadian DIP Adequate Protection Payments before all Existing Hollister Obligations have been paid in full in cash, then such Canadian DIP Lender shall pay over to the Existing Hollister Agent (for the ratable benefit of the Existing Hollister Lenders) an amount equal to the lesser of (x) the Canadian DIP Adequate Protection Payments received by such Canadian DIP Lender; and (y) the amount of the shortfall in the payment in full of the Existing Hollister Obligations;

(iv)    Information.  Delivery to the Canadian DIP Agent of any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent

or the DIP Lenders under the DIP Agreement, with copies to be provided contemporaneously to the Committee.

21.     *Reservation of Rights of Canadian DIP Lenders*.  Notwithstanding any other provision hereof, the grant of adequate protection to the Canadian DIP Agent and the Canadian DIP Lenders pursuant hereto is without prejudice to the rights of the Canadian DIP Agent and/or the Canadian DIP Lenders to seek modification of the grant of such adequate protection or to seek different or additional adequate protection.

22.     *Perfection of DIP Liens and Adequate Protection Liens*.

(a)     The DIP Agent, the Existing Hollister Agent, and the Canadian DIP Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over any of their respective collateral, or take any other action to validate and perfect the DIP Liens and the Adequate Protection Liens, as applicable (each, a "Perfection Act"), and the Debtors are authorized and directed to perform any acts requested or required by the DIP Agent, the Existing Hollister Agent and/or the Canadian DIP Agent to give effect to any such Perfection Act, and each Perfection Act shall be deemed to have been accomplished as of the date and time of entry of the Interim Order notwithstanding the date and time actually accomplished.  Any and all applicable filing or recording offices are authorized and directed to accept, file and/or record any document effectuating any Perfection Act.  Whether or not any of the DIP Agent, the Existing Hollister Agent, or the Canadian DIP Agent, in their respective sole discretion, chooses to perform any Perfection Act, the DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, nonavoidable and not subject to challenge, dispute or subordination as of the date of entry of the Interim Order.  Should the DIP Agent, the Existing Hollister Agent, or the Canadian DIP Agent attempt to perform any Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the DIP Liens and the Adequate Protection Liens, as applicable.

(b)      A certified copy of the Interim Order or this Final Order may, in the discretion of the DIP Agent, the Existing Hollister Agent, and the Canadian DIP Agent, as the case may be, be filed with or recorded in the appropriate filing or recording offices in addition to or in lieu of the financing statements, mortgages, intellectual property filings, notices of lien or similar instruments, and all such filing or recording offices are hereby authorized and directed to accept certified copies of the Interim Order or this Final Order for filing and/or recording.

(c)      The Debtors shall execute and deliver to the DIP Agent, the Existing Hollister Agent, or the Canadian DIP Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agent, the Existing Hollister Agent, or the Canadian DIP Agent, as the case may be, may reasonably request to evidence, confirm, validate or perfect the DIP Liens and the Adequate Protection Liens, with copies to be provided to counsel for the Committee.

(d)      Any provision of any lease, license, contract or other agreement that requires (i) the consent or approval of one or more party thereto or (ii) the payment of any fees or obligations to any governmental entity, in each case, in order for the Debtors to pledge, grant, sell, assign, or otherwise transfer any interest thereunder, or the proceeds thereof, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code, and any such provision shall have no force and effect with respect to the granting of the DIP Liens or the Adequate Protection Liens under this Interim Order.

23.      *Preservation of Rights Granted Under the Order.*  (a) No claim or lien having a priority senior to or *pari passu* with those granted by the Interim Order or the Final Order to the DIP Agent, the Existing Hollister Agent, or, subject to the terms of the Intercreditor Agreement, the Canadian DIP Agent shall be granted or allowed while any portion of the DIP Obligations, the Adequate Protection Obligations, the Existing Hollister Obligations or the Canadian DIP Obligations remain outstanding, and the DIP Liens, the Adequate Protection Liens and the Existing Hollister Agent's and the Canadian DIP Agent's liens on the Prepetition Collateral shall not be, except as set forth in the Intercreditor Agreement, subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the

Bankruptcy Code or otherwise.

(b)     Unless all DIP Obligations shall have been indefeasibly paid in full in cash in accordance with the terms of the DIP Documents, in the case of clause (i) below, the Debtors shall not seek, and in the case of clauses (i) and (ii) below, it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use Cash Collateral if the Debtors seek, or if this Court orders, (i) any modification of this Final Order without the prior written consent of the DIP Agent (and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent); or (ii) conversion or dismissal of any of the Chapter 11 Cases.

(c)     If any or all of the provisions of this Final Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the effective date of such reversal, stay, modification or vacatur; or (ii) the validity, priority or enforceability of the DIP Liens or the Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any use of the Cash Collateral, and any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors prior to the effective date of such reversal, stay, modification or vacatur shall, to the extent provided in section 364(e) of the Bankruptcy Code, be governed in all respects by the original provisions of this Final Order, and the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders shall be entitled to all of the rights, remedies, privileges and benefits granted by section 364(e) of the Bankruptcy Code, this Interim Order and the DIP Documents.

(d)     Except as expressly provided in this Final Order or in the DIP Documents, the DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims and all other rights and remedies of the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Canadian DIP Agent, and the Existing Lenders granted by this Final Order and the DIP Documents shall survive, and shall not be modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code or

dismissing any of the Chapter 11 Cases; or (ii) the entry of an order confirming a plan of reorganization in any of the Chapter 11 Cases, it being understood that, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors shall be deemed to have waived any discharge as to any unpaid DIP Obligations or Adequate Protection Obligations.  The terms and provisions of this Final Order and the DIP Documents shall be binding in the Chapter 11 Cases, shall continue in any successor cases and in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP Liens, the Adequate Protection Liens, the DIP Obligations, the Adequate Protection Obligations, the Superpriority Claims, the Section 507(b) Claims, and all other rights and remedies of the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders granted by this Final Order and the DIP Documents shall continue in full force and effect until, as applicable, all DIP Obligations are indefeasibly paid in full in cash, and all Adequate Protection Obligations are indefeasibly paid in full in cash or otherwise satisfied (or deemed to have been so paid or satisfied).

24.    *Effect of Stipulations on Third Parties*.  Each of the stipulations and admissions contained in this Final Order, including without limitation, in paragraph 4 hereof, shall be binding upon the Debtors and any successors thereto (including, without limitation, any estate representative or a chapter 7 or chapter 11 trustee appointed or elected for the Debtors, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), as well as the Committee, under all circumstances.  The Debtors and the Committee hereby irrevocably waive and relinquish any and all right to initiate or prosecute an adversary proceeding or a contested matter (i) challenging the validity, enforceability, priority or extent of the Existing Hollister Obligations or the liens on the Prepetition Collateral securing the Existing Hollister Obligations, or the Canadian DIP Obligations or the liens on the Prepetition Collateral securing the Canadian DIP Obligations; or (ii) asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, or defenses in existence as of the Petition Date (collectively, the "Claims

and Defenses") against the Existing Hollister Agent, any of the Existing Hollister Lenders, the Canadian DIP Agent, or any of the Canadian DIP Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, acting in such capacity, in connection with any matter related to the Existing Hollister Obligations, the Canadian DIP Obligations or the Prepetition Collateral.  In light of such waiver and relinquishment by the Debtors and the Committee, and the passage of the deadline specified in the Interim DIP Order to assert Claims and Defenses, (i) the Existing Hollister Obligations and the Canadian DIP Obligations are deemed to constitute allowed claims, not subject to counterclaim, setoff, subordination (except as set forth in the Intercreditor Agreement), recharacterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case, and to the extent repaid shall be deemed to have been indefeasibly repaid; (ii) the liens on the Prepetition Collateral securing the Existing Hollister Obligations and the Canadian DIP Obligations are deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraphs 18 and 20, as applicable, not subject to defense, counterclaim, recharacterization, subordination (except as provided in the Intercreditor Agreement) or avoidance; (iii) the Existing Hollister Obligations, the Canadian DIP Obligations and the liens on the Prepetition Collateral granted to secure the Existing Hollister Obligations and the Canadian DIP Obligations are not subject to any other or further challenge by any party in interest (including the Committee); and (iv) all parties shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any Debtor).

          25.    *Limitation on Use*.  The Debtors shall use the DIP Loans, the DIP Collateral and the Prepetition Collateral (including Cash Collateral) solely as provided in this Final Order and the DIP Documents, including the Approved Budget as modified by the Permitted Variance (as defined in the DIP Credit Agreement).  Notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Loans, DIP Collateral, Prepetition Collateral (including Cash Collateral) or the Carve-Out may be used to (a) object, contest or raise

any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Existing Hollister Documents, the Canadian DIP Documents or the liens or claims granted under the Interim Order, the Final Order, the DIP Documents, the Existing Hollister Documents, or the Canadian DIP Documents; (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, the Canadian DIP Lenders or the Monitor, or any of their affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors; (c) prevent, hinder or otherwise delay the DIP Agent's, the DIP Lenders', the Existing Hollister Agent's, the Existing Hollister Lenders', the Canadian DIP Agent's, or the Canadian DIP Lenders' assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral, as applicable, in accordance with the DIP Documents, the Existing Hollister Documents, the Canadian DIP Documents, as applicable, or this Final Order; (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, the Canadian DIP Lenders, or the Monitor hereunder or under the DIP Documents, the Existing Hollister Documents, or the Canadian DIP Documents, as applicable; in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent; or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents, including the Approved Budget.  Under no circumstances shall any fees or expenses incurred in violation of any of the provisions of this paragraph 25 constitute allowed administrative expense claims in any of the Chapter 11 Cases, and non-payment of such fees and expenses shall not constitute grounds for denying confirmation of any plan of reorganization or liquidation proposed by the Debtors.  For the avoidance of doubt, nothing in this Final Order vests or confers on any entity, including the Committee, standing or authority to pursue any Claims and Defenses belonging to the Debtors or their estates with respect to the Existing Hollister Documents, the Existing Hollister Obligations, the Canadian DIP Documents, or the Canadian DIP Obligations.

26.    *Access to Collateral*.  Notwithstanding anything contained herein to the

contrary and without limiting any other rights or remedies of the DIP Agent contained in this Final Order or the DIP Documents, or otherwise available at law or in equity, and subject to the terms of the DIP Documents, the DIP Agent may, on the same terms and conditions set forth in any agreement between the relevant landlord and the Existing Hollister Agent at any time delivered in connection with the Existing Hollister Credit Agreement or any predecessor agreement (whether related to the same leased premises or another leased premises), enter upon any leased premises of the Debtors for the purpose of exercising any remedy with respect to the DIP Collateral located thereon and shall be entitled to all of the applicable Debtor's rights and privileges as lessee under such lease without interference from the landlords thereunder. Nothing herein shall require the DIP Agent to assume any lease as a condition to the rights afforded to the DIP Agent in this paragraph.

27.    *Insurance*.  To the extent the Existing Hollister Agent is listed as a loss payee under any of the Debtors' insurance policies, the DIP Agent shall also be deemed to be a loss payee under each such insurance policy and shall act in that capacity and, subject to the terms of the DIP Documents, distribute any proceeds recovered or received in respect of any such insurance policy (other than insurance proceeds with respect to the casualty at any given leased premises, which shall be paid to the landlord of such leased premises to the extent the applicable policy so provides), in the same order of priority as set forth in paragraph 28 below with respect to the Hollister Sale Proceeds (as defined therein).

28.    *Hollister Sale*.  (a)  Sale Process.  The auction and sale process for the Hollister Sale shall be in form and substance satisfactory to the DIP Agent, the Existing Hollister Agent, the Canadian DIP Agent, and the Committee, and shall be conducted in consultation with the legal advisors to certain beneficial holders of the 8% convertible debentures issued by GBGL (the "Bondholders") and the Monitor, and otherwise as contemplated by the Bidding Procedures approved by this Court on February 28, 2013 (the "Bidding Procedures").

(b)    Credit Bid Right.  Subject to Paragraph 28(d) below, each of the DIP Lenders and the Existing Hollister Lenders, or any designee or assignee of either of them, shall have the right, as contemplated by section 363(k) of the Bankruptcy Code and acting through the

DIP Agent and the Existing Hollister Agent, respectively, to "credit bid" (a "Credit Bid"), in full or in part, the amount of their respective secured claims at the Hollister Sale or any other sale of the Debtors' assets occurring pursuant to section 363 of the Bankruptcy Code or included as part of any plan of reorganization or liquidation proposed in any of the Chapter 11 Cases.

(c)     Third-Party Sale.  If the purchaser of the Debtors' assets is not the DIP Agent or the Existing Hollister Agent (or a designee or assignee of either of them), the consideration provided by such purchaser (the "Hollister Sale Proceeds") shall – following Court approval of, and immediately upon, closing of the Hollister Sale – be distributed in the following order of priority: (i) as required to fund (A) any amounts payable pursuant to the Carve-Out, (B) any accrued and unpaid administrative expenses other than those included in the Carve-Out and the Committee Settlement Funding Obligations (as defined below), and (C) any completion fee owed under the Engagement Letter (the "CIBC Engagement Letter") between CIBC World Markets Inc. and the Debtors approved by the Court on March 28, 2013 (collectively, the "Chapter 11 Expenses"); (ii) as required to fund the Committee Settlement Funding Obligations; and (iii) to the following identified parties: (A) the DIP Agent to pay in full the DIP Obligations; (B) the Existing Hollister Agent to pay in full the Hollister Adequate Protection Obligations; (C) the Existing Hollister Agent to pay in full the Existing Hollister Obligations; (D) the Canadian DIP Agent to pay in full the Canadian DIP Adequate Protection Payments; (E) the Canadian DIP Agent to pay in full the obligations (the "Hollister Intra-Group Loan Obligations") under that certain Intra-Group Loan Agreement, dated as of October 3, 2012, between the DIP Borrowers and GBGL (as amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "Hollister Intra-Group Loan Facility"); and (F) GBGL to pay in full the obligations under the promissory note, dated as of January 23, 2013, issued by Rodeo (the "Rodeo Note") in favor of GBG Rusaf Gold Ltd. in the amount of $8,833,324.50 (all of the foregoing, the "Existing Obligations");

(d)     Credit Bid Sale.  In the event that the Existing Hollister Lenders and/or the DIP Lender (or a designee or assignee of either of the foregoing) make(s) a Credit Bid that is determined to be the highest and best offer for the assets that are the subject of the Hollister Sale,

in addition to the other obligations that must be satisfied under the Bidding Procedures and this Final Order, such Credit Bid must provide for the payment of cash sufficient to fund (i) the Chapter 11 Expenses; and (ii) the Committee Settlement Funding Obligations.

(e)     Reservation of Rights.  Notwithstanding anything to the contrary in this Final Order, nothing herein shall impair the rights, if any, of the Bondholders or the Royalty Claimants (as defined below) with respect to the Hollister Sale, including with respect to the distribution of the Hollister Sale Proceeds, other than with respect to the satisfaction of the Chapter 11 Expenses as set forth in this Final Order or the terms of the settlement with the Committee set forth in paragraph 29 hereof (other than with respect to the modified marshaling provision set forth in paragraph 29(c)).

29.     *Resolution of Committee Objections*.  In order to resolve objections to this Final Order raised by the Committee, the DIP Agent (or its designee) shall provide for the satisfaction of the following monetary (the "Committee Settlement Funding Obligations") and non-monetary obligations (the "Other Committee Settlement Obligations," and together with the Settlement Funding Obligations, the "Committee Settlement Obligations"):

(a)     GUC Trust Fund Contribution.  Immediately upon closing of the Hollister Sale, $1,000,000 (the "GUC Trust Fund Contribution") shall be irrevocably deposited into a separate trust account designated by the Committee (the "GUC Trust Fund"), either out of the Hollister Sale Proceeds or the separate resources of the DIP Lenders or the Existing Hollister Lenders, as applicable, for the exclusive payment of allowed nonpriority unsecured claims other than Deficiency Claims (as defined below) (the "GUC Claims") and funding of the Liquidation Trust (as defined below).  Upon deposit into the GUC Trust Fund, the GUC Trust Fund Contribution shall be deemed to constitute a further carve out of the DIP Collateral.  The GUC Trust Fund Contribution shall be increased by the additional irrevocable cash deposit, either out of the Hollister Sale Proceeds or the separate resources of the DIP Lenders or the Existing Hollister Lenders, as applicable, of (i) 2.5% of the amount of any Hollister Sale Proceeds in

excess of $54 million[3] but less than $70 million; (ii) 5% of the amount of any Hollister Sale Proceeds in excess of $70 million; and (iii) the amount of any Essential Vendor Adjustment (as defined below); *provided that*, for the avoidance of doubt, the GUC Trust Fund Contribution shall not exceed the aggregate amount of allowed unsecured claims against the Debtors;

(b)      Essential Vendor Adjustment.  To the extent that the Debtors utilize less than the $5 million allocated in the Approved Budget to make payments to essential trade vendors, shippers and parties with alleged liens on the Debtors' assets (other than claims of royalty interests, which interests shall continue to attach to the applicable mining interests to be sold as part of the Hollister Sale) (collectively, the "Essential Vendors"), the GUC Trust Fund shall be increased by such amount as is necessary to maintain the same distribution on account of the GUC Claims (presumed to be 10% based solely upon the GUC Trust Fund Contribution, or such proportionately higher percentage as required to reflect Hollister Sale Proceeds in excess of $54 million, in accordance with the formula set forth in paragraph 29(a) above) as would have been made had the full $5 million allocated in the Approved Budget been used to satisfy the claims of the Essential Vendors, *provided, however*, that to the extent that the pool of GUC Claims is reduced because an Essential Vendor provides a full release and waiver of any or all of its GUC Claims against the Debtors in exchange for receipt of an Essential Vendor payment by the Debtors in an amount less than the aggregate amount of its GUC Claims (the "Released Prepetition Claim"), then the amount of the Released Prepetition Claim shall be added to aggregate total of funds deemed paid to Essential Vendors by the Debtors and deducted from the GUC Claims pool for purposes of the foregoing calculation;

(c)      Modified Marshalling Provision.  To the extent the Hollister Sale Proceeds exceed $70 million, then all amounts otherwise payable on account of the Canadian DIP Facility shall be held in a segregated escrow account (the "Escrowed Funds") for a period of five (5) months following the closing date of the Hollister Sale (the "Escrow Period").  To the extent that

---

[3]      To the extent the consideration provided by a purchaser (including by means of a Credit Bid) at the Hollister Sale includes a non-cash component, such component shall be valued, for purposes of this provision, as provided for in the CIBC Engagement Letter.

the Canadian DIP Facility is not repaid from other sources (including payment from the obligors under that that certain Revised Facility Agreement dated as December 5, 2011 among, among others, GBGL, as borrower, and Credit Suisse AG and Standard Chartered Bank) at the end of the Escrow Period, then the Escrowed Funds shall be released to the Debtors and applied to repay the outstanding obligations under the Canadian DIP Facility;

(d)       Payment of Priority Tax Claims and 503(b)(9) Claims.  Upon the effective date of the Plan (defined below) and in accordance with the terms thereof, or pursuant to an alternative mechanism as discussed in paragraph 29(e) below, the DIP Lenders or the Existing Hollister Lenders (or their respective designees or assignees), as applicable, shall (i) pay, either out of the Hollister Sale Proceeds or other resources, all allowed claims arising under section 503(b)(9) of the Bankruptcy Code (the "503(b)(9) Claims"), subject to an aggregate cap of $800,000 (the "503(b)(9) Amount Cap"); and (ii) provide for the satisfaction in the manner permitted under section 1129(a)(9)(C) of the Bankruptcy Code of all allowed unsecured claims of governmental units entitled to priority under section 507(a)(8) of the Bankruptcy Code (the "Allowed Priority Tax Claims"), subject to an aggregate cap agreed upon between the Committee and the DIP Agent (the "Priority Tax Claim Cap").  For avoidance of doubt, the source of the DIP Lenders' obligation to pay the 503(b)(9) Amount and the Priority Tax Claims shall be sources other than the GUC Trust Fund Contribution;

(e)       Proposal of Liquidating Plan.  The Debtors, after consultation with the Monitor, shall file a chapter 11 plan in form and substance satisfactory to the DIP Agent and the Committee (the "Plan") and related disclosure statement, each consistent with the terms of this Final Order, on or before April 22, 2013, and seek confirmation of the Plan on an expedited basis.  To the extent that (i) the amount of the Section 503(b)(9) Claims is greater than $800,000; or (ii) the aggregate amount of the Priority Tax Claims is greater than the Priority Tax Cap, the Debtors, the Committee, and the DIP Agent shall explore, in consultation with the Monitor, alternative structures for confirming the Plan or concluding the Chapter 11 Cases through alternative means, *provided, however*, that (a) neither the DIP Agent nor the DIP Lenders shall assert any right to payment of any Superpriority or Adequate Protection Claims out of the GUC

Trust Fund or the GUC Trust Fund Contribution as a condition to confirmation of the Plan; and (b) for the avoidance of doubt, regardless of any alternate plan or other resolution of these Chapter 11 cases, nothing herein shall impair or otherwise affect the Carve-Out or the satisfaction of the Chapter 11 Expenses and Wind Down Costs as otherwise provided in this Final Order.  The Plan shall contain customary plan releases for the Debtors, the Committee, the DIP Agent, the Existing Hollister Agent, the Canadian DIP Agent, and the Existing Lenders, and their respective officers, directors, agents, advisors and professionals;

(f)     Liquidation Trust.  The Plan shall provide for (i) the establishment of a liquidating trust (the "Liquidation Trust") in order to, *inter alia*, administer the Avoidance Actions; and (ii) the appointment of a liquidating trustee, who will be selected exclusively by the Committee.  The Plan shall also provide that (i) eighty percent (80%) of the proceeds received from the prosecution of the Avoidance Actions, after deducting all costs related to the prosecution of such actions (the "Net Avoidance Action Proceeds"), shall be applied to satisfy GUC Claims; and (ii) twenty percent (20%) of the Net Avoidance Action Proceeds (the "Lenders' Avoidance Action Proceeds") shall be applied to satisfy the Deficiency Claims (as defined below); *provided, however*, that after the Deficiency Claims are satisfied in full, the Net Avoidance Action Proceeds shall be allocated as provided in the Plan;

(g)     Waiver of Lenders' Deficiency Claims.  All deficiency claims relating to the Existing Obligations, except for (a) intercompany debt other than that created by advances under the Canadian DIP Credit Facility, and (b) obligations under the Rodeo Note, (collectively, the "Deficiency Claims") shall be waived by the Hollister Agent, the DIP Agent, and the Canadian DIP Agent, respectively, *provided, however*, that to the extent that any Deficiency Claims exist as of the effective date of the Plan, then such waiver shall not apply to (i) the Lenders' Avoidance Action Proceeds, which shall be distributed to the Existing Lenders under the Plan; and (ii) the net proceeds of any claims against the Debtors' current and former directors and officers (the "D&O Claims").  The DIP Agent and the Committee shall seek to agree prior to confirmation of the Plan as to (i) whether the D&O Claims will be prosecuted, (ii) how such prosecution, if undertaken, is to be funded; and (iii) how the proceeds of such claims will be

33

allocated.  For purposes of clarification, Deficiency Claims shall include any Superpriority or Adequate Protection Claims that have not been paid out of the proceeds of the DIP Collateral (which, for avoidance of doubt, does not include the GUC Trust Fund or the Avoidance Actions);

(h)    Wind-Down Costs.  The reasonable costs and expenses required to confirm the Plan and conclude the Chapter 11 Cases incurred after the later of May 31, 2013 and the closing of the Hollister Sale (the "Wind-Down Costs") shall be borne and paid by the DIP Lenders pursuant to a budget to be agreed upon prior to the Hollister Sale by the DIP Agent, the Debtors, and the Committee.  Unless otherwise agreed to by the DIP Lenders, the Wind-Down Costs shall be limited to the payment of up to (i) $400,000 for the Debtors' professionals; (ii) $50,000 for the Committee's professionals; and (iii) $50,000 for other fees and expenses; *provided, however*, that if the Plan is not confirmed on or before July 1, 2013, then the Wind-Down Costs shall increase by up to $100,000 for each thirty (30) day-period thereafter required to confirm and consummate the Plan, *provided, further*, that the Wind-Down Costs shall not exceed an aggregate total of $600,000 without the written consent of the DIP Agent, the Existing Hollister Agent, and the Canadian DIP Agent;

(i)    Cap on Committee Professional Fee Claims.  The reasonable fees and expenses of the Committee's professionals incurred prior to May 31, 2013 shall be capped in an aggregate amount of $600,000;

(k)    Preservation of Certain Rights against GBG Rusaf Gold Ltd.  Notwithstanding anything to contrary in this Final Order, the Committee reserves any and all its rights to object to the nature, validity and amount of any unsecured deficiency claim (the "Committee Reservation") asserted by GBC Rusaf Gold Ltd., or any of its successors or assigns, with respect to the Rodeo Note, to the extent that such claim is not satisfied in full from the DIP Collateral.

30.    *Limits on Liability*.

(a)    The DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders, and each of

their respective participants, agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives, successors, and assigns, are forever released and discharged from any claims, rights, demands, damages, actions, causes of action, costs, expenses, whether known or unknown, of or by any entity or person, including the Debtors and their estates and the Committee, and each of their respective agents, officers, directors, affiliates, employees, attorneys, professionals, trustees, representatives (including any Committee), successors and assigns, acting in such capacity, arising or accruing prior to the date hereof and arising from or relating to the Priority Term Facility, the Existing Hollister Facility, and the Canadian DIP Facility, the application of the DIP Collateral to the DIP Obligations or the application of the Prepetition Collateral to the other Existing Obligations, or any claim or assertion of a right, interest or claim in or to the DIP Collateral or the Prepetition Collateral.  Nothing in this Final Order or in any of the DIP Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their affiliates (as defined in the Bankruptcy Code) in the operation of their businesses, or in connection with their restructuring efforts.  None of the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Canadian DIP Agent, and the Existing Lenders shall, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Collateral or Prepetition Collateral, (B) any loss or damage to the foregoing occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency or other person, and all risk of loss, damage or destruction of the DIP Collateral and the Prepetition Collateral shall be borne by the Debtors.

(b)    In determining to make any DIP Loan under the Priority Term Facility, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Final Order or the DIP Documents, the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the

Canadian DIP Lenders, shall not be deemed to be in control of the operations of any of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of any of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq.* as amended, or any similar federal or state statute).

31.    *Master Proof of Claim; Rule 2019.*

(a)    To facilitate the processing of claims, to ease the burden upon this Court and to reduce any unnecessary expense to the Debtors' estates, each of the Existing Hollister Agent and the Canadian DIP Agent is authorized, but not directed, to file a single master proof of claim in the Chapter 11 Cases (each, a "Master Proof of Claim") on behalf of themselves and the Existing Hollister Lenders and the Canadian DIP Lenders, respectively, on account of their claims arising under the Existing Hollister Documents and the Canadian DIP Documents, as applicable, and hereunder.  Neither the Existing Hollister Agent nor the Canadian DIP Agent shall be required to file a verified statement pursuant to Bankruptcy Rule 2019 in the Chapter 11 Cases.

