# EXHIBIT 1

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

dated as of April 26, 2013

by and among

RODEO CREEK GOLD INC.,

ANTLER PEAK GOLD INC.,

HOLLISTER VENTURE CORP.,

TOUCHSTONE RESOURCES COMPANY

and

WATERTON NEVADA HOLDINGS, LLC

# TABLE OF CONTENTS

**Page**

ARTICLE 1 DEFINITIONS ................................................................................ 1
    1.1    Defined Terms .................................................................................1
    1.2    Interpretation .................................................................................9

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES ................... 10
    2.1    Assets to be Acquired ....................................................................10
    2.2    Excluded Assets ...........................................................................12
    2.3    Liabilities to be Assumed by the Buyer ...........................................13
    2.4    Excluded Liabilities ......................................................................13
    2.5    Rejection of Assumed Contracts......................................................14

ARTICLE 3 CLOSING; PURCHASE PRICE ........................................................ 14
    3.1    Closing; Transfer of Possession; Certain Deliveries ...........................14
    3.2    Purchase Price ..............................................................................16
    3.3    Allocation of Purchase Price...........................................................16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS................................ 16
    4.1    Organization.................................................................................16
    4.2    Due Authorization, Execution and Delivery; Enforceability.................16
    4.3    Consents .....................................................................................17
    4.4    No Conflicts ................................................................................17
    4.5    Title to Acquired Assets.................................................................17
    4.6    Title to Real Property ....................................................................17
    4.7    Environmental Matters....................................................................17
    4.8    Compliance with Other Laws and Permits .........................................18
    4.9    Financial Advisors ........................................................................18
    4.10    Labor Matters...............................................................................19
    4.11    Litigation....................................................................................19
    4.12    Rock Creek...................................................................................19
    4.13    CCAA Proceedings........................................................................19
    4.14    Full Disclosure ............................................................................19

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ................................ 20
    5.1    Organization.................................................................................20
    5.2    Due Authorization, Execution and Delivery; Enforceability.................20
    5.3    Consents .....................................................................................20
    5.4    No Conflicts ................................................................................20
    5.5    Financial Capability ......................................................................20
    5.6    Financial Advisors ........................................................................20
    5.7    Opportunity for Independent Investigation.........................................20
    5.8    HSR...........................................................................................21

ARTICLE 6 COVENANTS OF THE PARTIES ......................................................... 21
    6.1      Conduct of Business Pending the Closing ..........................................21
    6.2      Access .................................................................................................21
    6.3      Public Announcements ........................................................................22
    6.4      Tax Matters .........................................................................................22
    6.5      Regulatory Approvals ..........................................................................23
    6.6      Employee Matters ................................................................................24
    6.7      Confidentiality ....................................................................................25
    6.8      Further Assurances ..............................................................................25
    6.9      Sale Order ...........................................................................................25
    6.10    Buyer's Acknowledgements; Nature of Representations ....................26
    6.11    Replacement Credit Support and Reclamation Requirements .............28
    6.12    Insurance ............................................................................................28
    6.13    Intellectual Property ...........................................................................28
    6.14    Inventory Payment ..............................................................................29
    6.15    Surface Use and License Agreement ..................................................30
    6.16    Permits Covenant ................................................................................30

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ...................................... 30
    7.1      Conditions Precedent to Obligations of the Buyer .............................30
    7.2      Conditions Precedent to the Obligations of the Sellers ......................32

ARTICLE 8 TERMINATION .................................................................................... 33
    8.1      Termination of Agreement ..................................................................33
    8.2      Consequences of Termination .............................................................33

ARTICLE 9 MISCELLANEOUS ............................................................................... 34
    9.1      Expenses .............................................................................................34
    9.2      Assignment .........................................................................................34
    9.3      Parties in Interest ................................................................................34
    9.4      Notices ................................................................................................34
    9.5      Choice of Law; Jurisdiction and Venue .............................................35
    9.6      Entire Agreement; Amendments and Waivers ...................................35
    9.7      Schedules; Supplementation and Amendment of Schedules .............35
    9.8      Counterparts; Facsimile and Electronic Signatures ...........................36
    9.9      Retention of Deposit Not Penalty .......................................................36
    9.10    Severability ........................................................................................36
    9.11    Specific Performance .........................................................................36
    9.12    WAIVER OF RIGHT TO TRIAL BY JURY ....................................36
    9.13    NO CONSEQUENTIAL DAMAGES ...............................................36
    9.14    Survival ..............................................................................................37
    9.15    Non-Recourse .....................................................................................37

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of April 26, 2013 (the "*Effective Date*"), by and among RODEO CREEK GOLD INC., a Nevada corporation, ANTLER PEAK GOLD INC., a Nevada corporation, HOLLISTER VENTURE CORP., a Nevada corporation, and TOUCHSTONE RESOURCES COMPANY, a Nevada corporation (each a "*Seller*" and, collectively, the "*Sellers*"), and WATERTON NEVADA HOLDINGS, LLC, a Nevada limited liability company (the "*Buyer*"). The Sellers and the Buyer are each referred to herein as a "*Party*" and, collectively, as the "*Parties*."

WHEREAS, the Sellers will, as of the Closing, hold and/or operate all of the assets, permits, contracts and other rights currently used or held for use in operating the Business;

WHEREAS, on September 19, 2012, Great Basin Gold Ltd., a Canadian corporation and the direct or indirect parent of each Seller, applied for protection from its creditors (thereby commencing the "*CCAA Proceedings*") before the Supreme Court of British Columbia (the "*CCAA Court*") pursuant to the *Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36*;

WHEREAS, on February 25, 2013, the Sellers filed voluntary petitions ("*Petitions*") for relief (commencing the "*Chapter 11 Cases*") under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the District of Nevada (the "*Bankruptcy Court*"); and

WHEREAS, upon the terms and subject to the conditions contained in this Agreement, and subject to the approval of the Bankruptcy Court in the Chapter 11 Cases, the Sellers wish to sell to the Buyer and the Buyer wishes to purchase from the Sellers all of the right, title and interest of the Sellers as of the Closing Date in the Acquired Assets and to assume from the Sellers the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises, representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and, intending to be legally bound hereby, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1    <u>Defined Terms</u>.  As used herein, the terms below shall mean the following:

"*Acquired Assets*" has the meaning set forth in <u>Section 2.1</u>.

"*Acquired Permits*" has the meaning set forth in <u>Section 2.1(f)</u>.

"*Affiliate*" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

1

"*Agreement*" means this Asset Purchase Agreement, together with all exhibits hereto and the Schedules.

"*Allocation*" has the meaning set forth in <u>Section 3.3</u>.

"*Assignment and Assumption of Mining Leases*" means an assignment and assumption of mining leases to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"*Assignment and Assumption of Assumed Contracts, Acquired Permits and Agreements*" means an assignment and assumption of Assumed Contracts, Acquired Permits and any other instrument typically transferred by assignment to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"*Assumed Contracts*" has the meaning set forth in <u>Section 2.1(e)</u>.

"*Assumed Liabilities*" has the meaning set forth in <u>Section 2.3</u>.

"*Assumption Agreement*" means an assumption agreement to be delivered by the Buyer at Closing, in form and substance reasonably acceptable to the Sellers.

"*Bankruptcy Code*" has the meaning set forth in the recitals.

"*Bankruptcy Court*" has the meaning set forth in the recitals.

"*Benefit Plan*" means any employee benefit plan (as defined in section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, cash- and stock-based incentive compensation, disability, death benefit, hospitalization, medical, dental, life, severance, vacation, sick leave, fringe benefit, or welfare plan, program, policy, practice or arrangement, whether or not subject to ERISA, or any employment, retention, consulting, change in control, termination or severance plan, program, policy, practice, arrangement or agreement sponsored, maintained or contributed to, or required to be maintained or contributed to, by the Sellers for the benefit of any present or former officer, employee or director, retiree or spouse, dependent or other beneficiary of any of the Sellers who worked or works in the Business.

"*Bid Procedures*" means the bidding procedures approved by the Bid Procedures Order, as such procedures may be amended or modified in accordance with the Bid Procedures Order.

"*Bid Procedures Order*" means the Order of the Bankruptcy Court, dated March 1, 2013, and amended on March 29, 2013, as such order may be further amended or modified from time to time.

"*Bill of Sale*" means a bill of sale for the Acquired Assets to be delivered by the Sellers to the Buyer at Closing, in form and substance reasonably acceptable to the Buyer.

"*Business*" means the ownership and operation of the Hollister gold mining facility located in Elko County, Nevada and the Esmeralda mill facility located in Mineral County, Nevada.

"***Business Day***" means any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"***Buyer***" has the meaning set forth in the preamble.

"***Cash Consideration***" means $15,000,000.

"***CCAA Court***" has the meaning set forth in the recitals.

"***CCAA Proceedings***" has the meaning set forth in the recitals.

"***Chapter 11 Cases***" has the meaning set forth in the recitals.

"***Claims***" means all rights or causes of action (whether in law or equity), obligations, demands, restrictions, indemnities, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including all "claims" as defined in section 101(5) of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 3.1(a).

"***Closing Date***" has the meaning set forth in Section 3.1(a).

"***Code***" means the Internal Revenue Code of 1986.

"***Confidentiality Agreement***" has the meaning set forth in Section 6.7.

"***Consent***" has the meaning set forth in Section 4.3.

"***Contract***" means any written contract, lease, license, purchase order, sales order or other agreement, arrangement, understanding or commitment that is binding upon a Person or its property.

"***Credit Suisse***" means Credit Suisse AG.

"***Credit Support/Reclamation Arrangements***" has the meaning set forth in Section 6.11.

"***CS Side Letter***" means the side letter agreement to be entered into by and between Credit Suisse and the Buyer after the date hereof.

"***Deposit***" means $1,500,000.

"***Effective Date***" has the meaning set forth in the preamble.

"***Employees***" has the meaning set forth in Section 6.6(a).

"***Environmental Law***" means any Law as in effect on the Effective Date relating to pollution, hazardous materials or protection of the environment or human health.

3

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.4</u>.

"***Existing CS Debt***" means (i) $49,414,337.90 in principal amount and accrued interest that the Sellers owe Credit Suisse, as agent and lender, and the other financial institutions that are lenders under that certain Credit Agreement, dated as of February 23, 2011, and (ii) all amounts owing as of the Closing pursuant that certain Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement as approved by the Bankruptcy Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(b) and (c) (I) Authorizing Debtors to (A) Obtain Postpetition Financing; and (B) Use Cash Collateral; (II) Granting Liens, Including Priming Liens, and Superpriority Claims, (III) Granting Adequate Protection, and (IV) Granting Related Relief* dated April 8, 2013.

"***Filing***" has the meaning set forth in <u>Section 4.3</u>.

"***GAAP***" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"***Governmental Entity***" means any federal, state, provincial, local, municipal, foreign or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"***Interim Period***" has the meaning set forth in <u>Section 6.1</u>.

"***Inventory***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Inventory Ounces***" has the meaning set forth in <u>Section 6.14</u>.

"***Inventory Payment Measure***" has the meaning set forth in <u>Section 6.14</u>.

"***IT Assets***" means computers, software (to the extent transferable), servers, workstations, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by the Sellers and used in the Business.

"***Law***" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, Order, principle of common law, judgment or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity or other requirement or rule of law.

"***Leased Machinery and Equipment***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Liabilities***" means, as to any Person, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or

4

contingent, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"**Lien**" means any lien (statutory or otherwise), Claim, pledge, option, charge, right of first refusal, hypothecation, encumbrance, easement, lease or sublease, security interest, right-of-way, encroachment, mortgage, deed of trust, restriction on transferability or other similar restriction, whether imposed by agreement, law or otherwise, whether of record or otherwise.

"**London Good Delivery Bars**" means gold bullion bars which are defined in and meet the standards and specifications of the London Bullion Market Association.

"**Machinery and Equipment**" has the meaning set forth in <u>Section 2.1(b)</u>.

"**Material Adverse Effect**" means any change, event, circumstance, development or effect that is or would reasonably be expected to be materially adverse to the Acquired Assets, the Business, the Properties, the Sellers, or the business, operations or condition (financial or otherwise) of the Business or materially adverse (or that would reasonably be expected to be materially adverse) to the Sellers' ability to perform its obligations under this Agreement in a timely fashion or to consummate the transactions contemplated hereby in a timely fashion, but shall exclude any change, event, circumstance, development or effect resulting or arising from: (a) any circumstance generally affecting the international, national or regional mining industry (except to the extent that the Business is disproportionately adversely affected by such changes relative to other industry participants); (b) any change in economic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities, or changes imposed by a Governmental Entity associated with additional security (except to the extent that the Business is disproportionately adversely affected by such changes relative to other industry participants); (c) changes or prospective changes in Law, GAAP or official interpretations of the foregoing (except to the extent that the Business is disproportionately adversely affected by such changes relative to other industry participants); (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Buyer unreasonably refused consent under this Agreement; (e) the transactions contemplated hereby or any announcement hereof or the identity of the Buyer, including any loss, diminution or disruption, whether actual or threatened, of existing or prospective customer, distributor, supplier or other relationships resulting therefrom; (f) the failure in and of itself by any Seller to meet any projections or estimates, including internal projections or estimates of revenue, earnings or performance (it being understood that the underlying causes of the failure to meet such projections shall be taken into account in determining whether a Material Adverse Effect has occurred); or (g) the pendency of the CCAA Proceedings or Chapter 11 Cases and any action approved by, or motion made before, the Bankruptcy Court or CCAA Court.

"**Mill Ounces**" has the meaning set forth in <u>Section 6.14</u>.

"**Net Profits Royalty Agreement**" means the agreement to be entered into by the Buyer and Sellers in respect of net profits royalty payments payable by the Buyer to Sellers or their designee (who may be designated pursuant to the Sale Order and/or a plan of reorganization in

the Chapter 11 Cases) until the earlier of (i) the receipt by Sellers or their designee of a total of $90,000,000 in such payments and (ii) nine (9) years from Closing.

"***Non-Party Affiliates***" has the meaning set forth in <u>Section 9.15</u>.

"***Notices***" has the meaning set forth in <u>Section 9.4</u>.

"***Operating Records and Other Information***" means all data, information (including tangible and intangible information such as drill core, drill logs, assays, metallurgical test work, mine plans and similar information), agreements, files, books (including accounting books and records), operating records, operating, safety and maintenance manuals, engineering and design plans, blueprints and as-built plans, specifications, drawings, reports, procedures, facility compliance plans, test records and results, other records and filings made with regulatory agencies regarding operations of the Business, environmental procedures and similar records and employee records for the Employees to the limited extent necessary for the Buyer to comply with applicable Law after the Closing Date.  For the avoidance of doubt, the foregoing includes all reports, documents, data and other information relating to the Hollister Expansion Environmental Impact Statement, the Programmatic Agreement, and any Permits or applications or materials in support of renewal of any Permits.  Except as otherwise expressly provided herein, the foregoing does not include (a) accounting books and records of any Affiliate of any Seller, (b) items proprietary to third parties that are not freely transferable in connection with the sale of the Business, (c) SEC or SEDAR filings that are publicly available or other publicly available information or records, (d) records not in the possession and control of any Seller or any Affiliate of any Seller and (e) records not permitted by law to be transferred from any Seller or any Affiliate of any Seller to the Buyer.

"***Order***" means any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity.

"***Outside Date***" has the meaning set forth in <u>Section 8.1(b)</u>.

"***Owned Machinery and Equipment***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Owned Real Property***" has the meaning set forth in <u>Section 4.6(a)</u>.

"***Party***" has the meaning set forth in the preamble.

"***Permits***" means permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"***Permitted Liens***" means: (a) title of a lessor under a capital or operating lease that is an Assumed Contract; (b) terms and conditions of any Assumed Contract; (c) such Liens, imperfections in title, charges, easements, restrictions, encumbrances or other matters that are due exclusively to zoning or subdivision, entitlement, and other land use Laws or regulations; (d) Liens or encumbrances that arise exclusively by reason of acts of the Buyer or with the prior written approval of the Buyer; (e) orders or rulings of the Nevada State Office of the Bureau of Land Management or the Nevada Division of Water Resources to the extent such orders or rulings do not invalidate (or could reasonably be expected to invalidate) the mining claims or

6

water rights that are subject of such orders or rulings; or (f) all covenants, conditions, restrictions, easements, charges, rights of way, or other similar encumbrances on title, in each case, filed of record in the real property records to which they relate or affect or filed with the Nevada State Office of the Bureau of Land Management or filed with the Nevada Division of Water Resources, which do not materially affect the value of the real property or interfere with the use thereof or the operation of the Business.

"***Person***" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"***Petition Date***" means the date on which the Petitions are filed with the Bankruptcy Court in the Chapter 11 Cases.

"***Petitions***" has the meaning set forth in the recitals.

"***Proceeding***" means any claim, action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases or CCAA Proceedings, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"***Properties***" has the meaning set forth in Section 2.1(a).

"***Purchase Price***" means the aggregate consideration that is the sum of: (a) the Cash Consideration, plus (b) the entering into of the Net Profits Royalty Agreement by the Buyer, plus (c) the cure payments in accordance with Section 7.1(j), plus (d) the amounts, if any, to be paid by the Buyer pursuant to Section 6.14.

"***Quit Claim Deeds***" means quit claim deeds to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"***Reclamation Obligation***" means any and all actions required during, or following cessation of, any exploration, mining or processing activities conducted by or in connection with the Business, or required at or on property utilized by the Business, that is required either by Law or by Permit.

"***Refined Ounces***" means refined gold bullion in the form of London Good Delivery Bars, produced, derived or resulting from the Inventory Ounces.

"***Refinery***" means Johnson Matthey Inc.'s refinery in Salt Lake City, Utah, USA.

"***Refinery Ounces***" has the meaning set forth in Section 6.14.

"***Representative***" means, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"***RK***" means RK Mine Finance Trust I.

"***Rock Creek"*** has the meaning set forth in <u>Section 2.1(j)</u>.

"***Sale***" has the meaning set forth in <u>Section 6.14</u>.

"***Sale Hearing***" has the meaning specified in the Bid Procedures Order.

"***Sale Order***" means an Order or Orders of the Bankruptcy Court, which shall be in the form of Exhibit H to Docket No. 16 in the Chapter 11 Cases (with such modifications to be mutually agreed upon by Buyer and Sellers), authorizing and approving, without limitation, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement and authorizing the Sellers to consummate the transactions contemplated hereby.

"***Schedules***" means the disclosure schedules delivered in connection with the execution of this Agreement.

"***Sellers***" has the meaning set forth in the preamble.

"***Seller Trademarks and Logos***" has the meaning set forth in <u>Section</u> **Error! Reference source not found.**.

"***Surface Use and License Agreement***" has the meaning set forth in <u>Section 6.15</u>.

"***Tax***" means any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, unclaimed property liabilities, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, stamp duty reserve, estimated or other similar tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"***Tax Authority***" means any taxing or other authority (whether within or outside the United States) competent to impose Tax.

"***Tax Return***" means any and all returns, declarations, reports, documents, claims for refund, or information returns, statements or filings that are required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"***Transfer Tax***" means any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect

thereto including, without limitation, any filing fees to be paid to the Bureau of Land Management, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"*Unrefined Gold Ounces*" means troy ounces of raw or crushed ore, concentrate, doré and/or other unrefined gold.

"*WARN Act*" means the Worker Adjustment and Restraining Notification Act.

"*Water Rights Quit Claim Deeds*" means water rights quit claim deeds to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

1.2    Interpretation.

(a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

(b)    Words denoting any gender shall include all genders.

(c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

(d)    A reference to any legislation or to any provision of any legislation shall include any amendment, modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)    All references to "$" and dollars shall be deemed to refer to United States currency.

(f)    All references to any financial or accounting terms shall be defined in accordance with GAAP, unless otherwise defined herein.

(g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement, unless otherwise specified.  All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement, as they may be modified by the Schedules, unless otherwise specified.

(h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(j)      If a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(k)      A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended, restated, supplemented or otherwise modified from time to time, except to the extent prohibited by this Agreement or that other agreement or document.

(l)      Exhibits, Schedules, annexes and other documents referred to as part of this Agreement are hereby incorporated herein and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any exhibit, Schedule or annex but not otherwise defined therein shall be defined as set forth in this Agreement.

(m)      The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and shall not be a part of, or affect the meaning or interpretation of, this Agreement.

(n)      This Agreement is the result of the joint efforts of the Sellers and the Buyer, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1      Assets to be Acquired.  Subject to the terms and conditions of this Agreement and the Sale Order, and upon entry of the Sale Order, at the Closing, the Sellers shall sell, convey, assign, transfer and deliver to the Buyer, free and clear of all Liens (other than Permitted Liens) as provided in the Sale Order and the Buyer shall purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in each and all of the Acquired Assets.  "**Acquired Assets**" means all properties, assets and rights of every nature, tangible and intangible, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of the Sellers as the same shall exist on the Closing Date that are (a) owned by any Seller, (b) used or held in connection with the ownership, lease, use or operation of the Business and (c) not Excluded Assets.  The Acquired Assets shall include:

(a)      the real property, mining claims and water rights, surface use rights, access rights or agreements, easements and rights of way, whether owned or leased, in each case used or held for use in the operation of the Business, including those listed on Schedule 4.6(a) (the "**Properties**") and which shall include all buildings, fixtures, improvements, tunnels, drifts, power lines, pipe lines and roads located on or used in connection with the Properties;

(b)      all of (i) the Sellers' owned equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), materials, furniture, fixtures, improvements, tooling and other tangible property used or held for use in the operation of the Business (the "**Owned Machinery and Equipment**"), (ii) the Sellers' rights to any equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), materials, furniture, fixtures, improvements, tooling and other

tangible property used or held for use in the operation of the Business, that is leased pursuant to an Assumed Contract (the "***Leased Machinery and Equipment***" and, collectively with the Owned Machinery and Equipment, the "***Machinery and Equipment***") and (iii) the rights of the Sellers to any warranties, express or implied, and licenses received from manufacturers and sellers of the Machinery and Equipment;

(c)    all accounts receivable accrued in the operation of the Business in the ordinary course of business during the Chapter 11 Cases (other than accounts receivable from RK), and, other than those used or consumed in the ordinary course of business or sold in the ordinary course of business prior to Closing, all inventories, ore stockpiles, loaded carbon, doré or other minerals in process (at the Esmeralda mill facility, the Refinery, or otherwise), and all doré, bullion, Unrefined Gold Ounces, and Refined Gold held for any Seller's account by any refiner (including the Refinery), in each case, used or held for use in connection with the Business (collectively, "***Inventory***");

(d)    all right, title and interest of the Sellers in and to the IT Assets used or held for use in the operation of the Business;

(e)    all Contracts entered into by any Seller that are executory and unexpired as of the Closing Date and that will be assumed by the Sellers and assigned to the Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code in connection with the transactions contemplated in this Agreement, in each case that are (i) related to the Business and (ii) listed on Schedule 2.1(e), that the Buyer elects to assume by Notice to the Sellers prior to the Closing Date pursuant to Section 2.5 (collectively, the "***Assumed Contracts***");

(f)    all Permits used or required for the ownership or operation of the Business, but only to the extent that such Permits are transferable by the Sellers to the Buyer by assignment or otherwise (including those that will pass to the Buyer as successor in title to the Acquired Assets by operation of Law) (the "***Acquired Permits***"), and, notwithstanding Section 6.11, to the extent acceptable to the Governmental Entity with jurisdiction, those cash deposits, letters of credit or other assets or collateral in support of any letters of credit or any obligation with respect thereto of any Seller that secure Reclamation Obligations arising under any Permits;

(g)    except as set forth in Section 2.2(e), and subject to the right of the Sellers to retain copies for legal or tax reasons, the Operating Records and Other Information;

(h)    all rights, Claims, actions, refunds, causes of action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guaranties, indemnities and other contractual Claims, in each case, to the extent related to the other assets set forth in this Section 2.1 or the Assumed Liabilities and, with respect to any employees and any vendors with whom any of the Sellers have conducted business in the year prior to the Closing and with whom the Buyer will continue to engage in connection with the operation of the Business following the Closing (including, for the avoidance of doubt, any vendor that is a party to an Assumed Contract); *provided*, *however*, that Acquired Assets shall not include any claims of the estate under Article 5 of the United States

11

Bankruptcy Code or analogous state statutes including, but not limited to, claims under Section 547, 548, 549 or 550 of the Bankruptcy Code nor shall the Acquired Assets include any Claims, actions, refunds, causes of action, suits, proceedings, rights of recovery, rights of setoff, rights of recoupment or other similar rights, in each case, not related to the other Acquired Assets, the Business or the Assumed Liabilities including claims against directors and officers of any of the Sellers;

      (i)    any royalty or similar interest held by the Sellers relating to the Business, including any net profits royalty held by Touchstone Resources Company; and

      (j)    all of Rodeo Creek Gold Inc.'s interest as member in Rock Creek Conservancy, LLC, a Nevada limited liability company ("***Rock Creek***").

    2.2   <u>Excluded Assets</u>.  The Buyer does not assume and shall have no right to any asset of the Sellers that is not expressly assumed by the Buyer as an Acquired Asset (collectively, the "***Excluded Assets***"), which Excluded Assets include, for the avoidance of doubt:

      (a)    except as provided in <u>Section 2.1(f)</u>, all cash and cash equivalents, marketable securities, security entitlements, instruments and other investments and all bank accounts and securities accounts;

      (b)    any prepayments made with regard to insurance policies not assumed by the Buyer and security deposits, prepaid expenses or prepayments to the extent made in connection with any other Excluded Asset or Excluded Liability;

      (c)    the Seller Trademarks and Logos;

      (d)    any Contract other than the Assumed Contracts;

      (e)    any Operating Records and Other Information that any Seller is required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings and all Operating Records and Other Information related to Taxes paid or payable by any Seller or any of their respective Affiliates; *provided, that,* to the extent the Buyer requires access to any of the foregoing the Sellers shall provide such access and/or copies thereof, to the extent providing such access and/or copies is permitted by Law;

      (f)    all rights, Claims, actions, refunds, causes of action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guaranties, indemnities and other contractual Claims, in each case, other than those set forth in <u>Section 2.1(h)</u>; and

      (g)    all accounts receivable from RK.

2.3    <u>Liabilities to be Assumed by the Buyer</u>.  Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, the Sellers shall assign to the Buyer and the Buyer shall assume from the Sellers and pay when due, perform and discharge, in due course, without duplication, the following Liabilities of any Seller or any Affiliate of any Seller (collectively, the "***Assumed Liabilities***"), whether such Liabilities and obligations arose or will arise prior to, on or after the Closing Date, including:

(a)    any Liabilities and obligations arising from or relating to Reclamation Obligations or arising in connection with the Acquired Permits, in each case, relating to the ownership or operation of the Business or the Acquired Assets after the Closing;

(b)    all Liabilities arising after the Closing out of or relating to the Buyer's operation of the Business or its ownership or operation of the Acquired Assets;

(c)    all Liabilities of any Seller or any Affiliate of any Seller under each of the Assumed Contracts that arise out of or relate to the period from and after the Closing and not resulting from any breach or default by, or waiver or extension given by or to, any Seller; and

(d)    all Liabilities that may arise under the WARN Act to the extent such Liabilities arise out of a breach by Buyer of <u>Section 6.6(d)</u>.

2.4    <u>Excluded Liabilities</u>.  The Buyer does not assume any Liability of the Sellers or of any Affiliate of any Seller relating to or arising out of any of the following, which shall be retained and remain Liabilities of the Sellers (collectively, the "***Excluded Liabilities***"):

(a)    any indebtedness for borrowed money of the Sellers to the extent not expressly assumed hereunder as part of the Assumed Liabilities, including the Existing CS Debt;

(b)    except as set forth in <u>Section 6.5</u>, all costs and expenses incurred or to be incurred by the Sellers in connection with this Agreement and the consummation of the transactions contemplated hereby;

(c)    except as provided in <u>Section 2.3(d)</u>, all Liabilities and obligations relating to current or former employees and directors or other service providers whose employment or services related to the maintenance and operation of the Business, any Benefit Plans or any Liabilities in relation to COBRA continuation coverage;

(d)    any Liabilities to the extent relating to the Excluded Assets;

(e)    any Liabilities of the Sellers, whether occurring or accruing before, at, or after the Closing Date, (i) associated with noncompliance with Environmental Laws (including fines, penalties, damages, and remedies); (ii) arising under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 810 *et. seq.* or its associated regulations and/or (iii) assessed by the United States Department of Labor's Mine Safety and Health Administration; in each case, relating to pre-Closing operations or ownership of the Business;

(f)       any Liabilities for or related to Taxes relating to the Business and the Acquired Assets in respect of the period prior to Closing;

(g)       any Liabilities and obligations arising from or relating to accounts payable accrued in the operation of the Business prior to Closing;

(h)       any Liabilities for Transfer Taxes, if any; and

(i)        any Liabilities that are not Assumed Liabilities.

2.5       Rejection of Assumed Contracts.  From the date hereof until two (2) Business Days prior to the Sale Hearing, the Buyer shall have the right, upon Notice to the Sellers, to exclude any Contract from the Assumed Contracts, or, in the alternative, supplement the Assumed Contracts (subject to the requirements of sections 365(a) and 365(f) of the Bankruptcy Code), for any reason.  Any Contract so excluded by the Buyer shall be deemed to no longer be an Assumed Contract, shall be deemed to be an Excluded Asset.  Any Schedules hereto shall be amended to reflect any changes made pursuant to this Section 2.5 and the Buyer shall have no obligation to pay the cure amount (if any) associated with any Contract that is excluded from the Assumed Contracts pursuant to this Section 2.5.  For the avoidance of doubt, any such exclusion or addition of any Assumed Contract shall not result in a change to the amount of the Cash Consideration.

**ARTICLE 3**
**CLOSING; PURCHASE PRICE**

3.1       Closing; Transfer of Possession; Certain Deliveries.

(a)       The consummation of the transactions contemplated herein (the "***Closing***") shall take place on the second (2nd) Business Day after all of the conditions set forth in Article 7, other than those conditions that by their nature are to be satisfied at the Closing, have been either satisfied or waived by the Party entitled to waive such condition or on such other date as the Parties shall mutually agree.  The Closing shall be held at the offices of Sidley Austin LLP at 787 7th Ave in New York, New York, at 10:00 a.m., local time, unless the Parties otherwise agree.  The actual date of the Closing is the "***Closing Date***."  For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. on the Closing Date.

(b)       At the Closing, the Sellers shall deliver to the Buyer:

(i)        a true and correct copy of the Sale Order;

(ii)       a duly executed Bill of Sale;

(iii)      a duly executed Assignment and Assumption of Assumed Contracts, Acquired Permits and Agreements;

(iv)      the certificate contemplated by Section 7.1(c);

14

(v)    duly executed Quit Claim Deeds for each parcel of Owned Real Property;

(vi)    duly executed Quit Claim Deeds for each mining claim listed on Schedule 4.6(c);

(vii)    a duly executed Assignment and Assumption of Mining Leases for each mining claim listed on Schedule 4.6(d);

(viii)    duly executed Water Rights Quit Claim Deeds for each water right listed on Schedule 4.6(e);

(ix)    duly executed affidavits of the Sellers, prepared in accordance with U.S. Treasury Regulations section 1.1445-2(b), certifying as to the Sellers' non-foreign status;

(x)    a true and complete copy, certified by the Secretary or an Assistant or Attesting Secretary of each Seller, of the resolutions duly and validly adopted by the sole equityholder of such Seller evidencing the authorization of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby; and

(xi)    such other documents, instruments and certificates as the Buyer may reasonably request.

(c)    At the Closing, the Buyer shall:

(i)    deliver to the Sellers the Cash Consideration less the amount of the Deposit;

(ii)    enter into the Net Profits Royalty Agreement;

(iii)    pay the portion of the Purchase Price representing cure payments and deliver to the Sellers evidence of such payment;

(iv)    deliver to the Sellers a duly executed Assumption Agreement;

(v)    deliver to the Sellers a duly executed Assignment and Assumption of Mining Leases for each mining claim listed on Schedule 4.6(d);

(vi)    deliver to the Sellers the certificate contemplated by Section 7.2(c);

(vii)    deliver to the Sellers a true and complete copy, certified by the Secretary or an Assistant or Attesting Secretary of the Buyer, of the resolutions duly and validly adopted by the Manager of the Buyer evidencing its authorization of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby; and

(viii)  deliver to the Sellers such other documents, instruments and certificates as the Sellers may reasonably request.

3.2     Purchase Price.  In consideration for the Acquired Assets and subject to the terms and conditions of this Agreement, the Buyer shall at the Closing assume the Assumed Liabilities as provided in Section 2.3 and pay the Purchase Price (other than the amounts, if any, owed by the Buyer pursuant to Section 6.14, which shall be paid in accordance with Section 6.14 subsequent to the Closing).  Subject to Section 8.2(b), the Sellers are entitled to retain the Deposit, which shall be credited as part of the Purchase Price.

3.3     Allocation of Purchase Price.  The sum of the Purchase Price and the value of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with section 1060 of the Code and the U.S. Treasury Regulations promulgated thereunder (and any similar provision of state or local Law, as appropriate).  The allocation shall be agreed to by the Sellers and the Buyer within sixty (60) days after the Closing Date, which allocation shall constitute the "*Allocation*." Each of the Parties shall (a) file all Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation, (b) provide the other Party with any information required to complete Internal Revenue Service Form 8594 within fourteen (14) days of the request for such information, (c) notify and provide the other Party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes regarding the Allocation. Notwithstanding the preceding sentence, the Parties may settle any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither the Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Notwithstanding anything in this Agreement to the contrary, this Section 3.3 shall survive the Closing Date without limitation.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth on the Schedules, the Sellers hereby jointly and severally represent and warrant to the Buyer as follows:

4.1     Organization. Each Seller is duly organized, validly existing and in good standing under the Laws of the State of Nevada.  Each Seller has all necessary power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the date of this Agreement.

4.2     Due Authorization, Execution and Delivery; Enforceability.  Each Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and subject to the Sale Order having been entered by the Bankruptcy Court to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  This Agreement constitutes the legally valid and binding obligation of each Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

4.3     <u>Consents</u>.  Subject to the Sale Order having been entered by the Bankruptcy Court and a corresponding order approving the transactions having been entered by the CCAA Court, none of the execution, delivery or performance of this Agreement by any Seller will require any material consent, approval, license, permit, Order or authorization (each, a "***Consent***") of or from, or registration, notice, declaration or filing (each, a "***Filing***") with or to, any Governmental Entity.

4.4     <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby (a) does not and will not conflict with or result in any breach of any provision of the articles of incorporation or bylaws or similar organizational documents of such Seller and (b) will not, as of the Closing, conflict with or result in any breach of any provision of, in any material respect, any Assumed Contract.

4.5     <u>Title to Acquired Assets</u>.  The Sellers have good and valid title to the Acquired Assets, free and clear of all Liens, other than Permitted Liens.

4.6     <u>Title to Real Property</u>.

(a)     <u>Schedule 4.6(a)</u> sets forth a true and complete list of all real property (other than mining claims) owned by any Seller that is used in connection with the operation of the Business ("***Owned Real Property***").

(b)     The Sellers do not lease any real property (other than mining claims) used in connection with the operation of the Business.

(c)     <u>Schedule 4.6(c)</u> sets forth a true and complete list of all material owned mining claims used in connection with the operation of the Business.  All such mining claims were and are validly located and have been maintained in accordance with the laws of the United States and the State of Nevada.

(d)     <u>Schedule 4.6(d)</u> sets forth a true and complete list of all material leased, subleased or licensed mining claims used in connection with the operation of the Business.  All such leases, subleases or licenses are in good standing and all royalty or other obligations accruing after the Petition Date have been timely paid or performed.

(e)     <u>Schedule 4.6(e)</u> sets forth a true and complete list of all material owned water rights used in connection with the operation of the Business.  All such water rights are in good standing.

4.7     <u>Environmental Matters</u>.

(a)     <u>Schedule 4.7</u> sets forth a true and complete list of all material Permits issued by any Governmental Entity under any Environmental Laws and to which any Seller is a party as of the Effective Date.  The Permits held by the Sellers are all of the material Permits required under any Environmental Laws for the operation of the Business in all material respects as currently conducted and each Seller is in compliance with such Permits and with applicable Environmental Laws in all material respects.  Each such Permit is in full force and effect, and is

17

not subject to any pending or threatened Proceeding to revoke, cancel, suspend or declare any of such Permits invalid in any respect.

(b)      The Sellers are not subject to any Order with respect to any Environmental Laws that has not been fulfilled and is outstanding.

(c)      None of the real properties or mining claims owned, leased or operated by the Sellers is the subject of any federal or state Proceeding regarding a release of hazardous materials into the environment, nor, to the knowledge of the Sellers, have any hazardous materials been stored, used or released, in a quantity or manner at or on the Properties, or at any off-site location to which such hazardous materials were sent by any Seller, which would reasonably be expected to result in any obligations to pay for or perform any remedial action.

(d)      Since January 1, 2012, none of the Sellers has received any written notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other claims of liability regarding any alleged violation of Environmental Laws.

4.8      <u>Compliance with Other Laws and Permits</u>.

(a)      <u>Schedule 4.8</u> sets forth a true and complete list of all material Permits issued by any Governmental Entity under any Laws (other than Environmental Laws) and to which any Seller is a party as of the Effective Date.  The Permits held by the Sellers are all of the material Permits required under any Laws (other than Environmental Laws) for the operation of the Business in all material respects as currently conducted and each Seller is in compliance with such Permits and with applicable Laws (other than Environmental Laws) in all material respects.

(b)      Since January 1, 2012, each Seller has complied in all material respects with all applicable Laws that affect the Business, and no Seller has received any written notice of any alleged violation of applicable Law in any material respect, or is aware of any pending or threatened notice of such violation, in any case including under the Permits set forth on <u>Schedule 4.8</u> or by agency action.

(c)      The Sellers are not subject to any Order with respect to any such Laws (other than Environmental Laws) that has not been fulfilled and is outstanding.

(d)      Since January 1, 2012, none of the Sellers has received any written notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other claims of liability regarding any alleged violation of such Laws (other than Environmental Laws).

4.9      <u>Financial Advisors</u>.  No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Sellers in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers.

4.10    Labor Matters.

(a)    No Seller is a party to a labor or collective bargaining agreement and there are no labor or collective bargaining agreements that pertain to the Employees of the Business. No labor organization or group of Employees of the Business has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation currently pending or, to the knowledge of the Sellers, threatened to be brought or filed with the National Labor Relations Board or other labor relations tribunal. To the knowledge of the Sellers, there is no organizing activity involving the Business pending or threatened by any labor organization or group of Employees of the Business. To the knowledge of the Sellers, there are no strikes, work stoppages, slowdowns, lockouts or similar labor disputes, unfair labor practice charges, arbitrations, material grievances, unfair employment practice charges or complaints, or other claims or complaints against the Business, pending or threatened by or on behalf of any Employee or group of Employees of the Business.

(b)    The Sellers have not taken any action that could constitute a "mass layoff", "mass termination" or "plant closing" within the meaning of the WARN Act with respect to Employees of the Business or that could otherwise trigger notice requirements or liability under any federal, local, provincial, state or foreign plant closing notice or collective dismissal law with respect to Employees of the Business.

4.11    Litigation.  There is no material Proceeding pending, or to the knowledge of the Sellers, threatened against any Seller or any of their respective Affiliates relating to the Business, the Acquired Assets or the Assumed Liabilities. None of the Sellers or any of their respective Affiliates is a party to any Order or other arrangement with any Governmental Entity relating to the Business, the Acquired Assets or the Assumed Liabilities.

4.12    Rock Creek.  Rock Creek is duly organized, validly existing and in good standing under the laws of the State of Nevada. Rock Creek has no assets other than the contracts set forth in Schedule 4.12, and Rock Creek has all necessary power and authority to perform its obligations under and comply with the terms of such contracts. Rock Creek has no liabilities. There is no Proceeding pending, or to the knowledge of the Sellers, threatened against Rock Creek. Rock Creek is not a party to any Order or other arrangement with any Governmental Entity.

4.13    CCAA Proceedings.  Great Basin Gold Ltd. has no material property interest in the Acquired Assets.

4.14    Full Disclosure.  No representation or warranty by Sellers in this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

# ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth on the Schedules, the Buyer represents and warrants to the Sellers as follows:

5.1    <u>Organization</u>.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  The Buyer has all necessary power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the date of this Agreement.

5.2    <u>Due Authorization, Execution and Delivery; Enforceability</u>.  The Buyer has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  This Agreement constitutes the legally valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3    <u>Consents</u>.  None of the execution, delivery or performance of this Agreement by the Buyer will require any Consent of or from, or Filing with or to, any Governmental Entity.

5.4    <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in any breach of any provision of its organizational documents, except as would not result in a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

5.5    <u>Financial Capability</u>. The Buyer (a) has, and at the Closing will have, sufficient internal funds available to pay the Purchase Price and any expenses incurred by the Buyer in connection with the transactions contemplated by this Agreement, (b) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) has not incurred any obligation, commitment, restriction or liability of any kind, which would impair or adversely affect such resources and capabilities.

5.6    <u>Financial Advisors</u>.  No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Buyer in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers or any of their respective Affiliates.

5.7    <u>Opportunity for Independent Investigation</u>.   Prior to its execution of this Agreement, the Buyer has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Sellers, the Business and the Assumed Contracts.  The Buyer is, and has been, assisted by advisors, consultants and legal counsel, knowledgeable and experienced in businesses similar to the Business and in purchasing and operating mining facilities similar to the Business with respect to analyzing and evaluating the

merits and risks of entering into this Agreement and the transactions contemplated hereby. In making its decision to execute this Agreement and undertake the obligations set forth herein, the Buyer has relied and will rely upon the advice of its advisors, consultants and legal counsel and the results of its independent investigation and verification, and the agreements, representations and warranties set forth herein. The Buyer acknowledges and affirms that all materials and information requested by the Buyer have been provided to the Buyer to the Buyer's reasonable satisfaction. The Buyer has completed its investigation, verification, analysis, review and evaluation of the Sellers, the Business and otherwise as the Buyer has deemed necessary or appropriate.

5.8    <u>HSR</u>. Based on the Buyer's fair market valuation of the Acquired Assets, the filing of a notification and report form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 is not required.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Business Pending the Closing</u>. During the period from the Effective Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing (the "***Interim Period***"), except as may be required by applicable Law, the Bankruptcy Court or the CCAA Court, as expressly permitted or authorized hereby or relating to the transactions contemplated by this Agreement, the identity of Buyer or actions taken with the prior written consent of the Buyer (not to be unreasonably withheld, delayed or conditioned), the Sellers shall operate the Business in the ordinary course of business (including with respect to the preservation and protection of the Acquired Assets) and shall not, without the prior written consent of the Buyer (not to be unreasonably withheld, delayed or conditioned):

(a)    transfer, issue, encumber, sell or dispose of any of the material Acquired Assets, other than in the ordinary course of business;

(b)    enter into, amend, encumber, modify or terminate any Contract or Permit that is material to the operation of the Business outside the ordinary course of business;

(c)    send any broadly-distributed communication to Employees regarding the transactions contemplated by this Agreement; or

(d)    agree to do anything prohibited by this <u>Section 6.1</u>.

6.2    <u>Access</u>.

(a)    Subject to applicable Law, during the Interim Period, the Sellers shall (i) give the Buyer and its Representatives reasonable access during normal business hours to the offices, Properties, Employees, books and records of the Sellers, (ii) furnish to the Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as the Buyer and its Representatives reasonably request, and (iii) cooperate reasonably with the Buyer in its investigation of the Business. Such site access with regard to all Properties shall also provide for the Buyer to conduct any and all testing it may determine in its sole discretion to undertake, including mining, milling and the collection of samples at or on the

Properties.  In connection with such testing the Parties agree that the Buyer may engage third-party vendors to analyze samples collected pursuant to this <u>Section 6.2</u> (including ore samples), which analysis may take place off-site.   All inspections shall be conducted so as not to interfere unreasonably with the operation of the Business by the Sellers.  The Buyer agrees to indemnify and hold the Sellers and their respective Affiliates and Representatives harmless of and from all actions, suits, Claims, investigations, fines, judgments, damages, losses, deficiencies, liabilities, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to damage or injuries arising from the Buyer's or any of its Representatives' inspection of the Business and, notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement.

(b)     From and after the Closing until the date that is twelve (12) months after the Closing Date, to the extent permitted by Law, the Buyer agrees to provide Sellers and their respective Representatives (including any liquidating trustee appointed under a plan in the Sellers' cases or counsel to the Official Committee of Unsecured Creditors), in connection with the administration and closing of the Chapter 11 Cases, the prosecution or settlement of or any proceeding or action relating thereto, or the preparation and filing of final Tax returns, with reasonable access during normal business hours to the Operating Records and Other Information relating to the period preceding the Closing, and to allow Sellers and their respective Representatives (including any liquidating trustee appointed under a plan in the Sellers' cases or counsel to the Official Committee of Unsecured Creditors), at such person's sole cost and expense, to make extracts and copies of such books and records during such access. Any such access shall be during regular business hours upon reasonable advance notice under the supervision of the Buyer's personnel, in such a manner as to maintain confidentiality, and without disruption to the operations of the Business or the Buyer. Buyer shall, to the extent permitted by Law, give thirty (30) days notice to the Sellers of Buyer's intent to destroy any material portion of the Operating Records and Other Information.

6.3     <u>Public Announcements</u>.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the transactions contemplated hereby, and no Party shall issue any such press release or public announcement without the prior written approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court or CCAA Court) or obligations pursuant to the rules and regulations of, and any listing agreement with, any national securities exchange, on condition that if a Party is required to make any such announcement, the disclosing Party shall promptly before the announcement is made deliver Notice to the other Party thereof where practicable and lawful to do so, and the disclosing Party shall use its commercially reasonable efforts to agree upon the text of any such announcement with the other Party prior to the release of the announcement.  The Parties shall cause their respective Affiliates and Representatives to comply with this <u>Section 6.3</u>.

6.4     <u>Tax Matters</u>.

(a)     All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Sellers.  The Parties shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for

exemption or exclusion from the application or imposition of any Transfer Taxes. The Buyer and the Sellers, as required by applicable Law, shall file all necessary documentation and returns with respect to such Transfer Taxes when due and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Party. The Sellers shall jointly and severally pay all such Transfer Taxes when due.

(b)    The Buyer, on the one hand, and the Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns relating to Tax periods that began prior to the Closing Date, including any claim for exemption or exclusion from the application or imposition of any Taxes with respect to such periods, the preparation for any audit by any Tax Authority with respect to such periods, and the prosecution or defense of any Proceeding relating to any Tax Return with respect to such periods. The obligations of the Parties pursuant to the immediately preceding sentence with respect to any Tax period shall expire upon the expiration of the applicable statute of limitations with respect to such period.

6.5    Regulatory Approvals.

(a)    The Buyer and Sellers shall use their reasonable best efforts, and shall cause their Affiliates to use their respective reasonable best efforts, to (i) promptly obtain all authorizations, consents, Permits and approvals of all Governmental Entities that may be, or become, necessary for its execution and delivery of, performance of its obligations pursuant to, and consummation of the transactions contemplated by, this Agreement, (ii) take all such actions as may be requested by any such Governmental Entity to obtain such authorizations, consents, Permits and approvals, (iii) avoid the entry of, or effect the dissolution of, any Order that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement and (iv) cause all of the conditions to the obligations of the other party to consummate the transactions contemplated by this Agreement to be met as promptly as practicable and in any event on or prior to the Outside Date (to the extent such conditions are within the control or influence of such Party). The Parties shall reasonably cooperate in connection with any filings or notifications required in connection therewith, and neither Sellers nor the Buyer nor their respective Affiliates shall take any action that would reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents, Permits or approvals.

(b)    Each Party to this Agreement shall promptly notify the other Party of any substantive oral or written communication it receives from any Governmental Entity relating to the matters that are the subject of this Agreement, permit the other Party to review in advance any substantive communication proposed to be made by such Party to any Governmental Entity and provide the other Party with copies of all correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand. No Party to this Agreement shall agree to participate in any meeting or discussion with any Governmental Entity in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity and applicable Law, gives the other Party the

opportunity to attend and participate in such meeting. Subject to the Confidentiality Agreement, the Parties to this Agreement will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing or to secure all necessary authorizations, consents, Permits and approvals for the Buyer's ownership of the Acquired Assets and operation of the Business after the Closing.

        (c)     If any Governmental Entity shall seek, or shall have indicated that it may seek, the enactment, entry, enforcement or promulgation of any Law or Order restraining or prohibiting the transactions contemplated by this Agreement, the Buyer and each Seller shall use its reasonable best efforts to resolve any such objections.

        (d)     Notwithstanding anything in this Agreement to the contrary, the Buyer acknowledges on behalf of itself and its Affiliates and its and their Representatives, successors and assigns, that the operation of the Business shall remain in the dominion and control of Sellers until the Closing and that none of the Buyer, any of its Affiliates or its or their respective successors or assigns will provide, directly or indirectly, any directions, orders, advice, aid, assistance or information to any director, officer or employee of Sellers, except as specifically contemplated or permitted by this Article 6 or as otherwise consented to in writing in advance by an executive officer of a Seller.

     6.6     Employee Matters.

        (a)     The Sellers agree that the Buyer or an Affiliate of the Buyer may make offers of employment, in the Buyer's sole and absolute discretion, to any employee whose employment is related to the maintenance and operation of the Business, including such individuals who are not actively at work on account of illness, disability or leave of absence (collectively, the "**_Employees_**"). Such offers of employment, if accepted by the Employees, shall be on terms and conditions as Buyer and each such Employee may mutually agree. In connection with the determination by the Buyer regarding whether to make any such potential offers of employment, the Sellers shall, during the Interim Period, give the Buyer and its Representatives reasonable access during normal business hours to all such Employees for purposes of interviews.

        (b)     Nothing herein express or implied by this Agreement shall confer upon any Person, including any Employee, or any other current or former employee of any Seller, or any beneficiary or legal Representative thereof, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

        (c)     The Sellers shall retain sponsorship of, or cause their Affiliates to assume sponsorship of, and shall continue to be liable for all benefits payable under any and all Benefit Plans, programs, policies, arrangements or employment agreements and any and all compensation, bonuses, vacation benefits or any other benefit or compensation earned by any Employee or former employee whether as an employee of the Sellers and their respective Affiliates or of Buyer and its Affiliates, and the Buyer and its Affiliates shall not be liable for

any of such liability, including all severance or similar payments under any and all Benefits Plans or otherwise. In addition, the Sellers shall administer and continue to be liable for, or cause their Affiliates to administer and be liable for, all employment-related Claims, including all workers' compensation Claims brought on or before the Closing Date.

(d)    The Buyer shall make offers of employment to and continue to employ such number of employees of the Sellers, and on such terms and conditions of employment, and for such period of time, as shall be necessary so that the Sellers will not be required to provide notice under the federal WARN Act.  Subject to the foregoing and applicable laws, such offers of employment shall be made by the Buyer in its sole discretion.

(e)    The Sellers and their respective Affiliates shall provide COBRA continuation coverage (within the meaning of section 4980B of the Code and the U.S. Treasury Regulations thereunder) to all individuals who are M&A qualified beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation 54.4980B-9) with respect to the transactions contemplated by this Agreement for the duration of the period to which such individuals are entitled to such coverage.

(f)    No current or former employee of the Business or any other service provider to the Business shall have, or be deemed to have, any third-party beneficiary rights under this Section 6.6 or otherwise.

6.7    Confidentiality. Until the Closing, the confidentiality of any data or information received by the Buyer regarding the Business, Properties, Acquired Assets, or any of the Sellers (including any information obtained pursuant to Section 6.2) shall be maintained by the Buyer and its Affiliates and Representatives in accordance with the confidentiality agreement between the Buyer and Great Basin Gold Inc. dated January 10, 2013 (the "*Confidentiality Agreement*"). Notwithstanding any other provision in this Agreement or in the Confidentiality Agreement to the contrary, the terms of the Confidentiality Agreement shall continue in full force and effect for two (2) years after the Effective Date, except in the event the transactions contemplated hereby are consummated, in which case the terms of the Confidentiality Agreement shall thereupon cease and terminate.

6.8    Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Date, the Sellers shall execute and deliver to the Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to the Buyer, and take such additional actions as the Buyer may reasonably request, to promptly vest in the Buyer all of the Sellers' right, title and interest in and to the Acquired Assets, including the prompt transfer of Acquired Permits.

6.9    Sale Order.

(a)    The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order.

(b)    The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i)      the Acquired Assets shall be sold to the Buyer free and clear of all Liens (except for Permitted Liens and Assumed Liabilities);

(ii)     the transactions contemplated by this Agreement were negotiated at arm's length, that the Buyer acted in good faith in all respects and the Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iii)    the terms and conditions of the sale of the Acquired Assets to the Buyer as set forth herein are approved;

(iv)     the Sellers are authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(v)      the Buyer and the Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; and

(vi)     the Sale Order is binding upon any successors to the Sellers, including any trustees in respect of the Sellers or the Acquired Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code.

(c)      In the event the Sale Order is appealed, the Buyer and the Sellers shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(d)      The Sellers further covenant and agree that the terms of any plan of reorganization or liquidation submitted to the Bankruptcy Court by the Sellers shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

6.10    Buyer's Acknowledgements; Nature of Representations.

(a)      Except for the specific representations and warranties expressly made by the Sellers in Article 4 or otherwise in this Agreement, the Buyer acknowledges and agrees that:

(i)      None of (A) the Sellers, (B) any Non-Party Affiliate, or (C) any Affiliate of the foregoing is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of the Sellers or their respective businesses, assets, liabilities, operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the Business, the effectiveness or the success of any operations or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Sellers furnished to the Buyer or its Representatives or made available to the Buyer and its Representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of,

26

or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; and

(ii)    no Representative of any Seller or any Affiliate of any Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement.

(b)    In connection with the Buyer's investigation of the Business, the Buyer has received from the Sellers, certain Non-Party Affiliates and their respective Affiliates and Representatives certain projections and other forecasts, including certain business plan information of the Business.  The Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to it.  Accordingly, the Buyer acknowledges that none of the Sellers, such Non-Party Affiliates or their respective Representatives or Affiliates have made any representation or warranty with respect to such projections and other forecasts and plans.

(c)    Except for the specific representations and warranties expressly made by the Sellers in Article 4 or otherwise in this Agreement, the Buyer specifically disclaims (i) that it is relying upon or has relied upon any information or statements that may have been made by any Person, and acknowledges and agrees that the Sellers have specifically disclaimed and do hereby specifically disclaim any such other information or statement made by any Person; and (ii) any obligation or duty by the Sellers to make any disclosures of fact or circumstances not required to be disclosed pursuant to the specific representations and warranties set forth in Article 4 or otherwise in this Agreement.

(d)    The Buyer is acquiring the Acquired Assets subject only to the specific representations and warranties set forth in Article 4 or otherwise in this Agreement.  The Buyer acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and the Acquired Assets and, in making the determination to proceed with the transactions contemplated by this Agreement, the Buyer has relied on the results of its own independent investigation and the representations and warranties set forth in Article 4 or otherwise in this Agreement.

(e)    The Sellers are selling the Acquired Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the representations and warranties contained in Article 4 or otherwise in this Agreement, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for the Buyer's intended use or a particular purpose or any use or purpose whatsoever.

6.11    <u>Replacement Credit Support and Reclamation Requirements</u>. Prior to Closing, subject to <u>Section 2.1(f)</u>, the Buyer shall deliver to the applicable beneficiary or counterparty duly executed replacement or substitute guaranties, letters of credit, bonds, security deposits, and other surety obligations and evidence of financial capacity, in each case acceptable to the relevant beneficiary or counterparty, in replacement of those credit support arrangements and Reclamation Obligation assurances set forth in <u>Schedule 6.11</u> (the "***Credit Support/Reclamation Arrangements***").    This obligation shall not extend to any Credit Support/Reclamation Arrangement which, pursuant to <u>Section 2.1(f)</u>, the relevant Governmental Entity with jurisdiction has approved or consented to an assignment of the existing Credit Support/Reclamation Arrangement from any Seller to Buyer. For all Credit Support/Reclamation Arrangements so replaced, the Buyer shall, following the Closing, use its reasonable best efforts to cause the full and unconditional release as of Closing of the Sellers and their respective Affiliates from all obligations relating to the Credit Support/Reclamation Arrangements and any liabilities related thereto.    The Sellers understand and agree that the Buyer may meet or confer with applicable Governmental Entities prior to the Closing (and the Sellers agree to provide their reasonable cooperation in connection therewith to the extent requested by the Buyer) in order to confirm, among other things, reasonably prompt transfer or re-issue of all necessary Permits and that there will be no material changes to any Reclamation Obligation following the Closing.

6.12    <u>Insurance</u>.

(a)    All insurance policies maintained by or for the benefit of the Acquired Assets not held directly by the Sellers shall cease to apply thereto from and after Closing and the Buyer acknowledges and agrees that it shall not have any right or interest in or to any insurance awards or proceeds payable under any of the Sellers' other insurance policies relating to any damage, destruction or casualty loss with respect to the Acquired Assets on or prior to the Closing Date and shall not have or claim any interest therein.    The Buyer shall be solely responsible for providing insurance with respect to the Business for any event or occurrence of any kind whatsoever first occurring after Closing.

(b)    In the event that any Seller makes or pursues any claim arising under any insurance policy not held directly by the Sellers during the period prior to the Closing, including any claim under the Sellers' property and business interruption insurance policies for damage to the Acquired Assets discovered after Closing but the occurrence giving rise to such damage occurred before Closing, the Buyer shall cooperate as necessary with the Sellers and their respective Affiliates with respect to such claims and provide any necessary assistance requested by the Sellers or their respective Affiliates to assist the Sellers or their respective Affiliates in making or pursuing any such claims (it being understood that any assistance or documentation required by the Sellers' or their respective Affiliates' insurance underwriters shall be deemed "necessary" as such term is used in this <u>Section 6.12</u>).    Any costs and expenses reasonably incurred by the Buyer in connection with its cooperation pursuant to this <u>Section 6.12(b)</u> shall be promptly reimbursed by the Sellers.

6.13    <u>Intellectual Property</u>. It is expressly agreed that the Buyer is not purchasing, acquiring or otherwise obtaining any right, title or interest in the name "Great Basin Gold" or any derivative thereof, or any trade names, trademarks, identifying logos or service marks related thereto or employing the word "Great Basin Gold" or any part or variation of any of the

foregoing or any confusingly similar trade names, trademarks, logos or service marks (collectively, the "***Seller Trademarks and Logos***").  Neither the Buyer nor any of its Affiliates shall make any use of the Seller Trademarks and Logos from and after the Closing, including through the use of stationery or letterhead.  The Buyer shall, at its own cost and within thirty (30) days after the Closing Date, remove, or cause to be removed, from the Acquired Assets any and all of the Seller Trademarks and Logos.

6.14    <u>Inventory Payment</u>.  As of the Closing Date, the Buyer shall determine, in accordance with customary industry practices, acting reasonably, subject to monitoring by a third-party consultant selected by the Sellers and Credit Suisse (at their expense and not, for the avoidance of doubt, at the Buyer's expense), the number of equivalent ounces of gold  held as Inventory at:

(a) the Refinery or any other refiner (the ***"Refinery Ounces"***), including all equivalent ounces of gold at the refinery or in transit to the refinery but excluding any equivalent ounces of gold at the Refinery for which the Sellers received payment prior to the Closing Date, and

(b) the Esmeralda mill facility (the ***"Mill Ounces"***, and together with the Refinery Ounces, the ***"Inventory Ounces"***).  Mill Ounces include all equivalent ounces of gold at the Esmeralda mill facility including those in any ore stockpiles, within the carbon-in-leach tanks either in solution or loaded on carbon, poured and on site and in carbon waiting to be recycled or shipped to a refiner.

The above determination shall (i) be based on the average recovery rate at the Esmeralda mill facility during the 90-day period (excluding any days on which the mill does not operate) prior to the Closing Date, and (ii) shall take into account the terms and conditions of the Buyer's contract with the Refinery (which shall be in form and substance similar to the Refinery's standard form refinery contract).

In connection with the consummation of the transactions contemplated by this Agreement, following Closing, the Buyer agrees to use commercially reasonable efforts to: (i) process the Inventory Ounces into Refined Ounces in a manner and on a time frame consistent with industry practices, and (ii) sell such Refined Ounces (the "***Sale***") on a time frame consistent with the Sellers' current practices.

Following the Sale of an amount of equivalent ounces equaling the Inventory Ounces (including all equivalent ounces sold from the time of the Closing until the total equivalent ounces sold post-Closing equal the Inventory Ounces), in the event that the sum of:

(y) 75% of the revenue from the Sale of an amount of equivalent ounces equal to the amount of Refinery Ounces; and,

(z) 50% of the revenue from the Sale of an amount of equivalent ounces equal to the amount of Mill Ounces

(together, the ***"Inventory Payment Measure"***)

29

exceeds $3,000,000, the Buyer agrees to promptly pay to the Sellers an amount equal to the Inventory Payment Measure minus $3,000,000. In the event that the Inventory Payment Measure is less than $3,000,000, the Buyer shall be entitled to a prompt payment from Credit Suisse of an amount equal to $3,000,000 minus the Inventory Payment Measure. Such payment from Credit Suisse shall be pursuant to the terms of the CS Side Letter. To the extent not inconsistent with the terms of this agreement, the Buyer shall be free to conduct all of the foregoing activities in the manner it deems appropriate (including manner of processing, timing of the Sale (which may occur in one or a series of transactions), and selection of counterparties to the Sale.

6.15    Surface Use and License Agreement.    The Sellers shall use their use their reasonable best efforts prior to the Closing to acquire and assume and assign to the Buyer that certain Surface Use and License Agreement, dated September 25, 2007, by and between 26 Ranch Inc. and Great Basin Gold Inc. (the "*Surface Use and License Agreement*").

6.16    Permits Covenant.    Prior to and following Closing, the Sellers shall use their best efforts to ensure the prompt transfer to the Buyer of all Acquired Permits.

## ARTICLE 7
## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1    Conditions Precedent to Obligations of the Buyer.    The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Buyer in the Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Each of the representations and warranties of the Sellers contained herein shall be true and correct on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date; *provided*, *however*, that the failure of any such representations or warranties to be true and correct on and as of the Closing Date shall not constitute a basis for the Buyer to refuse to consummate the transactions contemplated hereby unless such failure has resulted in a Material Adverse Effect.

(b)    The Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)    The Buyer shall have received certificates, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in Section 7.1(a) and Section 7.1(b) have been fulfilled.

(d)    There shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)    The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Buyer in its sole and absolute discretion, and as of the Closing Date the Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of the Buyer.

(f)    The Sale Order shall be non-appealable and otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari.  Notwithstanding anything herein to the contrary, the Buyer may, in its sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that the Buyer is a "Good Faith Purchaser" pursuant to 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section.

(g)    The Monitor appointed in the CCAA Proceedings shall have confirmed in writing that the Monitor has no objection to the transactions contemplated by this Agreement.

(h)    The parties set forth on Schedule 7.1(h) shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

(i)    Since the date of the Agreement, there shall not have occurred any change, event, circumstance, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(j)    The Assumed Contracts shall have been assumed by the Sellers and assigned to the Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code, and the applicable cure amount for the assumption of each such agreement shall not exceed the applicable cure amount indicated for such agreement on Schedule 2.1(e) (unless the applicable cure amount is revised by the Sellers pursuant to a settlement of an objection to any such cure amount with the consent, not to be unreasonably withheld, of the Buyer), and the aggregate amount of all cure amounts paid by the Buyer with respect to the Assumed Contracts shall not exceed $5,000,000.

(k)    The Surface Use and License Agreement shall have been assigned to the Buyer and such assignment shall be a valid and binding assignment on 26 Ranch Inc.

(l)    The Buyer and the Sellers shall have entered into the Net Profits Royalty Agreement, and the Buyer and Credit Suisse shall have entered into the CS Side Letter, each in form and substance mutually satisfactory to the Sellers, the Buyer and Credit Suisse.

(m)    The Buyer shall have confirmed to its reasonable satisfaction through the discussions referred to in Section 6.11 that the amounts of the Reclamation Obligations relating to the Permits set forth on Schedule 4.7 (other than Reclamation Obligations relating to (i) the environmental impact statement at the Hollister mine or (ii) actions taken by the Buyer) will not, as of the Closing, exceed the amounts of such Reclamation Obligations as of the Effective Date by more than $1,500,000.

7.2    <u>Conditions Precedent to the Obligations of the Sellers</u>.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Sellers in the Sellers' sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Each of the representations and warranties of the Buyer contained herein shall be true and correct on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date; *provided*, *however*, that the failure of any such representations or warranties to be true and correct on and as of the Closing Date shall not constitute a basis for the Sellers to refuse to consummate the transactions contemplated hereby unless such failure has resulted in a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

(b)    The Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement (including those obligations and agreements set forth in <u>Section 6.6(d)</u>) required to be performed by it on or prior to the Closing Date.

(c)    The Sellers shall have received a certificate, dated the Closing Date, of an executive officer of the Buyer to the effect that the conditions specified in <u>Section 7.2(a)</u> and <u>Section 7.2(b)</u> have been fulfilled.

(d)    There shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)    The Bankruptcy Court shall have entered the Bid Procedures Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Bid Procedures Order shall be in effect on the Closing Date.

(f)    The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(g)    The parties set forth on <u>Schedule 7.2(g)</u> shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

(h)    The Buyer and the Sellers shall have entered into the Net Profits Royalty Agreement in form and substance mutually satisfactory to the Sellers and the Buyer.

(i)    The Sellers shall have received evidence of the full and unconditional release of the Sellers and their respective Affiliates from all obligations relating to the Credit Support/Reclamation Arrangements and any liabilities related thereto in accordance with <u>Section 6.11</u>.

**ARTICLE 8**
**TERMINATION**

8.1    <u>Termination of Agreement</u>.    This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by written agreement of the Sellers and the Buyer;

(b)    by the Sellers or the Buyer if the Closing does not occur on or before May 17, 2013, *provided*, *however*, that if any of the conditions set forth in <u>Section 7.1</u> have not been satisfied or waived by the Buyer, then the Sellers may, in their sole discretion on or prior to May 17, 2013 upon written notice to the Buyer, extend the Outside Date to a date not later than May 31, 2013 (the "***Outside Date***"); *provided*, *further*, that the failure of the Closing to occur on or prior to the Outside Date is not a result of or caused by the terminating party's material breach of any of its representations and warranties contained in this Agreement and such terminating party has not failed in any material respect to perform any of its material obligations hereunder; or

(c)    by the Sellers or the Buyer if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining the Buyer or the Sellers from consummating the transactions contemplated hereby is entered and such Order shall become final.

8.2    <u>Consequences of Termination</u>.

(a)    In the event of any termination of this Agreement by any Party pursuant to <u>Section 8.1</u>, written Notice thereof shall be given by the terminating Party to the other Party, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than the last sentence of <u>Section 6.2(a)</u>, and all of <u>Section 6.3</u>, <u>Section 6.7</u>, this <u>Section 8.2</u> and <u>Article 9</u> and, to the extent applicable in respect of such Sections and Article, <u>Article 1</u>), and the transactions contemplated hereby shall be abandoned without further action of the Parties, except that such termination shall not relieve any Party of any liability for any prior breach of this Agreement.

(b)    The Deposit shall only be refunded to the Buyer in the event that the Agreement is terminated pursuant to <u>Section 8.1</u> (other than due to any fault or failure of the Buyer in any material respect) or in the event that the Closing does not occur due to a failure of any of the conditions to Closing in <u>Section 7.1</u> to have been satisfied (other than due to any fault or failure of the Buyer in any material respect). If the Closing does not occur for any other reason (other than due to any fault or failure of any of the Sellers in any material respect) and the conditions to Closing in <u>Section 7.1</u> have been satisfied or would be capable of being satisfied on the Closing Date had the Closing occurred, the Sellers shall be entitled to retain the Deposit as full liquidated damages for all damages to the Sellers from such failure, which shall be held for the benefit of the creditors of the Sellers.

## ARTICLE 9
## MISCELLANEOUS

9.1    <u>Expenses</u>.    Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the transactions contemplated hereby.

9.2    <u>Assignment</u>.    Neither this Agreement nor any of the rights or obligations hereunder may be assigned by the Sellers without the prior written consent of the Buyer, or by the Buyer without the prior written consent of the Sellers.    Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

9.3    <u>Parties in Interest</u>.  This Agreement shall be binding upon and inure solely to the benefit of the Buyer and the Sellers, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, except as expressly set forth herein, including, for the avoidance of doubt, the intended third-party beneficiaries contemplated by <u>Section 6.10</u> and <u>Section 9.15</u>.

9.4    <u>Notices</u>.    All notices, demands, requests, consents, approvals or other communications (collectively, "***Notices***") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be deemed given on the date personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail with confirmation of receipt, addressed as set forth below, or to such other address as such Party shall have specified most recently by Notice; *provided*, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m., New York time, Notice shall be deemed given on the next Business Day.

| | |
|---|---|
| If to Sellers: | Rodeo Creek Gold Inc. |
| | P.O. Box 2610 |
| | Winnemucca, NV  89466 |
| | Attention:  Chief Executive Officer |
| | |
| With a copy to: | Sidley Austin LLP |
| | One South Dearborn |
| | Chicago, IL 60603 |
| | Attention:  Jessica C.K. Boelter |
| | Matthew G. McQueen |
| | Email:    jboelter@sidley.com |
| | mmcqueen@sidley.com |
| | |
| If to the Buyer: | Buyer c/o Waterton Global Resource Management, Inc. |
| | 199 Bay Street, Suite 5050 |
| | Toronto, Ontario |
| | M5L 1E2 Canada |

34

Attention:  Richard J. Wells
Email:        rwells@watertonglobal.com

Tel: +1 416 504 3505
Fax: 416 504 3200

With a copy to:        Allen & Overy LLP
                       1221 Avenue of the Americas
                       New York, NY 10020
                       Attention: Ken Coleman
                                  Richard D. Smith
                       Email:     ken.coleman@allenovery.com
                                  richard.d.smith@allenovery.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

        9.5    <u>Choice of Law; Jurisdiction and Venue</u>.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

        9.6    <u>Entire Agreement; Amendments and Waivers</u>.  This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by the Sellers and the Buyer, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

        9.7    <u>Schedules; Supplementation and Amendment of Schedules</u>.  The Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this

Agreement. Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the entire Agreement and not just such section so long as the relevance of such disclosure to other sections of the Agreement is reasonably apparent.

9.8    Counterparts; Facsimile and Electronic Signatures.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.9    Retention of Deposit Not Penalty.    Retention of the Deposit by the Sellers (if permitted pursuant to Section 8.2.(b)) represents agreed full liquidated damages that is a reasonable approximation of the actual damages that the Sellers would suffer for such failure in consummating the transactions contemplated by this Agreement described in Section 8.2(b) and does not represent either a penalty or compensation for the transaction costs of the transactions contemplated by this Agreement.

9.10    Severability.    The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.11    Specific Performance.    The Parties acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Buyer, on the one hand, or the Sellers, on the other hand, in accordance with the specific terms contained herein or were otherwise breached by the Buyer, on the one hand, or the Sellers, on the other hand, shall therefore be entitled to an injunction or injunctions to prevent breaches or termination of this Agreement by the Sellers, on the one hand, or the Buyer, on the other hand, and to enforce specifically the terms and provisions of this Agreement.

9.12    WAIVER OF RIGHT TO TRIAL BY JURY.    THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.13    NO CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL ANY PARTY BE LIABLE UNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY OR INCIDENTAL DAMAGES, LOST PROFITS OR COSTS OF ANY OTHER PARTY OR ITS AFFILIATES, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), WARRANTY OR OTHERWISE,

36

AND ALL SUCH INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY AND INCIDENTAL DAMAGES, LOST PROFITS AND COSTS ARE HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVED, RELEASED AND DISCHARGED.

9.14    <u>Survival</u>.    Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement (other than the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the Parties following the Closing, including the covenants contained in <u>Section 6.5(b)</u> and <u>Section 6.8</u>) shall expire and be of no further force and effect as of the Closing and no Party shall thereafter have any liability whatsoever with respect thereto.

9.15    <u>Non-Recourse</u>.    All Claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or any other document, certificate or instrument delivered pursuant hereto, or the negotiation, execution, performance or non-performance of this Agreement or any other document, certificate or instrument delivered pursuant hereto (including any representation or warranty made in or in connection with this Agreement or any other document, certificate or instrument delivered pursuant hereto or as an inducement to enter into this Agreement and the other documents delivered pursuant hereto) may be made only against the Person or Persons that are expressly identified as parties hereto or thereto.   In no event shall any Party, or party to the other documents delivered pursuant hereto, have any shared or vicarious liability for the actions or omissions of any other Person.   No Person who is not a named party to this Agreement or the other documents delivered pursuant hereto, including any past, present or future director, manager, officer, employee, incorporator, member, partner, equity holder, Affiliate, agent, attorney or Representative of any Party ("***Non-Party Affiliates***"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or any other document, certificate or instrument delivered pursuant hereto or for any claim based on, in respect of, or by reason of this Agreement or any other document, certificate or instrument delivered pursuant hereto or its negotiation or execution; and each party hereto or thereto waives and releases all such liabilities, Claims and obligations against any such Non-Party Affiliates.   The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of <u>Section 6.10</u> and this <u>Section 9.15</u>.

*[Signatures Follow]*

37

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers and the Buyer as of the date first above written.

**<u>SELLERS</u>**:

RODEO CREEK GOLD INC.

By: _____
    Name:
    Title:

ANTLER PEAK GOLD INC.

By: _____
    Name:
    Title:

HOLLISTER VENTURE CORP.

By: _____
    Name:
    Title:

TOUCHSTONE RESOURCES COMPANY

By: _____
    Name:
    Title:

**<u>BUYER</u>**:

WATERTON NEVADA HOLDINGS, LLC

By: _____
    Name:
    Title: