**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| In re:<br><br>RODEO CREEK GOLD INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company<br>☐ Affects Antler Peak Gold Inc. | Chapter 11<br><br>Case No. BK-13-50301 (MKN)<br><br>Jointly Administered<br><br>**SUPPLEMENTAL DECLARATION OF MICHAEL STEWART IN SUPPORT OF THE SALE MOTION** |

MICHAEL STEWART, under penalty of perjury, declares as follows:

1. I am currently a Managing Director of CIBC World Markets, Inc. ("CIBC"). CIBC is the financial advisor and investment banker for the debtors and debtors-in-possession in the above-captioned chapter 11 cases (each a "Debtor" and collectively, the "Debtors").

2. I lead the CIBC team in the marketing and sale process subject of the *Motion for: (I) an Order (A) Scheduling a Hearing to Consider the Proposed Sale of the Debtors' Assets and Approving the Form and Manner of Notice Thereof; (B) Establishing Bidding Procedures Relating to the Sale and the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts, and (C) Granting Certain Related Relief; and (II) an Order (A) Approving the Sale, (B) Authorizing the Sale, Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* [Docket No. 16] (the "Sale Motion") and the *Debtors' Brief in Support of Proposed Sale in Connection with Motion for an Order (A) Approving the Sale of the Debtors' Assets to the Winning Bidder at Auction, (B) Authorizing the Sale, Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Granting Certain Related Relief* (the "Supplemental Brief").[1] Except as otherwise indicated, all facts set forth in

---

[1] Capitalized terms used but not defined in this Declaration shall have the meaning ascribed to such terms in the Sale Motion or the Supplemental Brief.

this Declaration are based upon either my personal knowledge, my review of relevant documents, or my opinion based upon my experience, knowledge, and information concerning the Debtors' financial affairs and the process the Debtors have undertook in marketing their Nevada Operations. I am over the age of 18 and authorized to submit this Declaration on behalf CIBC. If called upon to testify, I would testify to the facts set forth herein.

3. Under my direction, after entry of the Bidding Procedures Order, CIBC contacted one hundred six (106) potential bidders, including parties contacted prior to the Petition Date, that CIBC thought were, or could be, interested in the Nevada Operations. This list included mine owners and operators, private equity funds, investment banks, and similar institutions. I believe that the number and diversity of the potential bidders was instrumental in obtaining the best result at the Auction.

4. Fifteen (15) parties signed confidentiality agreements during the Pre-Petition Marketing Process, and an additional twenty-nine (29) parties subsequently entered into confidentiality agreements. Each of the potential bidders that executed confidentiality agreements received certain confidential materials prepared by the Debtors' management, in consultation with CIBC, which provided the potential bidders an in-depth analysis of the Nevada Operations and the Acquired Assets. Furthermore, each of the potential bidders received access to an electronic data room with comprehensive diligence materials regarding the Nevada Operations. Forty (40) potential bidders accessed the data room. CIBC, with the assistance of the Debtors and their counsel, continually updated the data room in order to provide potential bidders with the most up-to-date information available.

5. Additionally, the Debtors, through CIBC and the Debtors' other advisors, responded to numerous information requests from potential bidders, and CIBC conducted hundreds of calls with potential bidders. During the Pre-Petition Marketing Phase and the post-Petition Date marketing phase, the Debtors conducted site visits, each of which generally lasted multiple days, for eighteen (18) potential bidders and operators. Eleven (11) potential bidders undertook their site visits after the Petition Date. Such site visits included management presentations, which the Debtors' management prepared in consultation with the CIBC and

which contained, among other things, a business overview of the Debtors, a profile of the Debtors' recent history and current situation and a summary of the Debtors' financial performance, explanation of such performance and a five-year financial plan with key assumptions.

6. On the Bid Deadline, the Debtors received seven (7) bids. The Debtors and their advisors carefully reviewed each bid in order to qualify the bidders for participation in the Auction and to select the opening bid at the Auction. Although none of the bids that were submitted met all of the criteria specified in the Amended Bidding Procedures to become a Qualified Bid, the Debtors determined, after consulting with their key creditor constituencies, to invite each of the bidders to the Auction in order to foster an environment designed to maximize value for the Debtors' estates.

7. Each bidder was permitted to attend the Auction provided such bidder was prepared to: (i) waive any diligence contingencies, (ii) sign a binding Asset Purchase Agreement at the conclusion of the Auction in such bidder's capacity as either the Successful Bidder or Backup Bidder, (3) demonstrate it had the financial wherewithal to provide a deposit and close the transaction, and (4) submit a bid that was higher or better than the opening bid.

8. The Auction was conducted on April 23, 2013 at the Sheraton – New York Times Square Hotel, 811 Seventh Avenue, New York, New York 10019 at approximately 9:00 a.m. (Eastern Time) and on April 24, 2013 at the New York offices of Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, New York 10019 at approximately 10:00 a.m. (Eastern Time). Of the seven (7) bidders, four (4) participated in the Auction. The Auction commenced with the announcement of the opening bid and was followed by extensive discussions and negotiations between the Debtors and each of the Qualified Bidders regarding their bids in an effort to identify the highest and otherwise best bid. The Auction lasted a total of approximately twenty-three (23) hours over the course of two (2) days.

9. The Debtors, in consultation with their key constituencies, evaluated each bid based on, among other things, the purchase price and/or the net value provided by such bid, the claims likely to be created by such bid in relation to other bids, the viability of the

counterparties to the transaction, the extent of the proposed revisions to the form of asset purchase agreement filed with the Sale Motion and the terms of any related transaction documents, other factors affecting the speed, certainty and value of the proposed transaction, the assets included or excluded from the bid and the transaction costs and risks associated with each bid, the estimated number of employees of the Debtors that would be offered post closing employment by the bidder and any proposed measures associated with their continued employment, the transition services required from the Debtors post-closing and any related restructuring costs, and the likelihood of swiftly and successfully closing the transaction.

10. In summary, the Successful Bid generally provides for $15 million in cash consideration (subject to an upward adjustment on account of certain inventory liquidation parameters), a 15% net profits royalty over a nine (9) year period (capped at $90 million), any necessary cure amounts, capped at $5 million, agreement that avoidance actions and non-ordinary course litigation claims would not be included in the Acquired Assets and agreement to make offers of employment to and continue to employ a number of employees of the Debtors. The Backup Bid generally provides for $15 million in cash consideration (subject to an upward adjustment on account of certain inventory liquidation parameters), a 10% net profits royalty over a nine (9) year period (capped at $65 million), agreement that avoidance actions and non-ordinary course litigation claims would not be included in the Acquired Assets and agreement to make offers of employment to and continue to employ a number of employees of the Debtors.

11. I believe that the Successful Bid represents the highest or otherwise best offer available for the Acquired Assets, and that the Backup Bid represents the next highest or otherwise next best offer available for the Acquired Assets

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

        I declare under the penalty of perjury that the foregoing is true and correct.

*[signature]*

Michael Stewart
Managing Director Investment Banking
CIBC World Markets, Inc.