_____

Honorable Mike K. Nakagawa
United States Bankruptcy Judge

**Entered on Docket**
**May 03, 2013**

_____

Jessica C.K. Boelter (IL SBN 6277801)
Thomas A. Labuda, Jr. (IL SBN 6225401)
Matthew G. Martinez (IL SBN 6297132)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Counsel for Debtors
and Debtors in Possession

Donald A. Lattin (NV SBN 693)
Christopher D. Jaime (NV SBN 4640)
MAUPIN, COX & LEGOY, PC.
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Nevada Counsel for
Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>RODEO CREEK GOLD INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company<br>☐ Affects Antler Peak Gold Inc. | Chapter 11<br><br>Case No. BK-13-50301 (MKN)<br><br>Jointly Administered<br><br><br>**ORDER (A) APPROVING THE SALE OF THE DEBTORS' ASSETS FREE AND CLEAR OF INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING CERTAIN RELATED RELIEF**<br><br>Hearing Date:      May 2, 2013<br>Hearing Time:      1:30 p.m. (PT)<br>Place:                 300 Las Vegas Blvd.<br>                          Las Vegas, NV 89101 |

Upon the motion, dated February 25, 2013 [Docket No. 16] (the "Motion")[1], of Rodeo Creek Gold Inc. ("Rodeo Creek") and its affiliated debtors and debtors in possession (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), for entry of an order, pursuant to sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002, 6004 and 9014 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the District of Nevada (the "Local Rules"), seeking, among other things:

A.  entry of an order (the "Bidding Procedures Order"):

a.  approving sale procedures (the "Bidding Procedures") in connection with the sale (the "Sale") of all of the right, title and interest in the Debtors' assets (the "Acquired Assets");

b.  scheduling a hearing (the "Sale Hearing") to consider approval of the Sale;

c.  scheduling a deadline for bidding on the Acquired Assets and scheduling an auction (the "Auction") for the Acquired Assets;

d.  establishing certain procedures for the sale, assumption and assignment of certain executory contracts and unexpired leases, including notice of proposed cure amounts (the "Cure Notice");

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Motion, or, if not defined in the Motion, shall have the meanings ascribed to them in the Asset Purchase Agreement (as defined herein).

e.   approving a form of notice of the Sale and the Bidding Procedures (the "Sale Notice") and a publication notice (the "Publication Notice");

f.   granting certain related relief;

B.   entry of this order (this "Order"):

a.   approving the Sale of the Acquired Assets, free and clear of all liens, claims (including, without limitation, as defined in section 101(5) of the Bankruptcy Code), rights or claims based on any successor or transferee liability, interests, encumbrances, rights, remedies, restrictions, liabilities and contractual commitments of any kind or nature whatsoever, whenever arising, whether at law or in equity; and

b.   granting certain related relief;

and upon the Dombrowski Declaration, the Stewart Sale Procedures Declaration, the *Declaration of Michael D. Kang in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 40] and the *Supplemental Declaration of Michael Stewart in Support of the Sale Motion* [Docket No. 448]; and the Bidding Procedures Hearing having been held on February 28, 2013; and the Court having entered the Bidding Procedures Order [Docket No. 67] on March 1, 2013; and the Court having entered an amended Bidding Procedures Order (the "Amended Bidding Procedures Order") [Docket No. 286] March 29, 2013 which, among other things, approved amended Bidding Procedures (the "Amended Bidding Procedures"); and the Auction having been held on April 23-24, 2013 in accordance with the Amended Bidding Procedures Order; and at the conclusion of the Auction, Waterton Global Mining Company, LLC (f/k/a

2

Waterton Nevada Holdings LLC) having been chosen as the Successful Bidder (the "Successful Bidder" or the "Purchaser"); and the Sale Hearing having been held on May 2, 2013 in accordance with the Amended Bidding Procedures Order; and the Debtors having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as Exhibit A with the Purchaser (such Asset Purchase Agreement, the "Asset Purchase Agreement"); and the Sale Hearing having been held on May 2, 2013 in accordance with the Amended Bidding Procedures Order; and upon the record of the Bidding Procedures Hearing and the Sale Hearing, and all of the proceedings before this Court; and this Court having reviewed the Motion and any objections thereto and having found and determined that the relief sought in the Motion, and entry of this Order, is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest; and after due deliberation thereon and sufficient cause appearing therefore, it is hereby:

**FOUND AND DETERMINED THAT:**[2]

A.    **Jurisdiction and Venue.**  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue for these Chapter 11 Cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates.**  The statutory predicates for the relief sought in the Motion are 105, 363, and 365 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008 and 9014 of the Bankruptcy Rules and Rules 2002, 6004 and 9014 of the Local Rules.  The consummation

---

[2] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

of the transactions contemplated by the Motion, the Asset Purchase Agreement and this Order is legal, valid and properly authorized under all such provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of such transactions.

C.    **Notice.**  As evidenced by the affidavits of service and publication filed with the Court, proper, timely, adequate, and sufficient notice of the Motion, the Bidding Procedures, the Bidding Procedures Hearing, the Bidding Procedures Order, the Amended Bidding Procedures Order, the Amended Bidding Procedures, the Sale Hearing, the procedures for assumption and assignment of Assumed Contracts (as defined in paragraph W below), the Proposed Cure Payments, the Sale and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given under the particular circumstances and no further notice need be provided.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

D.    Actual written notice of the Motion, the Bidding Procedures, the Bidding Procedures Hearing, the Amended Bidding Procedures, the Auction, the Sale Hearing, the procedures for assumption and assignment of contracts and leases, the Proposed Cure Payments, the Sale and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to all interested persons and entities, including, without limitation: (i) all entities that assert any Lien, Claim or Interest (each as defined below) in the Acquired Assets; (ii) all parties to the Assumed Contracts assumed and sold and assigned pursuant to this Order; (iii) all governmental taxing authorities that have or as a result of the sale of the Acquired Assets may have Claims, contingent or otherwise, against the Debtors; (iv) all parties that filed

4

requests for notices under Bankruptcy Rule 9010(b) or were entitled to notice under Bankruptcy Rule 2002; (v) all creditors (whether liquidated, contingent or unmatured) of the Debtors; (vi) all interested governmental, pension, environmental and other regulatory entities; (vii) the Office of the Attorney General of Nevada; (viii) the Office of the United States Trustee for the District of Nevada; (ix) all entities that heretofore expressed to the Debtors an interest in purchasing the Acquired Assets; and (x) all parties required to be provided notice pursuant to the Bidding Procedures Order and the Amended Bidding Procedures Order.  Other parties interested in bidding on the Acquired Assets were provided, upon request, sufficient information to make an informed judgment on whether to bid on the Acquired Assets.  The foregoing constitutes proper, timely, adequate, and sufficient notice under the particular circumstances of these cases, and no further notice need be provided.

E.    The Publication Notice was published in *The Wall Street Journal* (National Edition), *The Globe and Mail* and *The Mining Journal* on March 7, 2013 and in a separate version of *The Mining Journal* on March 22, 2013.  Such publication notice was compliant with the Bidding Procedures Order, and was sufficient and proper notice to any other interested parties, including those whose identities are unknown to the Debtors.

F.    **Extensive Efforts by Debtors.**  As of the Petition Date and for a period of several months before the commencement of these Chapter 11 Cases, the Debtors worked with their counsel and financial advisors to implement a viable transaction that would allow them to continue their operations.  The transactions subject of this Order are the result of the Debtors' extensive efforts in seeking to maximize recoveries to the Debtors' estates, for the benefit of creditors.

G.  **Business Justification.**  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale of the Acquired Assets.  In light of the circumstances of these Chapter 11 Cases and the risk of deterioration in the going concern value of the Acquired Assets pending the Sale, time is of the essence in (i) consummating the Sale and all related transactions, (ii) preserving the viability of the Debtors' businesses as going concerns, and (iii) minimizing the widespread and adverse economic consequences for the Debtors, their estates, and their creditors and employees.

H.  **Bidding Procedures Order and Amended Bidding Procedures Order.** On March 1, 2013, this Court entered the Bidding Procedures Order approving Bidding Procedures for the Acquired Assets.  On March 29, 2013, this Court entered the Amended Bidding Procedures Order approving Amended Bidding Procedures for the Acquired Assets. The Bidding Procedures, as amended by the Amended Bidding Procedures, provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets.

I.  **Adequate Marketing; Highest or Best Offer.**  As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing, and (ii) the representations of counsel made on the record at the Bidding Procedures Hearing and the Sale Hearing, (a) the Debtors have adequately marketed the Acquired Assets and conducted the sale process in compliance with the Amended Bidding Procedures Order; (b) a reasonable opportunity has been given to any interested party to make the highest and best offer for the Acquired Assets; (c) the consideration provided by the Purchaser in the Asset Purchase Agreement constitutes the highest or otherwise best offer for the Acquired Assets; (d) the consideration provides fair and reasonable consideration for the Acquired Assets and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States,

any state, territory, possession, or the District of Columbia; (e) the Sale will provide a greater recovery for the Debtors' creditors than would be provided by any other practically available alternative, including liquidation under chapter 7 of the Bankruptcy Code; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Acquired Assets for greater economic value to the Debtors or their estates; and (g) the Debtors' determination that the Asset Purchase Agreement constitutes the highest or best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgement.

J.      **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

K.      **Assets Property of the Estate.**  The Acquired Assets are property of the Debtors' estates and title thereto is vested in the Debtors' estates.

L.      **Great Basin Gold Ltd.'s and Great Basin Gold Inc.'s Assets.**  The Acquired Assets do not include any assets of Great Basin Gold, Ltd. ("GBGL") or Great Basin Gold Inc. ("GBGI").  For the avoidance of doubt, any cash, deposits, letters of credit or other assets or collateral in support of any letters of credit or any obligation with respect thereto, in each case that are the property of GBGL or GBGI, that secure Reclamation Obligations arising under any Permits are not Acquired Assets.

M.      **Sale in Best Interests.**  The actions represented to be taken by the Debtors and the Purchaser are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Debtors, their estates and creditors, and other parties in interest. Approval of the Asset Purchase Agreement and of the Sale and all related transactions at this

7

time is in the best interests of the Debtors, their creditors, their estates, and all other parties in interest.

N.    **No *Sub Rosa* Plan.**  The consummation of the Sale outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a plan of reorganization or liquidation for the Debtors.  The Transactions do not constitute a *sub rosa* plan of reorganization.

O.    **Arm's-Length Sale.**  The Asset Purchase Agreement, the Sale and the transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors, their insiders and affiliates, nor the Purchaser have engaged in any conduct that would cause or permit the Asset Purchase Agreement, the Sale, or any part of the transactions thereby to be avoided under section 363(n) of the Bankruptcy Code.

P.    **Good Faith Purchaser.**  The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

Q.    **Prompt Consummation.**  The Sale and the transactions related thereto must be approved and consummated as promptly as practicable in order to preserve the viability of the business to which the Acquired Assets relate as a going concern.

R.    **Corporate Authority.**  Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, and (iv) needs no consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, which may be waived in accordance with the terms therewith.

S.    **Free and Clear Findings Required by the Purchaser.**  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the Sale if the sale of the Assets to the Purchaser were not, pursuant to section 363(f) of the Bankruptcy Code, free and clear, except for Permitted Liens and Assumed Liabilities[3], of (i) all liens (statutory or otherwise), mortgages, pledges, security interests, charges, rights of first refusal, hypothecations, encumbrances, restrictive covenants, rights of offset or recoupment, leases or conditional sale arrangements (collectively, the "Liens"), (ii) all claims as defined in section 101(5) of the Bankruptcy Code, including all rights or causes of action (whether in law or in equity), obligations, demands, restrictions, indemnification claims or liabilities relating to any act or omission of the Debtors or any other person prior to the Closing, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of the above-captioned cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Claims"), and (iii) all

---

[3] "Permitted Liens" and "Assumed Liabilities" shall have the meanings ascribed to them in the Asset Purchase Agreement.

debts, liabilities, obligations, contractual rights and claims and labor, employment and pension claims (including any claims on account of pension liabilities of the Debtors that may be asserted by the Pension Benefit Guaranty Corporation), in each case, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or un-matured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise (collectively the "Interests").  Except for Permitted Liens and Assumed Liabilities, the Sale shall be free and clear of, and the Purchaser shall not be responsible for, any Liens, Claims or Interests, including, without limitation, in respect of the following: (i) any rights or Claims based on any successor or transferee liability, (ii) any Liens, Claims or Interests that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or the Purchaser's interest in the Acquired Assets, or any similar rights; (iii) any labor or employment agreements; (iv) mortgages, deeds of trust and security interests; (v) intercompany loans and receivables between the Debtors and any non-debtor subsidiary; (vi) any pension, multiemployer plan (as such term is defined in Section 3(37) or Section 4001(a)(3) of ERISA), health or welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee, worker's compensation, occupational disease or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of

1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of

1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the

Age Discrimination and Employment Act of 1967 and Age Discrimination in Employment Act,

as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus

Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements

of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Code and of any similar

state law (collectively, "COBRA"), (i) state discrimination laws, (j) state unemployment

compensation laws or any other similar state laws, or (k) any other state or federal benefits or

claims relating to any employment with the Debtors or any of their predecessors; (viii) the

Federal Mine Safety and Health Act of 1977 or its associated regulations; (ix) penalties of any

kind whatsoever assessed against the Debtors by the United States Department of Labor's Mine

Safety and Health Administration; (x) any bulk sales or similar law; (xi) any tax statutes or

ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended, and

any taxes arising under or out of, in connection with, or in any way relating to the operation of

the Acquired Assets prior to the Closing, including, without limitation, any Nevada Net Proceeds

of Minerals Tax (NRS Chapter 362) (or any other *ad valorem* taxes) assessed by the Nevada

Department of Taxation or any other applicable taxing authority; (xii) any unexpired and

executory contract or unexpired lease to which a Debtor is a party that is not an Assumed

Contract that will be assumed and assigned pursuant to this Order and the Asset Purchase

Agreement, including, without limitation, that certain Settlement Agreement dated as of October

13, 2010 by and between Rodeo Creek Gold, Inc. and the United States Bureau of Land

Management, which agreement resolved certain alleged violations of the Archaeological

Resources and Protection Act; (xiii) any other Excluded Liabilities as provided in the Asset

Purchase Agreement.  A sale of the Acquired Assets other than one free and clear of all Liens, Claims, and Interests would yield substantially less value for the Debtors' estates, with less certainty, than the Sale as contemplated.  Therefore, the Sale contemplated by the Asset Purchase Agreement free and clear of all Liens, Claims and Interests, except for Permitted Liens and Assumed Liabilities, is in the best interests of the Debtors',  their estates and creditors, and all other parties in interest.

    T. **Binding and Valid Transfer.**  The transfer of the Acquired Assets to the Purchaser will be a legal, valid, and effective transfer of the Acquired Assets and, except for the Permitted Liens and Assumed Liabilities, will vest the Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of all Liens, Claims, and Interests and any liabilities of the Debtors.

    U. **Satisfaction of 363(f) Standards.**  The Debtors may sell the Acquired Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Liens, Claims and Interests, and non-debtor parties to the Assumed Contracts who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. In all cases, each such person with Liens, Claims or Interests in the Acquired Assets is enjoined from taking any action against the Purchaser, the Purchaser's affiliates or any agent of the foregoing to recover any such Lien, Claim or Interest.

    V. **Necessity of Order.**  The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions without all of the relief

provided for in this Order (including, but not limited to, that the transfer of the Acquired Assets to Purchaser be free and clear of all Liens, Claims and Interests).  The consummation of the transactions pursuant to this Order and the Asset Purchase Agreement is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest.

W.    **Assumed Contracts.**  The Debtors have demonstrated that it is an exercise of their sound business judgment to sell, assume and assign the unexpired and executory contracts and leases listed on Schedule 2.1(e) of the Asset Purchase Agreement (collectively, the "Assumed Contracts", and individually, an "Assumed Contract") to the Purchaser in connection with the consummation of the Sale, and the assumption and assignment of the Assumed Contracts is in the best interests of the Debtors, their estates and creditors, and other parties in interest.  The Assumed Contracts being assigned to the Purchaser are an integral part of the Acquired Assets being purchased by the Purchaser, and, accordingly, such assumption and assignment of the Assumed Contracts and the liabilities associated therewith are reasonable, enhancing the value of the Debtors' bankruptcy estates.

X.    **Cure and Adequate Assurance.**  The Purchaser has cured or the Purchaser has demonstrated its ability to cure any default with respect to any act or omission that occurred prior to the Closing under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the of the Bankruptcy Code.  The Proposed Cure Payments or any other cure amount reached by agreement after a Cure Payment Objection are deemed the amounts necessary to "cure" within the meaning of section 365(b)(1) of the Bankruptcy Code all "defaults" within the meaning of section 365(b) of the Bankruptcy Code under such Assumed Contracts.  The Purchaser's promise to perform the obligations under the Assumed Contracts

13

after the Closing shall constitute adequate assurance of its future performance of and under the

Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy

Code.  All counterparties to the Assumed Contracts who did not file a Cure Payment Objection

or an objection to the assumption and assignment of the Assumed Contracts prior to the Sale

Hearing, are deemed to consent to the assumption by the Debtors of their respective Assumed

Contract and the assignment thereof to the Purchaser.  The objections of all counterparties to the

Assumed Contracts that did file an objection to the assumption and assignment of such parties'

respective Assumed Contract or Proposed Cure Payment relating thereto were heard at the Sale

Hearing (to the extent not withdrawn), were considered by the Court, and are overruled on the

merits with prejudice.  The Court finds that with respect to all such Assumed Contracts the

payment of the Proposed Cure Payments is appropriate and is deemed to fully satisfy the

Debtors' obligations under section 365(b) of the Bankruptcy Code.  Accordingly, all of the

requirements of sections 365(b) of the Bankruptcy Code have been satisfied for the assumption

and the assignment by the Debtors to the Purchaser of each of the Assumed Contracts.  To the

extent any Assumed Contract is not an executory contract within the meaning of section 365 of

the Bankruptcy Code, it shall be transferred to the Purchaser in accordance with the terms of this

Order that are applicable to the Acquired Assets.

       Y.    **Unenforceability of Anti-Assignment Provisions.**  Anti-assignment

provisions in any Assumed Contract shall not restrict, limit, or prohibit the assumption,

assignment, and sale of the Assumed Contracts and should be deemed and found to be

unenforceable anti-assignment provisions within the meaning of section 365(f) of the

Bankruptcy Code.

Z. **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), the Court expressly finds that there is no just reason for delay in the implementation of this Order and expressly directs entry of judgment as set forth herein.

AA. Entry of this Order is in the best interests of the Debtors, the Debtors' estates, their creditors, and other parties in interest.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. **Motion is Granted.** The Motion is granted and the relief requested therein with respect to the Sale is granted and approved in its entirety, as further described herein.

2. **Objections Overruled.** Any objections to the entry of this Order or to the relief granted herein or the relief requested in the Motion, including any objections to the Proposed Cure Payments or the assumption and assignment of any Assumed Contracts, that have not been withdrawn, waived, or settled, or not otherwise resolved pursuant to the terms hereof, if any, hereby are denied and overruled on the merits with prejudice.

3. **Approval.** The Asset Purchase Agreement, and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors are authorized to perform their obligations under, and comply with the terms of, the Asset Purchase Agreement and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the Asset Purchase Agreement and this Order. The Debtors are authorized to execute and deliver, and empowered to perform under,

consummate, and implement, the Asset Purchase Agreement, together with all additional instruments and documents that the Debtors or the Purchaser deem necessary or appropriate to implement the Asset Purchase Agreement and effectuate the transactions contemplated therein, and to take all further actions as may reasonably be required by the Purchaser for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to Purchaser's possession the Acquired Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement.

4.      **Binding Effect of Order.**  This Order and the Asset Purchase Agreement shall be binding in all respects upon all known and unknown creditors of, and holders of equity security interests in, any Debtor, including any holders of Liens, Claims and Interests, all counterparties to the Assumed Contracts, all successors and assigns of the Purchaser, each Debtor and their Affiliates and subsidiaries, the Acquired Assets, and any trustees appointed in the Debtors' Chapter 11 Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code and this Order shall not be subject to amendment or modification and the Asset Purchase Agreement shall not be subject to rejection.  Subject to the terms and conditions of the Asset Purchase Agreement, the terms of this Order shall apply in the event the Sale under the Asset Purchase Agreement is consummated by and under any chapter 11 plan, and may be incorporated into any confirmation order.  Nothing contained in any chapter 11 plan confirmed in the Debtors' Chapter 11 Cases or the order confirming any such chapter 11 plan shall conflict with or derogate from the provisions of the Asset Purchase Agreement or this Order.

5.      **Injunction.**  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to the Purchaser in accordance with the Asset Purchase Agreement and this

16

Order.  Following the Closing, except for persons entitled to enforce Assumed Liabilities and Permitted Liens, all Persons (including, but not limited to, the Debtors and/or their respective successors (including any trustee), creditors, investors, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Liens, Claims or Interests in the Acquired Assets or against the Debtors in respect of the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Liens, Claims or Interests of any kind or nature whatsoever against the Purchaser or any Affiliate of the Purchaser or any of their respective property, successors and assigns, or the Acquired Assets, as an alleged successor or on any other grounds.  No Person shall assert, and the Purchaser and the Acquired Assets shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), liabilities, claims and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Purchaser or the Debtors, or any obligation of any other party, under or with respect to, any Acquired Assets, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of Debtors that is not an Assumed Liability.

6.      **General Assignment.**  Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors' interests in the Acquired Assets and a bill of sale transferring good and marketable title in the Acquired Assets to the Purchaser free and clear of

all Liens, Claims and Interests.  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions.

7.    **Transfer Free and Clear.**  Except for the Permitted Liens and Assumed Liabilities, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Purchaser as required under the Asset Purchase Agreement, and such transfer shall be free and clear of all Liens, Claims, and Interests of any Person, including, without limitation, all such Liens, Claims, and Interests specifically enumerated in paragraph S of this Order, whether arising by agreement, by statute (including the Nevada net proceeds of minerals tax (NRS Chapter 362)) or otherwise and whether occurring or arising before, on or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Liens, Claims and Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of a Lien, Claim or Interest claims or may claim a Lien, Claim or Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Debtors may possess with respect thereto.

8.    **Valid Transfer.**  The transfer of the Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal, valid, and effective transfer of the Acquired Assets and shall vest the Purchaser with all right, title, and interest of the Debtors in and to the Acquired Assets free and clear of all Liens, Claims and Interests of any kind or nature whatsoever.

9.      **Exculpation and Release.**  Neither the Purchaser nor any of its affiliates, successors, and assigns, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the Asset Purchase Agreement and the entry into and consummation of the Sale, except as expressly provided in the Asset Purchase Agreement and this Order.

10.     **Direction to Release Interests.**  Upon the Closing, each of the Debtors' creditors and any other holder of a Lien, Claim or Interest is authorized and directed to execute such documents and take all other actions as may be necessary to release its Lien, Claim or Interest in the Acquired Assets, if any, as such Lien, Claim or Interest may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing a Lien, Claim or Interest in the Debtors or the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Liens, Claims and Interests, which the person or entity has with respect to the Debtors or the Acquired Assets or otherwise, then (i) the Debtors are authorized to execute and file such statements, instruments, releases, and other documents on behalf of the person or entity with respect to the Debtors or the Acquired Assets, and (ii) the Purchaser is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Liens, Claims and Interests of any kind or nature whatsoever in the Debtors or the Acquired Assets.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions

19

contemplated by the Asset Purchase Agreement, including, without limitation, recordation of this Order.  This Order shall be binding upon and shall govern the acts of all Persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments (including the Nevada Department of Taxation), secretaries of state, federal, state, and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

11.    **No Interference.**  Following the Closing of the Sale, no holder of any Lien, Claim or Interest shall interfere with the Purchaser's title to, or use and enjoyment of, the Acquired Assets based on, or related to, any such Lien, Claim or Interest, or based on any actions the Debtors may take in their Chapter 11 Cases.

12.    **Surrender of Possession.**  All entities that are currently, or on the Closing may be, in possession of some or all of the Acquired Assets in which the Debtors hold an interest hereby are directed to surrender possession of the Acquired Assets to the Purchaser on the Closing, unless the Purchaser otherwise agrees.

13.    **Post-Closing Actions and Transactions.**  The Debtors and the Purchaser, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Purchaser deem necessary or appropriate to implement and effectuate the terms of the Asset Purchase Agreement and this Order.  Further, effective as of the

Closing the Purchaser, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, its successors and assigns, to demand and receive any and all of the Acquired Assets, and from time to time institute and prosecute in the name of the Purchaser, for the benefit of the Purchaser, its successors and assigns, any and all proceedings at law, in equity, or otherwise, that the Purchaser, its successors or assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets that the Purchaser, its successors and assigns, shall deem desirable.  All of the foregoing powers granted to the Purchaser are coupled with an interest and are irrevocable by the Debtors.

14.    **Sale is Self-Executing**.  The Sale is self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

15.    **No Discriminatory Treatment.**  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to the Purchaser on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase Agreement.

16.    **Assumption and Assignment of Contracts.**  Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code and subject to and conditioned upon the Closing of

the Sale, the Debtors' sale, assumption and assignment to the Purchaser of the Assumed

Contracts is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with

respect thereto are deemed satisfied.

17.     The Debtors are authorized and directed in accordance with

sections 105(a) and 365 of the Bankruptcy Code to (i) assume and assign to the Purchaser,

effective as of the Closing, as provided by, and in accordance with, the Bidding Procedures

Order and the Asset Purchase Agreement, the Assumed Contracts free and clear of all Liens,

Claims and Interests of any kind or nature whatsoever, other than the Permitted Liens and

Assumed Liabilities, and (ii) execute and deliver to the Purchaser such documents or other

instruments as the Purchaser reasonably deem may be necessary to assign and transfer the

Assumed Contracts to the Purchaser.

18.     The Assumed Contracts shall be transferred and assigned to,

pursuant to the Bidding Procedures Order, the Amended Bidding Procedures Order and the Asset

Purchase Agreement, and thereafter remain in full force and effect for the benefit of, the

Purchaser, notwithstanding any provision in any such Assumed Contract (including those of the

type described in sections 365(b)(2), (e)(1), and (f) of the Bankruptcy Code) that prohibits,

restricts, or conditions such assignment or transfer.  The Debtors shall be relieved from any

further liability with respect to the Assumed Contracts after such assumption and assignment to

the Purchaser.  The Debtors may assign each Assumed Contract in accordance with sections 363

and 365 of the Bankruptcy Code, and any provisions in any Assumed Contracts that prohibit or

condition the assignment of such Assumed Contracts or terminate, recapture, impose any

penalty, condition renewal or extension, or modify any term or condition upon the assignment of

such Assumed Contracts, constitute unenforceable anti-assignment provisions which are void

22

1    and of no force and effect.  All other requirements and conditions under sections 363 and 365 of

2    the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of each

3    Assumed Contract have been satisfied.

4

5              19.    All defaults and all other obligations or Liabilities under any

6    Assumed Contract occurring, arising or accruing prior to the date of the assignment or transfer to

7    the Purchaser shall be deemed cured or satisfied upon payment by the Purchaser of the Proposed

8    Cure Payment or any other cure amount reached by agreement after a Cure Payment Objection,

9    and, without limiting the foregoing, no effect shall be given to any default of the type set forth in

10   section 365(b)(2) of the Bankruptcy Code, or the type of default concerning an unexpired lease

11   of real property described in section 365(b)(1) of the Bankruptcy Code whether or not such

12   Assumed Contract is an executory contract within the meaning of section 365 of the Bankruptcy

13   Code.  The Cure Payments amounts listed on Schedule 2.1(e) of the Asset Purchase Agreement,

14   or any other cure amount reached by agreement after a Cure Payment Objection, reflect the sole

15   amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults

16   under the Assumed Contracts, and no other amounts are or shall be due to the non-debtor parties

17   in connection with the assumption by the Debtors and assignment to the Purchaser of the

18   Assumed Contracts.

19

20             20.    Except as provided in the Asset Purchase Agreement or this Order,

21   after the Closing, the Debtors and their estates shall have no further liabilities or obligations with

22   respect to any Assumed Contract, and all holders of such claims arising from and after Closing

23   under any Assumed Contract are forever barred and estopped from asserting any claims under

24   any Assumed Contract against the Debtors, their successors or assigns, and their estates.

21.     The failure of the Debtors or the Purchaser to enforce at any time one or more terms or conditions of any Assumed Contract shall not be a waiver of such terms or conditions, or of the Debtors' and the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

22.     **No Successor Liability.**  Neither the Purchaser, nor any of its successors or assigns, or any of their respective affiliates shall have any liability for any Lien, Claim or Interest that arose or occurred prior to the Closing, or otherwise is assertable against the Debtors or is related to the Acquired Assets prior to the Closing.  The Purchaser is not and shall not be deemed a "successor" to the Debtors or their estates, have, de facto or otherwise, merged with or into the Debtors or be a mere continuation or substantial continuation of the Debtors or the enterprise of the Debtors under any theory of law or equity as a result of any action taken in connection with the Asset Purchase Agreement or any of the transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Acquired Assets.

23.     Without limiting the foregoing, and except to the extent the Purchaser assumes the Assumed Liabilities, or takes the Acquired Assets subject to the Permitted Liens, or as otherwise set forth in the Asset Purchase Agreement, the Purchaser shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any Liens, Claims or Interests, including under any theory of successor or transferee liability, de facto merger or continuity, whether known or unknown as of the Closing, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to of any of the following: (i) any foreign, federal, state, or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule, or regulation (including without limitation filing requirements under any such laws, rules or regulations); (ii)

24

under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation, or doctrine, or under any product warranty liability law or doctrine; (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements, or other similar agreement to which the Debtors are a party; (iv) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation, or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the (a) Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967, (g) the Americans with Disabilities Act of 1990, or (h) COBRA; (vi) environmental liabilities, debts, Claims, or obligations arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contamination substances or wastes), which my be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.; (vii) any liabilities, debts, or obligations of or required to be paid by the Debtors for any taxes of any kind for any period; (viii) any liabilities, debts, commitments, or obligations for any taxes relating to the operation of the Acquired Assets prior to the Closing; (ix) any bulk sale law; and (x) any litigation.

24.     **Governmental Matters.**  Nothing in this Order or the Asset Purchase Agreement releases, nullifies, or enjoins the enforcement of any liability to a federal

25

governmental unit of the United States under environmental statutes or under police and

regulatory statutes or regulations that any entity would be subject to as the operator of property

after the date of entry of this Order. Nothing in this Order or the Asset Purchase Agreement

authorizes transfer to the Purchaser of any licenses, permits, registrations, or other governmental

authorizations and approvals without the Purchaser's compliance with all applicable legal

requirements under non-bankruptcy law governing such transfers. Notwithstanding the foregoing

sentence, nothing in this Order shall (i) be interpreted to deem the Purchaser as the successor to

the Debtors under any successor liability doctrine with respect to any liabilities under

environmental statutes or regulations for penalties for days of violation prior to the Closing or for

liabilities relating to off-site disposal of wastes by the Debtors prior to the Closing; (ii) create for

any governmental unit any substantive right that does not already exist under law; or (iii) be

deemed or construed to be, an admission of liability by the Debtors.  Nothing in the APA or this

Order shall be construed to limit the Purchaser's obligations to comply with Nevada reclamation

laws on or after the Closing, including the requirements of NRS Chapter 519A.

          25.    **Fair Consideration.**  The consideration provided by the Purchaser

for the Acquired Assets under the Asset Purchase Agreement shall be deemed to constitute

reasonably equivalent value and fair consideration under the Bankruptcy Code and under the

laws of the United States, any state, territory, possession, or the District of Columbia.  The Sale

may not be avoided under section 363(n) of the Bankruptcy Code.  The Asset Purchase

Agreement was not entered into, and the Sale is not being consummated, for the purpose of

hindering, delaying, or defrauding creditors of the Debtors under the Bankruptcy Code or under

the laws of the United States, any state, territory, possession thereof, or the District of Columbia,

or any other applicable law.  Neither the Debtors nor the Purchaser have entered into the Asset

Purchase Agreement or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group of persons or entities has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors and their estates than the Purchaser.  The Court's approval of the Motion and the Asset Purchase Agreement are in the best interests of the Debtors, the bankruptcy estates of the Debtors, their creditors and all other parties in interest.

26.    **Retention of Jurisdiction.**  This Court retains jurisdiction, pursuant to its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Acquired Assets to the Purchaser; (ii) interpret, implement, and enforce the provisions of this Order; (iii) protect the Purchaser, any of the Purchaser's affiliates, or any agent of the foregoing, against any Liens, Claims or Interests against the Debtors or the Acquired Assets of any kind or nature whatsoever, and (iv) enter any order under section 363 and 365 of the Bankruptcy Code.

27.    **Good Faith Purchaser.**  The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of any of the Assumed Contracts).  The Purchaser is a Purchaser in good faith of the

Acquired Assets and is entitled to all the protections afforded by section 363(m) of the Bankruptcy Code.

28.    **Royalty Interests**.  Notwithstanding anything in this Order, the Purchaser shall acquire the Acquired Assets subject to any interests in the Acquired Assets held prior to the Closing (the "Royalty Interests") by Finley River Company, Hi-Tech Exploration, Hillcrest Mining Co. and Franco-Nevada U.S. Corporation (the "Royalty Claimants").  The Purchaser shall be obligated to continue to meet and satisfy the Royalty Interests to the Royalty Claimants accruing from and after the Closing; *provided*, *however*, that the Purchaser shall not be obligated to satisfy the Royalty Interests accruing prior to the Closing except as set forth on the record at the hearing before the Court on May 3, 2013.  Further, the Royalty Claimants reserve their rights to make any arguments in these Chapter 11 Cases regarding the amount and priority of any claims on account of pre-Closing Royalty Interests, which claims, if any, shall be claims against the Sellers' estates, and which claims, if any, shall not be obligations of the Purchaser except as set forth on the record at the hearing before the Court on May 3, 2013.  The Sellers similarly reserve their rights to raise any arguments or defenses with respect to any such claim.

29.    **Distribution of Proceeds.**  Notwithstanding anything to the contrary concerning the timing of distributions in paragraph 28 of the *Final Order Pursuant to 11 U.S.C. §§  105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(b) and (c) (I) Authorizing Debtors to (A) Obtain Postpetition Financing; and (B) Use Cash Collateral; (II) Granting Liens, Including Priming Liens, and Superpriority Claims, (III) Granting Adequate Protection, and (IV) Granting Related Relief* [Docket No. 342 (the "DIP Order")], the consideration provided by the Purchaser for the Acquired Assets shall not be distributed until

entry of a further order of the Court, *provided however*, that immediately upon closing of the Sale, $1,000,000 shall be irrevocably deposited into a separate trust account established by the Debtors for the exclusive payment of general unsecured claims pursuant to paragraph 29(a) of the DIP Order; *provided further*, *however*, for the avoidance of doubt, nothing herein shall affect or alter the priorities set forth in paragraph 28 of the DIP Order, or any other provision of the DIP Order.

30.   **San Juan Drilling.**  In lieu of recording a Notice of Lien in the relevant Office of the County Recorder as set forth by NRS 108.226(1), San Juan Drilling shall instead file such Notice of Lien with the Court and such filing on the Court's docket shall be deemed to be so recorded in such Office of the County Recorder for purposes of perfection.  Such filing with the Court shall satisfy the requirement of NRS 108.226(1) as to recordation, and no party shall be entitled to challenge the extent, validity, or priority of the lien based on its recording on the bankruptcy docket rather than in the relevant office of the County Recorder as specified in NRS 108.226(1). San Juan Drilling shall file such Notice of Lien on or before 45 days after the date of this Order and any adversary proceeding or other proceeding to determine the validity, priority or extent of any Lien of San Juan Drilling shall be commenced by any party in interest on or before 30 days after the filing of the Notice of Lien.  If no such proceeding is commenced, or if a proceeding is commenced and San Juan Drilling is determined to have a valid and perfected Lien, then such Lien shall be deemed to secure an Allowed Other Secured Claim as defined in the Plan at Docket No. 425, and a Non-Primed Lien and a Permitted Lien as set forth in Paragraph 32 of the DIP Order and no cash payments or other payments shall be made on account of the Existing Obligations (as defined in the DIP Order) until  all of the Debtors' obligations to San Juan Drilling secured by such Lien have been indefeasibly paid in

cash, or adequately reserved for.  Subject to the provisions herein and except as set forth herein, the rights of all parties in interest shall be reserved with respect to the validity, priority and extent of any Lien of San Juan Drilling.  Other than as specifically set forth herein, San Juan Drilling shall retain all statutory rights provided by NRS 108 et.seq.  For the avoidance of doubt, any Lien of San Juan Drilling shall not be an obligation of the Purchaser or encumber the Acquired Assets (which shall be sold free and clear of such Lien), but instead shall attach to the sale proceeds in accordance with this Order and paragraph 32 of the DIP Order.  The provisions set forth herein shall be binding on the Committee and/or any trustee appointed in these cases.

31.   **No Bulk Law Application.**  No law of any state or other jurisdiction, including any bulk sales law or similar law, shall apply in any way to the transactions contemplated by the Sale, the Asset Purchase Agreement, the Motion, and this Order.  No brokers were involved in consummation of the Sale, and no brokers' commissions are due to any person in connection with the Sale.

32.   **Subsequent Plan Provisions.**  Nothing contained in any chapter 11 plan confirmed in any Debtor's bankruptcy case or any order confirming any such plan or in any other order in these Chapter 11 Cases shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or this Order.

33.   **Inconsistencies with Prior Orders, Pleadings or Agreements**. To the extent this Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale.  To the extent there is any inconsistency between the terms of this Order and the terms of

the Asset Purchase Agreement (including all ancillary documents executed in connection

therewith), the terms of this Order shall govern.  Notwithstanding anything to the contrary in this

Order, nothing herein shall abrogate or modify the DIP Order except as set forth in paragraph 29

of this Order.

34.     **Failure to Specify Provisions.**  The failure to specifically include

any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or

impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase

Agreement be authorized and approved in its entirety.

35.     **Non-Material Modifications.**  The Asset Purchase Agreement and

any related agreements, documents, or other instruments may be modified, amended, or

supplemented by the parties thereto and in accordance with the terms thereof, without further

order of the Court, provided that any such modification, amendment, or supplement does not,

based on the Debtors' judgment, have any adverse effect on the Debtors' estates.

36.     **No Stay or Order.**  Notwithstanding the provisions of Bankruptcy

Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry

and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized

to close the transactions immediately upon entry of this Order.  Time is of the essence in closing

the transactions referenced herein, and the Debtors and the Purchaser intend to close the

transactions as soon as practicable.  Any party objecting to this Order must exercise due

diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

37.     The relief granted by this Order shall apply to any affiliated future

debtor (a "Future Debtor") in these jointly-administered cases.  An affiliated debtor shall be

deemed to be a Future Debtor upon the Court's entry of an order authorizing the joint

administration of such Future Debtor's chapter 11 case with these Chapter 11 Cases.

38.    **Appointment of Trustee.**  The provisions of the Asset Purchase

Agreement and this Order may be specifically enforced in accordance with the Asset Purchase

Agreement notwithstanding the appointment of any chapter 7 or chapter 11 trustee after the

Closing.

39.    All time periods set forth in this Order shall be calculated in

accordance with Bankruptcy Rule 9006(a).

40.    The provisions of this order are nonseverable and mutually

dependent.

41.    The Court shall retain jurisdiction with respect to all matters

relating to the interpretation or implementation of this Order.

**SUBMITTED BY:**

Donald A. Lattin, NV State Bar #693
Christopher D. Jaime, NV State Bar #4640
MAUPIN, COX & LEGOY, PC.
4785 Caughlin Parkway
Reno, Nevada 89519
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Nevada Counsel for Debtors and Debtors in Possession

Jessica C.K. Boelter, IL State Bar #6277801
Thomas A. Labuda, Jr., IL State Bar #6225401
Matthew G. Martinez, IL State Bar #6297132
SIDLEY AUSTIN LLP
One South Dearborn Street

32

Chicago, Illinois 60603

Counsel for Debtors and Debtors in Possession

In accordance with Local Rule 9021, counsel submitting this document certifies as follows (check one):

___**__**_____ The court has waived the requirement set forth in Local Rule 9021(b)(1)

_____ No party appeared at the hearing or filed an objection to the Motion.

_X_____ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

Approved by counsel to Official Committee of Unsecured Creditors

Approved by counsel to Credit Suisse, AG, as Agent

Approved by counsel to the Nevada Department of Conservation and Natural Resources, Division of Environmental Protection

Counsel to Redburn Tire Co. does not approve.

Approved by counsel to San Juan Drilling

Approved by counsel to Sandvick Mining and Construction USA, LLC

Approved by counsel to Franco-Nevada U.S. Corporation

Approved by counsel to Hillcrest Mining Company LLC, Finley River Company LLC and Hi-Tech Exploration Ltd.

Approved by counsel to the Purchaser

_____ I certify that this is a case under chapter 7 or 13, that I have served a copy of this order with the motion pursuant to Local Rule 9014(g), and that no party has objected to the form or content of the order.

###

# EXHIBIT A

**Asset Purchase Agreement**

ASSET PURCHASE AGREEMENT

dated as of April 26, 2013

by and among

RODEO CREEK GOLD INC.,

ANTLER PEAK GOLD INC.,

HOLLISTER VENTURE CORP.,

TOUCHSTONE RESOURCES COMPANY

and

WATERTON NEVADA HOLDINGS, LLC

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ........................................................................................... 1
    1.1    Defined Terms ............................................................................1
    1.2    Interpretation ..............................................................................9

ARTICLE 2 TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES ................... 10
    2.1    Assets to be Acquired ..............................................................10
    2.2    Excluded Assets .......................................................................12
    2.3    Liabilities to be Assumed by the Buyer ...................................13
    2.4    Excluded Liabilities .................................................................13
    2.5    Rejection of Assumed Contracts ..............................................14

ARTICLE 3 CLOSING; PURCHASE PRICE ................................................................. 14
    3.1    Closing; Transfer of Possession; Certain Deliveries ................14
    3.2    Purchase Price .........................................................................16
    3.3    Allocation of Purchase Price ....................................................16

ARTICLE 4 REPRESENTATIONS AND WARRANTIES OF SELLERS ............................. 16
    4.1    Organization .............................................................................16
    4.2    Due Authorization, Execution and Delivery; Enforceability ....16
    4.3    Consents ...................................................................................17
    4.4    No Conflicts .............................................................................17
    4.5    Title to Acquired Assets ...........................................................17
    4.6    Title to Real Property ...............................................................17
    4.7    Environmental Matters .............................................................17
    4.8    Compliance with Other Laws and Permits ...............................18
    4.9    Financial Advisors ...................................................................18
    4.10    Labor Matters ...........................................................................19
    4.11    Litigation ..................................................................................19
    4.12    Rock Creek ...............................................................................19
    4.13    CCAA Proceedings ...................................................................19
    4.14    Full Disclosure ........................................................................19

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF BUYER ............................... 20
    5.1    Organization .............................................................................20
    5.2    Due Authorization, Execution and Delivery; Enforceability ....20
    5.3    Consents ...................................................................................20
    5.4    No Conflicts .............................................................................20
    5.5    Financial Capability .................................................................20
    5.6    Financial Advisors ...................................................................20
    5.7    Opportunity for Independent Investigation ..............................20
    5.8    HSR ..........................................................................................21

ARTICLE 6 COVENANTS OF THE PARTIES ............................................................. 21
    6.1     Conduct of Business Pending the Closing..........................................21
    6.2     Access ................................................................................................21
    6.3     Public Announcements ......................................................................22
    6.4     Tax Matters .......................................................................................22
    6.5     Regulatory Approvals ........................................................................23
    6.6     Employee Matters .............................................................................24
    6.7     Confidentiality ..................................................................................25
    6.8     Further Assurances............................................................................25
    6.9     Sale Order .........................................................................................25
    6.10    Buyer's Acknowledgements; Nature of Representations ...................26
    6.11    Replacement Credit Support and Reclamation Requirements............28
    6.12    Insurance ...........................................................................................28
    6.13    Intellectual Property..........................................................................28
    6.14    Inventory Payment ............................................................................29
    6.15    Surface Use and License Agreement .................................................30
    6.16    Permits Covenant ..............................................................................30

ARTICLE 7 CONDITIONS TO OBLIGATIONS OF THE PARTIES ...................................... 30
    7.1     Conditions Precedent to Obligations of the Buyer ............................30
    7.2     Conditions Precedent to the Obligations of the Sellers .....................32

ARTICLE 8 TERMINATION ................................................................................. 33
    8.1     Termination of Agreement.................................................................33
    8.2     Consequences of Termination............................................................33

ARTICLE 9 MISCELLANEOUS .............................................................................. 34
    9.1     Expenses ...........................................................................................34
    9.2     Assignment .......................................................................................34
    9.3     Parties in Interest..............................................................................34
    9.4     Notices .............................................................................................34
    9.5     Choice of Law; Jurisdiction and Venue............................................35
    9.6     Entire Agreement; Amendments and Waivers ..................................35
    9.7     Schedules; Supplementation and Amendment of Schedules.............35
    9.8     Counterparts; Facsimile and Electronic Signatures ..........................36
    9.9     Retention of Deposit Not Penalty .....................................................36
    9.10    Severability .......................................................................................36
    9.11    Specific Performance ........................................................................36
    9.12    WAIVER OF RIGHT TO TRIAL BY JURY....................................36
    9.13    NO CONSEQUENTIAL DAMAGES................................................36
    9.14    Survival ............................................................................................37
    9.15    Non-Recourse ...................................................................................37

ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT is dated as of April 26, 2013 (the "**Effective Date**"), by and among RODEO CREEK GOLD INC., a Nevada corporation, ANTLER PEAK GOLD INC., a Nevada corporation, HOLLISTER VENTURE CORP., a Nevada corporation, and TOUCHSTONE RESOURCES COMPANY, a Nevada corporation (each a "**Seller**" and, collectively, the "**Sellers**"), and WATERTON NEVADA HOLDINGS, LLC, a Nevada limited liability company (the "**Buyer**"). The Sellers and the Buyer are each referred to herein as a "**Party**" and, collectively, as the "**Parties**."

WHEREAS, the Sellers will, as of the Closing, hold and/or operate all of the assets, permits, contracts and other rights currently used or held for use in operating the Business;

WHEREAS, on September 19, 2012, Great Basin Gold Ltd., a Canadian corporation and the direct or indirect parent of each Seller, applied for protection from its creditors (thereby commencing the "**CCAA Proceedings**") before the Supreme Court of British Columbia (the "**CCAA Court**") pursuant to the *Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36*;

WHEREAS, on February 25, 2013, the Sellers filed voluntary petitions ("**Petitions**") for relief (commencing the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"); and

WHEREAS, upon the terms and subject to the conditions contained in this Agreement, and subject to the approval of the Bankruptcy Court in the Chapter 11 Cases, the Sellers wish to sell to the Buyer and the Buyer wishes to purchase from the Sellers all of the right, title and interest of the Sellers as of the Closing Date in the Acquired Assets and to assume from the Sellers the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises, representations, warranties, covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged and, intending to be legally bound hereby, the Parties agree as follows:

**ARTICLE 1**
**DEFINITIONS**

1.1    <u>Defined Terms</u>.  As used herein, the terms below shall mean the following:

"**Acquired Assets***"* has the meaning set forth in <u>Section 2.1</u>.

"**Acquired Permits**" has the meaning set forth in <u>Section 2.1(f)</u>.

"**Affiliate**" means, with respect to any Person, any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, the Person specified, where "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, through ownership of voting securities or rights, by contract, as trustee, executor or otherwise.

1

"***Agreement***" means this Asset Purchase Agreement, together with all exhibits hereto and the Schedules.

"***Allocation***" has the meaning set forth in Section 3.3.

"***Assignment and Assumption of Mining Leases***" means an assignment and assumption of mining leases to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"***Assignment and Assumption of Assumed Contracts, Acquired Permits and Agreements***" means an assignment and assumption of Assumed Contracts, Acquired Permits and any other instrument typically transferred by assignment to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"***Assumed Contracts***" has the meaning set forth in Section 2.1(e).

"***Assumed Liabilities***" has the meaning set forth in Section 2.3.

"***Assumption Agreement***" means an assumption agreement to be delivered by the Buyer at Closing, in form and substance reasonably acceptable to the Sellers.

"***Bankruptcy Code***" has the meaning set forth in the recitals.

"***Bankruptcy Court***" has the meaning set forth in the recitals.

"***Benefit Plan***" means any employee benefit plan (as defined in section 3(3) of ERISA) or any deferred compensation, bonus, pension, retirement, profit sharing, savings, cash- and stock-based incentive compensation, disability, death benefit, hospitalization, medical, dental, life, severance, vacation, sick leave, fringe benefit, or welfare plan, program, policy, practice or arrangement, whether or not subject to ERISA, or any employment, retention, consulting, change in control, termination or severance plan, program, policy, practice, arrangement or agreement sponsored, maintained or contributed to, or required to be maintained or contributed to, by the Sellers for the benefit of any present or former officer, employee or director, retiree or spouse, dependent or other beneficiary of any of the Sellers who worked or works in the Business.

"***Bid Procedures***" means the bidding procedures approved by the Bid Procedures Order, as such procedures may be amended or modified in accordance with the Bid Procedures Order.

"***Bid Procedures Order***" means the Order of the Bankruptcy Court, dated March 1, 2013, and amended on March 29, 2013, as such order may be further amended or modified from time to time.

"***Bill of Sale***" means a bill of sale for the Acquired Assets to be delivered by the Sellers to the Buyer at Closing, in form and substance reasonably acceptable to the Buyer.

"***Business***" means the ownership and operation of the Hollister gold mining facility located in Elko County, Nevada and the Esmeralda mill facility located in Mineral County, Nevada.

"**Business Day**" means any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of New York are not required to open.

"**Buyer**" has the meaning set forth in the preamble.

"**Cash Consideration**" means $15,000,000.

"**CCAA Court**" has the meaning set forth in the recitals.

"**CCAA Proceedings**" has the meaning set forth in the recitals.

"**Chapter 11 Cases**" has the meaning set forth in the recitals.

"**Claims**" means all rights or causes of action (whether in law or equity), obligations, demands, restrictions, indemnities, consent rights, options, contract rights, covenants and interests of any kind or nature whatsoever, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including all "claims" as defined in section 101(5) of the Bankruptcy Code.

"**Closing**" has the meaning set forth in Section 3.1(a).

"**Closing Date**" has the meaning set forth in Section 3.1(a).

"**Code**" means the Internal Revenue Code of 1986.

"**Confidentiality Agreement**" has the meaning set forth in Section 6.7.

"**Consent**" has the meaning set forth in Section 4.3.

"**Contract**" means any written contract, lease, license, purchase order, sales order or other agreement, arrangement, understanding or commitment that is binding upon a Person or its property.

"**Credit Suisse**" means Credit Suisse AG.

"**Credit Support/Reclamation Arrangements**" has the meaning set forth in Section 6.11.

"**CS Side Letter**" means the side letter agreement to be entered into by and between Credit Suisse and the Buyer after the date hereof.

"**Deposit**" means $1,500,000.

"**Effective Date**" has the meaning set forth in the preamble.

"**Employees**" has the meaning set forth in Section 6.6(a).

"**Environmental Law**" means any Law as in effect on the Effective Date relating to pollution, hazardous materials or protection of the environment or human health.

3

"***ERISA***" means the Employee Retirement Income Security Act of 1974.

"***Excluded Assets***" has the meaning set forth in <u>Section 2.2</u>.

"***Excluded Liabilities***" has the meaning set forth in <u>Section 2.4</u>.

"***Existing CS Debt***" means (i) $49,414,337.90 in principal amount and accrued interest that the Sellers owe Credit Suisse, as agent and lender, and the other financial institutions that are lenders under that certain Credit Agreement, dated as of February 23, 2011, and (ii) all amounts owing as of the Closing pursuant that certain Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement as approved by the Bankruptcy Court's *Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 552 and Fed. R. Bankr. P. Rule 4001(b) and (c) (I) Authorizing Debtors to (A) Obtain Postpetition Financing; and (B) Use Cash Collateral; (II) Granting Liens, Including Priming Liens, and Superpriority Claims, (III) Granting Adequate Protection, and (IV) Granting Related Relief* dated April 8, 2013.

"***Filing***" has the meaning set forth in <u>Section 4.3</u>.

"***GAAP***" means generally accepted accounting principles as in effect from time to time in the United States, consistently applied.

"***Governmental Entity***" means any federal, state, provincial, local, municipal, foreign or other (a) government; (b) governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official or entity and any court or other tribunal); or (c) body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power of any nature.

"***Interim Period***" has the meaning set forth in <u>Section 6.1</u>.

"***Inventory***" has the meaning set forth in <u>Section 2.1(c)</u>.

"***Inventory Ounces***" has the meaning set forth in <u>Section 6.14</u>.

"***Inventory Payment Measure***" has the meaning set forth in <u>Section 6.14</u>.

"***IT Assets***" means computers, software (to the extent transferable), servers, workstations, routers, hubs, switches, circuits, networks, data communications lines and all other information technology equipment owned by the Sellers and used in the Business.

"***Law***" means any federal, state, provincial, local or foreign statute, law, ordinance, regulation, rule, code, Order, principle of common law, judgment or decree enacted, promulgated, issued, enforced or entered by any Governmental Entity or other requirement or rule of law.

"***Leased Machinery and Equipment***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Liabilities***" means, as to any Person, adverse Claims, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or

4

contingent, whether accrued, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"*Lien*" means any lien (statutory or otherwise), Claim, pledge, option, charge, right of first refusal, hypothecation, encumbrance, easement, lease or sublease, security interest, right-of-way, encroachment, mortgage, deed of trust, restriction on transferability or other similar restriction, whether imposed by agreement, law or otherwise, whether of record or otherwise.

"*London Good Delivery Bars*" means gold bullion bars which are defined in and meet the standards and specifications of the London Bullion Market Association.

"*Machinery and Equipment*" has the meaning set forth in Section 2.1(b).

"*Material Adverse Effect*" means any change, event, circumstance, development or effect that is or would reasonably be expected to be materially adverse to the Acquired Assets, the Business, the Properties, the Sellers, or the business, operations or condition (financial or otherwise) of the Business or materially adverse (or that would reasonably be expected to be materially adverse) to the Sellers' ability to perform its obligations under this Agreement in a timely fashion or to consummate the transactions contemplated hereby in a timely fashion, but shall exclude any change, event, circumstance, development or effect resulting or arising from: (a) any circumstance generally affecting the international, national or regional mining industry (except to the extent that the Business is disproportionately adversely affected by such changes relative to other industry participants); (b) any change in economic, financial market, regulatory or political conditions, including any engagements of hostilities, acts of war or terrorist activities, or changes imposed by a Governmental Entity associated with additional security (except to the extent that the Business is disproportionately adversely affected by such changes relative to other industry participants); (c) changes or prospective changes in Law, GAAP or official interpretations of the foregoing (except to the extent that the Business is disproportionately adversely affected by such changes relative to other industry participants); (d) compliance with this Agreement, including any effect on the Business resulting from failure to take any action to which the Buyer unreasonably refused consent under this Agreement; (e) the transactions contemplated hereby or any announcement hereof or the identity of the Buyer, including any loss, diminution or disruption, whether actual or threatened, of existing or prospective customer, distributor, supplier or other relationships resulting therefrom; (f) the failure in and of itself by any Seller to meet any projections or estimates, including internal projections or estimates of revenue, earnings or performance (it being understood that the underlying causes of the failure to meet such projections shall be taken into account in determining whether a Material Adverse Effect has occurred); or (g) the pendency of the CCAA Proceedings or Chapter 11 Cases and any action approved by, or motion made before, the Bankruptcy Court or CCAA Court.

"*Mill Ounces*" has the meaning set forth in Section 6.14.

"*Net Profits Royalty Agreement*" means the agreement to be entered into by the Buyer and Sellers in respect of net profits royalty payments payable by the Buyer to Sellers or their designee (who may be designated pursuant to the Sale Order and/or a plan of reorganization in

the Chapter 11 Cases) until the earlier of (i) the receipt by Sellers or their designee of a total of $90,000,000 in such payments and (ii) nine (9) years from Closing.

"***Non-Party Affiliates***" has the meaning set forth in <u>Section 9.15</u>.

"***Notices***" has the meaning set forth in <u>Section 9.4</u>.

"***Operating Records and Other Information***" means all data, information (including tangible and intangible information such as drill core, drill logs, assays, metallurgical test work, mine plans and similar information), agreements, files, books (including accounting books and records), operating records, operating, safety and maintenance manuals, engineering and design plans, blueprints and as-built plans, specifications, drawings, reports, procedures, facility compliance plans, test records and results, other records and filings made with regulatory agencies regarding operations of the Business, environmental procedures and similar records and employee records for the Employees to the limited extent necessary for the Buyer to comply with applicable Law after the Closing Date.  For the avoidance of doubt, the foregoing includes all reports, documents, data and other information relating to the Hollister Expansion Environmental Impact Statement, the Programmatic Agreement, and any Permits or applications or materials in support of renewal of any Permits.  Except as otherwise expressly provided herein, the foregoing does not include (a) accounting books and records of any Affiliate of any Seller, (b) items proprietary to third parties that are not freely transferable in connection with the sale of the Business, (c) SEC or SEDAR filings that are publicly available or other publicly available information or records, (d) records not in the possession and control of any Seller or any Affiliate of any Seller and (e) records not permitted by law to be transferred from any Seller or any Affiliate of any Seller to the Buyer.

"***Order***" means any judgment, order, injunction, writ, ruling, decree, stipulation or award of any Governmental Entity.

"***Outside Date***" has the meaning set forth in <u>Section 8.1(b)</u>.

"***Owned Machinery and Equipment***" has the meaning set forth in <u>Section 2.1(b)</u>.

"***Owned Real Property***" has the meaning set forth in <u>Section 4.6(a)</u>.

"***Party***" has the meaning set forth in the preamble.

"***Permits***" means permits, licenses, registrations, certificates of occupancy, approvals, consents, clearances and other authorizations issued by any Governmental Entity.

"***Permitted Liens***" means: (a) title of a lessor under a capital or operating lease that is an Assumed Contract; (b) terms and conditions of any Assumed Contract; (c) such Liens, imperfections in title, charges, easements, restrictions, encumbrances or other matters that are due exclusively to zoning or subdivision, entitlement, and other land use Laws or regulations; (d) Liens or encumbrances that arise exclusively by reason of acts of the Buyer or with the prior written approval of the Buyer; (e) orders or rulings of the Nevada State Office of the Bureau of Land Management or the Nevada Division of Water Resources to the extent such orders or rulings do not invalidate (or could reasonably be expected to invalidate) the mining claims or

water rights that are subject of such orders or rulings; or (f) all covenants, conditions, restrictions, easements, charges, rights of way, or other similar encumbrances on title, in each case, filed of record in the real property records to which they relate or affect or filed with the Nevada State Office of the Bureau of Land Management or filed with the Nevada Division of Water Resources, which do not materially affect the value of the real property or interfere with the use thereof or the operation of the Business.

"*Person*" means an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a Governmental Entity or any other entity.

"*Petition Date*" means the date on which the Petitions are filed with the Bankruptcy Court in the Chapter 11 Cases.

"*Petitions*" has the meaning set forth in the recitals.

"*Proceeding*" means any claim, action, arbitration, audit, known investigation (including a notice of preliminary investigation or formal investigation), notice of violation, hearing, litigation or suit (whether civil, criminal or administrative), other than the Chapter 11 Cases or CCAA Proceedings, commenced, brought, conducted or heard by or before any Governmental Entity or arbitrator.

"*Properties*" has the meaning set forth in Section 2.1(a).

"*Purchase Price*" means the aggregate consideration that is the sum of: (a) the Cash Consideration, plus (b) the entering into of the Net Profits Royalty Agreement by the Buyer, plus (c) the cure payments in accordance with Section 7.1(j), plus (d) the amounts, if any, to be paid by the Buyer pursuant to Section 6.14.

"*Quit Claim Deeds*" means quit claim deeds to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

"*Reclamation Obligation*" means any and all actions required during, or following cessation of, any exploration, mining or processing activities conducted by or in connection with the Business, or required at or on property utilized by the Business, that is required either by Law or by Permit.

"*Refined Ounces*" means refined gold bullion in the form of London Good Delivery Bars, produced, derived or resulting from the Inventory Ounces.

"*Refinery*" means Johnson Matthey Inc.'s refinery in Salt Lake City, Utah, USA.

"*Refinery Ounces*" has the meaning set forth in Section 6.14.

"*Representative*" means, with respect to any Person, such Person's officers, directors, managers, employees, agents, representatives and financing sources (including any investment banker, financial advisor, accountant, legal counsel, agent, representative or expert retained by or acting on behalf of such Person or its subsidiaries).

"***RK***" means RK Mine Finance Trust I.

"***Rock Creek***" has the meaning set forth in <u>Section 2.1(j)</u>.

"***Sale***" has the meaning set forth in <u>Section 6.14</u>.

"***Sale Hearing***" has the meaning specified in the Bid Procedures Order.

"***Sale Order***" means an Order or Orders of the Bankruptcy Court, which shall be in the form of Exhibit H to Docket No. 16 in the Chapter 11 Cases (with such modifications to be mutually agreed upon by Buyer and Sellers), authorizing and approving, without limitation, the sale, transfer and assignment of the Acquired Assets to Buyer in accordance with the terms and conditions of this Agreement and authorizing the Sellers to consummate the transactions contemplated hereby.

"***Schedules***" means the disclosure schedules delivered in connection with the execution of this Agreement.

"***Sellers***" has the meaning set forth in the preamble.

"***Seller Trademarks and Logos***" has the meaning set forth in <u>Section</u> **Error! Reference source not found.**.

"***Surface Use and License Agreement***" has the meaning set forth in <u>Section 6.15</u>.

"***Tax***" means any and all taxes, assessments, levies, duties or other governmental charge imposed by any Governmental Entity, including any income, alternative or add-on minimum, accumulated earnings, franchise, capital stock, environmental, profits, windfall profits, gross receipts, sales, use, value added, transfer, registration, stamp, premium, excise, customs duties, severance, real property, personal property, ad valorem, occupancy, license, occupation, unclaimed property liabilities, employment, payroll, social security, disability, unemployment, withholding, corporation, inheritance, stamp duty reserve, estimated or other similar tax, assessment, levy, duty (including duties of customs and excise) or other governmental charge of any kind whatsoever, including any payments in lieu of taxes or other similar payments, chargeable by any Tax Authority together with all penalties, interest and additions thereto, whether disputed or not.

"***Tax Authority***" means any taxing or other authority (whether within or outside the United States) competent to impose Tax.

"***Tax Return***" means any and all returns, declarations, reports, documents, claims for refund, or information returns, statements or filings that are required to be supplied to any Tax Authority or any other Person, including any schedule or attachment thereto, and including any amendments thereof.

"***Transfer Tax***" means any sales, use, transfer, conveyance, documentary transfer, stamp, recording or other similar Tax imposed upon the sale, transfer or assignment of property or any interest therein or the recording thereof, and any penalty, addition to Tax or interest with respect

thereto including, without limitation, any filing fees to be paid to the Bureau of Land Management, but such term shall not include any Tax on, based upon or measured by, the net income, gains or profits from such sale, transfer or assignment of the property or any interest therein.

"*Unrefined Gold Ounces*" means troy ounces of raw or crushed ore, concentrate, doré and/or other unrefined gold.

"*WARN Act*" means the Worker Adjustment and Restraining Notification Act.

"*Water Rights Quit Claim Deeds*" means water rights quit claim deeds to be delivered by the Sellers at Closing, in form and substance reasonably acceptable to the Buyer.

    1.2    <u>Interpretation</u>.

    (a)    Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation."

    (b)    Words denoting any gender shall include all genders.

    (c)    A reference to any Party to this Agreement or any other agreement or document shall include such Party's successors and permitted assigns.

    (d)    A reference to any legislation or to any provision of any legislation shall include any amendment, modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

    (e)    All references to "$" and dollars shall be deemed to refer to United States currency.

    (f)    All references to any financial or accounting terms shall be defined in accordance with GAAP, unless otherwise defined herein.

    (g)    The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and section, schedule and exhibit references are to this Agreement, unless otherwise specified.  All article, section, paragraph, schedule and exhibit references used in this Agreement are to articles, sections, paragraphs, schedules and exhibits to this Agreement, as they may be modified by the Schedules, unless otherwise specified.

    (h)    The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

    (i)    When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is not a Business Day, the period in question shall end on the next succeeding Business Day.

(j)    If a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(k)    A reference to any agreement or document (including a reference to this Agreement) is to the agreement or document as amended, restated, supplemented or otherwise modified from time to time, except to the extent prohibited by this Agreement or that other agreement or document.

(l)    Exhibits, Schedules, annexes and other documents referred to as part of this Agreement are hereby incorporated herein and made a part hereof and are an integral part of this Agreement.  Any capitalized terms used in any exhibit, Schedule or annex but not otherwise defined therein shall be defined as set forth in this Agreement.

(m)    The table of contents and the headings of the Articles and Sections herein are inserted for convenience of reference only and shall not be a part of, or affect the meaning or interpretation of, this Agreement.

(n)    This Agreement is the result of the joint efforts of the Sellers and the Buyer, and each provision hereof has been subject to the mutual consultation, negotiation and agreement of the Parties and there is to be no construction against any Party based on any presumption of that Party's involvement in the drafting thereof.

## ARTICLE 2
## TRANSFER OF ASSETS AND ASSUMPTION OF LIABILITIES

2.1    <u>Assets to be Acquired</u>.  Subject to the terms and conditions of this Agreement and the Sale Order, and upon entry of the Sale Order, at the Closing, the Sellers shall sell, convey, assign, transfer and deliver to the Buyer, free and clear of all Liens (other than Permitted Liens) as provided in the Sale Order and the Buyer shall purchase, acquire and accept from the Sellers, all of the Sellers' right, title and interest in each and all of the Acquired Assets.  "***Acquired Assets***" means all properties, assets and rights of every nature, tangible and intangible, real or personal, now existing or hereafter acquired, whether or not reflected on the books or financial statements of the Sellers as the same shall exist on the Closing Date that are (a) owned by any Seller, (b) used or held in connection with the ownership, lease, use or operation of the Business and (c) not Excluded Assets.  The Acquired Assets shall include:

(a)    the real property, mining claims and water rights, surface use rights, access rights or agreements, easements and rights of way, whether owned or leased, in each case used or held for use in the operation of the Business, including those listed on <u>Schedule 4.6(a)</u>, <u>Schedule 4.6(c)</u> and <u>Schedule 4.6(d)</u> (the "***Properties***") and which shall include all buildings, fixtures, improvements, tunnels, drifts, power lines, pipe lines and roads located on or used in connection with the Properties;

(b)    all of (i) the Sellers' owned equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery (whether mobile or otherwise), materials, furniture, fixtures, improvements, tooling and other tangible property used or held for use in the operation of the Business (the "***Owned Machinery and Equipment***"), (ii) the Sellers' rights to any equipment (including any cars, trucks, forklifts and other industrial vehicles), machinery

(whether mobile or otherwise), materials, furniture, fixtures, improvements, tooling and other tangible property used or held for use in the operation of the Business, that is leased pursuant to an Assumed Contract (the "***Leased Machinery and Equipment***" and, collectively with the Owned Machinery and Equipment, the "***Machinery and Equipment***") and (iii) the rights of the Sellers to any warranties, express or implied, and licenses received from manufacturers and sellers of the Machinery and Equipment;

(c)    all accounts receivable accrued in the operation of the Business in the ordinary course of business during the Chapter 11 Cases (other than accounts receivable from RK), and, other than those used or consumed in the ordinary course of business or sold in the ordinary course of business prior to Closing, all inventories, ore stockpiles, loaded carbon, doré or other minerals in process (at the Esmeralda mill facility, the Refinery, or otherwise), and all doré, bullion, Unrefined Gold Ounces, and Refined Gold held for any Seller's account by any refiner (including the Refinery), in each case, used or held for use in connection with the Business (collectively, "***Inventory***");

(d)    all right, title and interest of the Sellers in and to the IT Assets used or held for use in the operation of the Business;

(e)    all Contracts entered into by any Seller that are executory and unexpired as of the Closing Date and that will be assumed by the Sellers and assigned to the Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code in connection with the transactions contemplated in this Agreement, in each case that are (i) related to the Business and (ii) listed on Schedule 2.1(e), that the Buyer elects to assume by Notice to the Sellers prior to the Closing Date pursuant to Section 2.5 (collectively, the "***Assumed Contracts***");

(f)    all Permits used or required for the ownership or operation of the Business, but only to the extent that such Permits are transferable by the Sellers to the Buyer by assignment or otherwise (including those that will pass to the Buyer as successor in title to the Acquired Assets by operation of Law) (the "***Acquired Permits***"), and, notwithstanding Section 6.11, to the extent acceptable to the Governmental Entity with jurisdiction, those cash deposits, letters of credit or other assets or collateral in support of any letters of credit or any obligation with respect thereto of any Seller that secure Reclamation Obligations arising under any Permits;

(g)    except as set forth in Section 2.2(e), and subject to the right of the Sellers to retain copies for legal or tax reasons, the Operating Records and Other Information;

(h)    all rights, Claims, actions, refunds, causes of action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guaranties, indemnities and other contractual Claims, in each case, to the extent related to the other assets set forth in this Section 2.1 or the Assumed Liabilities and, with respect to any employees and any vendors with whom any of the Sellers have conducted business in the year prior to the Closing and with whom the Buyer will continue to engage in connection with the operation of the Business following the Closing (including, for the avoidance of doubt, any vendor that is a party to an Assumed Contract); *provided*, *however*, that

11

Acquired Assets shall not include any claims of the estate under Article 5 of the United States Bankruptcy Code or analogous state statutes including, but not limited to, claims under Section 547, 548, 549 or 550 of the Bankruptcy Code nor shall the Acquired Assets include any Claims, actions, refunds, causes of action, suits, proceedings, rights of recovery, rights of setoff, rights of recoupment or other similar rights, in each case, not related to the other Acquired Assets, the Business or the Assumed Liabilities including claims against directors and officers of any of the Sellers;

(i)     any royalty or similar interest held by the Sellers relating to the Business, including any net profits royalty held by Touchstone Resources Company; and

(j)     all of Rodeo Creek Gold Inc.'s interest as member in Rock Creek Conservancy, LLC, a Nevada limited liability company ("**Rock Creek**").

2.2     <u>Excluded Assets</u>.  The Buyer does not assume and shall have no right to any asset of the Sellers that is not expressly assumed by the Buyer as an Acquired Asset (collectively, the "***Excluded Assets***"), which Excluded Assets include, for the avoidance of doubt:

(a)     except as provided in <u>Section 2.1(f)</u>, all cash and cash equivalents, marketable securities, security entitlements, instruments and other investments and all bank accounts and securities accounts;

(b)     any prepayments made with regard to insurance policies not assumed by the Buyer and security deposits, prepaid expenses or prepayments to the extent made in connection with any other Excluded Asset or Excluded Liability;

(c)     the Seller Trademarks and Logos;

(d)     any Contract other than the Assumed Contracts;

(e)     any Operating Records and Other Information that any Seller is required by Law to retain, including Tax Returns, taxpayer and other identification numbers, financial statements and corporate or other entity filings and all Operating Records and Other Information related to Taxes paid or payable by any Seller or any of their respective Affiliates; *provided, that,* to the extent the Buyer requires access to any of the foregoing the Sellers shall provide such access and/or copies thereof, to the extent providing such access and/or copies is permitted by Law;

(f)     all rights, Claims, actions, refunds, causes of action, suits or proceedings, rights of recovery, rights of setoff, rights of recoupment, rights of indemnity or contribution and other similar rights (known and unknown, matured and unmatured, accrued or contingent, regardless of whether such rights are currently exercisable) against any Person, including all warranties, representations, guaranties, indemnities and other contractual Claims, in each case, other than those set forth in <u>Section 2.1(h)</u>; and

(g)     all accounts receivable from RK.

2.3     <u>Liabilities to be Assumed by the Buyer</u>.  Subject to the terms and conditions of this Agreement and on the basis of the representations, warranties, covenants and agreements herein contained, at the Closing, the Sellers shall assign to the Buyer and the Buyer shall assume from the Sellers and pay when due, perform and discharge, in due course, without duplication, the following Liabilities of any Seller or any Affiliate of any Seller (collectively, the "***Assumed Liabilities***"), whether such Liabilities and obligations arose or will arise on or after the Closing Date:

(a)     any Liabilities and obligations arising from or relating to Reclamation Obligations or arising in connection with the Acquired Permits, in each case, relating to the ownership or operation of the Business or the Acquired Assets after the Closing;

(b)     all Liabilities arising after the Closing out of or relating to the Buyer's operation of the Business or its ownership or operation of the Acquired Assets;

(c)     all Liabilities of any Seller or any Affiliate of any Seller under each of the Assumed Contracts that arise out of or relate to the period from and after the Closing and not resulting from any breach or default by, or waiver or extension given by or to, any Seller; and

(d)     all Liabilities that may arise under the WARN Act to the extent such Liabilities arise out of a breach by Buyer of <u>Section 6.6(d)</u>, whether such Liabilities and obligations arose or will arise prior to, on or after the Closing Date.

2.4     <u>Excluded Liabilities</u>.  The Buyer does not assume any Liability of the Sellers or of any Affiliate of any Seller relating to or arising out of any of the following, which shall be retained and remain Liabilities of the Sellers (collectively, the "***Excluded Liabilities***"):

(a)     any indebtedness for borrowed money of the Sellers to the extent not expressly assumed hereunder as part of the Assumed Liabilities, including the Existing CS Debt;

(b)     except as set forth in <u>Section 6.5</u>, all costs and expenses incurred or to be incurred by the Sellers in connection with this Agreement and the consummation of the transactions contemplated hereby;

(c)     except as provided in <u>Section 2.3(d)</u>, all Liabilities and obligations relating to current or former employees and directors or other service providers whose employment or services related to the maintenance and operation of the Business, any Benefit Plans or any Liabilities in relation to COBRA continuation coverage;

(d)     any Liabilities to the extent relating to the Excluded Assets;

(e)     any Liabilities of the Sellers, whether occurring or accruing before, at, or after the Closing Date, (i) associated with noncompliance with Environmental Laws (including fines, penalties, damages, and remedies); (ii) arising under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. §§ 810 *et. seq.* or its associated regulations and/or (iii) assessed by the United States Department of Labor's Mine Safety and Health Administration; in each case, relating to pre-Closing operations or ownership of the Business;

13

(f)    any Liabilities for or related to Taxes relating to the Business and the Acquired Assets in respect of the period prior to Closing;

(g)    any Liabilities and obligations arising from or relating to accounts payable accrued in the operation of the Business prior to Closing;

(h)    any Liabilities for Transfer Taxes, if any; and

(i)    any Liabilities that are not Assumed Liabilities.

2.5    Rejection of Assumed Contracts.    From the date hereof until two (2) Business Days prior to the Sale Hearing, the Buyer shall have the right, upon Notice to the Sellers, to exclude any Contract from the Assumed Contracts, or, in the alternative, supplement the Assumed Contracts (subject to the requirements of sections 365(a) and 365(f) of the Bankruptcy Code), for any reason.   Any Contract so excluded by the Buyer shall be deemed to no longer be an Assumed Contract, shall be deemed to be an Excluded Asset.   Any Schedules hereto shall be amended to reflect any changes made pursuant to this Section 2.5 and the Buyer shall have no obligation to pay the cure amount (if any) associated with any Contract that is excluded from the Assumed Contracts pursuant to this Section 2.5.   For the avoidance of doubt, any such exclusion or addition of any Assumed Contract shall not result in a change to the amount of the Cash Consideration.

**ARTICLE 3**
**CLOSING; PURCHASE PRICE**

3.1    Closing; Transfer of Possession; Certain Deliveries.

(a)    The consummation of the transactions contemplated herein (the "***Closing***") shall take place on the second (2ⁿᵈ) Business Day after all of the conditions set forth in Article 7, other than those conditions that by their nature are to be satisfied at the Closing, have been either satisfied or waived by the Party entitled to waive such condition or on such other date as the Parties shall mutually agree.   The Closing shall be held at the offices of Sidley Austin LLP at 787 7th Ave in New York, New York, at 10:00 a.m., local time, unless the Parties otherwise agree.   The actual date of the Closing is the "***Closing Date***."   For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 a.m. on the Closing Date.

(b)    At the Closing, the Sellers shall deliver to the Buyer:

(i)    a true and correct copy of the Sale Order;

(ii)    a duly executed Bill of Sale;

(iii)    a duly executed Assignment and Assumption of Assumed Contracts, Acquired Permits and Agreements;

(iv)    the certificate contemplated by Section 7.1(c);

         (v)    duly executed Quit Claim Deeds for each parcel of Owned Real Property;

         (vi)    duly executed Quit Claim Deeds for each mining claim listed on Schedule 4.6(c);

         (vii)    a duly executed Assignment and Assumption of Mining Leases for each mining claim listed on Schedule 4.6(d);

         (viii)    duly executed Water Rights Quit Claim Deeds for each water right listed on Schedule 4.6(e);

         (ix)    duly executed affidavits of the Sellers, prepared in accordance with U.S. Treasury Regulations section 1.1445-2(b), certifying as to the Sellers' non-foreign status;

         (x)    a true and complete copy, certified by the Secretary or an Assistant or Attesting Secretary of each Seller, of the resolutions duly and validly adopted by the sole equityholder of such Seller evidencing the authorization of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby; and

         (xi)    such other documents, instruments and certificates as the Buyer may reasonably request.

      (c)    At the Closing, the Buyer shall:

         (i)    deliver to the Sellers the Cash Consideration less the amount of the Deposit;

         (ii)    enter into the Net Profits Royalty Agreement;

         (iii)    pay the portion of the Purchase Price representing cure payments and deliver to the Sellers evidence of such payment;

         (iv)    deliver to the Sellers a duly executed Assumption Agreement;

         (v)    deliver to the Sellers a duly executed Assignment and Assumption of Mining Leases for each mining claim listed on Schedule 4.6(d);

         (vi)    deliver to the Sellers the certificate contemplated by Section 7.2(c);

         (vii)    deliver to the Sellers a true and complete copy, certified by the Secretary or an Assistant or Attesting Secretary of the Buyer, of the resolutions duly and validly adopted by the Manager of the Buyer evidencing its authorization of the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby and thereby; and

(viii)  deliver to the Sellers such other documents, instruments and certificates as the Sellers may reasonably request.

3.2    <u>Purchase Price</u>.  In consideration for the Acquired Assets and subject to the terms and conditions of this Agreement, the Buyer shall at the Closing assume the Assumed Liabilities as provided in <u>Section 2.3</u> and pay the Purchase Price (other than the amounts, if any, owed by the Buyer pursuant to <u>Section 6.14</u>, which shall be paid in accordance with <u>Section 6.14</u> subsequent to the Closing).   Subject to <u>Section 8.2(b)</u>, the Sellers are entitled to retain the Deposit, which shall be credited as part of the Purchase Price.

3.3    <u>Allocation of Purchase Price</u>.  The sum of the Purchase Price and the value of the Assumed Liabilities (to the extent properly taken into account under the Code) shall be allocated among the Acquired Assets in accordance with section 1060 of the Code and the U.S. Treasury Regulations promulgated thereunder (and any similar provision of state or local Law, as appropriate).  The allocation shall be agreed to by the Sellers and the Buyer within sixty (60) days after the Closing Date, which allocation shall constitute the "***Allocation***." Each of the Parties shall (a) file all Tax Returns (including Internal Revenue Service Form 8594) consistent with the Allocation, (b) provide the other Party with any information required to complete Internal Revenue Service Form 8594 within fourteen (14) days of the request for such information, (c) notify and provide the other Party with reasonable assistance in the event of an examination, audit or other proceeding relating to Taxes regarding the Allocation. Notwithstanding the preceding sentence, the Parties may settle any proposed deficiency or adjustment by any Tax Authority based upon or arising out of the Allocation, and neither the Buyer nor the Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Tax Authority challenging such Allocation. Notwithstanding anything in this Agreement to the contrary, this <u>Section 3.3</u> shall survive the Closing Date without limitation.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth on the Schedules, the Sellers hereby jointly and severally represent and warrant to the Buyer as follows:

4.1    <u>Organization</u>. Each Seller is duly organized, validly existing and in good standing under the Laws of the State of Nevada.  Each Seller has all necessary power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the date of this Agreement.

4.2    <u>Due Authorization, Execution and Delivery; Enforceability</u>.  Each Seller has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and subject to the Sale Order having been entered by the Bankruptcy Court to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.   This Agreement constitutes the legally valid and binding obligation of each Seller, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

16

4.3     <u>Consents</u>.  Subject to the Sale Order having been entered by the Bankruptcy Court and a corresponding order approving the transactions having been entered by the CCAA Court, none of the execution, delivery or performance of this Agreement by any Seller will require any material consent, approval, license, permit, Order or authorization (each, a "***Consent***") of or from, or registration, notice, declaration or filing (each, a "***Filing***") with or to, any Governmental Entity.

4.4     <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement by each Seller and the consummation of the transactions contemplated hereby (a) does not and will not conflict with or result in any breach of any provision of the articles of incorporation or bylaws or similar organizational documents of such Seller and (b) will not, as of the Closing, conflict with or result in any breach of any provision of, in any material respect, any Assumed Contract.

4.5     <u>Title to Acquired Assets</u>.  The Sellers have good and valid title to the Acquired Assets, free and clear of all Liens, other than Permitted Liens.

4.6     <u>Title to Real Property</u>.

(a)     <u>Schedule 4.6(a)</u> sets forth a true and complete list of all real property (other than mining claims) owned by any Seller that is used in connection with the operation of the Business ("***Owned Real Property***").

(b)     The Sellers do not lease any real property (other than mining claims) used in connection with the operation of the Business.

(c)     <u>Schedule 4.6(c)</u> sets forth a true and complete list of all material owned mining claims used in connection with the operation of the Business.  All such mining claims were and are validly located and have been maintained in accordance with the laws of the United States and the State of Nevada.

(d)     <u>Schedule 4.6(d)</u> sets forth a true and complete list of all material leased, subleased or licensed mining claims used in connection with the operation of the Business.  All such leases, subleases or licenses are in good standing and all royalty or other obligations accruing after the Petition Date have been timely paid or performed.

(e)     <u>Schedule 4.6(e)</u> sets forth a true and complete list of all material owned water rights used in connection with the operation of the Business.  All such water rights are in good standing.

4.7     <u>Environmental Matters</u>.

(a)     <u>Schedule 4.7</u> sets forth a true and complete list of all material Permits issued by any Governmental Entity under any Environmental Laws and to which any Seller is a party as of the Effective Date.  The Permits held by the Sellers are all of the material Permits required under any Environmental Laws for the operation of the Business in all material respects as currently conducted and each Seller is in compliance with such Permits and with applicable Environmental Laws in all material respects.  Each such Permit is in full force and effect, and is

17

not subject to any pending or threatened Proceeding to revoke, cancel, suspend or declare any of such Permits invalid in any respect.

(b)     The Sellers are not subject to any Order with respect to any Environmental Laws that has not been fulfilled and is outstanding.

(c)     None of the real properties or mining claims owned, leased or operated by the Sellers is the subject of any federal or state Proceeding regarding a release of hazardous materials into the environment, nor, to the knowledge of the Sellers, have any hazardous materials been stored, used or released, in a quantity or manner at or on the Properties, or at any off-site location to which such hazardous materials were sent by any Seller, which would reasonably be expected to result in any obligations to pay for or perform any remedial action.

(d)     Since January 1, 2012, none of the Sellers has received any written notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other claims of liability regarding any alleged violation of Environmental Laws.

4.8     Compliance with Other Laws and Permits.

(a)     Schedule 4.8 sets forth a true and complete list of all material Permits issued by any Governmental Entity under any Laws (other than Environmental Laws) and to which any Seller is a party as of the Effective Date.  The Permits held by the Sellers are all of the material Permits required under any Laws (other than Environmental Laws) for the operation of the Business in all material respects as currently conducted and each Seller is in compliance with such Permits and with applicable Laws (other than Environmental Laws) in all material respects.

(b)     Since January 1, 2012, each Seller has complied in all material respects with all applicable Laws that affect the Business, and no Seller has received any written notice of any alleged violation of applicable Law in any material respect, or is aware of any pending or threatened notice of such violation, in any case including under the Permits set forth on Schedule 4.8 or by agency action.

(c)     The Sellers are not subject to any Order with respect to any such Laws (other than Environmental Laws) that has not been fulfilled and is outstanding.

(d)     Since January 1, 2012, none of the Sellers has received any written notice from any Governmental Entity or any other Person regarding any pending or threatened Proceedings or other claims of liability regarding any alleged violation of such Laws (other than Environmental Laws).

4.9     Financial Advisors.  No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Sellers in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers.

4.10    Labor Matters.

(a)    No Seller is a party to a labor or collective bargaining agreement and there are no labor or collective bargaining agreements that pertain to the Employees of the Business. No labor organization or group of Employees of the Business has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation currently pending or, to the knowledge of the Sellers, threatened to be brought or filed with the National Labor Relations Board or other labor relations tribunal.  To the knowledge of the Sellers, there is no organizing activity involving the Business pending or threatened by any labor organization or group of Employees of the Business.  To the knowledge of the Sellers, there are no strikes, work stoppages, slowdowns, lockouts or similar labor disputes, unfair labor practice charges, arbitrations, material grievances, unfair employment practice charges or complaints, or other claims or complaints against the Business, pending or threatened by or on behalf of any Employee or group of Employees of the Business.

(b)    The Sellers have not taken any action that could constitute a "mass layoff", "mass termination" or "plant closing" within the meaning of the WARN Act with respect to Employees of the Business or that could otherwise trigger notice requirements or liability under any federal, local, provincial, state or foreign plant closing notice or collective dismissal law with respect to Employees of the Business.

4.11    Litigation.  There is no material Proceeding pending, or to the knowledge of the Sellers, threatened against any Seller or any of their respective Affiliates relating to the Business, the Acquired Assets or the Assumed Liabilities.  None of the Sellers or any of their respective Affiliates is a party to any Order or other arrangement with any Governmental Entity relating to the Business, the Acquired Assets or the Assumed Liabilities.

4.12    Rock Creek.  Rock Creek is duly organized, validly existing and in good standing under the laws of the State of Nevada.  Rock Creek has no assets other than the contracts set forth in Schedule 4.12, and Rock Creek has all necessary power and authority to perform its obligations under and comply with the terms of such contracts.  Rock Creek has no liabilities. There is no Proceeding pending, or to the knowledge of the Sellers, threatened against Rock Creek.  Rock Creek is not a party to any Order or other arrangement with any Governmental Entity.  For the purposes of ERISA, Rock Creek has never been a contributing sponsor of any Benefit Plan and has never employed any employees.

4.13    CCAA Proceedings.  Great Basin Gold Ltd. has no material property interest in the Acquired Assets.

4.14    Full Disclosure.  No representation or warranty by Sellers in this Agreement contains any untrue statement of a material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

19

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

Except as set forth on the Schedules, the Buyer represents and warrants to the Sellers as follows:

5.1     Organization.  The Buyer is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization.  The Buyer has all necessary power and authority to own or lease and operate its assets and to carry on the business conducted by it in the manner conducted on the date of this Agreement.

5.2     Due Authorization, Execution and Delivery; Enforceability.  The Buyer has the requisite power and authority to enter into, execute and deliver this Agreement and the other agreements contemplated hereby and to perform its obligations hereunder and thereunder and has taken all necessary action required for the due authorization, execution, delivery and performance by it of this Agreement and the transactions contemplated hereby.  This Agreement constitutes the legally valid and binding obligation of the Buyer, enforceable against it in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency or similar Laws affecting the enforcement of creditors' rights generally or by equitable principles relating to enforceability.

5.3     Consents.  None of the execution, delivery or performance of this Agreement by the Buyer will require any Consent of or from, or Filing with or to, any Governmental Entity.

5.4     No Conflicts.  The execution, delivery and performance of this Agreement by the Buyer and the consummation of the transactions contemplated hereby, do not and will not conflict with or result in any breach of any provision of its organizational documents, except as would not result in a material adverse effect on the ability of the Buyer to perform its obligations under this Agreement or to consummate the transactions contemplated hereby.

5.5     Financial Capability. The Buyer (a) has, and at the Closing will have, sufficient internal funds available to pay the Purchase Price and any expenses incurred by the Buyer in connection with the transactions contemplated by this Agreement, (b) has, and at the Closing will have, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (c) has not incurred any obligation, commitment, restriction or liability of any kind, which would impair or adversely affect such resources and capabilities.

5.6     Financial Advisors.  No Person acting, directly or indirectly, as a broker, finder or financial advisor for the Buyer in connection with the transactions contemplated by this Agreement is entitled to any fee or commission or like payment in respect thereof from the Sellers or any of their respective Affiliates.

5.7     Opportunity for Independent Investigation.  Prior to its execution of this Agreement, the Buyer has conducted to its satisfaction an independent investigation and verification of the current condition and affairs of the Sellers, the Business and the Assumed Contracts.  The Buyer is, and has been, assisted by advisors, consultants and legal counsel, knowledgeable and experienced in businesses similar to the Business and in purchasing and operating mining facilities similar to the Business with respect to analyzing and evaluating the

merits and risks of entering into this Agreement and the transactions contemplated hereby. In making its decision to execute this Agreement and undertake the obligations set forth herein, the Buyer has relied and will rely upon the advice of its advisors, consultants and legal counsel and the results of its independent investigation and verification, and the agreements, representations and warranties set forth herein. The Buyer acknowledges and affirms that all materials and information requested by the Buyer have been provided to the Buyer to the Buyer's reasonable satisfaction. The Buyer has completed its investigation, verification, analysis, review and evaluation of the Sellers, the Business and otherwise as the Buyer has deemed necessary or appropriate.

5.8    <u>HSR</u>.  Based on the Buyer's fair market valuation of the Acquired Assets, the filing of a notification and report form pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 is not required.

## ARTICLE 6
## COVENANTS OF THE PARTIES

6.1    <u>Conduct of Business Pending the Closing</u>.  During the period from the Effective Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing (the "***Interim Period***"), except as may be required by applicable Law, the Bankruptcy Court or the CCAA Court, as expressly permitted or authorized hereby or relating to the transactions contemplated by this Agreement, the identity of Buyer or actions taken with the prior written consent of the Buyer (not to be unreasonably withheld, delayed or conditioned), the Sellers shall operate the Business in the ordinary course of business (including with respect to the preservation and protection of the Acquired Assets) and shall not, without the prior written consent of the Buyer (not to be unreasonably withheld, delayed or conditioned):

(a)    transfer, issue, encumber, sell or dispose of any of the material Acquired Assets, other than in the ordinary course of business;

(b)    enter into, amend, encumber, modify or terminate any Contract or Permit that is material to the operation of the Business outside the ordinary course of business;

(c)    send any broadly-distributed communication to Employees regarding the transactions contemplated by this Agreement; or

(d)    agree to do anything prohibited by this <u>Section 6.1</u>.

6.2    <u>Access</u>.

(a)    Subject to applicable Law, during the Interim Period, the Sellers shall (i) give the Buyer and its Representatives reasonable access during normal business hours to the offices, Properties, Employees, books and records of the Sellers, (ii) furnish to the Buyer and its Representatives such financial, operating and property data related to the Acquired Assets and other information as the Buyer and its Representatives reasonably request, and (iii) cooperate reasonably with the Buyer in its investigation of the Business. Such site access with regard to all Properties shall also provide for the Buyer to conduct any and all testing it may determine in its sole discretion to undertake, including mining, milling and the collection of samples at or on the

Properties.  In connection with such testing the Parties agree that the Buyer may engage third-party vendors to analyze samples collected pursuant to this <u>Section 6.2</u> (including ore samples), which analysis may take place off-site.   All inspections shall be conducted so as not to interfere unreasonably with the operation of the Business by the Sellers.  The Buyer agrees to indemnify and hold the Sellers and their respective Affiliates and Representatives harmless of and from all actions, suits, Claims, investigations, fines, judgments, damages, losses, deficiencies, liabilities, costs and expenses (including attorneys' fees and expenses) that arise out of or relate to damage or injuries arising from the Buyer's or any of its Representatives' inspection of the Business and, notwithstanding anything to the contrary in this Agreement, such obligation to indemnify shall survive Closing or any termination of this Agreement.

(b)    From and after the Closing until the date that is twelve (12) months after the Closing Date, to the extent permitted by Law, the Buyer agrees to provide Sellers and their respective Representatives (including any liquidating trustee appointed under a plan in the Sellers' cases or counsel to the Official Committee of Unsecured Creditors), in connection with the administration and closing of the Chapter 11 Cases, the prosecution or settlement of or any proceeding or action relating thereto, or the preparation and filing of final Tax returns, with reasonable access during normal business hours to the Operating Records and Other Information relating to the period preceding the Closing, and to allow Sellers and their respective Representatives (including any liquidating trustee appointed under a plan in the Sellers' cases or counsel to the Official Committee of Unsecured Creditors), at such person's sole cost and expense, to make extracts and copies of such books and records during such access. Any such access shall be during regular business hours upon reasonable advance notice under the supervision of the Buyer's personnel, in such a manner as to maintain confidentiality, and without disruption to the operations of the Business or the Buyer. Buyer shall, to the extent permitted by Law, give thirty (30) days notice to the Sellers of Buyer's intent to destroy any material portion of the Operating Records and Other Information.

6.3    <u>Public Announcements</u>.  The Parties shall consult with each other before issuing, and provide each other the opportunity to review and comment upon, any press release or public announcement of this Agreement and the transactions contemplated hereby, and no Party shall issue any such press release or public announcement without the prior written approval of the other Party, in each case except as may be required by Law, court process (including the filing of this Agreement with the Bankruptcy Court or CCAA Court) or obligations pursuant to the rules and regulations of, and any listing agreement with, any national securities exchange, on condition that if a Party is required to make any such announcement, the disclosing Party shall promptly before the announcement is made deliver Notice to the other Party thereof where practicable and lawful to do so, and the disclosing Party shall use its commercially reasonable efforts to agree upon the text of any such announcement with the other Party prior to the release of the announcement.  The Parties shall cause their respective Affiliates and Representatives to comply with this <u>Section 6.3</u>.

6.4    <u>Tax Matters</u>.

(a)    All Transfer Taxes arising out of the transfer of the Acquired Assets pursuant to this Agreement shall be borne by the Sellers.  The Parties shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for

exemption or exclusion from the application or imposition of any Transfer Taxes. The Buyer and the Sellers, as required by applicable Law, shall file all necessary documentation and returns with respect to such Transfer Taxes when due and shall promptly, following the filing thereof, furnish a copy of such return or other filing and a copy of a receipt showing payment of any such Transfer Tax to the other Party. The Sellers shall jointly and severally pay all such Transfer Taxes when due.

(b)     The Buyer, on the one hand, and the Sellers, on the other hand, shall furnish or cause to be furnished to the other, upon request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as is reasonably necessary for filing of all Tax Returns relating to Tax periods that began prior to the Closing Date, including any claim for exemption or exclusion from the application or imposition of any Taxes with respect to such periods, the preparation for any audit by any Tax Authority with respect to such periods, and the prosecution or defense of any Proceeding relating to any Tax Return with respect to such periods. The obligations of the Parties pursuant to the immediately preceding sentence with respect to any Tax period shall expire upon the expiration of the applicable statute of limitations with respect to such period.

6.5     Regulatory Approvals.

(a)     The Buyer and Sellers shall use their reasonable best efforts, and shall cause their Affiliates to use their respective reasonable best efforts, to (i) promptly obtain all authorizations, consents, Permits and approvals of all Governmental Entities that may be, or become, necessary for its execution and delivery of, performance of its obligations pursuant to, and consummation of the transactions contemplated by, this Agreement, (ii) take all such actions as may be requested by any such Governmental Entity to obtain such authorizations, consents, Permits and approvals, (iii) avoid the entry of, or effect the dissolution of, any Order that would otherwise have the effect of preventing or materially delaying the consummation of the transactions contemplated by this Agreement and (iv) cause all of the conditions to the obligations of the other party to consummate the transactions contemplated by this Agreement to be met as promptly as practicable and in any event on or prior to the Outside Date (to the extent such conditions are within the control or influence of such Party). The Parties shall reasonably cooperate in connection with any filings or notifications required in connection therewith, and neither Sellers nor the Buyer nor their respective Affiliates shall take any action that would reasonably be expected to have the effect of delaying, impairing or impeding the receipt of any required authorizations, consents, Permits or approvals.

(b)     Each Party to this Agreement shall promptly notify the other Party of any substantive oral or written communication it receives from any Governmental Entity relating to the matters that are the subject of this Agreement, permit the other Party to review in advance any substantive communication proposed to be made by such Party to any Governmental Entity and provide the other Party with copies of all correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Governmental Entity or members of its staff, on the other hand. No Party to this Agreement shall agree to participate in any meeting or discussion with any Governmental Entity in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent permitted by such Governmental Entity and applicable Law, gives the other Party the

opportunity to attend and participate in such meeting. Subject to the Confidentiality Agreement, the Parties to this Agreement will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing or to secure all necessary authorizations, consents, Permits and approvals for the Buyer's ownership of the Acquired Assets and operation of the Business after the Closing.

(c)    If any Governmental Entity shall seek, or shall have indicated that it may seek, the enactment, entry, enforcement or promulgation of any Law or Order restraining or prohibiting the transactions contemplated by this Agreement, the Buyer and each Seller shall use its reasonable best efforts to resolve any such objections.

(d)    Notwithstanding anything in this Agreement to the contrary, the Buyer acknowledges on behalf of itself and its Affiliates and its and their Representatives, successors and assigns, that the operation of the Business shall remain in the dominion and control of Sellers until the Closing and that none of the Buyer, any of its Affiliates or its or their respective successors or assigns will provide, directly or indirectly, any directions, orders, advice, aid, assistance or information to any director, officer or employee of Sellers, except as specifically contemplated or permitted by this Article 6 or as otherwise consented to in writing in advance by an executive officer of a Seller.

6.6    Employee Matters.

(a)    The Sellers agree that the Buyer or an Affiliate of the Buyer may make offers of employment, in the Buyer's sole and absolute discretion, to any employee whose employment is related to the maintenance and operation of the Business, including such individuals who are not actively at work on account of illness, disability or leave of absence (collectively, the "**Employees**"). Such offers of employment, if accepted by the Employees, shall be on terms and conditions as Buyer and each such Employee may mutually agree. In connection with the determination by the Buyer regarding whether to make any such potential offers of employment, the Sellers shall, during the Interim Period, give the Buyer and its Representatives reasonable access during normal business hours to all such Employees for purposes of interviews.

(b)    Nothing herein express or implied by this Agreement shall confer upon any Person, including any Employee, or any other current or former employee of any Seller, or any beneficiary or legal Representative thereof, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement.

(c)    The Sellers shall retain sponsorship of, or cause their Affiliates to assume sponsorship of, and shall continue to be liable for all benefits payable under any and all Benefit Plans, programs, policies, arrangements or employment agreements and any and all compensation, bonuses, vacation benefits or any other benefit or compensation earned by any Employee or former employee whether as an employee of the Sellers and their respective Affiliates or of Buyer and its Affiliates, and the Buyer and its Affiliates shall not be liable for

any of such liability, including all severance or similar payments under any and all Benefits Plans or otherwise. In addition, the Sellers shall administer and continue to be liable for, or cause their Affiliates to administer and be liable for, all employment-related Claims, including all workers' compensation Claims brought on or before the Closing Date.

(d)     The Buyer shall make offers of employment to and continue to employ such number of employees of the Sellers, and on such terms and conditions of employment, and for such period of time, as shall be necessary so that the Sellers will not be required to provide notice under the federal WARN Act.  Subject to the foregoing and applicable laws, such offers of employment shall be made by the Buyer in its sole discretion.

(e)     The Sellers and their respective Affiliates shall provide COBRA continuation coverage (within the meaning of section 4980B of the Code and the U.S. Treasury Regulations thereunder) to all individuals who are M&A qualified beneficiaries (within the meaning assigned to such term under Q&A-4 of Treasury Regulation  54.4980B-9) with respect to the transactions contemplated by this Agreement for the duration of the period to which such individuals are entitled to such coverage.

(f)     No current or former employee of the Business or any other service provider to the Business shall have, or be deemed to have, any third-party beneficiary rights under this Section 6.6 or otherwise.

6.7     Confidentiality. Until the Closing, the confidentiality of any data or information received by the Buyer regarding the Business, Properties, Acquired Assets, or any of the Sellers (including any information obtained pursuant to Section 6.2) shall be maintained by the Buyer and its Affiliates and Representatives in accordance with the confidentiality agreement between the Buyer and Great Basin Gold Inc. dated January 10, 2013 (the "*Confidentiality Agreement*"). Notwithstanding any other provision in this Agreement or in the Confidentiality Agreement to the contrary, the terms of the Confidentiality Agreement shall continue in full force and effect for two (2) years after the Effective Date, except in the event the transactions contemplated hereby are consummated, in which case the terms of the Confidentiality Agreement shall thereupon cease and terminate.

6.8     Further Assurances.  Subject to the terms and conditions herein provided, following the Closing Date, the Sellers shall execute and deliver to the Buyer such bills of sale, endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to the Buyer, and take such additional actions as the Buyer may reasonably request, to promptly vest in the Buyer all of the Sellers' right, title and interest in and to the Acquired Assets, including the prompt transfer of Acquired Permits.

6.9     Sale Order.

(a)     The Buyer agrees that it will promptly take such actions as are reasonably requested by the Sellers to assist in obtaining entry of the Sale Order.

(b)     The Sale Order will provide, among other things, that pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

25

(i)    the Acquired Assets shall be sold to the Buyer free and clear of all Liens (except for Permitted Liens and Assumed Liabilities);

(ii)    the transactions contemplated by this Agreement were negotiated at arm's length, that the Buyer acted in good faith in all respects and the Buyer shall be found to be a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code;

(iii)    the terms and conditions of the sale of the Acquired Assets to the Buyer as set forth herein are approved;

(iv)    the Sellers are authorized and directed to consummate the transactions contemplated by this Agreement and to comply in all respects with the terms of this Agreement;

(v)    the Buyer and the Sellers did not engage in any conduct that would allow the transactions contemplated by this Agreement to be set aside pursuant to section 363(n) of the Bankruptcy Code; and

(vi)    the Sale Order is binding upon any successors to the Sellers, including any trustees in respect of the Sellers or the Acquired Assets in the case of any proceeding under chapter 7 of the Bankruptcy Code.

(c)    In the event the Sale Order is appealed, the Buyer and the Sellers shall use their respective commercially reasonable efforts to defend such appeal at their own cost and expense.

(d)    The Sellers further covenant and agree that the terms of any plan of reorganization or liquidation submitted to the Bankruptcy Court by the Sellers shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement.

6.10    Buyer's Acknowledgements; Nature of Representations.

(a)    Except for the specific representations and warranties expressly made by the Sellers in Article 4 or otherwise in this Agreement, the Buyer acknowledges and agrees that:

(i)    None of (A) the Sellers, (B) any Non-Party Affiliate, or (C) any Affiliate of the foregoing is making or has made any representation or warranty, expressed or implied, at law or in equity, in respect of the Sellers or their respective businesses, assets, liabilities, operations, prospects or condition (financial or otherwise), including with respect to merchantability or fitness for any particular purpose of any assets, the nature or extent of any liabilities, the prospects of the Business, the effectiveness or the success of any operations or the accuracy or completeness of any confidential information memoranda, documents, projections, material or other information (financial or otherwise) regarding the Sellers furnished to the Buyer or its Representatives or made available to the Buyer and its Representatives in any "data rooms," "virtual data rooms," management presentations or in any other form in expectation of,

26

or in connection with, the transactions contemplated hereby, or in respect of any other matter or thing whatsoever; and

(ii)    no Representative of any Seller or any Affiliate of any Seller has any authority, express or implied, to make any representations, warranties or agreements not specifically set forth in this Agreement.

(b)    In connection with the Buyer's investigation of the Business, the Buyer has received from the Sellers, certain Non-Party Affiliates and their respective Affiliates and Representatives certain projections and other forecasts, including certain business plan information of the Business.  The Buyer acknowledges that there are uncertainties inherent in attempting to make such projections and other forecasts and plans and accordingly is not relying on them, that the Buyer is familiar with such uncertainties, that the Buyer is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections and other forecasts and plans so furnished to it.  Accordingly, the Buyer acknowledges that none of the Sellers, such Non-Party Affiliates or their respective Representatives or Affiliates have made any representation or warranty with respect to such projections and other forecasts and plans.

(c)    Except for the specific representations and warranties expressly made by the Sellers in Article 4 or otherwise in this Agreement, the Buyer specifically disclaims (i) that it is relying upon or has relied upon any information or statements that may have been made by any Person, and acknowledges and agrees that the Sellers have specifically disclaimed and do hereby specifically disclaim any such other information or statement made by any Person; and (ii) any obligation or duty by the Sellers to make any disclosures of fact or circumstances not required to be disclosed pursuant to the specific representations and warranties set forth in Article 4 or otherwise in this Agreement.

(d)    The Buyer is acquiring the Acquired Assets subject only to the specific representations and warranties set forth in Article 4 or otherwise in this Agreement.  The Buyer acknowledges that it has conducted to its satisfaction, its own independent investigation of the Business and the Acquired Assets and, in making the determination to proceed with the transactions contemplated by this Agreement, the Buyer has relied on the results of its own independent investigation and the representations and warranties set forth in Article 4 or otherwise in this Agreement.

(e)    The Sellers are selling the Acquired Assets "as is", "where is" and with all faults, limitations and defects (hidden and apparent) and subject only to the representations and warranties contained in Article 4 or otherwise in this Agreement, without any other representation or warranty of any nature whatsoever and without any guarantee or warranty (whether express or implied) as to their title, quality, merchantability or their fitness for the Buyer's intended use or a particular purpose or any use or purpose whatsoever.

6.11    Replacement Credit Support and Reclamation Requirements. Prior to Closing, subject to Section 2.1(f), the Buyer shall deliver to the applicable beneficiary or counterparty duly executed replacement or substitute guaranties, letters of credit, bonds, security deposits, and other surety obligations and evidence of financial capacity, in each case acceptable to the relevant beneficiary or counterparty, in replacement of those credit support arrangements and Reclamation Obligation assurances set forth in Schedule 6.11 (the "***Credit Support/Reclamation Arrangements***"). This obligation shall not extend to any Credit Support/Reclamation Arrangement which, pursuant to Section 2.1(f), the relevant Governmental Entity with jurisdiction has approved or consented to an assignment of the existing Credit Support/Reclamation Arrangement from any Seller to Buyer. For all Credit Support/Reclamation Arrangements so replaced, the Buyer shall, following the Closing, use its reasonable best efforts to cause the full and unconditional release as of Closing of the Sellers and their respective Affiliates from all obligations relating to the Credit Support/Reclamation Arrangements and any liabilities related thereto. The Sellers understand and agree that the Buyer may meet or confer with applicable Governmental Entities prior to the Closing (and the Sellers agree to provide their reasonable cooperation in connection therewith to the extent requested by the Buyer) in order to confirm, among other things, reasonably prompt transfer or re-issue of all necessary Permits and that there will be no material changes to any Reclamation Obligation following the Closing.

6.12    Insurance.

(a)    All insurance policies maintained by or for the benefit of the Acquired Assets not held directly by the Sellers shall cease to apply thereto from and after Closing and the Buyer acknowledges and agrees that it shall not have any right or interest in or to any insurance awards or proceeds payable under any of the Sellers' other insurance policies relating to any damage, destruction or casualty loss with respect to the Acquired Assets on or prior to the Closing Date and shall not have or claim any interest therein. The Buyer shall be solely responsible for providing insurance with respect to the Business for any event or occurrence of any kind whatsoever first occurring after Closing.

(b)    In the event that any Seller makes or pursues any claim arising under any insurance policy not held directly by the Sellers during the period prior to the Closing, including any claim under the Sellers' property and business interruption insurance policies for damage to the Acquired Assets discovered after Closing but the occurrence giving rise to such damage occurred before Closing, the Buyer shall cooperate as necessary with the Sellers and their respective Affiliates with respect to such claims and provide any necessary assistance requested by the Sellers or their respective Affiliates to assist the Sellers or their respective Affiliates in making or pursuing any such claims (it being understood that any assistance or documentation required by the Sellers' or their respective Affiliates' insurance underwriters shall be deemed "necessary" as such term is used in this Section 6.12). Any costs and expenses reasonably incurred by the Buyer in connection with its cooperation pursuant to this Section 6.12(b) shall be promptly reimbursed by the Sellers.

6.13    Intellectual Property. It is expressly agreed that the Buyer is not purchasing, acquiring or otherwise obtaining any right, title or interest in the name "Great Basin Gold" or any derivative thereof, or any trade names, trademarks, identifying logos or service marks related thereto or employing the word "Great Basin Gold" or any part or variation of any of the

foregoing or any confusingly similar trade names, trademarks, logos or service marks (collectively, the "***Seller Trademarks and Logos***").  Neither the Buyer nor any of its Affiliates shall make any use of the Seller Trademarks and Logos from and after the Closing, including through the use of stationery or letterhead.  The Buyer shall, at its own cost and within thirty (30) days after the Closing Date, remove, or cause to be removed, from the Acquired Assets any and all of the Seller Trademarks and Logos.

6.14    <u>Inventory Payment</u>.  As of the Closing Date, the Buyer shall determine, in accordance with customary industry practices, acting reasonably, subject to monitoring by a third-party consultant selected by the Sellers and Credit Suisse (at their expense and not, for the avoidance of doubt, at the Buyer's expense), the number of equivalent ounces of gold  held as Inventory at:

(a) the Refinery or any other refiner (the ***"Refinery Ounces"***), including all equivalent ounces of gold at the refinery or in transit to the refinery but excluding any equivalent ounces of gold at the Refinery for which the Sellers received payment prior to the Closing Date, and

(b) the Esmeralda mill facility (the ***"Mill Ounces"***, and together with the Refinery Ounces, the ***"Inventory Ounces"***).  Mill Ounces include all equivalent ounces of gold at the Esmeralda mill facility including those in any ore stockpiles, within the carbon-in-leach tanks either in solution or loaded on carbon, poured and on site and in carbon waiting to be recycled or shipped to a refiner.

The above determination shall (i) be based on the average recovery rate at the Esmeralda mill facility during the 90-day period (excluding any days on which the mill does not operate) prior to the Closing Date, and (ii) shall take into account the terms and conditions of the Buyer's contract with the Refinery (which shall be in form and substance similar to the Refinery's standard form refinery contract).

In connection with the consummation of the transactions contemplated by this Agreement, following Closing, the Buyer agrees to use commercially reasonable efforts to: (i) process the Inventory Ounces into Refined Ounces in a manner and on a time frame consistent with industry practices, and (ii) sell such Refined Ounces (the "***Sale***") on a time frame consistent with the Sellers' current practices.

Following the Sale of an amount of equivalent ounces equaling the Inventory Ounces (including all equivalent ounces sold from the time of the Closing until the total equivalent ounces sold post-Closing equal the Inventory Ounces), in the event that the sum of:

(y) 75% of the revenue from the Sale of an amount of equivalent ounces equal to the amount of Refinery Ounces; and,

(z) 50% of the revenue from the Sale of an amount of equivalent ounces equal to the amount of Mill Ounces

(together, the ***"Inventory Payment Measure"***)

29

exceeds $3,000,000, the Buyer agrees to promptly pay to the Sellers an amount equal to the Inventory Payment Measure minus $3,000,000.  In the event that the Inventory Payment Measure is less than $3,000,000, the Buyer shall be entitled to a prompt payment from Credit Suisse of an amount equal to $3,000,000 minus the Inventory Payment Measure.  Such payment from Credit Suisse shall be pursuant to the terms of the CS Side Letter.  To the extent not inconsistent with the terms of this agreement, the Buyer shall be free to conduct all of the foregoing activities in the manner it deems appropriate (including manner of processing, timing of the Sale (which may occur in one or a series of transactions), and selection of counterparties to the Sale.

6.15    Surface Use and License Agreement.    The Sellers shall use their use their reasonable best efforts prior to the Closing to acquire and assume and assign to the Buyer that certain Surface Use and License Agreement, dated September 25, 2007, by and between 26 Ranch Inc. and Great Basin Gold Inc. (the "*Surface Use and License Agreement*").

6.16    Permits Covenant.  Prior to and following Closing, the Sellers shall use their best efforts to ensure the prompt transfer to the Buyer of all Acquired Permits.

**ARTICLE 7**
**CONDITIONS TO OBLIGATIONS OF THE PARTIES**

7.1    Conditions Precedent to Obligations of the Buyer.  The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Buyer in the Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)    Each of the representations and warranties of the Sellers contained herein shall be true and correct on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date; *provided*, *however*, that the failure of any such representations or warranties to be true and correct on and as of the Closing Date shall not constitute a basis for the Buyer to refuse to consummate the transactions contemplated hereby unless such failure has resulted in a Material Adverse Effect.

(b)    The Sellers shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by them on or prior to the Closing Date.

(c)    The Buyer shall have received certificates, dated the Closing Date, of an executive officer of each Seller to the effect that the conditions specified in Section 7.1(a) and Section 7.1(b) have been fulfilled.

(d)    There shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)     The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Buyer in its sole and absolute discretion, and as of the Closing Date the Sale Order shall be in full force and effect and shall not have been reversed, vacated, or stayed, and shall not have been amended, supplemented, or otherwise modified in any material respect without the prior written consent of the Buyer.

(f)     The Sale Order shall be non-appealable and not otherwise subject to review, reversal, modification or amendment, by appeal or writ of certiorari.  Notwithstanding anything herein to the contrary, the Buyer may, in its sole and absolute discretion, complete the transactions contemplated by this Agreement prior to the Sale Order becoming a final non-appealable order of the Bankruptcy Court, *but only* to the extent the Sale Order provides that the Buyer is a "Good Faith Purchaser" pursuant to 363(m) of the Bankruptcy Code and is entitled to all of the protections afforded to such purchasers by that section.

(g)     The Monitor appointed in the CCAA Proceedings shall have confirmed in writing that the Monitor has no objection to the transactions contemplated by this Agreement.

(h)     The parties set forth on Schedule 7.1(h) shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

(i)     Since the date of the Agreement, there shall not have occurred any change, event, circumstance, development or effect that has had or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(j)     The Assumed Contracts shall have been assumed by the Sellers and assigned to the Buyer pursuant to sections 365(a) and 365(f) of the Bankruptcy Code, and the applicable cure amount for the assumption of each such agreement shall not exceed the applicable cure amount indicated for such agreement on Schedule 2.1(e) (unless the applicable cure amount is revised by the Sellers pursuant to a settlement of an objection to any such cure amount with the consent, not to be unreasonably withheld, of the Buyer), and the aggregate amount of all cure amounts paid by the Buyer with respect to the Assumed Contracts shall not exceed $5,000,000.

(k)     The Surface Use and License Agreement shall have been assigned to the Buyer and such assignment shall be a valid and binding assignment on 26 Ranch Inc.

(l)     The Buyer and the Sellers shall have entered into the Net Profits Royalty Agreement, and the Buyer and Credit Suisse shall have entered into the CS Side Letter, each in form and substance mutually satisfactory to the Sellers, the Buyer and Credit Suisse.

(m)     The Buyer shall have confirmed to its reasonable satisfaction through the discussions referred to in Section 6.11 that the amounts of the Reclamation Obligations relating to the Permits set forth on Schedule 4.7 (other than Reclamation Obligations relating to (i) the environmental impact statement at the Hollister mine or (ii) actions taken by the Buyer) will not, as of the Closing, exceed the amounts of such Reclamation Obligations as of the Effective Date by more than $1,500,000.

7.2     Conditions Precedent to the Obligations of the Sellers.  The obligation of the Sellers to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by the Sellers in the Sellers' sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)     Each of the representations and warranties of the Buyer contained herein shall be true and correct on and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except to the extent that any such representation or warranty is expressly made as of a specified date, in which case such representation or warranty shall have been true and correct as of such specified date; *provided*, *however*, that the failure of any such representations or warranties to be true and correct on and as of the Closing Date shall not constitute a basis for the Sellers to refuse to consummate the transactions contemplated hereby unless such failure has resulted in a material adverse effect on the ability of the Buyer to consummate the transactions contemplated hereby.

(b)     The Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement (including those obligations and agreements set forth in Section 6.6(d)) required to be performed by it on or prior to the Closing Date.

(c)     The Sellers shall have received a certificate, dated the Closing Date, of an executive officer of the Buyer to the effect that the conditions specified in Section 7.2(a) and Section 7.2(b) have been fulfilled.

(d)     There shall be no Law or Order that restrains or prevents the transactions contemplated by this Agreement.

(e)     The Bankruptcy Court shall have entered the Bid Procedures Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Bid Procedures Order shall be in effect on the Closing Date.

(f)     The Bankruptcy Court shall have entered the Sale Order, which shall be in form and substance acceptable to the Sellers, and no Order staying, reversing, modifying or amending the Sale Order shall be in effect on the Closing Date.

(g)     The parties set forth on Schedule 7.2(g) shall have agreed to release or authorize the release of all Liens relating to the Acquired Assets in a form reasonably satisfactory to the Parties.

(h)     The Buyer and the Sellers shall have entered into the Net Profits Royalty Agreement in form and substance mutually satisfactory to the Sellers and the Buyer.

(i)     The Sellers shall have received evidence of the full and unconditional release of the Sellers and their respective Affiliates from all obligations relating to the Credit Support/Reclamation Arrangements and any liabilities related thereto in accordance with Section 6.11.

32

**ARTICLE 8**
**TERMINATION**

8.1    Termination of Agreement.    This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)    by written agreement of the Sellers and the Buyer;

(b)    by the Sellers or the Buyer if the Closing does not occur on or before May 17, 2013, *provided*, *however*, that if any of the conditions set forth in Section 7.1 have not been satisfied or waived by the Buyer, then the Sellers may, in their sole discretion on or prior to May 17, 2013 upon written notice to the Buyer, extend the Outside Date to a date not later than May 31, 2013 (the "*Outside Date*"); *provided*, *further*, that the failure of the Closing to occur on or prior to the Outside Date is not a result of or caused by the terminating party's material breach of any of its representations and warranties contained in this Agreement and such terminating party has not failed in any material respect to perform any of its material obligations hereunder; or

(c)    by the Sellers or the Buyer if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or if any Order permanently restraining, prohibiting or enjoining the Buyer or the Sellers from consummating the transactions contemplated hereby is entered and such Order shall become final.

8.2    Consequences of Termination.

(a)    In the event of any termination of this Agreement by any Party pursuant to Section 8.1, written Notice thereof shall be given by the terminating Party to the other Party, specifying the provision hereof pursuant to which such termination is made, this Agreement shall thereupon terminate and become void and of no further force and effect (other than the last sentence of Section 6.2(a), and all of Section 6.3, Section 6.7, this Section 8.2 and Article 9 and, to the extent applicable in respect of such Sections and Article, Article 1), and the transactions contemplated hereby shall be abandoned without further action of the Parties, except that such termination shall not relieve any Party of any liability for any prior breach of this Agreement.

(b)    The Deposit shall only be refunded to the Buyer in the event that the Agreement is terminated pursuant to Section 8.1 (other than due to any fault or failure of the Buyer in any material respect) or in the event that the Closing does not occur due to a failure of any of the conditions to Closing in Section 7.1 to have been satisfied (other than due to any fault or failure of the Buyer in any material respect). If the Closing does not occur for any other reason (other than due to any fault or failure of any of the Sellers in any material respect) and the conditions to Closing in Section 7.1 have been satisfied or would be capable of being satisfied on the Closing Date had the Closing occurred, the Sellers shall be entitled to retain the Deposit as full liquidated damages for all damages to the Sellers from such failure, which shall be held for the benefit of the creditors of the Sellers.

**ARTICLE 9**
**MISCELLANEOUS**

9.1    Expenses.    Except as set forth in this Agreement and whether or not the transactions contemplated hereby are consummated, each Party shall bear all costs and expenses incurred or to be incurred by such Party in connection with this Agreement and the consummation of the transactions contemplated hereby.

9.2    Assignment.    Neither this Agreement nor any of the rights or obligations hereunder may be assigned by the Sellers without the prior written consent of the Buyer, or by the Buyer without the prior written consent of the Sellers.    Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

9.3    Parties in Interest.  This Agreement shall be binding upon and inure solely to the benefit of the Buyer and the Sellers, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement, except as expressly set forth herein, including, for the avoidance of doubt, the intended third-party beneficiaries contemplated by Section 6.10 and Section 9.15.

9.4    Notices.    All notices, demands, requests, consents, approvals or other communications (collectively, "*Notices*") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be deemed given on the date personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile or electronic mail with confirmation of receipt, addressed as set forth below, or to such other address as such Party shall have specified most recently by Notice; *provided*, that if delivered or transmitted on a day other than a Business Day or after 5:00 p.m., New York time, Notice shall be deemed given on the next Business Day.

|  |  |
|---|---|
| If to Sellers: | Rodeo Creek Gold Inc. |
|  | P.O. Box 2610 |
|  | Winnemucca, NV  89466 |
|  | Attention:  Chief Executive Officer |
|  |  |
| With a copy to: | Sidley Austin LLP |
|  | One South Dearborn |
|  | Chicago, IL 60603 |
|  | Attention: Jessica C.K. Boelter |
|  |      Matthew G. McQueen |
|  | Email:    jboelter@sidley.com |
|  |      mmcqueen@sidley.com |
|  |  |
| If to the Buyer: | Buyer c/o Waterton Global Resource Management, Inc. |
|  | 199 Bay Street, Suite 5050 |
|  | Toronto, Ontario |
|  | M5L 1E2 Canada |

34

Attention:  Richard J. Wells
Email:      rwells@watertonglobal.com

Tel: +1 416 504 3505
Fax: 416 504 3200

With a copy to:          Allen & Overy LLP
                         1221 Avenue of the Americas
                         New York, NY 10020
                         Attention: Ken Coleman
                                    Richard D. Smith
                         Email:     ken.coleman@allenovery.com
                                    richard.d.smith@allenovery.com

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

9.5     Choice of Law; Jurisdiction and Venue.  This Agreement shall be construed and interpreted, and the rights of the Parties shall be determined, in accordance with the Laws of the State of New York, without giving effect to any provision thereof that would require the application of the substantive Laws of any other jurisdiction and, to the extent applicable, the Bankruptcy Code.  With the exception of any appeals, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated.

9.6     Entire Agreement; Amendments and Waivers.   This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement among the Parties pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the Parties.  This Agreement may be amended, supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by the Sellers and the Buyer, or in the case of a waiver, by the Party waiving compliance.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

9.7     Schedules; Supplementation and Amendment of Schedules.  The Sellers may, at their option, include in the Schedules items that are not material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this

35

Agreement.  Information disclosed in the Schedules shall constitute a disclosure for all purposes under this Agreement notwithstanding any reference to a specific section, and all such information shall be deemed to qualify the entire Agreement and not just such section so long as the relevance of such disclosure to other sections of the Agreement is reasonably apparent.

9.8    Counterparts; Facsimile and Electronic Signatures.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.  Counterparts to this Agreement may be delivered via facsimile or electronic mail.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the Party against whom enforcement is sought.

9.9    Retention of Deposit Not Penalty.  Retention of the Deposit by the Sellers (if permitted pursuant to Section 8.2.(b)) represents agreed full liquidated damages that is a reasonable approximation of the actual damages that the Sellers would suffer for such failure in consummating the transactions contemplated by this Agreement described in Section 8.2(b) and does not represent either a penalty or compensation for the transaction costs of the transactions contemplated by this Agreement.

9.10    Severability.  The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement.  In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect.

9.11    Specific Performance.  The Parties acknowledge that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed by the Buyer, on the one hand, or the Sellers, on the other hand, in accordance with the specific terms contained herein or were otherwise breached by the Buyer, on the one hand, or the Sellers, on the other hand, shall therefore be entitled to an injunction or injunctions to prevent breaches or termination of this Agreement by the Sellers, on the one hand, or the Buyer, on the other hand, and to enforce specifically the terms and provisions of this Agreement.

9.12    WAIVER OF RIGHT TO TRIAL BY JURY.  THE PARTIES HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).

9.13    NO CONSEQUENTIAL DAMAGES. IN NO EVENT SHALL ANY PARTY BE LIABLE UNDER OR IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT FOR ANY INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY OR INCIDENTAL DAMAGES, LOST PROFITS OR COSTS OF ANY OTHER PARTY OR ITS AFFILIATES, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE OR STRICT LIABILITY), WARRANTY OR OTHERWISE,

AND ALL SUCH INDIRECT, CONSEQUENTIAL, SPECIAL, PUNITIVE, EXEMPLARY AND INCIDENTAL DAMAGES, LOST PROFITS AND COSTS ARE HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVED, RELEASED AND DISCHARGED.

9.14    Survival.    Each and every representation, warranty, covenant, and agreement contained in this Agreement or in any instrument delivered pursuant to this Agreement (other than the covenants contained in this Agreement that by their terms are to be performed (in whole or in part) by the Parties following the Closing, including the covenants contained in Section 6.5(b) and Section 6.8) shall expire and be of no further force and effect as of the Closing and no Party shall thereafter have any liability whatsoever with respect thereto.

9.15    Non-Recourse.    All Claims or causes of action (whether in contract or in tort, in law or in equity) that may be based upon, arise out of or relate to this Agreement or any other document, certificate or instrument delivered pursuant hereto, or the negotiation, execution, performance or non-performance of this Agreement or any other document, certificate or instrument delivered pursuant hereto (including any representation or warranty made in or in connection with this Agreement or any other document, certificate or instrument delivered pursuant hereto or as an inducement to enter into this Agreement and the other documents delivered pursuant hereto) may be made only against the Person or Persons that are expressly identified as parties hereto or thereto.  In no event shall any Party, or party to the other documents delivered pursuant hereto, have any shared or vicarious liability for the actions or omissions of any other Person.  No Person who is not a named party to this Agreement or the other documents delivered pursuant hereto, including any past, present or future director, manager, officer, employee, incorporator, member, partner, equity holder, Affiliate, agent, attorney or Representative of any Party ("***Non-Party Affiliates***"), shall have any liability (whether in contract or in tort, in law or in equity, or based upon any theory that seeks to impose liability of an entity party against its owners or affiliates) for any obligations or liabilities arising under, in connection with or related to this Agreement or any other document, certificate or instrument delivered pursuant hereto or for any claim based on, in respect of, or by reason of this Agreement or any other document, certificate or instrument delivered pursuant hereto or its negotiation or execution; and each party hereto or thereto waives and releases all such liabilities, Claims and obligations against any such Non-Party Affiliates.  The Parties acknowledge and agree that the Non-Party Affiliates are intended third-party beneficiaries of Section 6.10 and this Section 9.15.

*[Signatures Follow]*

IN WITNESS WHEREOF, this Agreement has been duly executed and delivered by the duly authorized officers of the Sellers and the Buyer as of the date first above written.

**SELLERS**:

RODEO CREEK GOLD INC.

By: _____

    Name:

    Title:

ANTLER PEAK GOLD INC.

By: _____

    Name:

    Title:

HOLLISTER VENTURE CORP.

By: _____

    Name:

    Title:

TOUCHSTONE RESOURCES COMPANY

By: _____

    Name:

    Title:

*[Signature Page to Asset Purchase Agreement]*

**BUYER**:

WATERTON NEVADA HOLDINGS, LLC

By: _____

Name: RICHARD J. UELS

Title: MANAGER