(b)    Subject to the last proviso in this sub-paragraph (b), upon filing of the applicable Master Proof of Claim, the Existing Hollister Agent, the Canadian DIP Agent, and each Existing Hollister Lender and Canadian DIP Lender, shall be deemed to have filed a proof of claim in the amount set forth opposite its name in such Master Proof of Claim arising under the Existing Hollister Documents, the Canadian DIP Documents, or this Final Order, as applicable, and the claims of the Existing Hollister Agent, each Existing Hollister Lender, the Canadian DIP Agent, and each Canadian DIP Lender named in the applicable Master Proof of Claim shall be allowed or disallowed as if each such entity had filed a separate proof of claim in the Chapter 11 Cases; *provided* that each of the Existing Hollister Agent and Canadian DIP Agent may, but shall not be required to, amend its Master Proof of Claim from time to time to, among other things, reflect a change in the identity of the holders of claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from transfer of any such claims.

(c)    The provisions set forth in sub-paragraphs (a) and (b) above are intended solely for the purpose of administrative convenience and, except to the extent set forth herein, neither the provisions of this paragraph nor the filing or content of any Master Proofs of Claim shall affect the substantive rights of the Debtors, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders or any other party in interest or their respective successors in interest, including without limitation, the right of each Existing Hollister Lender and Canadian DIP Lender to vote separately on any plan of reorganization or liquidation proposed in the Chapter 11 Cases

32.    *San Juan Drilling Claims.*  Notwithstanding anything herein to the contrary, to the extent that the mechanics' lien asserted by San Juan Drilling, Inc. ("San Juan") is demonstrated to the Debtors' and the DIP Agent's satisfaction or found by the Court to constitute (a) a Non-Primed Lien, and (b) a "Permitted Lien" under, and as defined in, each of the Existing Hollister Credit Facility and the Canadian DIP Credit Facility, no cash payments shall be made on account of the Existing Obligations hereunder, including, without limitation, pursuant to paragraph 28 hereof, until all of the Debtors' obligations to San Juan secured by such lien have been indefeasibly paid in cash or adequately reserved for, provided that this paragraph 32 shall not in any way limit the obligations of the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders to satisfy the Committee Settlement Obligations.

33.    *Royalty Claimant Claims.*  Each of Franco-Nevada U.S. Corp., Hillcrest Mining Company LLC, Finley River Company LLC, and Hi-Tech Exploration, Ltd. (collectively the "Royalty Claimants") asserts, among other things, that it is entitled to adequate protection, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, on account of any diminution in the value of its interest, if any, in the Prepetition Collateral, including Cash Collateral, resulting from the sale, lease, or use by the Debtors of the Prepetition Collateral (including Cash Collateral), the granting of the Priming Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code.  The Debtors dispute such assertions, but nevertheless agree and it is hereby ordered that:

37

(a)     The Debtors shall produce information reasonably requested by the Royalty Claimants that is necessary to audit required quarterly royalty payments including (i) gross ounces of gold and silver sold; (ii) price received for the gold and silver sold; (iii) percentage mined from the claims to which the Royalty Claimants' royalty rights allegedly pertain; and (iv) all deductions taken from such royalty payments;

(b)     To the extent that a Royalty Claimant files an administrative claim and, in adjudicating that claim, the Court determines that any amounts owed to such Royalty Claimant on account of production occurring post-petition are or to have been such Royalty Claimant's property and not property of the Debtors' bankruptcy estates, such Royalty Claimant's claim for any such amounts shall be part of the Carve-Out and/or shall not be subordinated to the Superpriority Claims pursuant to Section 364(c)(1).  Alternatively, to the extent such amounts are determined to be part of the bankruptcy estate, nothing contained within this Final Order shall foreclose, bar, or prevent such Royalty Claimant from asserting an administrative claim for payment of such post-petition amounts and, if such administrative claim is allowed, the Court from providing for such administrative claim as if it were part of the Carve-Out;

(c)     Notwithstanding any other provision of this Final Order, nothing contained in this Final Order shall foreclose, bar or prevent: (i) a Royalty Claimant from seeking to assert a lien on the Debtors' property; (ii) the Court from adjudicating whether or not such a lien, if asserted by such Royalty Claimant, exists; or (iii) the Court from finding such lien is of a higher priority than the DIP Liens, the Adequate Protection Liens, or any other lien on the Debtors' property, including without limitation, the proceeds of any sale of the Debtors' property; provided, however, that the rights of the Debtors, the DIP Agent, the DIP Lenders, and all other parties-in-interests with respect to such matters are fully reserved.

(d)     Nothing contained within this Final Order shall be construed as a waiver of any Royalty Claimant's right to assert a claim, interest, charge or assessment against any and all payments or proceeds remitted to the DIP Agent, on behalf of the DIP Lenders, or to the Existing Hollister Agent and the Canadian DIP Agent, on behalf of the applicable Existing Lenders, respectively, for any and all amounts due and owing to such Royalty Claimant by the

Debtors.  Nothing herein, moreover, shall foreclose, bar or prevent a Royalty Claimant from asserting any rights or remedies in this case, including without limitation: an administrative claim for post-petition royalty payments owed to such Royalty Claimant by the Debtors; a claim, secured or otherwise, for prepetition royalty payments due and owing to such Royalty Claimant against the Debtors, subsequent purchasers of the Debtors' property, the DIP Lenders, or the Debtors' property; recognition of an equitable lien against certain of the Debtors' property to secure payment of all amounts due and owing to such Royalty Claimant by the Debtors; seeking payment of any and all amounts due and owing to such Royalty Claimant from the proceeds of any sale of the Debtors' property; recognition of such Royalty Claimant's landowner's royalty and right to future royalty payments with respect to any subsequent purchaser of the Debtors' property; as well as any and all other rights and remedies that such Royalty Claimant may be required to assert to protect its interests.  For the avoidance of doubt, the rights of the Debtors, the DIP Agent and DIP Lenders and all other parties-in-interests with respect to such matters are fully reserved.

> 34.    *No Prejudice to the Debtors' Affiliates.* Nothing contained in this Final Order shall be construed as a waiver of any of the Canadian Debtor's or its affiliates' rights to assert claims, interests, charges or assessments against any of the Debtors, for any and all amounts due and owing to the Canadian Debtor or its affiliates by the Debtors.  Nothing herein, moreover, shall foreclose, bar or prevent the Canadian Debtor or its affiliates from asserting any rights or remedies in these or other proceedings, including without limitation: (a) administrative claims; (b) any claim, secured or otherwise, for intercompany amounts due and owing to the Canadian Debtor or its affiliates against the Debtors, subsequent purchasers of the Debtors' property, the DIP Lenders, or the Debtors' property; (c) seeking payment of any and all amounts due and owing by the Debtors to the Canadian Debtor or its affiliates from the proceeds of any sale of the Debtors' property; and (d) any and all other rights and remedies that the Canadian Debtor or its affiliates may assert to protect their interests.  For the avoidance of doubt, the rights of the Debtors, the Committee and all other parties-in-interests with respect to such matters are fully reserved.

35.  *Other.*  Nothing contained in this Final Order shall be construed as a determination by this Court that the Liquidation Trust, the beneficiaries thereof, or the holders of the Deficiency Claims are the only parties that may (a) properly assert a claim or cause of action arising from or related to the operative facts and circumstances giving rise to the Avoidance Actions or the D&O Claims, or (b) collect or enforce, including on, from, or against any applicable insurance policy, a judgment or settlement arising from such facts and circumstances.

36.  *Order Governs.*  In the event of any inconsistency between the provisions of this Final Order, the Interim Order, and the DIP Documents, the provisions of this Final Order shall govern.

37.  *Binding Effect; Successors and Assigns.*  The DIP Documents and the provisions of this Final Order, including all findings herein, shall be binding upon the Monitor and all parties in interest in the Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, the Canadian DIP Lenders, and the Debtors, and the successors and assigns of any of the foregoing (including any chapter 7 or chapter 11 trustee appointed or elected for the Debtors, an examiner with expanded powers appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of the Debtors or with respect to the property of the Debtors' estates) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, the Canadian DIP Lenders, the Monitor and their respective successors and assigns, and the Carve-Out recipients to the extent of the Carve-Out; *provided* that, except to the extent expressly set forth in this Final Order, the DIP Agent, the DIP Lenders, the Existing Hollister Agent, the Existing Hollister Lenders, the Canadian DIP Agent, and the Canadian DIP Lenders shall have no obligation to permit the use of the DIP Loans or the Prepetition Collateral, including Cash Collateral, by, or extend any financing to, any chapter 7 trustee or similar responsible person appointed for the estate of any Debtor.

38.  *Effectiveness.*  This Final Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon entry hereof, and there shall be no

stay of effectiveness of this Final Order.

39.     *Retention of Jurisdiction*.  This Court shall, and hereby does, retain jurisdiction with respect to all matters arising from or related to the implementation and interpretation of this Final Order.

40.     *Sale Milestones*.  Notwithstanding anything to the contrary in the DIP Agreement, the sale milestones set forth on Schedule 5.01(n) to the DIP agreement are hereby modified to conform to the dates and deadlines set forth in that certain Amended Order (A) Scheduling a Hearing to Consider the Proposed Sale of the Debtors' Assets and Approving the Form and Manner of Notice Thereof, (B) Establishing Bidding Procedures Relating to the Sale and the Assumption and Assignment of Certain Executory Contacts and Unexpired Leases, Including Notice of Proposed Cure Amounts and (C) Granting Certain Related Relief [ECF No. 286].

**IT IS SO ORDERED**

SUBMITTED BY:

Donald A. Lattin, NV State Bar #4640
Christopher D. Jaime, NV State Bar #693
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Local Reorganization Counsel
For Debtors and Debtors in Possession

 – and –

Jessica C.K. Boelter, Esq., IL State Bar # 6277801
Thomas A. Labuda, Jr., Esq., IL State Bar # 6225401
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603

Reorganization Counsel for
Debtors and Debtors in Possession

1

2  **APPROVED**/DISAPPROVED:

3  DOWNEY BRAND LLP

4  By: __*s/ Sallie B. Armstrong*___
   Sallie B. Armstrong, Esq.
5  100 W. Liberty Street, Suite 900
   Reno, NV  89501
6  775/329-5900

7   – and –

8
   MILBANK, TWEED, HADLEY
9  & MCCLOY LLP
   Dennis C. O'Donnel, Esq.
10 One Chase Manhattan Plaza
   New York, NY 10005
11 (212) 530-5000
   Attorneys for the DIP Agent and DIP Lenders
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

In accordance with Local Rule 9021, counsel submitting this document certifies as follows (check one):

____ The court has waived the requirement set forth in Local Rule 9021(b)(1)

____ No party appeared at the hearing or filed an objection to the Motion.

_X_ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

Counsel to the DIP Agent – Approved

Counsel to the Committee – Approved

Counsel to the Monitor – Approved

Counsel to GBGL – Approved

Counsel to Franco-Nevada U.S. Corp. – Approved

Counsel to Hillcrest Mining Company LLC, Finley River Company LLC, and Hi-Tech Exploration, Ltd. – Approved

Counsel to the Bondholders – Approved

Counsel to Caterpillar Financial Services Corporation – No response

Counsel to San Juan – No response

____ I certify that this is a case under chapter 7 or 13, that I have served a copy of this order with the motion pursuant to Local Rule 9014(g), and that no party has objected to the form or content of the order.

### ###

**<u>Exhibit A</u>**

DRAFT – 4/8/13

---

**AMENDED AND RESTATED SENIOR SECURED SUPER PRIORITY PRIMING
DEBTOR-IN-POSSESSION CREDIT AGREEMENT**


Dated as of April [__], 2013


Among

**RODEO CREEK GOLD INC.
ANTLER PEAK GOLD INC.**
<u>as DIP Borrowers,</u>


**THE DIP LENDERS PARTY HERETO**,


**HOLLISTER VENTURE CORP.
TOUCHSTONE RESOURCES COMPANY**
<u>as Guarantors,</u>


and


**CREDIT SUISSE AG**
<u>as DIP Lender and DIP Agent</u>

---

## TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS AND ACCOUNTING TERMS ................................................................ 3

SECTION 1.01.  Certain Defined Terms ............................................................. 3
SECTION 1.02.  Computation of Time Periods; Terms Generally ...................................... 22
SECTION 1.03.  Accounting Terms ................................................................. 22
SECTION 1.04.  Times and Definition of Day ...................................................... 23

ARTICLE II AMOUNTS AND TERMS OF THE DIP LOANS ............................................... 23

SECTION 2.01.  The DIP Loans .................................................................... 23
SECTION 2.02.  Making the DIP Loans ............................................................. 23
SECTION 2.03.  Withdrawal of DIP Loans .......................................................... 25
SECTION 2.04.  Repayment of DIP Loans; Extension of Scheduled Final Maturity
               Date ............................................................................ 25
SECTION 2.05.  Termination or Reduction of the Commitments ...................................... 25
SECTION 2.06.  Interest ......................................................................... 26
SECTION 2.07.  Interest Rate Determination ...................................................... 26
SECTION 2.08.  Prepayments of Loans ............................................................. 27
SECTION 2.09.  Increased Costs .................................................................. 28
SECTION 2.10.  Illegality ....................................................................... 29
SECTION 2.11.  Payments and Computations ........................................................ 29
SECTION 2.12.  Taxes ............................................................................ 30
SECTION 2.13.  Sharing of Payments, Etc. ........................................................ 32
SECTION 2.14.  Evidence of Debt ................................................................. 32
SECTION 2.15.  Fees ............................................................................. 33

ARTICLE III CONDITIONS PRECEDENT ................................................................ 34

SECTION 3.01.  Conditions Precedent to Closing .................................................. 34
SECTION 3.02.  Additional Conditions Precedent to Borrowing ..................................... 35
SECTION 3.03.  Determinations Under Section 3.01 and Section 3.02 ................................ 36

ARTICLE IV REPRESENTATIONS AND WARRANTIES ....................................................... 36

SECTION 4.01.  Representations and Warranties of the DIP Borrowers ............................... 36
SECTION 4.02.  Representations and Warranties of the Guarantors ................................. 38

ARTICLE V COVENANTS OF THE DIP BORROWERS AND THE GUARANTORS ....................................... 40

SECTION 5.01.  Affirmative Covenants of the DIP Borrowers ....................................... 40
SECTION 5.02.  Negative Covenants of the DIP Borrowers .......................................... 44
SECTION 5.03.  Covenants of the Guarantors ...................................................... 45

i

ARTICLE VI EVENTS OF DEFAULT ................................................................................................ 46

SECTION 6.01.  Events of Default.................................................................................................... 46
SECTION 6.02.  Canadian DIP Credit Facility and Burnstone Credit Facility ................................ 50
SECTION 6.03.  Remedies ............................................................................................................... 50


ARTICLE VII GUARANTY ............................................................................................................... 51

SECTION 7.01.  Guaranty ................................................................................................................ 51
SECTION 7.02.  No Impairment of Guaranty .................................................................................. 52
SECTION 7.03.  Subrogation ........................................................................................................... 52


ARTICLE VIII PRIORITY AND COLLATERAL SECURITY ......................................................... 53

SECTION 8.01.  Superpriority Claims and Collateral Security........................................................ 53
SECTION 8.02.  Collateral Security Perfection ............................................................................... 54
SECTION 8.03.  No Discharge; Survival of Claims......................................................................... 54


ARTICLE IX THE DIP AGENT.......................................................................................................... 55

SECTION 9.01.  Appointment and Authority ................................................................................... 55
SECTION 9.02.  Rights as a DIP Lender .......................................................................................... 55
SECTION 9.03.  Exculpatory Provisions.......................................................................................... 55
SECTION 9.04.  Reliance by the DIP Agent .................................................................................... 56
SECTION 9.05.  Delegation of Duties.............................................................................................. 56
SECTION 9.06.  Resignation of the DIP Agent ............................................................................... 57
SECTION 9.07.  Non-Reliance on the DIP Agent and Other DIP Lenders...................................... 57
SECTION 9.08.  DIP Agent May File Proofs of Claim ................................................................... 57


ARTICLE X MISCELLANEOUS......................................................................................................... 58

SECTION 10.01. Amendments, Etc. ................................................................................................. 58
SECTION 10.02. Notices, Communications and Treatment of Information ..................................... 59
SECTION 10.03. No Waiver; Remedies ........................................................................................... 62
SECTION 10.04. Costs and Expenses ............................................................................................... 62
SECTION 10.05. Right of Set off ..................................................................................................... 64
SECTION 10.06. Binding Effect ....................................................................................................... 64
SECTION 10.07. Assignments and Participations............................................................................. 64
SECTION 10.08. Governing Law ...................................................................................................... 67
SECTION 10.09. Execution in Counterparts ..................................................................................... 67
SECTION 10.10. Jurisdiction, Etc. ................................................................................................... 67
SECTION 10.11. Waiver of Jury Trial .............................................................................................. 68
SECTION 10.12. USA Patriot Act .................................................................................................... 68
SECTION 10.13. Confidentiality....................................................................................................... 68
SECTION 10.14. No Fiduciary Duty................................................................................................. 69
SECTION 10.15. Independence of Covenants.................................................................................... 69
SECTION 10.16. DIP Borrowers' Obligations.................................................................................. 69

ii

SECTION 10.17. Survival of Representations and Warranties ............................................................... 71

SECTION 10.18. Entire Agreement ................................................................................................. 71

SECTION 10.19. Sensitive Countries .............................................................................................. 71

iii

#4839-7606- 0179

Schedules

Schedule 1.01        -        Collateral Account Details
Schedule 2.01        -        Commitments
Schedule 3.01(c)     -        Litigation
Schedule 4.01(j)     -        Accounts
Schedule 4.01(n)     -        Environmental Action
Schedule 5.01(c)     -        Required Insurance
Schedule 5.01(n)     -        Milestones
Schedule 5.02(b)     -        Pre-Petition Date Debt

Exhibits

Exhibit A        -        Form of Assignment and Assumption
Exhibit B        -        Form of Note
Exhibit C        -        Form of Production Report
Exhibit D        -        Form of Withdrawal Notice
Exhibit E        -        Form of Notice of Borrowing
Exhibit F        -        Initial Approved Budget

#4839-7606- 0179

This AMENDED AND RESTATED SENIOR SECURED SUPER PRIORITY PRIMING DEBTOR IN POSSESSION CREDIT AGREEMENT (the "Agreement"), dated as of April [__], 2013 among RODEO CREEK GOLD INC., a Nevada corporation ("Rodeo Creek"), ANTLER PEAK GOLD INC., a Nevada corporation ("Antler Peak," and, together with Rodeo Creek, the "DIP Borrowers"), each entity that is a signatory under the caption "DIP Lender" on the signature pages hereto and each entity that becomes a "DIP Lender" after the date hereof pursuant to Section 10.07 (the "DIP Lenders"), HOLLISTER VENTURE CORP., a Nevada corporation ("Hollister Venture"), TOUCHSTONE RESOURCES COMPANY, a Nevada corporation ("Touchstone", and together with Hollister Venture, the "Guarantors") and CREDIT SUISSE AG, as administrative agent (in such capacity, the "DIP Agent").

RECITALS

WHEREAS, on February 25, 2013 (the "Petition Date"), the DIP Borrowers, together with Hollister Venture and Touchstone (collectively, the "Debtors") filed petitions under chapter 11 of the United States Bankruptcy Code (the "Chapter 11 Cases") in the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court");

WHEREAS, the DIP Borrowers intend to continue to operate their businesses as debtors and debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, the DIP Borrowers, Great Basin Gold, Ltd., a Canadian limited company (the "Parent"), the lenders party thereto (the "Canadian DIP Lenders") and Credit Suisse AG, as facility agent and security agent for the Canadian DIP Lenders (in such capacities, together with its successors in such capacities, the "Canadian DIP Agent"), have previously entered into a Debtor-In-Possession Loan Facility Agreement, dated as of October 3, 2012 (as amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "Canadian DIP Credit Facility"), pursuant to which the Canadian DIP Lenders extended certain loans to the Parent;

WHEREAS, the DIP Borrowers and the Parent have previously entered into an Intra-Group Loan Agreement, dated as of October 3, 2012 (as amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "Intra-Group Loan Agreement"), pursuant to which the Parent agreed to on-lend a portion of the amounts disbursed under the Canadian DIP Credit Facility to the DIP Borrowers up to a maximum amount equal to $10,000,000;

WHEREAS, the DIP Borrowers, Credit Suisse AG, as administrative agent (in such capacity, together with its successors in such capacities, the "Existing Hollister Agent") and the lenders party thereto (the "Existing Hollister Lenders") have previously entered into the Credit Agreement, dated as of February 23, 2011, as amended by that certain (a) Amendment to the Credit Agreement dated as of March 8, 2011, among the DIP Borrowers and the Existing Hollister Agent, (b) Waiver No. 2 and Amendment No. 2 to the Credit Agreement and Waiver No. 1 and Amendment No. 1 to the Depository Agreement, dated as of October 3, 2012, among the DIP Borrowers, the Existing Hollister Lenders, the Existing Hollister Agent and each other party from time to time party thereto and (c) Amendment and Waiver Agreement to Credit Agreement, Depository Agreement, Second Amended and Restated Intercreditor Agreement and

1

Waiver No. 2 and Amendment No. 2 to the Credit Agreement and Waiver No. 1 and Amendment No. 1 to the Depositary Agreement, dated as of January 23, 2013, among the DIP Borrowers, the Existing Hollister Lenders, the Existing Hollister Agent and each other party from time to time party thereto (as further amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "Existing Hollister Credit Facility");

WHEREAS, Rodeo Creek and Credit Suisse International (in such capacity, together with its successors in such capacities, the "Hedge Bank") are parties to that certain ISDA Master Agreement, dated as of March 8, 2011 (as amended, supplemented or otherwise modified from time to time prior to the Petition Date, the "ISDA Agreement" and together with the Existing Hollister Credit Facility, the "Existing Hollister Obligations").

WHEREAS, Rodeo Creek has issued a promissory note, dated as of January 23, 2013, in favor of GBG Rusaf Gold Ltd. ("Rusaf") in the amount of $8,833,324.50 (the "Rodeo Note").

WHEREAS, pursuant to the Intercompany Debt Settlement Agreement, dated as of January 23, 2013, between Rusaf and the Parent, Rusaf assigned all of its rights, title and interest to the Rodeo Note to the Parent.

WHEREAS, as of the Petition Date, the Existing Hollister Lenders and the Hedge Bank are owed no less than $49,414,337.90, plus interest thereon, unpaid fees, costs and expenses in respect thereof, including, without limitation, any prepayment or make-whole payments payable as a result of the prepayment thereof (collectively, the "Existing Hollister Obligations");

WHEREAS, as of the Petition Date, the Canadian DIP Lenders are owed no less than $34,987,093 in respect of the loans under the Canadian DIP Credit Facility allocated to the DIP Borrowers and the Intra-Group Loan Agreement, plus interest thereon, unpaid fees, costs and expenses in respect thereof, including, without limitation, any prepayment or make-whole payments payable as a result of the prepayment thereof (the "Canadian DIP Obligations");

WHEREAS, the DIP Borrowers have requested that the DIP Lenders provide financing to the DIP Borrowers consisting of a term loan advanced to the DIP Borrowers pursuant to Sections 364(c) and (d) of the Bankruptcy Code, in an aggregate principal amount of up to $9,000,000, which shall be funded upon satisfaction of the conditions set forth herein, including, without limitation, entry of the Final Order, in order to pay transaction costs, including fees and expenses of the DIP Agent, capital expenditures, working capital, Operating Costs and the fees, costs and expenses incurred by the DIP Borrowers in the administration of the Chapter 11 Cases, to the extent reflected in the Approved Budget, subject to the Permitted Variance;

WHEREAS, in connection with the Chapter 11 Cases the DIP Borrowers, the Guarantors and Credit Suisse AG as Dip Lender and DIP Agent entered into that certain Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement, dated as of March 7, 2013 (the "Original Hollister DIP Credit Agreement");

2

#4839-7606- 0179

WHEREAS, in connection with the Chapter 11 Cases and the entry of the Final Order by the Bankruptcy Court the DIP Lenders have indicated their willingness to amend and restate the Original Hollister DIP Credit Agreement in the form hereof and have agreed to provide a credit facility to the DIP Borrowers, all on terms and conditions set forth herein and in the other DIP Loan Documents and in accordance with sections 364(c) and (d) of the Bankruptcy Code, so long as:

(a)    such post-petition obligations are, (i) subject in priority only to Senior Statutory Liens and the Carve Out as hereinafter provided, (ii) secured by Liens on all property, rights and interests, real and personal, tangible and intangible, of the DIP Borrowers, whether now owned or hereafter acquired, and (iii) given a Superpriority Claim as provided in the Interim Order and the Final Order; and

(b)    the holders of the Canadian DIP Obligations and the holders of the Existing Hollister Obligations receive certain adequate protection for use of their Cash Collateral, the diminution in value of their collateral and the priming of their prepetition Liens, in each case securing the Canadian DIP Obligations and the Existing Hollister Obligations; and

WHEREAS, the DIP Borrowers have agreed to provide such collateral security, Superpriority Claims and adequate protection subject to the approval of the Bankruptcy Court.

NOW, THEREFORE, in consideration of the premises and the mutual agreements herein set forth, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

SECTION 1.01.    Certain Defined Terms.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"13-Week Forecast" has the meaning specified in Section 5.01(i)(xi).

"Act" has the meaning specified in Section 10.12.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the DIP Agent.

"Affected Interest Period" has the meaning specified in Section 2.07(b).

"Affiliate" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person or is a director or officer of such Person.  For purposes of this definition, the term "control" (including the terms "controlling", "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power to vote 50% or more of the Voting Stock of such Person or to direct or

3

cause the direction of the management and policies of such Person, whether through the ownership of Voting Stock, by contract or otherwise.

"Agreement" has the meaning specified in the preamble hereto.

"Antler Peak" has the meaning specified in the preamble hereto.

"Applicable Lending Office" means, with respect to any DIP Lender, the office of such DIP Lender specified as its "Applicable Lending Office" in the Administrative Questionnaire delivered by such DIP Lender to the DIP Agent and the DIP Borrowers or in the Assignment and Assumption pursuant to which it became a DIP Lender, or such other office of such DIP Lender as such DIP Lender may from time to time specify to the DIP Borrowers and the DIP Agent.

"Applicable Rate" means, for any day with respect to any Loan, 3.75% per annum.

"Approved Budget" means the Initial Approved Budget and each other 13-Week Forecast delivered by the Borrowers to the Administrative Agent and approved by the Lenders in accordance with Section 5.01(i)(xi).

"Approved Electronic Communications" means each Communication that each DIP Borrower is obligated to, or otherwise chooses to, provide to the DIP Agent pursuant to any DIP Loan Document or the transactions contemplated therein, including any financial statement, financial and other report, notice, request, certificate and other information material; provided that, solely with respect to delivery of any such Communication by a DIP Borrower to the DIP Agent, "Approved Electronic Communication" shall exclude any service of process.

"Assignment and Assumption" means an assignment and assumption entered into by a DIP Lender and an Eligible Assignee, and accepted by the DIP Agent, in substantially the form of Exhibit A hereto or any other form approved by the DIP Agent (such approval not to be unreasonably withheld or delayed) and, so long as no Event of Default has occurred and is continuing, the DIP Borrowers (such approval of the DIP Borrowers not to be unreasonably withheld or delayed).

"Authorized Officer" means those agents, managers, directors or officers whose signature and incumbency shall have been certified to the DIP Agent and the DIP Lenders pursuant to a certificate delivered to the DIP Lenders in form and substance satisfactory to the DIP Agent.

"Avoidance Actions" means the claims and causes of action referenced in paragraph 8(a) of the Final Order.

"Bankruptcy Code" means United States Bankruptcy Code, as codified at 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" has the meaning specified in the recitals hereto.

"<u>Burnstone Credit Facility</u>" means the Revised Term Facility Agreement, dated as of December 5, 2011, among the Parent, the lenders party thereto, Credit Suisse AG, as facility agent and security agent, and each other party from time to time party thereto.

"<u>Borrowing</u>" means a borrowing consisting of LIBO Rate Loans having the same Interest Period.

"<u>Business Day</u>" means a day of the year on which banks are not required or authorized by law to close in New York City or Zurich, Switzerland, and on which dealings are carried on in the London interbank market.

"<u>Canadian DIP Adequate Protection Payments</u>" means the payment of (a) current interest under the Canadian DIP Credit Facility and (b) the reasonable fees and expenses incurred by the Canadian DIP Lenders under the Canadian DIP Credit Facility (including the reasonable fees and expenses of their counsel, financial advisor and consultants).

"<u>Canadian DIP Agent</u>" has the meaning specified in the recitals hereto.

"<u>Canadian DIP Credit Facility</u>" has the meaning specified in the recitals hereto.

"<u>Canadian DIP Lenders</u>" has the meaning specified in the recitals hereto.

"<u>Canadian DIP Obligations</u>" has the meaning specified in the recitals hereto.

"<u>Capital Stock</u>" of any Person means any and all shares, units, interests, rights to purchase, warrants, options, participation or other equivalents of or interests in (however designated) equity of such Person, including any Preferred Stock, but excluding any debt securities convertible into such equity.

"<u>Carve Out</u>" means, the sum of (a) the Professional Fees incurred by the DIP Borrowers, Guarantors and the Creditors' Committee at any time before the delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Bankruptcy Court prior to or after such delivery; (b) the Professional Fees accrued after delivery by the DIP Agent of the Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court and not exceeding an aggregate amount of $50,000, of which the Professional Fees of the Creditors' Committee shall not exceed $20,000; and (c) the U.S. Trustee's fees, pursuant to 28 U.S.C. § 1930.

"<u>Carve Out Trigger Notice</u>" means a written notice of the occurrence of an Event of Default under this Agreement delivered by the DIP Agent to the Debtors and their counsel, the U.S. Trustee and counsel to the Creditors' Committee .

"<u>Cash Collateral</u>" means all cash, negotiable instruments, documents of title, securities, deposit accounts, or other Cash Equivalent Instruments whenever acquired which constitutes Collateral, including all proceeds, products, offspring, rents, or profits relating to same.

"<u>Cash Equivalent Investments</u>" means (a) any direct obligation of (or unconditionally guaranteed by) the United States (or any agency or political subdivision thereof, to the extent

5

#4839-7606- 0179

such obligations are supported by the full faith and credit of the United States) maturing not more than two years from the date of acquisition thereof, (b) any certificate of deposit, time deposit, or bankers acceptance, maturing not more than one year after its date of acquisition, or any demand deposit accounts which, in any case, is issued by or established at any bank or trust company organized under the laws of the United States (or any state thereof) and which (i) has (A) a long term debt credit rating of A2 or higher from Moody's or A or higher from S&P and (B) a combined capital and surplus greater than $250,000,000 or (ii) is Credit Suisse AG, (c) money market funds that (i) comply with the criteria set forth in Rule 2a-7 under the Investment Company Act of 1940, (ii) are rated A or higher by S&P and A2 or higher by Moody's and (iii) have portfolio assets of at least $5,000,000,000 or (d) shares of investment companies that are registered under the Investment Company Act of 1940, as amended, and that have investment guidelines restricting 95% of such funds' investments to one or more of the types of securities described in clauses (a) through (c) above.

"CCAA" means the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c. C-36, as amended.

"CCAA Proceeding" means the proceeding commenced in the Supreme Court of British Columbia by the Parent pursuant to the CCAA.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted, promulgated or issued.

"Change of Control" means a (a) failure of the Parent to own and control, directly or indirectly, 100% of the DIP Borrowers and (b) failure of the DIP Borrowers to own and control, directly or indirectly, 100% of the Subsidiaries.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Chapter 11 Expenses" means, collectively, (a) all amounts payable pursuant to the Carve Out, (b) any accrued and unpaid administrative expenses (other than those included in the Carve Out and the Committee Settlement Obligations) and (c) the CIBC Completion Fee.

"CIBC Completion Fee" means any completion fee owed to CIBC World Markets Inc. under the Engagement Letter between CIBC World Markets Inc. and the Debtors approved by the Bankruptcy Court on March 28, 2013.

6

"Closing Date" is defined in 3.01.

"Collateral" means all the assets and properties subject to the Liens created by the Orders, excluding Avoidance Actions and Proceeds thereof (except as provided in paragraph 29(f) of the Final Order).

"Collateral Account" means the deposit account of the DIP Agent set forth on Schedule 1.01.

"Commitment" means, with respect to each DIP Lender, the commitment of such DIP Lender to make DIP Loans under this Agreement as set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such DIP Lender assumed its Commitment, as applicable, as such commitment as reflected on Schedule 2.01 may be (a) modified from time to time pursuant to Section 2.05 and (b) modified from time to time pursuant to assignments by or to such DIP Lender pursuant to Section 10.07.

"Committee Settlement Funding Obligations" means all payments required to be made pursuant to Section 29 of the Final Order.

"Communications" means each notice, demand, communication, information, document and other material provided for hereunder or under any other DIP Loan Document or otherwise transmitted between the parties hereto relating to this Agreement, the other DIP Loan Documents, each DIP Borrower or its Affiliates, or the transactions contemplated by this Agreement or the other DIP Loan Documents including, without limitation, all Approved Electronic Communications.

"Creditors' Committee" means the Official Committee of Unsecured Creditors appointed by the U.S. Trustee in relation to the Chapter 11 Cases.

"Debt" of any Person means, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than trade payables incurred in the ordinary course of such Person's business for which collection proceedings have not been commenced, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all obligations of such Person created or arising under any conditional sale or other similar title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all obligations of such Person as lessee under leases that have been, in accordance with GAAP, recorded as capital leases, (f) all obligations of such Person in respect of acceptances, letters of credit or similar extensions of credit, (g) all net obligations of such Person in respect of Hedge Agreements, (h) all Debt of others referred to in clauses (a) through (g) above or clause (i) below guaranteed directly, or indirectly through a Subsidiary, by such Person, or in effect guaranteed directly, or indirectly through a Subsidiary, by such Person through a written agreement either (1) to pay or purchase such Debt or to advance or supply funds for the payment or purchase of such Debt or (2) to purchase, sell or lease (as lessee or lessor) property,

7

or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Debt or to assure the holder of such Debt against loss and (i) all Debt referred to in clauses (a) through (h) above secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Debt.

"Debtors" has the meaning specified in the recitals hereto.

"Default" means any Event of Default or any event that would constitute an Event of Default, but for the requirement that notice be given or time elapse or both.

"DIP Agent" has the meaning specified in the preamble hereto.

"DIP Borrowers" has the meaning specified in the preamble hereto.

"DIP Lender Appointment Period" has the meaning specified in Section 9.06.

"DIP Lenders" has the meaning specified in the preamble hereto.

"DIP Loan" has the meaning specified in Section 2.01(a).

"DIP Loan Documents" means, collectively, this Agreement, the Notes, if any, and each certificate, agreement or document executed by any DIP Borrower or any Guarantor and delivered to the DIP Agent or any DIP Lender in connection with or pursuant to any of the foregoing.

"DIP Termination Declaration" has the meaning specified in Section 6.03(a).

"Disbursement Account" means the deposit account in the name of Rodeo Creek at Bank of America, designated as the "General Account", account number 5010 0085 7862.

"Discretionary Capital Expenditures" means costs and expenses related to capital improvements or expansions of the Project that are intended to enhance the economic value of the Project but are not necessary to maintain, operate and develop the Project in accordance with the Mine Plan and prudent industry practices.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith; provided that the term "Disposition" shall not include any loss of or damage to, or any condemnation or other taking of, any property.

"Eligible Assignee" means (i) a DIP Lender; (ii) an Affiliate of a DIP Lender; (iii) a commercial bank organized under the laws of the United States, or any State thereof, and having

8

total assets in excess of $5,000,000,000; (iv) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof, and having total assets in excess of $5,000,000,000; (v) a commercial bank organized under the laws of any other country that is a member of the Organization for Economic Cooperation and Development or has concluded special lending arrangements with the International Monetary Fund associated with its General Arrangements to Borrow or of the Cayman Islands, or a political subdivision of any such country, and having total assets in excess of $5,000,000,000 so long as such bank is acting through a branch or agency located in the United States or in the country in which it is organized or another country that is described in this clause (v); (vi) the central bank of any country that is a member of the Organization for Economic Cooperation and Development; or (vii) any other Person approved by the DIP Agent and the DIP Borrowers, such approval not to be unreasonably withheld or delayed; provided, however, that none of the DIP Borrowers nor any of their Affiliates shall qualify as an Eligible Assignee.

"Environmental Action" means any obligation, liability, action, suit, demand, demand letter, claim, notice of non compliance or violation, notice of liability or potential liability, investigation, proceeding, consent order or consent agreement relating in any way to any Environmental Law, Environmental Permit or Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment, including, without limitation, (a) by any governmental or regulatory authority for enforcement, cleanup, removal, response, remedial or other actions or damages or relating to violations or alleged violations of any Environmental Law or any Environmental Permit and (b) by any governmental or regulatory authority or any third party for damages, contribution, indemnification, cost recovery, compensation or injunctive relief.

"Environmental Law" means any federal, state, local or foreign statute, law, ordinance, rule, regulation, code, order, judgment, decree or judicial or agency interpretation, policy or guidance relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to mine health and safety, mine reclamation, mine rehabilitation or mine operating requirements or the use, handling, transportation, treatment, storage, disposal, arrangement for disposal, release or discharge of Hazardous Materials, in each case, as amended or supplemented from time to time.

"Environmental Permit" means any permit, approval, identification number, license, financial assurance obligation or other authorization required under any Environmental Law.

"Equator Principles" means the principles named "Equator Principles – A financial industry benchmark for determining, assessing and managing social & environmental risk in project financing" adopted by various financing institutions in the form dated July 2006 that are published on the internet at www.equator-principles.com.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means, with respect to any DIP Borrower, any Person that for purposes of Title IV of ERISA is a member of such DIP Borrower controlled group, or under

9

common control with such DIP Borrower, within the meaning of Section 414 of the Internal Revenue Code.

"ERISA Event" means (a) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, with respect to any Plan unless the 30 day notice requirement with respect to such event has been waived by the PBGC; (b) the application for a minimum funding waiver with respect to a Plan; (c) the provision by the administrator of any Plan of a notice of intent to terminate such Plan pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (d) the cessation of operations at a facility of a DIP Borrower or any ERISA Affiliate thereof in the circumstances described in Section 4062(e) of ERISA; (e) the withdrawal by a DIP Borrower or any ERISA Affiliate thereof from a Multiple Employer Plan during a plan year for which it was a substantial employer, as defined in Section 4001(a)(2) of ERISA; (f) the imposition of a lien under Section 303(k) of ERISA with respect to any Plan; (g) the provision of security with respect to a Plan pursuant to Section 436 of ERISA; (h) the institution by the PBGC of proceedings to terminate a Plan or to have a trustee appointed to administer a Plan pursuant to Section 4042 of ERISA, or the occurrence of any event or condition described in Section 4042 of ERISA that is reasonably expected to result in the termination of, or the appointment of a trustee to administer, a Plan; (i) any failure by any Plan to satisfy the minimum funding standard (within the meaning of  Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (j) a determination that any Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Code or Section 303 of ERISA); (k) the incurrence by a DIP Borrower or any of its ERISA Affiliates of any liability with respect to the complete or partial withdrawal from any Multiemployer Plan; or (l) the receipt by a DIP Borrower or any ERISA Affiliate of any notice of a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 of ERISA.

"Eurocurrency Liabilities" has the meaning assigned to that term in Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"Excluded FATCA Tax" means any tax, assessment or other governmental charge imposed under FATCA that would not have been imposed but for a failure by a DIP Lender (or any financial institution through which any payment is made to such DIP Lender) to comply with the requirements of FATCA.

"Excluded Tax" means (a) any Excluded FATCA Tax, (b) any Tax based on or measured by net income imposed on a DIP Lender or the DIP Agent as a result of such Person being organized under the law of or, in the case of a DIP Lender, maintaining its Applicable Lending Office in, the jurisdiction imposing such Tax, and (c) in the case of a DIP Lender organized under the laws of a jurisdiction outside the United States, any withholding tax that (i) is in effect and would apply to amounts payable to such DIP Lender at the time such DIP Lender becomes a party to this Agreement (or designates a new lending office), except to the extent that such DIP Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the DIP Borrowers with respect to any

10

withholding tax pursuant to Section 2.12(a), or (ii) is attributable to such DIP Lender's failure to comply with Section 2.12(d).

"Existing Agents" means collectively, the Canadian DIP Agent and the Existing Hollister Agent.

"Existing Hollister Agent" has the meaning specified in the recitals hereto.

"Existing Hollister Credit Facility" has the meaning specified in the recitals hereto.

"Existing Hollister Lenders" has the meaning specified in the recitals hereto.

"Existing Lenders" means collectively, the Canadian DIP Lenders, the Existing Hollister Lenders and the Hedge Bank.

"Existing Hollister Obligations" has the meaning specified in the recitals hereto.

"Existing Obligations" means collectively, the Existing Hollister Obligations, the Canadian DIP Obligations and the obligations of Rodeo Creek under the Rodeo Note.

"Extension Fee" has the meaning specified in Section 2.15(b).

"Extension Request" has the meaning specified in Section 2.04(b).

"Event of Default" has the meaning specified in Section 6.01.

"FATCA" means sections 1471 through 1474 of the Internal Revenue Code of 1986, as amended and in effect on the date hereof, provided, however, FATCA shall also include any amendments to Sections 1471 through 1474 of the Code and Treasury Regulations and other official interpretations published after the date hereof if, in each case, FATCA provides a commercially reasonable mechanism to avoid tax imposed thereunder by satisfying the information reporting and other requirements of FATCA.

"Federal Funds Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the DIP Agent from three Federal funds brokers of recognized standing selected by it.

"Final Maturity Date" means the earlier of the (a) Scheduled Final Maturity Date and (b) date on which any DIP Loan is accelerated in accordance with Article VI.

"Final Order" means that certain final order of the Bankruptcy Court with respect to the Chapter 11 Cases issued on April 8, 2013.

"<u>Final Order Availability Date</u>" means the first date after the Closing Date on which (a) the Final Order has been entered and (b) the conditions set forth in Section 3.02 are met.

"<u>Final Order Facility Amount</u>" means $9,000,000.

"<u>Financial Advisor</u>" means Canadian Imperial Bank of Commerce.

"<u>Funding Date</u>" means each date on which the DIP Loans are made.

"<u>GAAP</u>" has the meaning specified in Section 1.03.

"<u>Governmental Authority</u>" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"<u>Guarantors</u>" has the meaning specified in the preamble hereto.

"<u>Guaranty</u>" has the meaning specified in Section 7.01(a).

"<u>GUC Trust Fund</u>" means a separate trust account designated by the Creditors' Committee for deposit of such amounts as specified in paragraph 29 of the Final Order.

"<u>Hazardous Materials</u>" means (a) petroleum and petroleum products, byproducts or breakdown products, radioactive materials, asbestos containing materials, polychlorinated biphenyls or radon gas and (b) any other chemicals, materials, substances or wastes designated, classified or regulated as hazardous or toxic or as a pollutant or contaminant under any Environmental Law or with respect to which liability or standards of conduct are imposed under any Environmental Law.

"<u>Hedge Bank</u>" has the meaning specified in the recitals hereto.

"<u>HoldCo</u>" means Great Basin Gold Inc., a Nevada corporation.

"<u>Hollister Adequate Protection Payments</u>" means the payment of (a) current interest under the Existing Hollister Credit Facility and (b) the reasonable fees and expenses incurred by the Existing Hollister Lenders under the Existing Hollister Credit Facility (including the reasonable fees and expenses of their counsel, financial advisor and consultants).

"<u>Hollister Sale Proceeds</u>" has the meaning specified in Section 6.03(d).

"<u>Hollister Venture</u>" has the meaning specified in the preamble hereto.

"IFRS" means International Financial Reporting Standards.

"Incremental Loan Commitment" has the meaning specified in the Existing Hollister Credit Facility.

"Indemnified Party" has the meaning specified in Section 10.04(b).

"Information" has the meaning specified in Section 10.13.

"Initial Approved Budget" means the 13-Week Forecast delivered by the DIP Borrowers to the DIP Lenders and the DIP Agent on February 25, 2013, in form and substance satisfactory to the DIP Agent, and attached hereto on Exhibit F.

"Interest Period" means, for each LIBO Rate Loan comprising part of the same Set, the period commencing on the date of such LIBO Rate Loan and, subject to the provisions below, ending on the date three months thereafter and, thereafter, with respect to LIBO Rate Loans, each subsequent period commencing on the last day of the immediately preceding Interest Period and, subject to the provisions below, ending on the date three months thereafter provided, however, that:

(i)      no Interest Period shall end after the Final Maturity Date;

(ii)     Interest Periods commencing on the same date for LIBO Rate Loans comprising part of the same Set shall be of the same duration;

(iii)    whenever the last day of any Interest Period would otherwise occur on a day other than a Business Day, the last day of such Interest Period shall be extended to occur on the next succeeding Business Day; provided, however, that, if such extension would cause the last day of such Interest Period to occur in the next following calendar month, the last day of such Interest Period shall occur on the next preceding Business Day; and

(iv)    whenever the first day of any Interest Period occurs on a day of an initial calendar month for which there is no numerically corresponding day in the calendar month that succeeds such initial calendar month by the number of months equal to the number of months in such Interest Period, such Interest Period shall end on the last Business Day of such succeeding calendar month.

"Interim Order Facility Amount" means $3,600,000.

"Interim Order" means the order of the Bankruptcy Court with respect to the DIP Borrowers and the transactions and relief contemplated hereby and thereby, in form and substance satisfactory to the DIP Agent in its discretion, as the same may be amended, modified or supplemented from time to time with the express written joinder or consent of the DIP Agent and the Required DIP Lenders.

13

#4839-7606- 0179

"Interim Order Availability Date" means the first date after the Closing Date and on or prior to April 8, 2013 on which the conditions set forth in Section 3.02 are met.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"Intra-Group Loan Agreement" has the meaning specified in the recitals hereto.

"ISDA Agreement" has the meaning specified in the recitals hereto.

"Knowledge" means the actual knowledge of any officer, employee, member, agent, director or similarly situated person of any DIP Borrower or Guarantor.

"Knowledge of the DIP Borrower" means the actual knowledge of any officer, employee, member, agent, director or similarly situated person of any DIP Borrower or any knowledge that should have been obtained by such person of such DIP Borrower upon reasonable investigation and inquiry.

"LIBO Rate" means, for any Interest Period for each LIBO Rate Loan comprising part of the same Set, the rate appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the DIP Agent from time to time for purposes of providing quotations of interest rates applicable to US Dollar deposits in the London interbank market) at approximately 11:00 A.M., London time, two Business Days prior to the commencement of such Interest Period, as the rate for US Dollar deposits with a maturity comparable to such Interest Period.  In the event that such rate is not available at such time for any reason, then the "LIBO Rate" for any Interest Period each LIBO Rate Loan comprising part of the same Set shall be the rate per annum determined by the DIP Agent to be the rate at which deposits in US Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBO Rate Loans comprising such Set with a term equivalent to such Interest Period would be offered by the principal London office of the DIP Agent to major banks in the London interbank eurodollar market at their request at approximately 11:00 A.M. (London time) two Business Days prior to the commencement of such Interest Period, subject, however, to the provisions of Section 2.06. Notwithstanding the foregoing, the "LIBO Rate" for any such Interest Period shall be the rate per annum obtained by dividing (i) the rate per annum obtained by application of the foregoing provisions of this definition by (ii) a percentage equal to 100% minus the Statutory Reserve Percentage for such Interest Period.

"LIBO Rate Loan" means a DIP Loan that bears interest as provided in Section 2.06(a)(i).

"Lien" means any lien, security interest or other charge or encumbrance of any kind.

"Loan" means a LIBO Rate Loan by a DIP Lender to any DIP Borrower pursuant to this Agreement.

14

"Material Adverse Effect" means any event or circumstance occurring after the Petition Date, which is reasonably likely to have a  material adverse effect on (a) the financial condition, business, property, assets, financial or trading position, operations or prospect of any DIP Borrower or (b) the ability of any DIP Borrower to perform its obligations under this Agreement, the Transaction Documents or any Note.

"Mineral Resource Estimate Report" means the "Technical Report on the Update of the Mineral Resource and Mineral Reserve Estimates for the Hollister Gold Mine, Elko County, Nevada, USA" dated February 8, 2011, prepared by Johannes G. Oelofse, FSAIMM, Pr. Eng., Philip N. Bentley, Pr. Sci. Nat. and Daniel J. van Heerden, Pr. Eng., ESCA, FSAIMM, AMMSA, of Minxcon Consultants, filed on SEDAR on February 8, 2011.

"Mine Plan" means the forecast of mining operations described in the Mineral Resource Estimate Report.

"Monitor" means KPMG Inc. in its capacity as monitor in the CCAA Proceeding.

"Moody's" means Moody's Investors Service, Inc.

"Multiemployer Plan" means a multiemployer plan, as defined in Section 4001(a)(3) of ERISA, and the regulations thereunder, to which a DIP Borrower or any ERISA Affiliate thereof is making or accruing an obligation to make contributions, or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"Multiple Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of a DIP Borrower or any ERISA Affiliate thereof and at least one Person other than such DIP Borrower and the ERISA Affiliates thereof or (b) was so maintained and in respect of which such DIP Borrower or any ERISA Affiliate thereof could have liability under Section 4064 or 4069 of ERISA in the event such plan has been or were to be terminated.

"Negotiation Period" has the meaning specified in Section 2.07(b).

"Net Available Cash" from a Disposition, casualty or condemnation means cash payments received (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise and net proceeds from the sale or other disposition of any securities received as consideration, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Debt or other obligations relating to the properties or assets that are the subject of such transaction or event (as applicable) or received in any other non-cash form) therefrom, in each case net of:

(a)        all legal, accounting, investment banking, title and recording tax expenses, commissions and other fees and expenses incurred, and all federal, state, provincial, foreign and local taxes required to be paid or accrued as a liability under GAAP (after taking into account

15

#4839-7606- 0179

any available tax credits or deductions and any tax sharing agreements), as a consequence of such Disposition;

(b)    all payments made on any Debt which is secured by any assets subject to such transaction or casualty or condemnation (as applicable), or which must by its terms, or in order to obtain a necessary consent to such transaction, or by applicable law be repaid out of the proceeds from such transaction, casualty or condemnation (as applicable);

(c)    all distributions and other payments required to be made to minority interest holders in subsidiaries or joint ventures or to holders of royalty or similar interests as a result of such transaction, casualty or condemnation (as applicable); and

(d)    the deduction of appropriate amounts to be provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the assets disposed of in such transaction, casualty or condemnation (as applicable) and retained by the DIP Borrowers after such Disposition.

"Net Cash Proceeds" means, with respect to any issuance or sale of Debt or Capital Stock, or any Disposition, or any contribution to equity capital, the cash proceeds of such issuance, Disposition or contribution net of attorneys' fees, accountants' fees, underwriters' or placement agents' fees, listing fees, discounts or commissions and brokerage, consultant and other fees and charges actually incurred in connection with such issuance, sale or contribution and net of taxes paid or payable as a result of such issuance or sale (after taking into account any available tax credit or deductions and any tax sharing arrangements).

"Nevada 2011 Taxes" means the taxes due and owing by Rodeo Creek to the State of Nevada for the year ending December 31, 2011, in the approximate amount of $1,560,000.

"Nevada 2012 Taxes" means the taxes accruing due or due and owing, as applicable, to the State of Nevada by Rodeo Creek for the year ending December 31, 2012, in the approximate amount of $1,100,000.

"Nevada Operations" means the DIP Borrowers' consolidated milling, trial mining and bulk sampling operations in Nevada.

"Note" means a promissory note of any DIP Borrower payable to the order of any DIP Lender, delivered pursuant to a request made under Section 2.14 in substantially the form of Exhibit B hereto, evidencing the aggregate indebtedness of such DIP Borrower to such DIP Lender resulting from the Loan made to such DIP Borrower by such DIP Lender.

"Notice of Borrowing" has the meaning specified in Section 2.02(a).

"Obligations" has the meaning specified in Section 10.16(a).

"Offtake Agreements" mean that certain Contract for Sale & Purchase of Gold and Silver among the Parent, the Offtaker and Rodeo Creek dated as of July 20, 2009 and any other agreement that any DIP Borrower is party to that provides for the sale of the Project's minerals.

"Offtaker" means RK Mine Finance Trust I, a trust established under the laws of Australia and formerly known as Red Kite Explorer Trust.

"Operating Costs" means, with respect to the DIP Borrowers for any period of computation, the sum (without duplication) of the following amounts, in each case to the extent paid by or on behalf of the DIP Borrowers in relation to the Project during such period: (a) all mining and production costs, (b) all processing costs, including milling and transportation costs, (c) all maintenance costs, (d) all development expenditures incurred in implementation of the Mine Plan, (e) all hedging costs and (f) all other general and administrative costs, as each such category of costs are set out in any Approved Budget (excluding Professional Fees) or the Mine Plan and as such costs are reflected in the applicable financial statements; provided, however, that Discretionary Capital Expenditures shall not be included in the calculation of any Operating Costs.

"Other Connection Taxes" means, with respect to any Person, Taxes imposed as a result of a present or former connection between such Person and the jurisdiction imposing such Tax (other than connections arising from such Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any DIP Loan Document, or sold or assigned an interest in any DIP Loan or DIP Loan Document).

"Other Taxes" has the meaning specified in Section 2.12(b).

"Orders" means the Interim Order and the Final Order, as applicable.

"Parent" has the meaning specified in the recitals hereto.

"PBGC" means the Pension Benefit Guaranty Corporation (or any successor).

"Petition Date" has the meaning specified in the recitals hereto.

"Permitted Capital Expenditure" has the meaning specified in Section 5.02(k).

"Permitted Indebtedness" means (a) Debt in respect of the Obligations, (b) all obligations of the DIP Borrowers as lessee under leases that have been, in accordance with GAAP, recorded as capital leases; provided that the aggregate amount of such Debt outstanding shall not at any time exceed $1,000,000, (c) Debt incurred prior to the commencement of the Chapter 11 Cases and existing on the Petition Date as set forth in Schedule 5.02(b), but not any extensions, renewals or replacements of such Debt, (d) Permitted Subordinated Loans and (e) Debt owing by a DIP Borrower to the other DIP Borrower, provided that such Debt owing by a DIP Borrower to the other DIP Borrower shall not exceed $5,000,000 in the aggregate.

17

"Permitted Investments" means Cash Equivalent Investments.

"Permitted Liens" means, with respect to any Person, (a) the rights and interests of the Secured Parties as provided for in the Orders, (b) Liens for taxes, assessments and governmental charges and levies to the extent not yet due or not required to be paid under Section 5.01(b); (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation; (d) pledges or deposits to secure performance in connection with bids, tenders, contracts (other than contracts for the payment of money) or leases to which such Person is a party; (e) deposits to secure public or statutory obligations of such Person; (f) materialmen's, mechanics', carriers', workers', repairmen's and other like Liens in the ordinary course of business, or deposits to obtain the release of such Liens to the extent such Liens, in the aggregate, would not have a Material Adverse Effect; (g) deposits to secure surety and appeal bonds to which such Person is a party; (h) other pledges or deposits for similar purposes in the ordinary course of business, including pledges and deposits to secure indemnity, performance or other similar bonds and in connection with insurance maintained in accordance with Section 5.01(c) and the Approved Budget; (i) Liens created by or resulting from any litigation or legal or administrative proceeding which at the time is being contested in good faith by appropriate proceedings; (j) landlords' Liens under leases to which such Person is a party; (k) zoning restrictions, easements, licenses, and restrictions on the use of real property or minor irregularities in title thereto, which do not materially impair the use of such property in the operation of the business of such Person or the value of such property for the purpose of such business, (l) capital leases in respect of Permitted Indebtedness; (m) all Liens identified in the Title Report other than any Liens created by any deed of trust or instruments conveying any water rights identified therein, (o) Liens securing the Senior Secured Notes, and (p) Liens granted to the Existing Lenders as adequate protection under Sections 361, 362, 363 or 364(d) of the Bankruptcy Code by order of the Bankruptcy Court in the Chapter 11 Cases; provided that such Liens are subject and subordinate to the Liens securing the Obligations under this Agreement, the other DIP Loan Documents and the Orders.

"Permitted Sale" means a sale of all or substantially all of the assets, properties or Capital Stock or other equity interests of the DIP Borrowers pursuant to Section 363 of the Bankruptcy Code which either (a) is consented to by the DIP Agent and the Existing Agents or (b) results, or is found by the Bankruptcy Court to result, in indefeasible payment in full in cash of the Obligations.

"Permitted Subordinated Loans" means any subordinated loans made by the Parent or HoldCo to any DIP Borrower on subordination terms satisfactory to the DIP Agent in an aggregate principal amount of less than $245,000,000.

"Permitted Variance" means the amount, not to exceed $500,000 in the aggregate for the period between the submission of the Initial Approved Budget and the submission of any subsequent Approved Budget, by which the aggregate total of transaction costs, including fees and expenses of the DIP Agent (but excluding Professional Fees and expenses of the DIP Agent), capital expenditures, working capital and Operating Costs  exceeds the aggregate total of such costs projected for such period in the Initial Approved Budget.

#4839-7606- 0179

"Person" means an individual, partnership, corporation (including a business trust), joint stock company, trust, unincorporated association, joint venture, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"Plan" means a Single Employer Plan or a Multiple Employer Plan.

"Preferred Stock" as applied to the Capital Stock of any corporation, means Capital Stock of any class or classes (however designated) which is preferred as to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such corporation, over shares of Capital Stock of any other class of such corporation.

"Pre-petition Collateral" has the meaning specified in Section 5.01(j)(iii)(A).

"Primed Liens" has the meaning specified in Section 8.01(a)(iv).

"Production" means, for any period, the amount of gold and other minerals which has been produced.

"Production Report" means a report in the form attached hereto as Exhibit C setting forth the Production volume and Production price and such other information as the DIP Agent may reasonably request.

"Professional Fees" means allowed and unpaid fees, costs, expenses and disbursements incurred in connection with the Chapter 11 Cases by persons or firms retained by the DIP Borrowers and Guarantors or the Creditors' Committee in the Chapter 11 Cases pursuant to sections 327, 328, 363 or 1103 of the Bankruptcy Code.

"Project" means the Hollister gold mining facility located in Elko County, Nevada and the Esmeralda mill facility located in Mineral County, Nevada.

"Project Documents" means the Offtake Agreements and all permits and approvals necessary for the operation and maintenance of the Project.

"Project Revenues" means, for any period of computation, the sum (without duplication) of (a) all revenues received by the DIP Borrowers under the Project Documents during such period, (b) all revenues received by the DIP Borrowers from the sale of products or services during such period, (c) all amounts received under the Hollister Hedge Agreement during such period, (d) all earnings of the DIP Borrowers during such period on Permitted Investments and (e) all proceeds of business interruption insurance received by the DIP Borrowers during such period.

"Rate Determination Notice" has the meaning specified in Section 2.07(b).

"Register" has the meaning specified in Section 10.07(d).

"Related Indemnity Person" means, with respect to any Person, any other Person, so long

19

#4839-7606- 0179

as both Persons are any of an Institution, such Institution's Affiliates, and such Institution's and such Affiliates' respective officers, directors, employees, agents and advisors.  For purposes of the foregoing, "Institution" means the DIP Agent, any Lead Arranger or any DIP Lender.

"Related Party" means, with respect to any Person, any other Person, so long as both Persons are any of an Institution, such Institution's Affiliates, and such Institution's and such Affiliates' respective managers, administrators, trustees, partners, directors, officers, employees, agents, fund managers and advisors.  For purposes of the foregoing, "Institution" means the DIP Agent, any Lead Arranger, or any DIP Lender.

"Required Insurance" means the insurance coverage set forth on Schedule 5.01(c).

"Required DIP Lenders" means, at any time, DIP Lenders having at least a majority in interest of the sum of the outstanding principal amount of the Loans and the unused Commitments in effect at such time.

"Requisite Amount" has the meaning specified in Section 6.01(d).

"Reorganization Plan" means a chapter 11 plan of reorganization of the Debtors which either (a) is approved, and any amendments thereto are approved, by the DIP Lenders or (b) provides for, upon confirmation thereof, indefeasible payment in full in cash of the Obligations.

"Restricted Payment" means (a) all dividends paid by any DIP Borrower (in cash, Property (other than equity interests in such DIP Borrower) thereof or obligations) on, or other payments or distributions on account of, or the setting apart of money for a sinking or other analogous fund for, or the purchase, redemption, retirement or other acquisition by the Borrower of, any portion of any shares in any DIP Borrower or any warrants, rights or options to acquire any such shares; and (b) any payment of development, management or other similar fees, by any DIP Borrower to any Affiliate thereof, but excluding amounts payable pursuant to a contract entered into in accordance with Section 5.01(h).

"Restricting Information" has the meaning specified in Section 10.02(c).

"Rodeo Creek" has the meaning specified in the preamble hereto.

"Rodeo Note" has the meaning specified in the recitals hereto.

"Rusaf" has the meaning specified in the recitals hereto.

"Scheduled Final Maturity Date" means the earlier of (a) June 7, 2013, (b) April 8, 2013 if the Final Order has not been entered on or prior to such date and (c) the date of consummation of a Permitted Sale.

"SEC" means the U.S. Securities and Exchange Commission.

20

"SEDAR" means the System for Electronic Document Analysis and Retrieval filing system maintained by the Canadian Securities Administrators.

"Senior Secured Notes" means the $51,500,000 of face value of notes issued by the Parent on December 12, 2008 under an indenture administered by HSBC Bank (USA), N.A.

"Senior Statutory Liens" means valid and enforceable lien rights under state law, or otherwise, solely to the extent that such liens are valid, enforceable, non-avoidable and timely perfected and relate to claims arising prior to the Petition Date and attached to property upon which the holders of the Prepetition Obligations did not have a valid, enforceable, non-avoidable and perfected lien as of the Petition Date.

"Set" means the collective reference to LIBO Rate Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Statutory Reserve Percentage" for any Interest Period for all LIBO Rate Loans comprising part of the same Set means the reserve percentage applicable during such Interest Period (or if more than one such percentage shall be so applicable, the daily weighted average of such percentages for those days in such Interest Period during which any such percentage shall be so applicable) under regulations issued from time to time by the Board of Governors of the Federal Reserve System (or any successor) for determining the maximum reserve requirement (including, without limitation, any emergency, supplemental or other marginal reserve requirement) for such DIP Lender with respect to liabilities or assets consisting of or including Eurocurrency Liabilities (or with respect to any other category of liabilities that includes deposits by reference to which the interest rate on LIBO Rate Loans is determined) having a term equal to such Interest Period.

"Single Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, that (a) is maintained for employees of a DIP Borrower or any ERISA Affiliate thereof and no Person other than such DIP Borrower and the ERISA Affiliates thereof or (b) was so maintained and in respect of which such DIP Borrower or any ERISA Affiliate thereof could have liability under Section 4069 of ERISA in the event such plan has been or were to be terminated.

"Subsidiary" means Touchstone and Hollister Venture.

"Substitute Basis" has the meaning specified in Section 2.07(b).

"Superpriority Claim" means a claim against any DIP Borrower or its respective estate in the Chapter 11 Cases which is an allowed administrative expense claim of the kind specified in Section 503(b), 506(c) or 507(b) of the Bankruptcy Code with priority over all other administrative claims.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges, assessments, fees withholdings or similar charges, including any additions to tax,

penalties, interest and other liabilities with respect thereto, imposed by any Governmental Authority.

"<u>Title Report</u>" means the title opinions and water rights opinions with respect to the Project issued by Richard Harris of Harris & Thompson, lawyers, Reno, Nevada.

"<u>Total Loss</u>" means any loss, damage, destruction, casualty or other event that causes the Project to be damaged, destroyed or rendered unfit for normal use for any reason whatsoever, including without limitation through a failure of title or any loss of such property (including, without limitation, a condemnation or deed in lieu thereof), as determined by the DIP Agent (acting on the instructions of the Required DIP Lenders).

"<u>Touchstone</u>" has the meaning specified in the preamble hereto.

"<u>Transaction Documents</u>" means the DIP Loan Documents and the Project Documents.

"<u>US Dollars</u>" or "<u>$</u>" means the lawful money of the United States of America.

"<u>U.S. Trustee</u>" means the Office of the United States Trustee for the District of Nevada.

"<u>Voting Stock</u>" means capital stock issued by a corporation, or equivalent interests in any other Person, the holders of which are ordinarily, in the absence of contingencies, entitled to vote for the election of directors (or persons performing similar functions) of such Person, even if the right so to vote has been suspended by the happening of such a contingency.

"<u>Wind-Down Costs</u>" has the meaning specified in Section 6.03(d).

"<u>Withdrawal Notice</u>" means a notice delivered by the DIP Borrower to the DIP Agent and the DIP Lenders in substantially the form of Exhibit D, requesting a withdrawal of funds from the Collateral Account.

SECTION 1.02.        <u>Computation of Time Periods; Terms Generally</u>.        In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding".  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns and (c) any reference to any law or regulation herein shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time.

SECTION 1.03.        <u>Accounting Terms</u>.

#4839-7606- 0179

(a)      All terms of an accounting or financial nature shall be construed in accordance with generally accepted accounting principles of the applicable jurisdiction ("GAAP") and IFRS, as in effect from time to time, except as otherwise specifically prescribed in clause (b) below.

(b)      If any DIP Borrower notifies the DIP Agent that such DIP Borrower requests an amendment to any provision hereof to eliminate the effect of any change in GAAP or IFRS, as applicable, occurring after the date hereof or in the application thereof on the operation of such provision (or if the DIP Agent notifies any DIP Borrower that the Required DIP Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or IFRS, as applicable, or in the application thereof, then such provision shall be interpreted on the basis of GAAP or IFRS, as applicable, as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith

SECTION 1.04.      Times and Definition of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).  "Day" means "calendar day".

## ARTICLE II
## AMOUNTS AND TERMS OF THE DIP LOANS

SECTION 2.01.      The DIP Loans.

(a)      The DIP Loans.  Subject to the terms and conditions set forth herein, each DIP Lender severally agrees to make loans (the "DIP Loans" and each, a "DIP Loan") to the DIP Borrowers in an aggregate principal amount not to exceed such DIP Lender's Commitment.  The DIP Loans shall be made in separate draws and in an aggregate principal amount on each such occasion as follows:

(i)      on the Interim Order Availability Date, the Interim Order Facility Amount; and

(ii)      on the Final Order Availability Date, the Final Order Facility Amount.

(b)      The DIP Loans and any portion thereof repaid or prepaid hereunder may not be reborrowed.

SECTION 2.02.      Making the DIP Loans.

(a)      The Borrowing of DIP Loans shall be made on notice, given not later than 2:00 p.m. (Mountain time) on any Business Day prior to the date of the proposed Borrowing and the DIP Agent shall give each DIP Lender prompt notice thereof.  Each such notice (a "Notice of Borrowing") shall be in writing in substantially the form of Exhibit E hereto, specifying therein (i) the aggregate amount of such Borrowing, (ii) the initial Interest Period for each such Loan and (iii) the identity of the DIP Borrower to which the Loans are to be made. Each DIP Lender shall, before 12:00 noon (London time) (or such other time agreed upon by the

23

DIP Borrowers and the DIP Agent) on the date of the applicable Borrowing, make available for the account of its Applicable Lending Office to the DIP Agent at the DIP Agent's account, in same day funds, such DIP Lender's ratable portion of such Borrowing.  After the DIP Agent's receipt of such funds and upon fulfillment of the applicable conditions set forth in Article III, the DIP Agent will make such funds available to the applicable DIP Borrower at the DIP Agent's address referred to in Section 10.02.

(b)    A Notice of Borrowing shall be binding on the DIP Borrowers unless revoked in writing prior to the Borrowing of the Loans.  The DIP Borrowers shall indemnify each DIP Lender against any loss, cost or expense incurred by such DIP Lender as a result of any revocation of a Notice of Borrowing pursuant to the immediately preceding sentence or any failure to fulfill on or before the date of Borrowing the applicable conditions set forth in Article III, including, without limitation, any loss, cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such DIP Lender to fund the Loan to be made by such DIP Lender as part of such Borrowing when such Loan, as a result of such failure, is not made on such date.

(c)    Unless the DIP Agent shall have received notice from a DIP Lender prior to the date of a Borrowing that such DIP Lender will not make available to the DIP Agent such DIP Lender's ratable portion of such Borrowing, the DIP Agent may assume that such DIP Lender has made such portion available to the DIP Agent on the date of Borrowing in accordance with subsection (a) above and the DIP Agent may, in reliance upon such assumption, make available to the applicable DIP Borrower on such date a corresponding amount.  If and to the extent that such DIP Lender shall not have so made such ratable portion available to the DIP Agent, such DIP Lender and the DIP Borrowers severally (but as between the DIP Borrowers, jointly and severally) agree to repay to the DIP Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the DIP Borrowers until the date such amount is repaid to the DIP Agent, at (i) in the case of the DIP Borrowers, the interest rate applicable at the time to Loans comprising such Borrowing and (ii) in the case of such DIP Lender, the greater of the Federal Funds Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the DIP Agent in connection with the foregoing.  If the DIP Borrowers and such DIP Lender shall pay such interest to the DIP Agent for the same or an overlapping period, the DIP Agent shall promptly remit to the DIP Borrowers the amount of such interest paid by the DIP Borrowers for such period.  If such DIP Lender shall repay to the DIP Agent such corresponding amount, such amount so repaid shall constitute such DIP Lender's Loan as part of such Borrowing for purposes of this Agreement and the DIP Borrowers shall be relieved of their respective obligations to repay such amount under this subsection (c).  Any payment by the DIP Borrowers shall be without prejudice to any claim the DIP Borrowers may have against a DIP Lender that shall have failed to make such payment to the DIP Agent.

(d)    If any DIP Lender makes available to the DIP Agent funds for any Loan to be made by such DIP Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the applicable DIP Borrower by the DIP Agent because the conditions to the making of such Loan set forth in Article III are not satisfied or waived in

24

accordance with the terms hereof, the DIP Agent shall return such funds (in like funds as received from such DIP Lender) to such DIP Lender, without interest.

(e)    The obligations of the DIP Lenders hereunder to make Loans and to make payments pursuant to Section 10.04(c) are several and not joint.  The failure of any DIP Lender to make any Loan or to make any payment under Section 10.04(c) on any date required hereunder shall not relieve any other DIP Lender of its corresponding obligation to do so on such date, and no DIP Lender shall be responsible for the failure of any other DIP Lender to so make its Loan or to make its payment under Section 10.04(c).

(f)    Nothing herein shall be deemed to obligate any DIP Lender to obtain the funds for any Loan in any particular place or manner or to constitute a representation by any DIP Lender that it has obtained or will obtain the funds for any Loan in any particular place or manner.

SECTION 2.03.    <u>Withdrawal of DIP Loans</u>.  The DIP Borrowers may deliver to the DIP Agent a single Withdrawal Notice no later than 12:00 noon (London time).  Upon the receipt of a Withdrawal Notice, the DIP Agent shall transfer Loans in an aggregate principal amount equal to the amount specified in such Withdrawal Notice to the account of the DIP Borrowers specified in such Withdrawal Notice to fund expenses of the following week or such shorter period as specified in such Withdrawal Notice in accordance with the Approved Budget; <u>provided</u> that:  (x) after giving effect to each withdrawal, the aggregate Cash Collateral held by the DIP Borrowers will not exceed the amount necessary to fund all applicable expenditures for the following week by more than $100,000 and (y) funds withdrawn shall be used solely in accordance with Section 5.01(j).  Each Withdrawal Notice shall contain a certification by the DIP Borrowers that the withdrawal request pursuant thereto complies, and the application of the funds so withdrawn will comply, with the terms of this Agreement in all respects, and the DIP Agent shall be entitled to conclusively rely on such certification, absent manifest error.

SECTION 2.04.    <u>Repayment of DIP Loans; Extension of Scheduled Final Maturity Date</u>.

(a)    The DIP Borrowers agree to repay to the DIP Agent for the account of the DIP Lenders the aggregate principal amount of the Loans in one installment payable on the Final Maturity Date.

(b)    The DIP Borrowers may request not more than one one-month extension of the date set forth in clause (a) of the definition of Scheduled Final Maturity Date (such request, an "<u>Extension Request</u>").  The DIP Agent shall have the right to approve or reject the Extension Request in its sole discretion and unless the DIP Agent shall have given its prior written consent to the Extension Request, the DIP Loans shall be due and payable on the Final Maturity Date as set forth in clause (a) above.

SECTION 2.05.    <u>Termination or Reduction of the Commitments</u>.

(a)    The Commitments of the DIP Lenders with respect to:

#4839-7606- 0179

(i)     the Interim Order Facility Amount shall automatically terminate on April 8, 2013 if (A) the Interim Order Availability Date has not occurred as of such date and (B) the Final Order has not been entered as of such date; and

(ii)    the Final Order Facility Amount shall automatically terminate upon the earlier to occur of (A) April 8, 2013 if the Final Order has not been entered as of such date and the Final Order Availability Date has not occurred by such date and (B) the making of the DIP Loans allocable to such amount on the Final Order Availability Date.

(b)     The DIP Borrowers shall have the right, upon at least four days' notice to the DIP Agent, to terminate in whole or reduce ratably in part the unused portions of the Commitments of the DIP Lenders so long as the DIP Agent determines that such termination or reduction will not result in a funding shortfall.  Each partial reduction of the Commitments shall be in the aggregate amount of $2,000,000 or an integral multiple of $1,000,000 in excess thereof and, once terminated, a Commitment may not be reinstated.  The DIP Agent will promptly notify the DIP Lenders of any termination or reduction of the Commitments under this Section 2.05(b). Upon any reduction of the Commitments, the Commitment of each DIP Lender shall be reduced by such DIP Lender's ratable portion of such reduction amount.  All fees in respect of the Commitments accrued until the effective date of any termination of the Commitments shall be paid on the effective date of such termination.

SECTION 2.06.    Interest.

(a)     Scheduled Interest.  The DIP Borrowers shall pay interest on the unpaid principal amount of each Loan owing to each DIP Lender from each Funding Date until such principal amount of such Loan shall be paid in full, at the following rates per annum:

(i)     LIBO Rate Loans.  A rate per annum equal at all times during each Interest Period for such Loan to the sum of (x) the LIBO Rate for such Interest Period for such Loan plus (y) the Applicable Rate in effect from time to time, payable in arrears on the last day of such Interest Period.

(ii)    Default Interest.  Upon the occurrence and during the continuance of an Event of Default under Section 6.01(a), the DIP Borrowers shall pay interest on the overdue amount of principal, interest or fees, as the case may be, at a rate per annum which is the rate that would be otherwise applicable thereto pursuant to clause (a)(i) of this Section 2.06 plus 2%, and such interest shall be payable on demand.

SECTION 2.07.    Interest Rate Determination.

(a)     The DIP Agent shall give prompt notice to the DIP Borrowers and the DIP Lenders of the applicable interest rate determined by the DIP Agent for purposes of Section 2.06(a)(i).

(b)     If, on or prior to the first day of any Interest Period (an "Affected Interest Period"), the Required DIP Lenders notify the DIP Agent that the LIBO Rate for any Interest Period for the Loans will not adequately reflect the cost to such DIP Lenders of making, funding or maintaining their respective Loans for such Interest Period, the DIP Agent shall forthwith so

26

notify the DIP Borrowers and, upon such DIP Lender's request, the DIP Agent shall give notice thereof (a "Rate Determination Notice") to the DIP Borrowers and the DIP Lenders as soon as practicable thereafter.  If such notice is given, during the thirty-day period following such Rate Determination Notice (the "Negotiation Period") the DIP Agent and the DIP Borrowers shall negotiate in good faith with a view to agreeing upon a substitute interest rate basis (having the written approval of the Required DIP Lenders) for the Loans which shall reflect the cost to the DIP Lenders of funding their Loans from alternative sources (a "Substitute Basis"), and if such Substitute Basis is so agreed upon during the Negotiation Period, such Substitute Basis shall apply in lieu of the LIBO Rate to all Interest Periods commencing on or after the first day of the Affected Interest Period, until the circumstances giving rise to such notice have ceased to apply. If a Substitute Basis is not agreed upon during the Negotiation Period, the DIP Borrowers may elect to prepay the Loans pursuant to Section 2.08(a); provided, however, that if the DIP Borrowers do not elect so to prepay, each DIP Lender shall determine (and shall certify from time to time in a certificate delivered by such DIP Lender to the DIP Agent setting forth in reasonable detail the basis of the computation of such amount) the rate basis reflecting the cost to such DIP Lender of funding its Loans for the Interest Period commencing on or after the first day of the Affected Interest Period, until the circumstances giving rise to such notice have ceased to apply, and such rate basis shall be binding upon the DIP Borrowers and such DIP Lender and shall apply in lieu of the LIBO Rate for the relevant Interest Period.

SECTION 2.08.    Prepayments of Loans.

(a)    Optional Prepayments.  Upon 5 days written notice, the DIP Borrowers may prepay the outstanding principal amount of the Loans in whole or in part; provided, however, that each partial prepayment, except the last payment, shall be in an aggregate principal amount of $2,000,000 or an integral multiple of $1,000,000 in excess thereof.

(b)    Mandatory Prepayments.   Upon 5 Business Days written notice and subject to funding the Chapter 11 Expenses and the Committee Settlement Obligations, the DIP Borrowers shall prepay the outstanding principal amount of the DIP Loans in the following amounts and upon the occurrence of the following events,

(i)    with 100% of the Net Available Cash or Net Cash Proceeds from any issuance or sale of Capital Stock or Debt by the DIP Borrowers, the Subsidiaries and their respective Affiliates; and

(ii)    with 100% of the Net Available Cash or Net Cash Proceeds from any Disposition, casualty or condemnation.

(c)    Notices.  Prepayments pursuant to this Section 2.08 shall be made upon at least three Business Days' notice, stating the proposed date and aggregate principal amount of the applicable prepayment.  Upon receipt of a notice of prepayment pursuant to this clause (c), the DIP Agent shall promptly notify each DIP Lender of the contents thereof and of such DIP Lender's ratable share of such prepayment and such notice shall not thereafter be revocable.

(d)    Application; Other Amounts.    All prepayments pursuant to this Section 2.08 shall be applied in accordance with Section 6.03(c) and shall be accompanied by

interest accrued on the principal amount prepaid to the date of such prepayment, and the DIP Borrowers shall be obligated to reimburse the DIP Lenders in respect thereof pursuant to Section 10.04(d).

SECTION 2.09.        Increased Costs.

(a)      If any Change in Law shall:

(i)  impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any DIP Lender (other than any change by way of imposition or increase of reserve requirements included in the Statutory Reserve Percentage); or

(ii) impose on any DIP Lender or the London interbank market any other condition, cost or expense affecting this Agreement or the Loan of such DIP Lender;

and the result of any of the foregoing shall be to increase the cost to such DIP Lender of making or maintaining its Loan or of maintaining its Commitment, or to reduce the amount of any sum received or receivable by such DIP Lender hereunder (whether of principal, interest or any other amount) then, upon request of such DIP Lender, the DIP Borrowers will pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender for such additional costs incurred or reduction suffered.  This Section 2.09 shall not apply to any Taxes indemnified against pursuant to Section 2.12, Taxes described in clauses (a) or (c) of the definition of Excluded Taxes, or Other Connection Taxes.

(b)      If any DIP Lender determines that any Change in Law affecting such DIP Lender or any lending office of such DIP Lender or such DIP Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such DIP Lender's capital or on the capital of such DIP Lender's holding company, if any, as a consequence of this Agreement, the Commitment of such DIP Lender or the Loan of such DIP Lender to a level below that which such DIP Lender or such DIP Lender's holding company could have achieved but for such Change in Law (taking into consideration such DIP Lender's policies and the policies of such DIP Lender's holding company with respect to capital adequacy), then from time to time the DIP Borrowers will pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender or such DIP Lender's holding company for any such reduction suffered.

(c)      A certificate of any DIP Lender setting forth the amount or amounts necessary to compensate such DIP Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the DIP Borrowers shall

28

be conclusive absent manifest error. The DIP Borrowers shall pay to such DIP Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

SECTION 2.10.    <u>Illegality</u>. Notwithstanding any other provision of this Agreement, if any DIP Lender shall notify the DIP Agent that the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any central bank or other Governmental Authority having relevant jurisdiction asserts that it is unlawful, for any DIP Lender or its Applicable Lending Office to perform its obligations hereunder to make LIBO Rate Loans or to fund or maintain LIBO Rate Loans hereunder, (i) the obligation of such DIP Lender to make LIBO Rate Loans shall be suspended until the DIP Agent shall notify the DIP Borrowers and the DIP Lenders that the circumstances causing such suspension no longer exist and (ii) if such change shall so mandate, such DIP Lender's Loans shall be prepaid by the DIP Borrowers, together with accrued and unpaid interest thereon and all other amounts payable by the DIP Borrower under this Agreement, on or before such date as shall be mandated by such change.

SECTION 2.11.    <u>Payments and Computations</u>.

(a)    The DIP Borrowers shall make each payment hereunder and under the Notes, if any, not later than 2:00 P.M. (London time) on the day when due, in US Dollars, to the DIP Agent at the DIP Agent's account in same day funds, without set-off, counterclaim or deduction. The DIP Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal or interest ratably (other than amounts payable pursuant to Section 2.09, 2.10, 2.12 or 10.04(d)) to the DIP Lenders for the account of their respective Applicable Lending Offices, and like funds relating to the payment of any other amount payable to any DIP Lender to such DIP Lender for the account of its Applicable Lending Office, in each case to be applied in accordance with the terms of this Agreement. Upon its acceptance of an Assignment and Assumption and recording of the information contained therein in the Register pursuant to Section 10.07(d), from and after the effective date specified in such Assignment and Assumption, the DIP Agent shall make all payments hereunder and under the Notes, if any, in respect of the interest assigned thereby to the DIP Lender assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves. All payments received by the DIP Agent after 2:00 P.M. (London time) shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    All computations of interest and fees based on the LIBO Rate or the Federal Funds Rate shall be made by the DIP Agent on the basis of a year of 360 days, in each case for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest is payable. Each determination by the DIP Agent of an interest rate hereunder shall be conclusive and binding for all purposes, absent error in the calculation of such interest rate.

(c)    Whenever any payment hereunder or under the Notes, if any, shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of payment of interest; <u>provided</u>, <u>however</u>, that, if such extension would cause

payment of interest on or principal of LIBO Rate Loans to be made in the next following calendar month, such payment shall be made on the next preceding Business Day.

(d)    Unless the DIP Agent shall have received notice from the DIP Borrowers prior to the date on which any payment is due to the DIP Lenders that the DIP Borrowers will not make such payment in full, the DIP Agent may assume that the DIP Borrowers has made such payment in full to the DIP Agent on such date and the DIP Agent may, in reliance upon such assumption, cause to be distributed to each DIP Lender on such due date an amount equal to the amount then due such DIP Lender.  If and to the extent the DIP Borrowers shall not have so made such payment in full to the DIP Agent each DIP Lender severally agrees to repay to the DIP Agent forthwith on demand such amount distributed to such DIP Lender together with interest thereon, for each day from the date such amount is distributed to such DIP Lender until the date such DIP Lender repays such amount to the DIP Agent, at the greater of the Federal Funds Rate and a rate determined by the DIP Agent in accordance with banking industry rules on interbank compensation.

SECTION 2.12.    Taxes.

(a)    Unless otherwise required by applicable law, any and all payments by the DIP Borrowers hereunder or under the Notes, if any, shall be made, in accordance with Section 2.11, free and clear of and without deduction for any and all present or future Taxes.  If any DIP Borrower shall be required by law to deduct any Taxes from or in respect of any sum payable hereunder or under any Note to any DIP Lender or the DIP Agent, (i) in the case of Taxes other than Excluded Taxes, the sum payable shall be increased as may be necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.12) such DIP Lender or the DIP Agent, as the case may be, receives an amount equal to the sum it would have received had no such deductions for such Taxes been required, (ii) such DIP Borrower shall make such deductions and (iii) such DIP Borrower shall promptly pay the full amount deducted to the relevant Governmental Authority or other authority in accordance with applicable law.  Within 30 days after the date of any payment of Taxes, the DIP Borrowers shall furnish to the DIP Agent, at its address referred to in Section 10.02, the original or a certified copy of a receipt evidencing payment thereof.

(b)    In addition, the DIP Borrowers agree to pay any stamp taxes, documentary taxes, excise taxes, property taxes, and any other similar Taxes that arise from any payment made hereunder or under the Notes or from the execution, delivery or registration of, performing under, or otherwise with respect to, this Agreement or the Notes (herein referred to as "Other Taxes").

(c)    The DIP Borrowers shall indemnify each DIP Lender and the DIP Agent for the full amount of Taxes (other than Excluded Taxes) and Other Taxes (to the extent not previously paid under subsection (a) or (b) above) imposed on or paid by such DIP Lender or the DIP Agent, as the case may be, and any liability (including penalties, interest, expenses and any Taxes imposed by any jurisdiction on amounts payable under this Section 2.12) arising therefrom or with respect thereto.  This indemnification shall be made within 30 days from the date such DIP Lender or the DIP Agent, as the case may be, makes written demand therefor.  A certificate of the DIP Agent or such DIP Lender setting forth in reasonable detail the basis for determining

30

the amount payable by the DIP Borrowers pursuant to this Section 2.12(c) shall be forwarded to the DIP Borrowers through the DIP Agent and shall conclusively presumed to be correct absent manifest error.

(d)    Each DIP Lender organized under the laws of a jurisdiction outside the United States, on or prior to the date of its execution and delivery of this Agreement in the case of each Initial DIP Lender and on the date of the Assignment and Assumption pursuant to which it becomes a DIP Lender in the case of each other DIP Lender, and from time to time thereafter as requested in writing by the DIP Borrowers (but only so long as such DIP Lender remains lawfully able to do so), shall provide each of the DIP Agent and the DIP Borrowers with two properly and accurately completed and duly executed original Internal Revenue Service forms W-8BEN or W-8ECI, as appropriate, or any successor or other form prescribed by the Internal Revenue Service, establishing that payments to such DIP Lender are (i) in the case of an Initial DIP Lender, not subject to United States Federal withholding tax under the Internal Revenue Code because such payment is either effectively connected with the conduct by such DIP Lender of a trade or business in the United States or totally exempt from United States Federal withholding tax by reason of the application of an income tax treaty to which the United States is a party and (ii) in the case of any other DIP Lender, eligible for any available exemption from or reduction in United States Federal withholding tax. Each DIP Lender organized under the laws of a jurisdiction outside the United States further agrees to provide, promptly upon the reasonable demand of the DIP Borrower or the DIP Agent, any information, form or document, accurately completed, that may be required in order to demonstrate that such DIP Lender is in compliance with the requirements of FATCA. Each DIP Lender and the DIP Agent shall provide the DIP Borrowers and the DIP Agent with such other forms or questionnaires relating to the identity of such DIP Lenders or the DIP Agent, as the case may be, as a DIP Borrower may reasonably request to establish any available exemption from or reduction in Taxes that may be subject to indemnification under this Section 2.12.

(e)    Should a DIP Lender or amounts payable to a DIP Lender become subject to any Excluded Taxes, the DIP Borrowers shall take such steps at such DIP Lender's expense as such DIP Lender shall reasonably request to assist such DIP Lender to recover such Excluded Taxes.

(f)    In the event that any DIP Borrower makes an additional payment under subsection (a) or (c) above for the account of any DIP Lender or the DIP Agent and such DIP Lender or the DIP Agent, as the case may be, in its sole opinion, determines that it has finally and irrevocably received or been granted a credit against, or relief or remission from, or repayment of, any tax paid or payable by it in respect of or calculated with reference to the deduction or withholding giving rise to such additional payment, such DIP Lender or the DIP Agent, as the case may be, shall, to the extent that it determines that it can do so without prejudice to the retention of the amount of such credit, relief, remission or repayment, pay to such DIP Borrower such amount as such DIP Lender or the DIP Agent, as the case may be, shall, in its sole opinion, have determined is attributable to such deduction or withholding and will leave such DIP Lender or the DIP Agent, as the case may be, (after such payment) in no worse position than it would have been had such DIP Borrower not been required to make such additional payment. Each DIP Lender and the DIP Agent shall reasonably cooperate with the DIP Borrowers at the DIP Borrowers' written request and sole expense, in contesting any Tax or

31

Other Tax the DIP Borrowers would bear pursuant to this Section 2.12; provided, however, that (i) no tax return of such DIP Lender or the DIP Agent is or would be held open as a result of such contest, (ii) neither such DIP Lender nor the DIP Agent is required to reopen a tax year that has already closed and (iii) such DIP Lender and the DIP Agent shall, in the sole opinion of such DIP Lender and the DIP Agent, respectively, have determined that such contest will leave such DIP Lender and the DIP Agent, respectively, in no worse position than it would have been in had it not contested such Tax or Other Tax.  Nothing contained herein shall (i) interfere with the right of a DIP Lender or the DIP Agent to arrange its tax affairs in whatever manner it thinks fit or (ii) oblige any DIP Lender or the DIP Agent to claim any tax credit or to disclose any information relating to its tax affairs or any computations in respect thereof or (iii) require any DIP Lender or the DIP Agent to take or refrain from taking any action that would prejudice its ability to benefit from any other credits, reliefs, remissions or repayments to which it may be entitled or (iv).require a DIP Lender or the DIP Agent to contest any Tax or Other Tax or take any action in contesting any Tax or Other Tax if, in the sole judgment of such DIP Lender or the DIP Agent, such contest or action would be disadvantageous to such DIP Lender or the DIP Agent.  In pursuing any contest pursuant to this Section 2.12(f), the DIP Lender or the DIP Agent will be represented by counsel of such DIP Lender's or the DIP Agent's choice, and will defend against, settle or otherwise control the contest and will not relinquish control or decision making over the contest.

SECTION 2.13.    Sharing of Payments, Etc.  If any DIP Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set off, or otherwise) on account of the Loans owing to it (other than pursuant to Section 2.09, 2.10, 2.12, 10.04(d) or 10.07) in excess of its ratable share of payments on account of the Loans, such DIP Lender shall forthwith notify the DIP Agent of such fact and purchase from the other DIP Lenders such participations in the Loans owing to them as shall be necessary to cause such purchasing DIP Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of such excess payment is thereafter recovered from such purchasing DIP Lender, such purchase from each DIP Lender shall be rescinded and such DIP Lender shall repay to the purchasing DIP Lender the purchase price to the extent of such recovery together with an amount equal to such DIP Lender's ratable share (according to the proportion of (i) the amount of such DIP Lender's required repayment to (ii) the total amount so recovered from the purchasing DIP Lender) of any interest or other amount paid or payable by the purchasing DIP Lender in respect of the total amount so recovered.  Each DIP Borrower agrees that any DIP Lender so purchasing a participation from another DIP Lender by delivering payment pursuant to this Section 2.13 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right of set off) with respect to such participation as fully as if such DIP Lender were the direct creditor of such DIP Borrower in the amount of such participation.

SECTION 2.14.    Evidence of Debt.

(a)    Each DIP Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of each DIP Borrower to such DIP Lender resulting from each Loan owing to such DIP Lender from time to time, including the amounts of principal and interest payable and paid to such DIP Lender from time to time hereunder in respect of Loans.  Each DIP Borrower agrees that upon request by any DIP Lender to such DIP

Borrower (with a copy of such notice to the DIP Agent) to the effect that a Note is required in order for such DIP Lender to evidence (whether for purposes of pledge, enforcement or otherwise) the Loans owing to such DIP Lender, such DIP Borrower shall promptly execute and deliver to such DIP Lender a Note payable to the order of such DIP Lender in a principal amount up to the outstanding Loans of such DIP Lender.

(b)     The Register maintained by the DIP Agent pursuant to Section 10.07(d) shall include (i) the date and amount of each Borrowing, the Loans comprising each Borrowing and the Interest Period applicable thereto, (ii) the terms of each Assignment and Assumption delivered to and accepted by it, (iii) the amount of any principal or interest due and payable or to become due and payable from each DIP Borrower to each DIP Lender hereunder and (iv) the amount of any sum received by the DIP Agent from each DIP Borrower hereunder and each DIP Lender's share thereof.

(c)     Entries made in good faith by the DIP Agent in the Register pursuant to subsection (b) above, and by each DIP Lender in its account or accounts pursuant to subsection (a) above, shall be prima facie evidence of the amount of principal and interest due and payable or to become due and payable from each DIP Borrower to, in the case of the Register, each DIP Lender and, in the case of such account or accounts, such DIP Lender, under this Agreement, absent manifest error; provided, however, that the failure of the DIP Agent or such DIP Lender to make an entry, or any finding that an entry is incorrect, in the Register or such account or accounts shall not limit or otherwise affect the obligations of any DIP Borrower under this Agreement.

SECTION 2.15.     Fees.

(a)     Commitment Fee.  The DIP Borrowers shall pay to the DIP Agent for the account of each DIP Lender a commitment fee on the daily average unused amount of the Commitment of such DIP Lender, for each day during the period from and including the initial Funding Date to and including the funding or termination of all Commitments, at a rate equal to 1.25% per annum.  The commitment fee shall accrue at all times during such period, including at any time during which one or more of the conditions in Article III is not met, and shall be due and payable on the first Business Day of each month with respect to the previous month.  Such fees shall be fully earned upon becoming due and payable and shall not be refundable for any reason whatsoever.

(b)     Final Maturity Date Extension Fee.  The DIP Borrowers shall pay to the DIP Agent an extension fee equal to 1.00% of such DIP Lender's outstanding DIP Loans in the event that the Extension Request is approved by the DIP Agent pursuant to Section 2.04(b) (the "Extension Fee").  The amount of the Extension Fee shall be calculated on the effective date of the approved Extension Request; provided that such Extension Fee shall be payable on the Final Maturity Date and shall be fully earned when paid and shall not be refundable for any reason whatsoever.

#4839-7606- 0179

## ARTICLE III
## CONDITIONS PRECEDENT

SECTION 3.01.        Conditions Precedent to Closing.    This Agreement shall be effective on the date that the following conditions are satisfied (such date the "Closing Date") in the reasonable determination of the DIP Agent:

(a)        Each of this Agreement and the other DIP Loan Documents shall have been duly executed and delivered by each DIP Borrower and each of the other parties hereto and thereto.

(b)        Since the Petition Date, no event or circumstance has occurred which has had a Material Adverse Effect.

(c)        Except as set forth on Schedule 3.01(c), the Chapter 11 Cases and the CCAA Proceeding, there shall exist no action, suit, investigation, litigation or proceeding affecting any DIP Borrower or any Guarantor, pending or threatened before any court, governmental agency or arbitrator that (i) has a Material Adverse Effect or (ii) is initiated by any Person other than a DIP Lender in its capacity as a DIP Lender that purports to affect the legality, validity or enforceability of this Agreement or any Note or the consummation of the transactions contemplated hereby.

(d)        All governmental and third party consents and approvals necessary in connection with the transactions contemplated hereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the DIP Lenders) and shall remain in effect, and no law or regulation shall be applicable in the reasonable judgment of the DIP Lenders that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated hereby.

(e)        The DIP Agent and the DIP Lenders shall have completed any required Act or other "know your customer" compliance, the results of which are satisfactory to the DIP Agent and the DIP Lenders in their sole discretion

(f)        The DIP Borrowers shall have achieved each milestone set forth on Schedule 5.01(n) required to be achieved on or prior to the Closing Date.

(g)        All orders of the Bankruptcy Court entered on or about the Petition Date, including those providing for (i) the continuation of the DIP Borrowers' pre-petition cash management system and deposit and disbursement accounts, including deposit and disbursement accounts and the use and operation of the Collateral Account and (ii) payment of critical vendors, shall be in full force and effect and shall not have been reversed, modified or amended in any respect which is adverse to the interests of the DIP Agent and the DIP Lenders or any DIP Borrower.

(h)        The Interim Order and Final Order shall each have been entered by the Bankruptcy Court, and shall have been entered on sufficient prior notice to parties in interest, as determined by the DIP Agent and the Bankruptcy Court, and the DIP Agent shall have received a true and complete copy of the same, and such order shall be in full force and effect and shall not

34

#4839-7606- 0179

have been reversed, modified, amended, stayed, vacated, revised, rescinded or subject to appeal absent the prior written consent of the DIP Agent and the Required DIP Lenders.  The DIP Borrowers, the DIP Agent and the DIP Lenders shall be entitled to rely in good faith upon the Interim Order and Final Order, and shall be permitted and required to perform their respective obligations in compliance with this Agreement, notwithstanding any objections thereto, unless the Interim Order or Final Order, as applicable, has been stayed by a court of competent jurisdiction.

(i)    The DIP Agent shall have received such other information with respect to the condition (financial or otherwise), business, operations, performance, prospects of the DIP Borrowers or the Project as shall have been reasonably requested by the DIP Agent on or prior to the Closing Date.

SECTION 3.02.    <u>Additional Conditions Precedent to Borrowing</u>.  The obligation of each DIP Lender to make each Loan to be made by it (including the initial Loan) shall be subject to the prior or concurrent satisfaction, in the reasonable determination of the DIP Agent, of each of the following conditions precedent:

(a)    The DIP Agent shall have received a fully executed and delivered Notice of Borrowing.

(b)    As of any Funding Date (i) prior to the entry of the Final Order, the Interim Order shall be in full force and effect and shall not have been reversed, modified or amended in any respect and the DIP Borrowers shall be in compliance in all respects with the Interim Order or (ii) on or after the entry of the Final Order, the Final Order shall be in full force and effect and shall not have been reversed, modified or amended in any respect and the DIP Borrowers shall be in compliance in all respects with the Final Order.  If either the Interim Order or the Final Order is the subject of a pending appeal in any respect, none of such Order, the making of the Loans or the performance by any DIP Borrower of any of its obligations under any of the DIP Loan Documents shall be the subject of a presently effective stay pending appeal.

(c)    As of the initial Funding Date in respect of the Final Order Facility Amount, the Final Order shall be in full force and effect and shall not have been reversed, modified or amended in any respect and the DIP Borrowers shall be in compliance in all respects with the Final Order.

(d)    As of such Funding Date, no event shall have occurred and be continuing or would result from the making of such DIP Loan that would constitute a Default.

(e)    With respect to each Loan (other than the initial Loan), the DIP Agent shall have received satisfactory evidence that arrangements shall have been made by the DIP Borrowers to pay all invoiced fees and expenses of the DIP Agent and the DIP Lenders (including the invoiced fees and expenses of counsel and advisors to the DIP Agent) not later than fifteen (15) days following such Funding Date.

(f)    Except as has been previously disclosed to the DIP Agent as of such Funding Date, the representations and warranties made by each DIP Borrower and each Guarantor in the Transaction Documents to which it is a party are correct in all material respects;

35

provided that any representations and warranties herein or in any Transaction Document which expressly relate only to an earlier date shall be correct in all material respects as of such earlier date.

(g)    Except as set forth on Schedule 3.01(c), the Chapter 11 Cases and the CCAA Proceeding, as of such Funding Date, there is no pending or threatened action or proceeding affecting any DIP Borrower or any Guarantor before any court, governmental agency or arbitrator other than the Chapter 11 Cases and the CCAA Proceeding that has a Material Adverse Effect.

SECTION 3.03.    Determinations Under Section 3.01 and Section 3.02.    For purposes of determining compliance with the conditions specified in Sections 3.01 and 3.02, each DIP Lender shall be deemed to have consented to, approved or accepted or to be satisfied with each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to the DIP Lenders unless an officer of the DIP Agent responsible for the transactions contemplated by this Agreement shall have received notice from such DIP Lender prior to the initial Funding Date specifying its objection thereto.  The DIP Agent shall promptly notify the DIP Lenders and the DIP Borrowers of the occurrence of the initial Funding Date.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

SECTION 4.01.    Representations and Warranties of the DIP Borrowers.  Each DIP Borrower represents and warrants as follows, subject to entry of the Interim Order and the Final Order:

(a)    Such DIP Borrower is a corporation duly organized under the laws of the State of Nevada.

(b)    The execution, delivery and performance by such DIP Borrower of this Agreement, the Transaction Documents, if any, and the Notes, if any, and the consummation of the transactions contemplated hereby and thereby, are within such DIP Borrower's organizational powers, have been duly authorized by all necessary organizational action, and do not contravene (i) such DIP Borrower's organizational documents or (ii) any law or any contractual restriction binding on or affecting such DIP Borrower.

(c)    No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or regulatory body or any other third party is required for the due execution, delivery and performance by such DIP Borrower of this Agreement, the Transaction Documents, if any, or the Notes, if any, except for authorizations, approvals, actions, notices or filings which, if not made, would have a Material Adverse Effect.

(d)    This Agreement has been, and each of the Transaction Documents and Notes, if any, when delivered in connection herewith, will have been duly executed and delivered by such DIP Borrower.  This Agreement is, and each of the Transaction Documents and Notes when delivered hereunder will be, the legal, valid and binding obligation of such DIP Borrower enforceable against such DIP Borrower in accordance with their respective terms,

36

subject to general principles of equity, regardless of whether applied in proceedings in equity or at law.

(e)     There is no pending or, to the Knowledge of each DIP Borrower, threatened action, investigation or proceeding, including, without limitation, any Environmental Action, affecting such DIP Borrower before any court, governmental agency or arbitrator that is initiated by any Person other than (i) as specified on Schedule 3.01(c) or Schedule 4.01(n), (ii) the Chapter 11 Cases or (iii) a DIP Lender in its capacity as a DIP Lender (A) that has a Material Adverse Effect or (B) that purports to affect the legality, validity or enforceability of this Agreement, any Transaction Document or any Note.

(f)     Such DIP Borrower owns (a) in the case of owned real property, good and marketable fee title to, subject to Permitted Liens, and (b) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, including the Project, free and clear in each case of all Liens or claims, except for Permitted Liens and the Liens securing the Senior Secured Notes. The DIP Borrowers have rights to use all real property (including but not limited to fee simple, easement and leasehold estates), tangible personal property and intangible personal property necessary for the operation and maintenance of the Project for its intended purpose.

(g)     Such DIP Borrower is not an Investment Company, as such term is defined in the Investment Company Act of 1940, as amended.

(h)     No part of the proceeds of any Loans will be used in any manner that would result in a violation of Regulation U or X, issued by the Board of Governors of the Federal Reserve System, as now and from time to time hereafter in effect.

(i)     Other than as set forth on Schedule 4.01(j), none of the DIP Borrowers has any deposit accounts or securities accounts.

(j)     All material approvals and authorizations from governmental authorities with respect to the ownership, use, operation and maintenance of the Project that are currently required to be obtained, including all Environmental Permits, have been issued and are in full force and effect and there are no actions pending or threatened to revoke, cancel, limit, restrict, modify, terminate, appeal or otherwise challenge any such material approvals and authorizations.

(k)     Except as has been disclosed to the DIP Agent prior to the Closing Date with respect to the cash balances of the DIP Borrowers, all information (other than projections and general economic information) heretofore or contemporaneously furnished to the DIP Agent or the DIP Lenders by or on behalf of such DIP Borrower in connection with any DIP Loan Document or any transaction contemplated hereby, taken together as a whole with all other information with which such Person has previously been furnished by or on behalf of such DIP Borrower, whether furnished directly or by filing on SEDAR, is complete and correct in all material respects as of the date such information was furnished and as of the Closing Date, and does not contain any untrue statement of a material fact or omit to state any material fact

necessary to make any information not misleading in light of the circumstances under which furnished.

(l)     Copies of all Project Documents, in each case as currently in effect, have been delivered to the DIP Agent by the DIP Borrowers.  Except as has been previously disclosed to the DIP Agent, none of such Project Documents have been amended, modified or terminated, and no event or condition shall then exist which would permit any party to terminate such agreement.

(m)    Such DIP Borrower is, and has conducted the Project, its business, operations, assets, equipment, property, leaseholds, and other facilities, in compliance with all Environmental Laws and all other applicable laws in all material respects.

(n)     Except as set forth on Schedule 4.01(n), there are no facts, events or circumstances concerning any DIP Borrower, the Project or any of their current or former facilities, assets or operations (including, without limitation, any on-site or off-site release or disposal of any Hazardous Materials) that could give rise to an Environmental Action or any other liability or investigatory, corrective, rehabilitation or remedial obligation under any Environmental Law, except for any such Environmental Actions, liabilities or obligations that are not reasonably likely to have a Material Adverse Effect.

(o)     No ERISA Event has occurred or is reasonably expected to occur.

(p)     The Project has been operating in compliance with applicable requirements of the Equator Principles.

(q)     Such DIP Borrower has filed all Tax returns and reports required to be filed and has paid all Taxes levied or imposed upon it or its properties, income or assets otherwise due and payable, except for (A) those (i) which are not overdue by more than thirty (30) days, (ii) which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with the GAAP, or (iii) Taxes the nonpayment of which and Tax returns the non-filing of which could not reasonably be expected to have a Material Adverse Effect and (B) the Nevada 2011 Taxes and the Nevada 2012 Taxes.

(r)     No Default has occurred and is continuing.

SECTION 4.02.     <u>Representations and Warranties of the Guarantors</u>.     Each Guarantor represents and warrants as follows, subject to entry of the Interim Order and the Final Order:

(a)     Each Guarantor is duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized.

(b)     The execution, delivery and performance by such Guarantor of this Agreement and any other Transaction Document to which it is a party and the consummation of the transactions contemplated hereby and thereby, are within such Guarantor's organizational powers, have been duly authorized by all necessary organizational action, and do not contravene

38

(i) such Guarantor's organizational documents or (ii) any law or any contractual restriction binding on or affecting such Guarantor.  No authorization or approval or other action by, and no notice to or filing with, any Governmental Authority or any other third party is required for the due execution, delivery and performance by such Guarantor of this Agreement or any other Transaction Document to which it is a party, except for authorizations, approvals, actions, notices of filings which, if not made, would have a Material Adverse Effect.

(c)    This Agreement has been, and each other Transaction Documents to which it is a party, will have been duly executed and delivered by such Guarantor.  This Agreement is, and each of the Transaction Document to which it is a party when delivered hereunder will be, the legal, valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with their respective terms, subject to general principles of equity, regardless of whether applied in proceedings in equity or at law.

(d)    Except as set forth on Schedule 3.01(c), Schedule 4.01(n) and the CCAA Proceeding, there is no pending or, to the Knowledge of each Guarantor, threatened action, investigation or proceeding, including, without limitation, any Environmental Action, affecting such Guarantor (or any Subsidiary) before any court, governmental agency or arbitrator that is initiated by any Person other than a DIP Lender in its capacity as a DIP Lender (i) that has a Material Adverse Effect or (ii) that purports to affect the legality, validity or enforceability of this Agreement or any Transaction Document.

(e)    Except as has been disclosed to the DIP Agent prior to the Closing Date with respect to the cash balances of the DIP Borrowers, all information (other than projections and general economic information) heretofore or contemporaneously furnished to the DIP Agent or the DIP Lenders by or on behalf of such Guarantor in connection with any DIP Loan Document or any transaction contemplated hereby, taken together as a whole with all other information with which such Person has previously been furnished by or on behalf of such Guarantor, whether furnished directly or by filing on SEDAR, is complete and correct in all material respects as of the date such information was furnished and as of the date hereof, and does not contain any untrue statement of a material fact or omit to state any material fact necessary to make any information not misleading in light of the circumstances under which furnished.

(f)    Other than amounts that have been paid in full or with respect to which arrangements satisfactory to the DIP Agent have been made, no fees or Taxes (including documentary, stamp, transaction, registration, or similar Taxes) are required to have been paid to ensure the legality, validity, enforceability, priority or admissibility into evidence in applicable jurisdictions of this Agreement.

(g)    No Default with respect to such Guarantor has occurred and is continuing.

(h)    Except as set forth on Schedule 4.01(n), there are no facts, events or circumstances concerning such Guarantor or any of their current or former facilities, assets or operations (including, without limitation, any on-site or off-site release or disposal of any Hazardous Materials) that could give rise to an Environmental Action or any other liability or investigatory, corrective, rehabilitation or remedial obligation under any Environmental Law,

39

except for any such Environmental Actions, liabilities or obligations that do not have a Material Adverse Effect..

## ARTICLE V
## COVENANTS OF THE DIP BORROWERS AND THE GUARANTORS

SECTION 5.01.    Affirmative Covenants of the DIP Borrowers.  So long as any Loan shall remain unpaid or any DIP Lender shall have any Commitment hereunder, each DIP Borrower will:

(a)    Compliance with Laws, Etc.  Comply in all respects, with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA and Environmental Laws, except where the failure to so comply would not have a Material Adverse Effect.

(b)    Payment of Taxes, Etc.  File all Tax returns and reports required to be filed by it and pay (subject to any restrictions imposed by the Bankruptcy Code) and discharge before the same shall become delinquent, (i) all Taxes imposed upon it or upon its property and (ii) all lawful claims that, if unpaid, might by law become a Lien upon its property, provided that payment and discharge may be delayed if the Tax or claim is being contested in good faith and such DIP Borrower has made adequate provision for it (excluding, in any case, under clauses (i) and (ii), the Nevada 2011 Taxes and the Nevada 2012 Taxes).

(c)    Maintenance of Insurance.  Maintain the Required Insurance.

(d)    Preservation of Existence, Etc.  Preserve and maintain its corporate (including partnership, limited liability company or other legal organizational) existence, rights (charter and statutory, if applicable) and franchises.

(e)    Visitation Rights.  During normal business hours and upon reasonable notice, permit the DIP Agent or any of the DIP Lenders or any agents or representatives thereof, to examine and request copies of and abstracts from the records and books of account of (excluding any confidential information), which will be provided promptly by such DIP Borrower, and visit the properties of, such DIP Borrower, and to discuss the affairs, finances and accounts of such DIP Borrower with the appropriate representatives of such DIP Borrower, provided that such activities do not unreasonably interfere with the normal business operations of the DIP Borrowers.

(f)    Keeping of Books.  Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business in accordance with generally accepted accounting principles in effect from time to time.

(g)    Maintenance.  (i) Maintain and preserve its properties that are used or useful in the conduct of its business in good working order and condition, ordinary wear and tear excepted, to the extent funds are available therefor in the Approved Budget, (ii) to the extent funds are available therefor in the Approved Budget, maintain all equipment and spare parts inventory in accordance with Prudent Industry Practices, except as could not reasonably be expected to have a Material Adverse Effect, (iii) maintain all permits, licenses, approvals,

40

privileges, franchises and governmental authorizations necessary for the operation of the Project, except as could not reasonably be expected to have a Material Adverse Effect, (iv) maintain (A) in the case of owned real property, good and marketable fee title to, and (B) in the case of owned personal property, good and valid title to, or, in the case of leased real or personal property, valid and enforceable leasehold interests (as the case may be) in, all of its properties and assets, real and personal, tangible and intangible, of any nature whatsoever, including the Project, free and clear in each case of all Liens or claims, except for Permitted Liens and (v) maintain rights to use all real property (including but not limited to fee simple, easement and leasehold estates), tangible personal property and intangible personal property necessary for the operation and maintenance of the Project for its intended purpose.

(h)    _Transactions with Affiliates_.  Conduct all transactions otherwise permitted under this Agreement with any of its Affiliates on terms that are fair and reasonable and no less favorable to such DIP Borrower than it would obtain in a comparable arm's length transaction with a Person not an Affiliate.

(i)    _Reporting Requirements_.  Furnish to the DIP Agent to make available (and the DIP Agent agrees to make available and so deliver copies thereof) to each DIP Lender (it being understood that each such deliverable shall be subject to the confidentiality provisions of Section 10.13 hereof), and provide a copy of each such deliverable contemporaneously to the Creditors' Committee:

(i)    as soon as available and in any event within 60 days after the end of each quarter of each fiscal year of Rodeo Creek, the consolidated balance sheet of Nevada Operations as of the end of such quarter and the statements of income and cash flows of Nevada Operations for the period commencing at the end of the previous fiscal year and ending with the end of such quarter;

(ii)    as soon as available and in any event within 30 days after the end of each month, a Production Report for the Project for such month;

(iii)    as soon as available and in any event within 60 days after the end of each quarter in the fiscal year of the DIP Borrowers, the quarterly report and related materials prepared by the management of the DIP Borrowers and delivered to the board of directors of the Parent;

(iv)    as soon as possible and in any event within two Business Days after the occurrence of each Default continuing on the date of such statement, a statement of the chief financial officer, treasurer or controller of Rodeo Creek setting forth details of such Default and the action that the DIP Borrowers have taken and propose to take with respect thereto;

(v)    prompt notice of all actions and proceedings before any court, governmental agency or arbitrator having a Material Adverse Effect on any DIP Borrower, including any Environmental Action;

(vi)    prompt notice of any dispute or potential dispute with any counterparty to a Project Document except where such dispute could not reasonably be expected to have a Material Adverse Effect;

#4839-7606- 0179

(vii)    prompt written notice of any release or threatened release of Hazardous Materials relating to or arising from the facilities or operations of the DIP Borrowers or the Project, where such release or threatened release could reasonably be expected to result in a material liability or material investigatory, corrective, rehabilitation or remedial obligation under any Environmental Laws or could reasonably be expected to give rise to a material Environmental Claim;

(viii)    promptly after such DIP Borrower obtains knowledge of the occurrence of an ERISA Event with respect to any Plan or Multiemployer Plan, (i) a copy of each notice received in connection with such ERISA Event; or (ii) a written statement from such DIP Borrower describing such ERISA Event in reasonable detail and the action taken or to be taken with respect thereto;

(ix)    no later than 12:00 pm (Vancouver time) on the fourth Business Day of each week following the Closing Date, a report relating to the (A) actual cash receipts and disbursements for the prior week and (B) payments to, and amounts unpaid by, vendors with past-due balances;

(x)    (A) no later than 12:00 pm (Vancouver time) on the fourth Business Day of each week following February 25, 2013, a cash flow forecast for the DIP Borrowers for either the period through May 31, 2013, or the 13-week period following delivery of such forecast, whichever is longer (each, a "13-Week Forecast") in a form and with detail reasonably acceptable to the DIP Agent and reflecting, in separate tabulations with a weekly reconciliation and a monthly roll forward, the DIP Borrowers' good faith projections of all cash receipts and disbursements in connection with the operation of their respective businesses, which 13-Week Forecast shall be approved or objected to by the DIP Lenders on or before the Tuesday of the following week and (B) no later than each Business Day thereafter, a daily activity report of the Disbursement Account; and

(xi)    such other information respecting any DIP Borrower or any of the Subsidiaries as any DIP Lender through the DIP Agent may from time to time reasonably request.

(j)    Use of Proceeds.

(i)    The Loans will be used by the Borrowers to finance (A) transaction costs, including fees and expenses of the DIP Agent in accordance with Section 10.04, (B) capital expenditures, (C) working capital and/or (D) Operating Costs and (E) expenses incurred by the DIP Borrowers in the administration of the Chapter 11 Cases, in each case in accordance with the then-applicable Approved Budget or as otherwise approved by the DIP Lenders and the DIP Agent, subject to the Permitted Variance.

(ii)    The proceeds of the Loans shall not be used for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board of Governors of the Federal Reserve System).  Neither the Administrative Agent nor the Lenders shall have any responsibility as to the use of any proceeds of the Loans.

42

(iii)    Notwithstanding anything set forth in this Section 5.01(j) to the contrary and except as otherwise provided herein:

(A)    no portion of the Carve Out, the Collateral, or any collateral of the Existing Lenders (the "Pre-petition Collateral"), or proceeds of any DIP Loans may be used for or in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders. the Existing Lenders or the Monitor; and

(B)    neither the Carve Out nor any portion of the DIP Loans, the Collateral or the Pre-petition Collateral shall be used in connection with (I) preventing, hindering or delaying the DIP Lenders' or the DIP Agent's enforcement or realization upon the Collateral once an Event of Default has occurred and is continuing; (II) using or seeking to use the Collateral or the Pre-petition Collateral or selling or otherwise disposing of the Collateral or the Pre-petition Collateral without the consent of the DIP Agent or the Existing Agents; (III) using or seeking to use any insurance proceeds related to the Collateral without the consent of the DIP Agent or the Existing Agents; or (IV) incurring Debt other than in accordance with the Approved Budget, subject to any Permitted Variances and excluding Professional Fees.

(k)    Obligations Under Environmental Laws.  Comply in all material respects with all Environmental Laws, including, without limitation, any Environmental Permits, and conduct and complete any investigation, study, sampling or testing, and undertake any corrective, cleanup, removal, response, rehabilitation, remedial or other action necessary to identify, report, remove and clean up all Hazardous Materials present or released at, on, in, under or from any of its or the Project's facilities or real properties, to the extent any such actions are required for material compliance with Environmental Laws or to correct or resolve a material Environmental Claim.

(l)    Labor Actions.  Use best efforts to avoid any strikes, labor disputes or any other material labor actions involving employees of the DIP Borrowers.

(m)    Financial Advisor.  Upon the request of the DIP Agent or any DIP Lender, provide the DIP Agent or such DIP Lender (through one (1) representative or an alternative representative) access to any representatives, professional advisors and agents of the DIP Borrowers, including, the Financial Advisor, as well as the right to see and comment upon all offers which are received by the DIP Borrowers in connection with any proposed Permitted Sale and the right to participate, upon reasonable notice to the DIP Borrowers, in meetings with any third party with respect to any proposed Permitted Sale or strategic alternative process.  The DIP Agent and the DIP Lenders acknowledge no reliance on any advice or work product of the Financial Advisor received by the DIP Borrowers.

(n)    Milestones.  Achieve each milestone described on Schedule 5.01(n) on or prior to the applicable dates set forth therein.

43

SECTION 5.02.    <u>Negative Covenants of the DIP Borrowers</u>.  So long as any Loan shall remain unpaid or any DIP Lender shall have any Commitment hereunder, each DIP Borrower will not:

(a)    <u>Liens, Etc.</u>  Create or suffer to exist any Lien on or with respect to any of its properties, whether now owned or hereafter acquired, or on any of the income or profits therefrom other than Permitted Liens.

(b)    <u>Debt</u>.  Create, incur, assume or suffer to exist any Debt, other than Permitted Indebtedness.

(c)    <u>Mergers, Etc; Dispositions.</u>  (i) Merge or consolidate with or into, or convey, transfer, lease or otherwise dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to, any Person or (ii) convey, sell, lease, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of the Project other than (A) sale of products in accordance with the Project Documents and in the ordinary course of business, (B) assets no longer used or useful in its business in the ordinary course of its business, (C) Permitted Investments, (D) payments expressly permitted to be made under the DIP Loan Documents or made in the ordinary course of business or (E) a Permitted Sale.

(d)    <u>Accounting Changes</u>.  Make or permit any change in accounting policies or reporting practices, except as required or permitted by GAAP or applicable law.

(e)    <u>Subsidiaries; Equity Issuances</u>.  Form or have any subsidiary, whether direct or indirect, other than the Subsidiaries, own any equity interest in, or otherwise control any voting stock of or have any ownership interest in, any other Person other than the Subsidiaries or issue any equity interest in any Person that does not constitute part of the Collateral.

(f)    <u>Investments, Advances, Loans</u>.  Make any advance, loan or extension of credit to, or make any acquisitions (outside of the ordinary course of business of such DIP Borrower) or investments (whether by way of transfers of property, contributions to capital, acquisitions of stock, securities, evidences of indebtedness or otherwise) in, or purchase any stock, bonds, notes debentures or other securities of, any other Person, other than Permitted Investments.

(g)    <u>Business Activities</u>.  Conduct any activities other than those related to the development, operation and maintenance the Project and any activities incidental to the foregoing.

(h)    <u>Offtake Agreements</u>.  Except with the written approval of the DIP Agent, directly or indirectly agree to (i) any amendment, modification, termination, replacement, supplement, consent or waiver or (ii) waive any right to consent to any amendment, modification, termination, replacement, supplement or waiver of any right with respect to the Offtake Agreements; <u>provided</u>, <u>however</u> that any such amendment, modification, termination, replacement, supplement, consent or waiver that is made in the ordinary course of the DIP Borrowers' business and does not have a Material Adverse Effect shall not require the written approval of the DIP Agent.

44

(i)    <u>Change of Control</u>.  Permit any Change of Control.

(j)    <u>Organizational Documents</u>.  Materially amend its organizational documents.

(k)    <u>Capital Expenditures</u>.  Buy or acquire any asset, other than (i) in connection with capital expenditures (other than Discretionary Capital Expenditures) and other purchases (A) undertaken in the ordinary course of business in accordance with the Approved Budget, (B) necessary to comply with the Project Agreements, Applicable Law or Environmental Law in each case, in accordance with the Approved Budget or (ii) otherwise in accordance with the Approved Budget or as approved by the DIP Agent and the Required DIP Lenders (each, a "<u>Permitted Capital Expenditure</u>").

(l)    <u>Disputes</u>.  Consent to any proposed settlement, resolution or compromise of any litigation, arbitration or other dispute with any Person with a liability in excess of US$1,000,000 without the prior written consent of the DIP Agent.

(m)    <u>Chapter 11 Cases</u>.  Seek, consent or suffer to exist without the Required DIP Lenders' prior written consent (i) any modification, stay, vacation or amendment to the Orders; (ii) a priority claim for any administrative expense or unsecured claim against any DIP Borrower (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in Section 503(b), 506(c) or 507(b) of the Bankruptcy Code) equal or superior to the priority claim of the DIP Agent and the DIP Lenders in respect of the Obligations, other than the Carve Out and the GUC Trust Fund; (iii) any extension of the period of exclusivity for any DIP Borrower to file a chapter 11 plan beyond 180 days after the Petition Date without the consent of the Required DIP Lenders; and (iv) any motion to prescribe procedures governing the conduct or approval of the sale of all or substantially all of the assets, properties or Capital Stock or other equity interests of the DIP Borrowers pursuant to Section 363 of the Bankruptcy Code except for a Permitted Sale.

(n)    <u>Restricted Payments</u>.  Directly or indirectly declare or make any Restricted Payment except as provided in the Approved Budget.

(o)    <u>Accounts</u>.  Establish or maintain any bank accounts other than the accounts set forth on Schedule 4.01(j).

SECTION 5.03.    <u>Covenants of the Guarantors</u>.  So long as any Loan shall remain unpaid or any DIP Lender shall have any Commitment hereunder, each Guarantor agrees to comply with each of the covenants and obligations as follows:

(a)    <u>Compliance with Laws, Etc</u>.  Comply, and cause each of its subsidiaries to comply, in all respects, with all applicable laws, rules, regulations and orders, such compliance to include, without limitation, compliance with ERISA and Environmental Laws, except where the failure to so comply would not have a Material Adverse Effect.

(b)    <u>Payment of Taxes</u>.  File all Tax returns and reports required to be filed by it and pay and discharge, and cause each Obligor to pay and discharge (subject to any restrictions imposed by the Bankruptcy Code), before the same shall become delinquent, (i) all Taxes

45

imposed upon it or upon the Collateral and (ii) all lawful claims that, if unpaid, might by law become a Lien upon the Collateral, provided that payment and discharge may be delayed if the Tax or claim is being contested in good faith and such Obligor has made adequate provision for it.

(c)     Preservation of Existence, Etc.   Preserve and maintain its corporate (including partnership, limited liability company or other legal organizational) existence, rights (charter and statutory, if applicable) and franchises.

(d)     Keeping of Books.   Keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business in accordance with GAAP.

(e)     Accounting Changes.   Shall not make any change in accounting policies or reporting practices, except as required or permitted by GAAP or applicable law.

(f)     Visitation Rights.   During normal business hours and upon reasonable notice, permit the DIP Agent or any of the DIP Lenders or any agents or representatives thereof, to examine and request copies of and abstracts from the records and books of account of (excluding any confidential information), which will be provided promptly by such Guarantor, and visit the properties of, such Guarantor, and to discuss the affairs, finances and accounts of such Guarantor with the appropriate representatives of such Guarantor, provided that such activities do not unreasonably interfere with the normal business operations of the Guarantors.

(g)     Change of Business.   Each Guarantor shall not change the general nature of its business from that in which it is engaged as of the date hereof.

## ARTICLE VI
## EVENTS OF DEFAULT

SECTION 6.01.      Events of Default.   If any of the following events ("Event of Default") shall occur and be continuing:

(a)     Any DIP Borrower shall fail to pay any principal of any Loan when the same becomes due and payable; or any DIP Borrower shall fail to pay any interest on any Loan within three Business Days after the same becomes due and payable; or any fees or other amounts payable under this Agreement or any Note are not paid within three Business Days after the same become due and payable, subject to the notice provisions in the Final Order; or

(b)     Any representation or warranty made or deemed made by any DIP Borrower or Guarantor in connection with this Agreement or any Transaction Document to which such DIP Borrower or Guarantor is a party shall prove to have been incorrect in any material respect when made or deemed made; provided that no such event shall be an Event of Default if the misrepresentation or misstatement is capable of remedy and is remedied within 10 Business Days of the DIP Agent giving notice to the DIP Borrowers or the applicable Guarantor or of any DIP Borrower's or the applicable Guarantor's obtaining Knowledge thereof; or

46

(c)    (i) Any DIP Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(c), (d), (g), (i)(iv), (i)(vi), (j) or (m) or 5.02 required to be performed or observed by it, (ii) any DIP Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01(n) if such failure shall remain unremedied for 5 days after written notice thereof shall have been given to such DIP Borrower by the DIP Agent or any DIP Lender, (iii) any DIP Borrower shall fail to perform or observe any term, covenant or agreement contained in Section 5.01 required to be performed or observed by it if such failure shall remain unremedied for 30 days after written notice thereof shall have been given to such DIP Borrower by the DIP Agent or any DIP Lender, (iv) any Guarantor shall fail to perform or observe any term, covenant or agreement contained in Section 5.03(c) or (g) or Article VII, or (v)  other than as expressly set forth in this Section 6.01(c) and Article VI, any DIP Borrower or Guarantor shall fail to perform or observe any other term, covenant or agreement contained in any Transaction Document required to be performed or observed by it and such failure shall remain unremedied for the earlier of (A) any applicable cure or grace period and (B) 10 Business Days after written notice thereof shall have been given to such DIP Borrower or Guarantor by the DIP Agent or any DIP Lender or, if earlier, such DIP Borrower's or Guarantor's Knowledge of the failure to comply; or

(d)    Any DIP Borrower shall fail to pay any principal of or premium or interest on any Debt that is outstanding in a principal amount of at least $1,000,000 in the aggregate (but excluding Debt outstanding hereunder) of such DIP Borrower, as the case may be (the "Requisite Amount"), when the same becomes due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), and such failure shall continue after the later of five Business Days and the applicable grace period, if any, specified in the agreement or instrument relating to such Debt; or any such Debt aggregating the Requisite Amount shall be declared due and payable or any other event shall occur or condition shall exist under any agreement or instrument relating to any such Debt aggregating the Requisite Amount and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such event or condition is to accelerate the maturity of such Debt; or any such Debt aggregating the Requisite Amount shall be required to be prepaid or redeemed (other than by a regularly scheduled required prepayment or redemption), purchased or defeased, in each case prior to the stated maturity thereof where the cause of such prepayment, redemption, purchase or defeasance is the occurrence of an event or condition that is premised on a material adverse deterioration of the financial condition, results of operations or properties of such DIP Borrower; or

(e)    Any judgment or order for the payment of money in excess of $1,000,000 shall be rendered against any DIP Borrower and enforcement proceedings shall have been commenced by any creditor upon such judgment or order for which a stay of enforcement of such judgment or order, by reason of a pending appeal or otherwise, shall not be in effect; or

(f)    Any Transaction Document or any Lien granted thereunder or under the Orders shall (except in accordance with its terms), in whole or in part, terminate, cease to be effective or cease to be the legally valid, binding and enforceable obligation of any DIP Borrower and, in the case of a Project Document, such event has a Material Adverse Effect; any DIP Borrower or any other party shall, directly or indirectly, contest in any manner such effectiveness, validity, binding nature or enforceability; or, except as permitted under any DIP

47

Loan Document, any Lien shall, in whole or in part, cease to be a perfected first priority Lien (subject to Permitted Liens) or any DIP Borrower shall, directly or indirectly, contest such perfection or priority; or

(g)     Any DIP Borrower or its ERISA Affiliates shall incur, or shall be reasonably likely to incur, liability of at least $1,000,000 in the aggregate that as a result of the occurrence of any ERISA Event with respect to any DIP Borrower or any ERISA Affiliate;

(h)     Any DIP Borrower shall have voluntarily abandoned operation of the Project, such abandonment to be evidenced by either DIP Borrower's cessation of such operation for a period of 30 consecutive days for reasons not associated with the occurrence of a Total Loss or a force majeure event;

(i)     All or a substantial part of the property of any DIP Borrower is expropriated, condemned, confiscated or requisitioned by any Governmental Authority;

(j)     The occurrence of a Material Adverse Effect, unless such Material Adverse Effect is capable of remedy and is remedied to the satisfaction of the DIP Agent within 10 Business Days of the earlier of (i) written notice of such Material Adverse Effect given to any DIP Borrower by the DIP Agent or any DIP Lender or (ii) the applicable DIP Borrower's Knowledge of such Material Adverse Effect;

(k)     Any DIP Borrower shall fail to obtain, renew, maintain or comply with any approval, license, permit, lease, authorization, qualification, easement or right necessary to commission, use, operate, maintain or repair any part of the Project if such failure has a Material Adverse Effect;

(l)     Any Change of Control occurs without the prior written consent of the DIP Agent; or

(m)     The DIP Agent, the Bankruptcy Court shall enter, or the DIP Borrowers shall seek or support the entry of, any order (i) amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order or the Final Order in any manner adverse to the interest of the DIP Lenders or the DIP Agent, (ii) with respect to the Chapter 11 Cases that is adverse to the interests of the DIP Lenders or the DIP Agent, without the DIP Agent's or the Required DIP Lenders' consent, (iii) appointing a Chapter 11 trustee, a responsible officer or an examiner pursuant to section 1104 of the Bankruptcy Code with enlarged powers relating to the operation of the business of the DIP Borrower (powers beyond those set forth in section 1106(a)(3) and (4) and 1106(b) of the Bankruptcy Code) of the Bankruptcy Code in the Chapter 11 Cases, (iv) dismissing the Chapter 11 Cases or converting the Chapter 11 Cases to chapter 7 cases, (v) granting relief from the automatic stay to any creditor or creditors holding or asserting a Lien or Liens or reclamation claim(s) on the assets of the DIP Borrowers to permit such creditor or creditors to foreclose upon or to reclaim Collateral with a value in excess of $1,000,000 in any one instance or in the aggregate for all such events, or to any Person to permit actions that would have a Material Adverse Effect on the DIP Borrowers or their estates, (vi) except with respect to a Permitted Sale, approving the sale, transfer, lease, exchange, alienation or other disposition of all or substantially all of the assets,

properties or Capital Stock or other equity interests of the DIP Borrowers pursuant to section 363 of the Bankruptcy Code or otherwise, without the consent of the DIP Agent and the Required DIP Lenders, or (vii) terminating the DIP Borrowers' use of Cash Collateral;

(n)    An application shall be filed by the DIP Borrowers for the approval of, or there shall otherwise arise, any other Superpriority Claim in the Chapter 11 Cases (other than the Carve Out and the GUC Trust Fund) which is pari passu with or senior to the claims of the DIP Agent and the DIP Lenders against any of the DIP Borrowers unless after giving effect to the transactions contemplated by such application, all Debt (whether contingent or otherwise) shall be paid in full in cash;

(o)    The DIP Borrowers shall file a motion in the Chapter 11 Cases, or an order of the Bankruptcy Court shall otherwise be entered: (i) except as provided in the Orders, to use Cash Collateral of the DIP Lenders under section 363(c) of the Bankruptcy Code without the DIP Agent's and the Required DIP Lenders' consent, (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under section 506(c) or section 552(b) of the Bankruptcy Code, (iii) except with respect to a Permitted Sale, to sell, transfer, lease, exchange, alienate or otherwise dispose of all or substantially all of the assets, properties or Capital Stock or other equity interest of any DIP Borrower pursuant to section 363 of the Bankruptcy Code or otherwise without the consent of the Required DIP Lenders, or (iv) to take any other action or actions adverse to the DIP Agent or the DIP Lenders or their rights and remedies under the Orders, this Agreement, any of the other DIP Loan Documents or any of the documents evidencing or creating the DIP Agent's interest in any of the Collateral;

(p)    The Bankruptcy Court shall fail to enter the Final Order on or prior to April 8, 2013 with respect to those matters covered by the Interim Order;

(q)    Without the prior consent of the DIP Agent an order shall have been entered by the Bankruptcy Court reversing, vacating, staying, or otherwise amending, supplementing or modifying the Orders (or any DIP Borrower shall apply for authority to do so) or otherwise affecting in any material respect this Agreement or any other DIP Loan Document, and such order shall not have been reversed or vacated within seven (7) days;

(r)    Any DIP Borrower shall fail to comply with any of the Orders or any other order of the Bankruptcy Court.

(s)    Any DIP Borrower shall make any payment, by way of adequate protection or otherwise, of any prepetition debt or other obligations, other than as approved by the Bankruptcy Court and in accordance with the Orders and the Approved Budget;

(t)    A Total Loss occurs;

(u)    Any DIP Borrower shall be enjoined from conducting any material part of its business as a debtor in possession in accordance with the Approved Budget;

(v)    The assertion (or support) by any DIP Borrower of any investigation, claim or action against (i) the DIP Agent or the DIP Lenders or (ii) the Canadian DIP Agent or

the holders of the Canadian DIP Obligations (other than, in the case of clause (ii) only, a customary claim and lien investigation conducted by the Creditors' Committee);

(w)    The filing of a chapter 11 plan of reorganization in the Chapter 11 Cases that is not a Reorganization Plan;

(x)    Any DIP Borrower supports or provides material assistance to any Person proposing a chapter 11 plan or reorganization that is not a Reorganization Plan; or

SECTION 6.02.    Canadian DIP Credit Facility and Burnstone Credit Facility. Notwithstanding anything in Section 6.01 to the contrary, no default or event of default that shall have occurred and be continuing under the Canadian DIP Credit Facility or the Burnstone Credit Facility shall result in an Event of Default hereunder.

SECTION 6.03.    Remedies.

(a)    Upon the occurrence of an Event of Default, the DIP Agent may declare (i) the Obligations to be immediately due and payable, (ii) the termination, reduction or restriction of any unfunded Commitments, (iii) the termination of this Agreement and any other DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the Liens or the Obligations or (iv) the termination, reduction or restriction of the ability of the DIP Borrowers to use any Cash Collateral (any such declaration, the "DIP Termination Declaration").    The DIP Agent shall provide the DIP Termination Declaration to the Debtors and their counsel, the U.S. Trustee and counsel to the Creditors' Committee.

(b)    Subject to the provisions of subsection (a) above and any limitations set forth in the Interim Order and the Final Order, in the case of the occurrence of an Event of Default, the DIP Agent and the DIP Lenders will have all other rights and remedies available to a secured party under the UCC and at law and equity.

(c)    All proceeds realized from a Permitted Sale, the liquidation or other disposition of Collateral or otherwise received after maturity of the DIP Loans, whether by acceleration or otherwise, shall be applied:

(i)    *first*, as required to fund the Chapter 11 Expenses;

(ii)    *second*, as required to fund the Committee Settlement Funding Obligations;

(iii)    *third*, to the DIP Agent for payment or reimbursement of the Obligations;

(iv)    *fourth*, to the Existing Hollister Agent for payment in full of the Hollister Adequate Protection Payments;

(v)    *fifth*, to the Existing Hollister Agent for payment or reimbursement of the Existing Hollister Obligations;

50

(vi)    *sixth*, to the Canadian DIP Agent to pay in full the Canadian DIP Adequate Protection Payments;

(vii)    *seventh*, to the Canadian DIP Agent for payment or reimbursement of the obligations of the DIP Borrowers under the Intra-Group Loan Agreement;

(viii)    *eighth*, to the Parent for payment of the obligations of Rodeo Creek under the Rodeo Note;

(ix)    *ninth*, without duplication of any amounts paid pursuant to clause *seventh* above, deposit into a segregated escrow account for a period of five (5) months any amounts payable on account of the Canadian DIP Credit Facility for potential payment to the Canadian DIP Agent of the remaining obligations under such Canadian DIP Credit Facility, subject to the conditions set forth in paragraph 29(c) of the Final Order; and

(x)    *tenth,* any excess, after each of the amounts required to be paid pursuant to clauses *first* through *ninth* above shall have been indefeasibly paid in full in cash, shall be distributed subject to further order of the Bankruptcy Court.

## ARTICLE VII
## GUARANTY

SECTION 7.01.    <u>Guaranty</u>.

(a)    Each of the Guarantors unconditionally and irrevocably guarantees the due and punctual payment by the DIP Borrowers of the Obligations (the "<u>Guaranty</u>").  Each of the Guarantors further agrees that the Obligations may be extended or renewed, in whole or in part, without notice to or further assent from it, and it will remain bound upon this guaranty notwithstanding any extension or renewal of any of the Obligations.  The obligations of the Guarantors under this Article VII shall be joint and several.

(b)    Each of the Guarantors waives presentation to, demand for payment from and protest to the DIP Borrowers or any other Guarantor, and also waives notice of protest for nonpayment.  The obligations of the Guarantors under this Article VII shall not be affected by (i) the failure of the DIP Agent or any DIP Lender to assert any claim or demand or to enforce any right or remedy against the DIP Borrowers or any other Guarantor under the provisions of this Agreement or any other DIP Loan Document or otherwise; (ii) any extension or renewal of any provision hereof or thereof; (iii) any rescission, waiver, compromise, acceleration, amendment or modification of any of the terms or provisions of any of the DIP Loan Documents; (iv) the release, exchange, waiver or foreclosure of any security held by the DIP Agent for the Obligations or any of them; (v) the failure of the DIP Agent or any DIP Lender to exercise any right or remedy against any other Guarantor; or (vi) the release or substitution of the DIP Borrowers or any other Guarantor.

(c)    Each of the Guarantors further agrees that this guaranty constitutes a guaranty of payment when due and not just of collection, and waives any right to require that any resort be had by the DIP Agent or any DIP Lender to any security held for payment of the

#4839-7606- 0179

Obligations or to any balance of any deposit, account or credit on the books of the DIP Agent or any DIP Lender in favor of the DIP Borrowers or any other Guarantor, or to any other Person.

(d)    Each of the Guarantors hereby waives any defense that it might have based on a failure to remain informed of the financial condition of the DIP Borrowers and of any other Guarantor and any circumstances affecting the ability of the DIP Borrowers to perform under this Agreement.

(e)    Each Guarantor's guaranty shall not be affected by the genuineness, validity, regularity or enforceability of the Obligations or any other instrument evidencing any Obligations, or by the existence, validity, enforceability, perfection, or extent of any collateral therefor or by any other circumstance relating to the Obligations which might otherwise constitute a defense to this Guaranty.  Neither the DIP Agent nor any of the DIP Lenders makes any representation or warranty in respect to any such circumstances or shall have any duty or responsibility whatsoever to any Guarantor in respect of the management and maintenance of the Obligations.

(f)    Subject to the provisions of Article VI, upon the Obligations becoming due and payable (by acceleration or otherwise), the DIP Lenders shall be entitled to immediate payment of such Obligations by the Guarantors upon written demand by the DIP Agent without further application to or order of the Bankruptcy Court.

SECTION 7.02.    No Impairment of Guaranty.  The obligations of the Guarantors hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason, including any claim of waiver, release, surrender, alteration or compromise, and shall not be subject to any defense or set-off, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of the Obligations.  Without limiting the generality of the foregoing, the obligations of the Guarantors hereunder shall not be discharged or impaired or otherwise affected by the failure of the DIP Agent or any DIP Lender to assert any claim or demand or to enforce any remedy under this Agreement or any other agreement, by any waiver or modification of any provision thereof, by any default, failure or delay, willful or otherwise, in the performance of the Obligations, or by any other act or thing or omission or delay to do any other act or thing which may or might in any manner or to any extent vary the risk of the Guarantors or would otherwise operate as a discharge of the Guarantors as a matter of law, unless and until the Obligations are paid in full.

SECTION 7.03.    Subrogation.  Upon payment by any Guarantor of any sums to the DIP Agent or any DIP Lender hereunder, all rights of such Guarantor against the DIP Borrowers arising as a result thereof by way of right of subrogation or otherwise, shall in all respects be subordinate and junior in right of payment to the prior final and indefeasible payment in full of all the Obligations.  If any amount shall be paid to such Guarantor for the account of the DIP Borrowers, such amount shall be held in trust for the benefit of the DIP Agent and the DIP Lenders and shall forthwith be paid to the DIP Agent and the DIP Lenders to be credited and applied to the Obligations, whether matured or unmatured.

#4839-7606- 0179

## ARTICLE VIII
## PRIORITY AND COLLATERAL SECURITY

SECTION 8.01.    Superpriority Claims and Collateral Security.

(a)    Pursuant to the Interim Order (with respect to the period prior to entry of the Final Order) and upon entry of the Final Order with respect to the period after entry of the Final Order):

(i)    the Obligations shall at all times constitute an allowed Superpriority Claim in the Chapter 11 Cases pursuant to sections 364(c)(1) and 507(b) of the Bankruptcy Code subordinate only to the Carve Out and the GUC Trust Fund (as defined in paragraph 29(a) of the Final Order) and shall (A) otherwise have priority over any and all administrative expense claims and unsecured claims against the DIP Borrowers or their estate, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b) (except as set forth in the Interim Order), 546(c), 546(d), 726 (to the extent permitted by law), 1113 and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code and (B) shall at all times be senior to the rights of the DIP Borrower and its estate, and any successor trustee or other estate representative to the extent permitted by law, provided that such Superpriority Claim shall not be payable from the proceeds of Avoidance Actions except as otherwise set forth in paragraph 29(f) of the Final Order;

(ii)    pursuant to section 364(c)(2) of the Bankruptcy Code, the Liens securing the Obligations shall constitute valid, binding, continuing, enforceable, fully-perfected first priority Liens on, and security interest in, the Collateral, subject only to (A) the Carve Out; (B) the GUC Trust Fund; (C) valid, perfected, non-avoidable and enforceable Liens in existence on or as of the Petition Date; and (D) a valid Lien perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, and excluding Avoidance Actions or the proceeds thereof (except as otherwise set forth in paragraph 29(f) of the Final Order);

(iii)    pursuant to section 364(c)(3) of the Bankruptcy Code, the Liens securing the Obligations shall be secured by a perfected junior lien on Collateral that is subject only to Senior Statutory Liens; and

(iv)    pursuant to section 364(d)(1) of the Bankruptcy Code, the Liens securing the Obligations shall be secured by a perfected first priority, senior priming lien on the Collateral that secures the Prepetition DIP Obligations and the Existing Hollister Obligations, (collectively, the "Primed Liens"), which senior priming liens securing the Obligations shall also prime any liens granted after the Petition Date to provide adequate protection in respect of any of the Primed Liens.

(b)    Such Superpriority Claim referred to in Section 8.01(a)(i) shall be subject to the Carve Out and the GUC Trust Fund.  Such Lien referred to in Section 8.01(a) shall be subject to the Carve Out and the GUC Trust Fund, but otherwise shall be senior in priority to the adequate protection Liens securing the Prepetition Obligations and all other Liens and Senior

53

Statutory Liens entitled to priority under applicable law (to which the Lien shall be immediately junior in priority under section 364(c)(3) of the Bankruptcy Code), and excluding Avoidance Actions or the proceeds thereof (except as otherwise set forth in paragraph 29(f) of the Final Order).

        (c)     The security interests securing the Obligations shall not be subject to preservation of any lien under Section 551 of the Bankruptcy Code.

        SECTION 8.02.     <u>Collateral Security Perfection</u>.  Notwithstanding any provision of the Orders providing that such Order is sufficient and conclusive evidence of the validity, perfection and priority of the Liens granted to the DIP Agent on the Collateral without the necessity for any filing or recording of any financing statement or other instrument or document which may otherwise be required under the laws of any jurisdiction or the taking of any action to validate or perfect such liens or to provide for the priorities described herein, the DIP Borrowers agree to take all action that the DIP Agent or any DIP Lender may reasonably request as a matter of non-bankruptcy law to perfect and protect the DIP Agent's Liens for the benefit of the Secured Parties, and upon the Collateral and for such Liens to obtain the priority therefor contemplated hereby, including, without limitation, executing and delivering such documents and instruments, financing statements, providing such notices and assents of third parties, obtaining such governmental approvals and providing such other instruments and documents in recordable form as the DIP Agent or any DIP Lender may reasonably request.  The DIP Borrowers hereby irrevocably authorize the DIP Agent at any time and from time to time to file in any filing office in any UCC jurisdiction any initial financing statements and amendments thereto that (a) indicate the Collateral (i) as all assets of the DIP Borrowers or words of similar effect, regardless of whether any particular asset comprised in the Collateral falls within the scope of Article 9 of the UCC of any applicable jurisdiction, or (ii) as being of an equal or lesser scope or with greater detail, and (b) provide any other information required by part 5 of Article 9 of the UCC of any applicable jurisdiction for the sufficiency or filing office acceptance of any financing statement or amendment, including (i) whether any DIP Borrower is an organization, the type of organization and any organization identification number issued to such DIP Borrower and, (ii) in the case of a financing statement filed as a fixture filing, a sufficient description of real property to which the Collateral relates.  The DIP Borrowers agree to furnish any such information to the DIP Agent and the DIP Lenders promptly upon the DIP Agent's or any DIP Lender's request.

        SECTION 8.03.     <u>No Discharge; Survival of Claims</u>.  Except as expressly provided in this Agreement, the Interim Order, the Final Order or the other DIP Loan Documents, each of the DIP Borrowers agrees that (a) the Obligations shall not be discharged by the entry of an order confirming a chapter 11 plan (and each of the DIP Borrowers pursuant to section 1141(d) of the Bankruptcy Code, hereby waives any such discharge), (b) the Superpriority Claim granted to the DIP Agent and the DIP Lenders pursuant to the Interim Order and the Final Order and the Liens granted to the DIP Agent pursuant to such Orders shall not be affected in any manner by the entry of an order confirming a chapter 11 plan and (c) none of the DIP Borrowers shall propose or support any chapter 11 plan other than the Reorganization Plan.  In the event of any inconsistency between the terms and conditions of any of the DIP Loan Documents and the Interim Order or the Final Order, whichever is in effect at the time of reference thereto, the provisions of the Interim Order or the Final Order, as the case may be, shall govern and control.

54

The DIP Borrowers, the DIP Agent and the DIP Lenders shall be entitled to rely in good faith upon the Orders notwithstanding objection thereto or appeal therefrom by any interested party. The DIP Borrowers, the DIP Agent and the DIP Lenders shall be permitted and required to perform their respective obligations in compliance with this Agreement notwithstanding any such objection or appeal unless the relevant Order has been stayed by a court of competent jurisdiction.

## ARTICLE IX
## THE DIP AGENT

SECTION 9.01.        <u>Appointment and Authority</u>.  Each of the DIP Lenders hereby irrevocably appoints the DIP Agent as its agent and authorizes the DIP Agent to take such actions on its behalf and to exercise such powers as are delegated to the DIP Agent by the terms hereof and the other DIP Loan Documents, together with such actions and powers as are reasonably incidental thereto.

SECTION 9.02.        <u>Rights as a DIP Lender</u>.  The Person serving as the DIP Agent hereunder shall have the same rights and powers in its capacity as a DIP Lender as any other DIP Lender and may exercise the same as though it were not the DIP Agent and the term "DIP Lender" or "DIP Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the DIP Agent hereunder in its individual capacity.  Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any DIP Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the DIP Agent hereunder and without any duty to account therefor to the DIP Lenders.

SECTION 9.03.        <u>Exculpatory Provisions</u>.  The DIP Agent shall not have any duties or obligations except those expressly set forth herein and in the other DIP Loan Documents. Without limiting the generality of the foregoing, the DIP Agent:

(a)        shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)        shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other DIP Loan Documents that the DIP Agent is required to exercise as directed in writing by the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be expressly provided for herein or in the other DIP Loan Documents), <u>provided</u> that the DIP Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the DIP Agent to liability or that is contrary to any DIP Loan Document or applicable law;

(c)        shall not, except as expressly set forth herein and in the other DIP Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any DIP Borrower or any of their respective Affiliates that is communicated to or obtained by the Person serving as the DIP Agent or any of its respective Affiliates in any capacity; and

(d)    shall not be required to take any action which exposes the DIP Agent to personal liability or which is contrary to this Agreement, the DIP Loan Documents or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law.

The DIP Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required DIP Lenders (or such other number or percentage of the DIP Lenders as shall be necessary, or as the DIP Agent shall believe in good faith shall be necessary, under the circumstances as provided in Article VI and Section 10.01 or (ii) in the absence of its own gross negligence or willful misconduct. The DIP Agent shall not be deemed to have knowledge of any Default unless and until notice describing such Default is given to the DIP Agent by a DIP Borrower or a DIP Lender.

The DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other DIP Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other DIP Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article III or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the DIP Agent.

SECTION 9.04.    Reliance by the DIP Agent.    The DIP Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The DIP Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a DIP Lender, the DIP Agent may presume that such condition is satisfactory to such DIP Lender unless the DIP Agent shall have received notice to the contrary from such DIP Lender prior to the making of such Loan. The DIP Agent may consult with legal counsel (who may be counsel for the DIP Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

SECTION 9.05.    Delegation of Duties. The DIP Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other DIP Loan Document by or through any one or more sub-agents appointed by it. The DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the DIP Agent and any such sub-agent, and shall apply to its activities in connection with the syndication of the credit facilities provided for herein as well as its activities as the DIP Agent.

56

#4839-7606- 0179

SECTION 9.06.        Resignation of the DIP Agent.  The DIP Agent may at any time give notice of its resignation to the DIP Lenders and the DIP Borrowers.  Upon receipt of any such notice of resignation, the Required DIP Lenders shall have the right, with the consent of the DIP Borrowers so long as no Default has occurred and is continuing (such consent not to be unreasonably withheld or delayed), to appoint a successor DIP Agent.  If no such successor shall have been so appointed by the Required DIP Lenders and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its resignation (such 30-day period, the "DIP Lender Appointment Period"), then the retiring DIP Agent may, on behalf of the DIP Lenders with the consent of the DIP Borrowers so long as no Default has occurred and is continuing (such consent not to be unreasonably withheld or delayed), appoint a successor DIP Agent.  In addition and without any obligation on the part of the retiring DIP Agent to appoint, on behalf of the DIP Lenders, a successor DIP Agent, the retiring DIP Agent may at any time upon or after the end of the DIP Lender Appointment Period notify the DIP Borrowers and the DIP Lenders that no qualifying Person has accepted appointment as successor DIP Agent and the effective date of the retiring DIP Agent's resignation.  Upon the resignation effective date established in such notice and regardless of whether a successor Agent has been appointed and accepted such appointment, the retiring DIP Agent's resignation shall nonetheless become effective and (i) the retiring DIP Agent shall be discharged from its duties and obligations as the DIP Agent hereunder and under the other DIP Loan Documents and (ii) all payments, communications and determinations provided to be made by, to or through the DIP Agent shall instead be made by or to each DIP Lender directly, until such time as the Required DIP Lenders appoint a successor DIP Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as the DIP Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties as the DIP Agent of the retiring (or retired) DIP Agent, and the retiring DIP Agent shall be discharged from all of its duties and obligations as the DIP Agent hereunder or under the other DIP Loan Documents (if not already discharged therefrom as provided above in this paragraph).  The fees payable by the DIP Borrowers to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed between the DIP Borrowers and such successor.  After the retiring DIP Agent's resignation hereunder and under the other DIP Loan Documents, the provisions of this Article IX and Section 10.04 shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring DIP Agent was acting as the DIP Agent.

SECTION 9.07.        Non-Reliance on the DIP Agent and Other DIP Lenders.  Each DIP Lender acknowledges that it has, independently and without reliance upon the DIP Agent or any other DIP Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each DIP Lender also acknowledges that it will, independently and without reliance upon the Agents or any other DIP Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other DIP Loan Document or any related agreement or any document furnished hereunder or thereunder.

SECTION 9.08.        DIP Agent May File Proofs of Claim.  In case of the pendency of any proceeding under any state or Federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally or any other judicial proceeding relative to any DIP

57

Borrower, the DIP Agent (irrespective of whether the principal of any DIP Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the DIP Agent shall have made any demand on any DIP Borrower) shall be entitled and empowered, by intervention in such proceeding or otherwise:

       (a)    to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the DIP Lenders and the DIP Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the DIP Lenders and the DIP Agent and their respective agents and counsel and all other amounts due the DIP Lenders and the DIP Agent under Sections 2.15 and 10.04) allowed in such judicial proceeding; and

       (b)    to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each DIP Lender to make such payments to the DIP Agent and, in the event that the DIP Agent shall consent to the making of such payments directly to the DIP Lenders, to pay to the DIP Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the DIP Agent and its agents and counsel, and any other amounts due the DIP Agent under Sections 2.15 and 10.04.

Nothing contained herein shall be deemed to authorize the DIP Agent to authorize or consent to or accept or adopt on behalf of any DIP Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any DIP Lender to authorize the DIP Agent to vote in respect of the claim of any DIP Lender in any such proceeding.

## ARTICLE X
## <u>MISCELLANEOUS</u>

SECTION 10.01.    <u>Amendments, Etc.</u>  No amendment or waiver of any provision of this Agreement or any Notes, nor consent to any departure by any DIP Borrower therefrom, shall in any event be effective unless the same shall be in writing and signed by the DIP Borrowers and the Required DIP Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided, however, that (i) no amendment, waiver or consent shall, unless in writing and signed by all the DIP Lenders, do any of the following: (A) waive any of the conditions specified in Sections 3.01 or 3.02, (B) change the percentage of the Commitments of or the aggregate unpaid principal amount of the Loans, or the number of DIP Lenders that shall be required for the DIP Lenders or any of them to take any action hereunder, (C) amend this Section 10.01 or (D) release any DIP Borrower from its obligations under Section 10.16; and (ii) no amendment, waiver or consent shall, unless in writing and signed by the Required DIP Lenders and each DIP Lender that has or is owed obligations under this Agreement or the Notes that are modified by such amendment, waiver or consent, (A) increase or extend the Commitment of such DIP Lender or subject such DIP Lender to any additional obligations (it being understood that any amendment, waiver or consent in respect of conditions precedent, covenants, Defaults or Events of Default shall not constitute an

58

increase or extension of the Commitment of any DIP Lender), (B) reduce the principal of, or interest on, the Loans made by such DIP Lender, fees or other amounts payable hereunder to such DIP Lender, (C) postpone any date fixed for any payment of principal of, or interest on, the Loans made by such DIP Lender, fees or other amounts payable hereunder to such DIP Lender or (D) waive the application of Section 2.13 or otherwise change Section 2.05, Section 2.08, Section 2.11 or Section 2.13 in a manner that would alter the pro rata sharing of any payment or reduction in the Commitments required thereby and provided further that no amendment, waiver or consent shall, unless in writing and signed by the DIP Agent, in addition to the DIP Lenders required above to take such action, affect the rights or duties of the DIP Agent under this Agreement or any Note. Notwithstanding anything to the contrary in this Section 10.01, notice of any amendments to this Agreement or any Notes shall be provided as set forth in the Interim Order and Final Order.

SECTION 10.02.    Notices, Communications and Treatment of Information.

(a)    Notices.

(i)    All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, or by any telecommunication device capable of creating a written record (including electronic mail), and addressed to the party to be notified as follows:

(A)    if to any DIP Borrower or Guarantor,
Ground Floor, 138 West Street, Sandton, 2146, South Africa
P 0 Box 78182, Sandton, 2146 South Africa
Attention: The Chief Executive Officer
+27 (0)11 3011 840

With a copy to (which shall not constitute notice):
McMillan, Suite 1500- 1055 West Georgia Street,
Vancouver, British Columbia V6E 4N7
Bernie Zinkhofer / Great Basin Responsible Partner
+001 (604) 68S 7084

(B)    if to the DIP Agent,
Credit Suisse AG
Corporate & Institutional Clients
Attn: Mrs. Zvjezdana Bjelos
Giesshübelstr. 30
8070 Zürich
Fax: +41 44 333 79 80
dana.bjelos@credit-suisse.com

(C)    if to any other DIP Lender, to it at its address (or telecopier number) set forth in its Administrative Questionnaire;

59

or at such other address as shall be notified in writing (x) in the case of the DIP Borrowers and the Agents, to the other parties hereto and (y) in the case of all other parties hereto, to the DIP Borrowers and the Agents.

(ii)    All notices, demands, requests, consents and other communications described in clause (i) shall be effective (1) if delivered by hand, including any overnight courier service, upon personal delivery, (2) if delivered by mail, when delivered and (3) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (i); provided that notices and communications to the DIP Agent pursuant to Article II or Article VII shall not be effective until received by the DIP Agent.

(iii)    Notwithstanding clauses (i) and (ii) (unless the DIP Agent requests that the provisions of clause (i) and (ii) be followed) and any other provision in this Agreement or any other DIP Loan Document providing for the delivery of any Approved Electronic Communication by any other means, the DIP Borrowers shall deliver all Approved Electronic Communications to the DIP Agent by (1) properly transmitting such Approved Electronic Communications in an electronic/soft medium in a format reasonably acceptable to the DIP Agent at dana.bjelos@credit-suisse.com or such other electronic mail address (or similar means of electronic delivery) as the DIP Agent may notify to the DIP Borrowers and (2) concurrently delivering a physical copy of such Approved Electronic Communication by mail or delivery service in accordance with Section 10.02(a)(ii). Nothing in this clause (iii) shall prejudice the right of the DIP Agent or any DIP Lender to deliver any Approved Electronic Communication to any DIP Borrower in any manner authorized in this Agreement or to request that any DIP Borrower effect delivery in such manner.

(b)    [Reserved].

(c)    Treatment of Information.

(i)    Certain of the DIP Lenders may enter into this Agreement and take or not take action hereunder or under the other DIP Loan Documents on the basis of information that does not contain material non-public information with respect to any of the DIP Borrowers or their securities ("Restricting Information"). Other DIP Lenders may enter into this Agreement and take or not take action hereunder or under the other DIP Loan Documents on the basis of information that may contain Restricting Information. Each DIP Lender acknowledges that United States federal and state securities laws as well as the securities laws of Canada and other jurisdictions prohibit any person from purchasing or selling securities on the basis of material, non-public information concerning the issuer of such securities or, subject to certain limited exceptions, from communicating such information to any other Person. Neither the Agents nor any of its Related Parties shall, by making any Communications (including Restricting Information) available to a DIP Lender, by participating in any conversations or other interactions with a DIP Lender or otherwise, make or be deemed to make any statement with regard to or otherwise warrant that any such information or Communication does or does not contain Restricting Information nor shall the DIP Agent or any of its Related Parties be responsible or liable in any way for any decision a DIP Lender may make to limit or to not limit its access to Restricting Information. In particular, none of the Agents nor any of its Related

60

Parties (1) shall have, and no Agent, on behalf of itself and each of its Related Parties, hereby disclaims, any duty to ascertain or inquire as to whether or not a DIP Lender has or has not limited its access to Restricting Information, such DIP Lender's policies or procedures regarding the safeguarding of material, nonpublic information or such DIP Lender's compliance with applicable laws related thereto or (2) shall have, or incur, any liability to any DIP Borrower or DIP Lender or any of their respective Related Parties arising out of or relating to the DIP Agent or any of its Related Parties providing or not providing Restricting Information to any DIP Lender other than as found by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the DIP Agent or any of its Related Parties.

(ii)     Each DIP Borrower agrees that (1) all Communications it provides to the Agents intended for delivery to the DIP Lenders shall be clearly and conspicuously marked "PUBLIC" if such Communications are determined by the DIP Borrowers not to contain Restricting Information which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof and (2) by marking Communications "PUBLIC," each DIP Borrower shall be deemed to have authorized the DIP Agent and the DIP Lenders to treat such Communications as either publicly available information or not material information (although such Communications remain subject to the confidentiality undertakings of Section 10.13) with respect to such DIP Borrower or its securities for purposes of United States Federal and state securities laws.  Neither the Agents nor any of their Affiliates shall be responsible for any statement or other designation by any DIP Borrower regarding whether a Communication contains or does not contain material non-public information with respect to any of the DIP Borrowers or their securities nor shall the DIP Agent or any of its Affiliates incur any liability to any DIP Borrower, any DIP Lender or any other Person for any action taken by the DIP Agent or any of its Affiliates based upon such statement or designation, including any action as a result of which Restricting Information is provided to a DIP Lender that may decide not to take access to Restricting Information.  Nothing in this Section 10.02(c) shall modify or limit a Person's obligations under Section 10.14 with regard to Communications and the maintenance of the confidentiality of or other treatment of Information.

(iii)     Each DIP Lender acknowledges that circumstances may arise that require it to refer to Communications that might contain Restricting Information.  Accordingly, each DIP Lender agrees that it will nominate at least one designee to receive Communications (including Restricting Information) on its behalf and identify such designee (including such designee's contact information) on such DIP Lender's Administrative Questionnaire.  Each DIP Lender agrees to notify the DIP Agent from time to time of such DIP Lender's designee's e-mail address to which notice of the availability of Restricting Information may be sent by electronic transmission.

(iv)     Each DIP Lender acknowledges that Communications delivered hereunder and under the other DIP Loan Documents may contain Restricting Information and that such Communications are available to all DIP Lenders generally.  Each DIP Lender that elects not to take access to Restricting Information does so voluntarily and, by such election, acknowledges and agrees that the Agents and other DIP Lenders may have access to Restricting Information that is not available to such electing DIP Lender.  Each such electing DIP Lender acknowledges the possibility that, due to its election not to take access to Restricting Information, it may not have access to any Communications (including, but not by way of

61

limitation, the items required to be made available to the DIP Agent specified in Section 5.01(i)) unless or until such Communications (if any) have been filed or incorporated into documents which have been filed with any public regulators. None of the DIP Borrowers, the Agents nor any DIP Lender with access to Restricting Information shall have any duty to disclose such Restricting Information to such electing DIP Lender or to use such Restricting Information on behalf of such electing DIP Lender, and shall not be liable for the failure to so disclose or use, such Restricting Information.

(v)     The provisions of the foregoing clauses of this Section 10.02(c) are designed to assist the Agents, the DIP Lenders and the DIP Borrowers in complying with their respective contractual obligations and applicable law in circumstances where certain DIP Lenders express a desire not to receive Restricting Information notwithstanding that certain Communications hereunder or under the other DIP Loan Documents or other information provided to the DIP Lenders hereunder or thereunder may contain Restricting Information. Neither the Agents nor any of their respective Related Parties warrants or makes any other statement with respect to the adequacy of such provisions to achieve such purpose nor does the DIP Agent or any of its Related Parties warrant or make any other statement to the effect that a DIP Borrower's or a DIP Lender's adherence to such provisions will be sufficient to ensure compliance by such DIP Borrower or DIP Lender with its contractual obligations or its duties under applicable law in respect of Restricting Information and each of the DIP Lenders and each DIP Borrower assume the risks associated therewith.

SECTION 10.03.     No Waiver; Remedies.  No failure on the part of any DIP Lender or the DIP Agent to exercise, and no delay in exercising, any right hereunder or under any Note shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The remedies herein provided are cumulative and not exclusive of any remedies provided by law.

SECTION 10.04.     Costs and Expenses.

(a)     Subject to the Approved Budget, the DIP Borrowers agree to pay on demand all reasonable out-of-pocket costs and expenses of the DIP Agent in connection with the preparation, execution, delivery, administration, modification and amendment of this Agreement, the Notes, the Transaction Documents and the other documents to be delivered hereunder and thereunder, including, without limitation, (A) all reasonable due diligence, syndication (including printing, distribution and bank meetings), transportation, computer, duplication, appraisal, audit and insurance expenses and (B) the reasonable fees and expenses of counsel and the financial advisor for the DIP Agent with respect thereto allowed in paragraph 6(a) of the Final Order and with respect to advising the DIP Agent as to its rights and responsibilities under this Agreement. Such expenses shall be paid by the DIP Borrowers upon presentation of an itemized statement of account (after reasonable time for the DIP Borrowers to review such statement of account), regardless of whether the transactions contemplated by this Agreement are consummated.  The DIP Borrowers further agree to pay on demand all costs and expenses of the Agents and the DIP Lenders, if any (including, without limitation, counsel fees and expenses), in connection with the enforcement (whether through negotiations, legal proceedings or otherwise) of this Agreement, the Notes and the other documents to be delivered hereunder, including, without limitation, all fees and expenses of counsel for the Agents and each DIP Lender in connection with the

62

enforcement of rights under this subsection (a), including in connection with the Chapter 11 Cases.

(b)     The DIP Borrowers agree to indemnify and hold harmless the DIP Agent, each DIP Lender, and each of their Affiliates and their officers, directors, employees, agents and advisors (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of, or in connection with the preparation for a defense of, any investigation, litigation or proceeding arising out of, related to or in connection with (i) the syndication of the credit facility established hereby, if any, this Agreement, the Notes, any of the transactions contemplated herein or the actual or proposed use of the proceeds of the Loans or (ii) the actual or alleged presence of Hazardous Materials on any property of any DIP Borrower or any Environmental Action relating in any way to any DIP Borrower, in each case WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PARTY, whether or not such investigation, litigation or proceeding is based on contract, tort or any other theory, whether or not it is brought by any DIP Borrower, its directors, shareholders or creditors or an Indemnified Party or any other Person or any Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated, except to the extent such claim, damage, loss, liability or expense (A) is found by a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnified Party or any of its Related Indemnity Persons or (B) arises from disputes among two or more DIP Lenders (but not including any such dispute that involves a DIP Lender to the extent such DIP Lender is acting in any different capacity (i.e., the DIP Agent) under this Agreement or to the extent that it involves the DIP Agent's syndication activities, if any).  The DIP Borrowers also agree not to assert any claim against the DIP Agent, any DIP Lender, any of their Affiliates, or any of their respective directors, officers, employees, attorneys and agents, on any theory of liability, for special, indirect, consequential or punitive damages arising out of or otherwise relating to this Agreement, the Notes, the Transaction Documents or any of the transactions contemplated herein or therein or the actual or proposed use of the proceeds of the Loans.

(c)     To the extent that the DIP Borrowers for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by them to the DIP Agent or any Affiliate of the DIP Agent or any of their respective officers, directors, employees, agents or advisors, each DIP Lender severally agrees to pay to the DIP Agent or such Affiliate, officer, director employee, agent or advisor, as the case may be, pro rata in accordance with such DIP Lender's outstanding Loans and unused Commitment or, if no Loans are outstanding and the Commitments have expired or been terminated, such DIP Lender's Commitment as most recently in effect (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the DIP Agent in its capacity as such, or was incurred by or asserted against such Affiliate, officer, director employee, agent or advisor acting for the DIP Agent in connection with such capacity, as the case may be.

63

(d)     If any payment of principal of any LIBO Rate Loan is made by any DIP Borrower to or for the account of a DIP Lender other than on the last day of the Interest Period for such Loan, as a result of a payment, prepayment (whether optional or mandatory) pursuant to this Agreement or acceleration of the maturity of the Loans pursuant to Section 6.02, the DIP Borrowers shall, upon demand by such DIP Lender (with a copy of such demand to the DIP Agent), pay to the DIP Agent for the account of such DIP Lender any amounts required to compensate such DIP Lender for any additional losses, costs or expenses that it may reasonably incur as a result of such payment, Conversion or failure to prepay, including, without limitation, any loss (excluding loss of anticipated profits), cost or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by any DIP Lender to fund or maintain such Loan.

(e)     Without prejudice to the survival of any other agreement of any DIP Borrower hereunder, the agreements and obligations of the DIP Borrowers contained in Sections 2.09, 2.12, and 10.04 shall survive the payment in full of principal, interest and all other amounts payable hereunder and under the Notes and termination of the Commitments.

SECTION 10.05.     Right of Set off.  Upon the occurrence and during the continuance of any Event of Default, subject to the lifting of the automatic stay in accordance with the provisions of the Interim Order and Final Order, each DIP Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such DIP Lender or such Affiliate to or for the credit or the account of any DIP Borrower against any and all of the obligations of such DIP Borrower now or hereafter existing under this Agreement and any Note held by such DIP Lender, whether or not such DIP Lender shall have made any demand under this Agreement or such Note and although such obligations may be unmatured.  Each DIP Lender agrees promptly to notify the DIP Borrowers and the DIP Agent after any such set off and application, provided that the failure to give such notices shall not affect the validity of such set off and application.  The rights of each DIP Lender and its Affiliates under this Section 10.05 are in addition to other rights and remedies (including, without limitation, other rights of set off) that such DIP Lender and its Affiliates may have.

SECTION 10.06.     Binding Effect.  This Agreement shall become effective (a) when it shall have been executed by the DIP Agent and when the DIP Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the DIP Borrowers, the Agents and each DIP Lender and their respective successors and assigns, except that no DIP Borrower shall have the right to assign its rights hereunder or any interest herein without the prior written consent of the DIP Lenders and (b) as provided in the Orders.

SECTION 10.07.     Assignments and Participations.

(a)     Each DIP Lender may, with the consent of the DIP Agent and the DIP Borrowers (each such consent not to be unreasonably withheld or delayed and such consent of the DIP Borrowers not to be required if an Event of Default has occurred and is continuing or if the applicable assignment is to a DIP Lender or an Affiliate of a DIP Lender) and, if demanded

64

by the DIP Agent or the DIP Borrowers (x) following a request for a payment to or on behalf of such DIP Lender under Section 2.09 or 2.12 or (y) following a notice given by such DIP Lender pursuant to Section 2.10, in each case upon at least ten Business Days' notice to such DIP Lender and the DIP Agent, will, assign to one or more Persons all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its unused Commitments and Loans owing to it and any Notes held by it), provided (i) except in the case of an assignment to a Person that, immediately prior to such assignment, was a DIP Lender or an Affiliate of a DIP Lender or an assignment of all of a DIP Lender's rights and obligations under this Agreement, the unused Commitment of and the outstanding principal amount of the Loans owing to the assigning DIP Lender being assigned pursuant to each such assignment (determined as of the date of the Assignment and Assumption with respect to such assignment) shall in no event be less than $2,000,000 or an integral multiple of $500,000 in excess thereof, (ii) each such assignment shall be to an Eligible Assignee, (iii) the parties to each such assignment shall execute and deliver to the DIP Agent, for its acceptance and recording in the Register, an Assignment and Assumption, together with a processing and recordation fee of $3,500 and any Notes subject to such assignment (provided that the DIP Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment), and (iv) the assignee, if it shall not be a DIP Lender, shall deliver to the DIP Agent an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the DIP Borrowers and their respective Subsidiaries or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.  Upon such execution, delivery, acceptance and recording, from and after the effective date specified in each Assignment and Assumption, (x) the assignee thereunder shall be a party hereto and, to the extent that rights and obligations hereunder have been assigned to it pursuant to such Assignment and Assumption, have (in addition to any such rights and obligations theretofore held by it) the rights and obligations of a DIP Lender hereunder and (y) the DIP Lender assignor thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Assumption, relinquish its rights other than rights of indemnification under Section 10.04 or otherwise relating to a time prior to the effective date of such Assignment and Assumption and be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all or the remaining portion of an assigning DIP Lender's rights and obligations under this Agreement, such DIP Lender shall cease to be a party hereto).

(b)     By executing and delivering an Assignment and Assumption, the DIP Lender assignor thereunder and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows:  (i) other than as provided in such Assignment and Assumption, such assigning DIP Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other instrument or document furnished pursuant hereto; (ii) such assigning DIP Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any DIP Borrower or the performance or observance by any DIP Borrower of any of its obligations under this Agreement or any other instrument or document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement, together with copies of the financial statements referred to in

#4839-7606- 0179

Section 4.01(e), the most recent financial statements required to be delivered pursuant to Section 5.01(i)(i) and (ii) and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (iv) such assignee will, independently and without reliance upon the DIP Agent, such assigning DIP Lender or any other DIP Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (v) such assignee confirms that it is an Eligible Assignee; (vi) such assignee appoints and authorizes the DIP Agent to take such action as agent on its behalf and to exercise such powers and discretion under this Agreement as are delegated to the DIP Agent by the terms hereof, together with such powers and discretion as are reasonably incidental thereto; and (vii) such assignee agrees that it will perform in accordance with their terms all of the obligations that by the terms of this Agreement are required to be performed by it as a DIP Lender.

(c)    Upon its receipt of an Assignment and Assumption executed by an assigning DIP Lender, an assignee representing that it is an Eligible Assignee and the DIP Borrowers, together with any Notes subject to such assignment, the DIP Agent shall, if such Assignment and Assumption has been completed and is in substantially the form of Exhibit A hereto or is in such other form approved by the DIP Agent and, so long as no Event of Default has occurred and is continuing, the DIP Borrowers (such approval of the DIP Borrowers not to be unreasonably withheld or delayed), (i) accept such Assignment and Assumption, (ii) record the information contained therein in the Register and (iii) give prompt notice thereof to the DIP Borrowers.

(d)    The DIP Agent shall maintain at its address referred to in Section 10.02 a copy of each Assignment and Assumption, acting solely for this purpose as an agent of the DIP Borrowers, delivered to and accepted by it and a register for the recordation of the names and addresses of the DIP Lenders and the unused Commitment of and the principal amount of the Loan owing to each DIP Lender from time to time (the "Register").  Except as otherwise provided in Section 2.14(c), the entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the DIP Borrowers, the DIP Agent and the DIP Lenders may treat each Person whose name is recorded in the Register as a DIP Lender hereunder for all purposes of this Agreement.  The Register shall be available for inspection by any DIP Borrower or any DIP Lender at any reasonable time and from time to time upon reasonable prior notice.

(e)    Each DIP Lender may sell participations to one or more banks or other entities (other than any DIP Borrower or any of its Affiliates) in or to all or a portion of its rights and obligations under this Agreement (including, without limitation, all or a portion of its unused Commitment and Loans owing to it and any Notes held by it); provided, however, that (i) such DIP Lender's obligations under this Agreement (including, without limitation, its Commitment to the DIP Borrowers hereunder) shall remain unchanged, (ii) such DIP Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) such DIP Lender shall remain the obligee of any such Loan for all purposes of this Agreement, (iv) the DIP Borrowers, the DIP Agent, and the other DIP Lenders shall continue to deal solely and directly with such DIP Lender in connection with such DIP Lender's rights and obligations under this Agreement and (v) no participant under any such participation shall have any right to approve any amendment or waiver of any provision of this Agreement or any Note, or any

66

consent to any departure by any DIP Borrower therefrom, except that a DIP Lender may agree with a participant as to the manner in which the DIP Lender shall exercise the DIP Lender's rights to approve any amendment, waiver or consent to the extent that such amendment, waiver or consent would reduce the principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation, or postpone any date fixed for any payment of principal of, or interest on, the Loans or any fees or other amounts payable hereunder, in each case to the extent subject to such participation.

(f)    Any DIP Lender may at any time, without the consent of the DIP Agent, or the DIP Borrowers, create a security interest in all or any portion of its rights under this Agreement (including, without limitation, the Loans owing to it, and any Note or Notes held by it and) to secure obligations of such DIP Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided, however, that no such pledge or assignment shall release such DIP Lender from any of its obligations hereunder or have the effect of increasing the costs payable by the DIP Borrowers.

(g)    Notwithstanding anything to the contrary in subsection (a) above, any DIP Lender may at any time, without the consent of, but with notice to, the DIP Borrowers, assign all or part of its rights or obligations under this Agreement to any Affiliate of such DIP Lender; provided, however, that no such assignment shall have the effect of increasing the costs payable by the DIP Borrowers.

SECTION 10.08.    Governing Law.    This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without giving effect to its conflicts of law provisions (other than Section 5-1401 and 5-1402 of the General Obligations Law of the State of New York).

SECTION 10.09.    Execution in Counterparts.    This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of a signature page to this Agreement by electronic transmission shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 10.10.    Jurisdiction, Etc.

(a)    Each of the parties hereto hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Bankruptcy Court, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, the Notes, the Orders, the Chapter 11 Case or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in the Bankruptcy Court  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any party may otherwise have to bring any action or proceeding relating to this Agreement, or the Notes in the courts of any jurisdiction.

67

(b)    Each of the parties hereto irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement, the Notes, the Order, or the Chapter 11 Cases in the Bankruptcy Court.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in such court.

SECTION 10.11.    Waiver of Jury Trial.  EACH OF THE BORROWERS, EACH AGENT AND THE LENDERS HEREBY IRREVOCABLY WAIVES TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES OR THE ACTIONS OF THE ADMINISTRATIVE AGENT, OR ANY LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

SECTION 10.12.    USA Patriot Act.  Each DIP Lender, as applicable, and the DIP Agent hereby notifies the DIP Borrowers that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Act"), they are required to obtain, verify and record information that identifies any DIP Borrower, which information includes the name and address of such DIP Borrower and other information that will allow such DIP Lender or the Lead Arranger to identify such DIP Borrower in accordance with the Act.  This notice is given in accordance with the requirements of the Act and is effective as to each DIP Lender and the DIP Agent.

SECTION 10.13.    Confidentiality.  Each of the Agents and the DIP Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives (it being understood that the DIP Agent or such DIP Lender, as the case may be, shall inform the Persons to whom such disclosure is made of the confidential nature of such Information and, in the case of any such disclosure to an Affiliate, director, officer or employee, cause compliance by such Persons with this Section), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, provided that the DIP Agent or such DIP Lender, as the case may be, shall, unless prohibited by law, notify the DIP Borrowers of any disclosure pursuant to this clause (c) as far in advance as is reasonably practicable under the circumstances, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or any action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions at least as restrictive as those of this Section to (i) any assignee of or participant in, or any prospective assignee of or participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective party (or its managers, administrators, trustees, partners, directors, officers, employees, agents, advisors and other representatives) to any swap, derivative or other transaction under which payments are to be made by reference to any DIP Borrower and its obligations, this Agreement or payments hereunder, (iii) any rating agency or (iv) the CUSIP Service Bureau or any similar organization,

68

(g) with the consent of the DIP Borrowers or (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the DIP Agent, any DIP Lender or any of their respective Affiliates on a non-confidential basis from a source other than the DIP Borrowers without a duty of confidentiality to any DIP Borrower having been breached to the knowledge of the DIP Agent or such DIP Lender, as the case may be. For purposes of this Section 10.13, "Information" means all information received from any DIP Borrower (including any information obtained based on a review of the books and records of any DIP Borrower) relating to any DIP Borrower or any of their respective businesses. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 10.14.    No Fiduciary Duty.  The DIP Borrowers agree that in connection with all aspects of the transactions contemplated hereby and any communications in connection therewith, the DIP Borrowers and their respective Affiliates, on the one hand, and the Agents, the DIP Lenders and their Affiliates, on the other hand, will have a business relationship that does not create, by implication or otherwise, any fiduciary duty on the part of the Agents, the DIP Lenders or their Affiliates, and no such duty will be deemed to have arisen in connection with any such transactions or communications.

SECTION 10.15.    Independence of Covenants.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

SECTION 10.16.    DIP Borrowers' Obligations.

(a)    Liability Joint and Several.  Notwithstanding anything in this Agreement or any other DIP Loan Document to the contrary, each DIP Borrower hereby accepts joint and several liability under this Agreement and under the other DIP Loan Documents in consideration of the financial accommodations to be provided by the Agents and the DIP Lenders under this Agreement and the other DIP Loan Documents, for the mutual benefit, directly and indirectly, of each DIP Borrower and in consideration of the undertakings of each other DIP Borrower to accept joint and several liability for the Obligations.  Each DIP Borrower, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other DIP Borrower, with respect to the payment of all of the Obligations, it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each DIP Borrower without preferences or distinction among them.  If and to the extent that any DIP Borrower shall fail to make any payment with respect to any of the Obligations as and when due in accordance with the terms thereof (whether at stated maturity, by acceleration or otherwise), then in each such event, the other DIP Borrower will jointly and severally make such payment with respect to such Obligations.  Subject to the terms and conditions hereof, the Obligations of each DIP Borrower under the provisions of this Section 10.16 constitute the absolute and unconditional, full recourse Obligations of each DIP Borrower, enforceable against each such DIP Borrower to the full extent of its properties and

assets, irrespective of the validity, binding effect or enforceability of this Agreement, the other DIP Loan Documents or any other circumstances whatsoever, and irrespective of any circumstance whatsoever that might otherwise constitute a discharge or defense of a guarantor or surety (other than payment in full in cash of the relevant Obligations pursuant to the DIP Loan Documents).  As used in this Section, "Obligations" shall mean all monetary liabilities and obligations of every nature of the DIP Borrowers from time to time owed to the DIP Agent, the DIP Lenders or any of them under this Agreement or any other DIP Loan Document, whether for principal, interest (including without limitation all interest and reasonable expenses accrued or incurred subsequent to the commencement of any bankruptcy or insolvency proceedings with respect to any DIP Borrower, whether or not such interest or expenses are allowed as a claim in such proceeding), reasonable fees, reasonable expenses, indemnification or otherwise and whether primary, secondary, direct, indirect, contingent, fixed or otherwise.  All DIP Borrowers acknowledge and agree that the delivery of funds to any DIP Borrower under this Agreement shall constitute valuable consideration and reasonably equivalent value to all DIP Borrowers for the purpose of binding them and their assets on a joint and several basis for the Obligations.

(b)    Obligations Independent.  The joint and several obligations of each DIP Borrower under this Section 10.16 are of payment and not of collection and are independent of the obligations of any other DIP Borrower, and a separate action or actions may be brought against each DIP Borrower whether or not action is brought against any other DIP Borrower. The DIP Agent may enforce this Agreement and the other DIP Loan Documents against any DIP Borrower without first making demand upon or instituting collection proceedings against any other DIP Borrower.

(c)    Obligations Unconditional.  The obligations of the DIP Borrowers under this Section 10.16 are absolute and unconditional, joint and several, and (in the case of any DIP Borrower) irrespective of the value, genuineness, validity, regularity or enforceability of the obligations of any other DIP Borrower under this Agreement or any other agreement or instrument referred to herein, or any substitution, release or exchange of any guarantee of or security for any of the Obligations, the release of any other DIP Borrower, or the failure to perfect any lien or security interest granted to or in favor of any Person, and, to the fullest extent permitted by applicable law, irrespective of any other circumstance whatsoever that might otherwise constitute a legal or equitable discharge or defense of any DIP Borrower (other than payment in full in cash of the relevant Obligations pursuant to the DIP Loan Documents), it being the intent of this Section 10.16 that the obligations of the DIP Borrowers under this Section 10.16 shall be absolute and unconditional, joint and several, under any and all circumstances.  Each DIP Borrower hereby expressly waives diligence, presentment, demand of payment, protest and all notices whatsoever, and any requirement that the DIP Agent or any DIP Lender exhaust any right, power or remedy or proceed against any other DIP Borrower or other Person under this Agreement or any other agreement or instrument referred to herein.

(d)    Subrogation and Contribution.  Without limiting the provisions of the following two paragraphs, each DIP Borrower agrees not to seek payment directly or indirectly from another DIP Borrower through a claim of indemnity, contribution, or otherwise with respect to any liability incurred by it under this Agreement or under any of the other DIP Loan Documents, until the date upon which all Obligations have been indefeasibly paid in full and the Commitments have terminated.  Any such claim which any DIP Borrower may have against any

70

other DIP Borrower with respect to any payments to the DIP Agent or any DIP Lender under this Agreement or under any other DIP Loan Documents is hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations.

In any action or proceeding involving any state corporate law, or any state or Federal bankruptcy, insolvency, reorganization or other law affecting the rights of creditors generally, if the obligations of any DIP Borrower under Section 10.16(a) would otherwise, taking into account the preceding provisions of this Section 10.16(d), be held or determined to be void, invalid or unenforceable, or subordinated to the claims of any other creditors, on account of the amount of its liability under Section 10.16(a), then, notwithstanding any other provision hereof to the contrary, the amount of such liability shall, without any further action by such DIP Borrower, the DIP Agent or any DIP Lender or any other Person, be automatically limited and reduced to the highest amount that is valid and enforceable and not subordinated to the claims of other creditors as determined in such action or proceeding.

(e)    <u>Reinstatement</u>.  The provisions of this Section 10.16 shall remain in effect until all of the Obligations shall have been indefeasibly paid in full and the Commitments shall have been terminated, <u>provided</u> that, in the event that all or any portion of the Obligations are paid by any DIP Borrower, the obligations of all DIP Borrowers under this Section 10.16 shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Person as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Obligations for all purposes under this Section 10.16.

SECTION 10.17.    <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder and in any other DIP Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof.  Such representations and warranties have been or will be relied upon by the Agents and each DIP Lender, regardless of any investigation made by the DIP Agent or any DIP Lender or on their behalf and notwithstanding that the DIP Agent or any DIP Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

SECTION 10.18.    <u>Entire Agreement</u>.  THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS AMONG THE PARTIES.

SECTION 10.19.    <u>Sensitive Countries</u>.  Each DIP Borrower undertakes not to use the funds under this Agreement for business activities relating to Iran, Myanmar (Burma), North Korea, Sudan, Cuba, and Syria or for business activities relating to other countries that are subject to economic and trade sanctions as communicated by Credit Suisse AG to such DIP Borrower.  Furthermore, each DIP Borrower undertakes not to use the funds under this Agreement for business activities that are subject to sanctions/embargos imposed by the Swiss

71

State Secretariat for Economic Affairs (SECO), the United Nations (UN), the European Union (EU) and/or the US Office of Foreign Assets Control (OFAC).  This includes in particular business activities involving persons named on any sanctions lists issued by one of the above-mentioned bodies.

[REMAINDER OF PAGE INTENTIONALLY BLANK]

72

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

ANTLER PEAK GOLD INC.,
as DIP Borrower

By: _____
  Name:
  Title:

By: _____
  Name:
  Title:

RODEO CREEK GOLD INC.,
as DIP Borrower


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

HOLLISTER VENTURE CORP.,
as Guarantor


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

TOUCHSTONE RESOURCES COMPANY,
as Guarantor


By: _____
    Name:
    Title:


By: _____
    Name:
    Title:

CREDIT SUISSE AG,
as DIP Lender


By:  _____
    Name:
    Title:


By:  _____
    Name:
    Title:

CREDIT SUISSE AG,
as DIP Agent


By: _____
    Name:
    Title:


By: _____
    Name:
    Title: