Jessica C.K. Boelter (IL SBN 6277801)
Thomas A. Labuda, Jr. (IL SBN 6225401)
Matthew E. Linder (IL SBN 6309552)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

Counsel for Debtors and Debtors in Possession

Donald A. Lattin (NV SBN 693)
Christopher D. Jaime (NV SBN 4640)
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone:  (775) 827-2000
Facsimile:  (775) 827-2185
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Nevada Counsel for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>RODEO CREEK GOLD INC.<br><br>☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Antler Peak Gold Inc.<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company | Chapter 11<br><br>Case No. BK-13-50301 (MKN)<br><br>Jointly Administered<br><br>**MOTION TO DISMISS CHAPTER 11 CASES AND GRANTING RELATED RELIEF**<br><br>Hearing Date:   July 11, 2013<br>Hearing Time:  1:30 p.m. (PT)<br>Place:            300 Las Vegas Blvd.<br>                       Las Vegas, NV 89101 |

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Rodeo Creek Gold Inc. and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors"),[1] by and through their undersigned counsel, hereby move this Court (the "Motion"), pursuant to sections 105(a), 305(a), and 1112(b) of Title 11 of the United States Code (the "Bankruptcy Code") and Rule 1017(a) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of an order, substantially in the form attached hereto, authorizing the dismissal of these Chapter 11 cases (the "Chapter 11

---

[1] The Debtors in these Chapter 11 cases are Rodeo Creek Gold Inc., Antler Peak Gold Inc., Hollister Venture Corporation, and Touchstone Resources Company.

Cases") and granting related relief.  In support of the Motion, the Debtors respectfully state as follows:

## I.    Preliminary Statement

1.    On May 20, 2013, the Debtors closed the sale of substantially all of their assets to Waterton Global Mining Company, LLC and thereby completed the liquidation of their businesses.  The sale, while properly undertaken in accordance with bidding procedures approved by this Court, yielded proceeds that were far less than initially anticipated and are likely sufficient to pay in cash only the administrative expenses of these Chapter 11 Cases and certain other payments approved by this Court in the final order approving DIP financing (the "Final DIP Order") [Docket No. 342 at ¶ 28].  The DIP Lenders (as defined in the Final DIP Order) and prepetition lenders, out of whose cash collateral such payments will be made, will likely see minimal cash recovery and will instead receive a "net profits royalty" interest in any future profits of the Hollister mine.  Other than the GUC Trust Fund (as defined below), no excess or unencumbered funds are available to fund distributions to unsecured creditors, and the Debtors, the Agent, and the Committee (each as defined below) all agree that best available option for all parties in interest is an expeditious exit from bankruptcy protection.

2.    In the Final DIP Order , the Court approved a certain "waterfall" for the distribution of the sale proceeds (the "Waterfall"), which had been agreed upon among the Debtors, Credit Suisse, as administrative and collateral agent under both the Debtors' DIP financing and prepetition secured facilities (the "Agent"), and the Official Committee of Unsecured Creditors (the "Committee").  This Waterfall provided for, among other things, the establishment of a $1,000,000 fund (subject to increase under specified circumstances) "for the exclusive payment of allowed nonpriority unsecured claims other than Deficiency Claims . . . and the funding of the Liquidation Trust" out of the proceeds of the Agent's collateral (the "GUC Trust Fund").  The Court's order approving the sale specifically preserved the Waterfall but provided that the sale proceeds would be distributed pursuant to a further Court order [Docket No. 475 at ¶ 29].

3.      By this Motion, the Debtors seek authority, with the support of the Agent and in consultation with the Committee, to distribute the sale proceeds in accordance with the Final DIP Order and then dismiss these Chapter 11 Cases.  Given that the sale proceeds are less than the amount of the secured debt, no distributions are available to either administrative claimants or unsecured creditors except from the proceeds of the Agent's collateral and to the extent the Agent has agreed to share such collateral with them.  The distribution of the proceeds of the Agent's collateral through either a Chapter 11 plan or by a Chapter 7 trustee would be impractical and result in unnecessary delay and increased administrative costs.  The Debtors therefore submit that the dismissal of these cases — after the payment of all administrative claims, the establishment of a liquidation trust to administer the GUC Trust Fund, and the turnover of the remaining sale proceeds to the Agent — is the most efficient resolution of these Chapter 11 Cases and best maximizes value for stakeholders.

## II.    Jurisdiction

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief requested herein are Bankruptcy Code §§ 105(a), 305(a), and 1112(b) and Bankruptcy Rule 1017(a).  The Debtors consent to the entry of a final order on this matter.

## III.    Background

5.      The Debtors commenced these Chapter 11 Cases in order to stabilize their business while they pursued a sale of substantially all of their assets and to maximize value for their stakeholders.  Additional information regarding the Debtors and the events leading up to the commencement of these cases is set forth in the Declaration of Raymond E. Dombrowski, Jr. in Support of the Debtors' Chapter 11 Petitions and First Day Motions [Docket No. 4].

6.      In connection with the commencement of these cases, the Debtors filed a motion for entry of an order approving bidding procedures and scheduling an auction and hearing for the sale of the Debtors' assets.  The Court approved the motion and entered an order approving

bidding procedures and setting dates for both an auction and a sale hearing [Docket Nos. 67 and 286].

7.      To fund operations during the sale process and to pay the transaction costs of the sale and other administrative expenses, the Debtors sought approval of $9,000,000 in DIP financing from the Agent.  The Court approved the DIP financing, on an interim basis, pursuant to an order dated February 27, 2012 (the "Interim DIP Order") [Docket No. 44].

8.      The Interim DIP Order provided for the distribution of the sale proceeds, immediately upon closing, to satisfy the several outstanding tranches of postpetition and prepetition secured indebtedness of the Debtors (the "Existing Obligations").  Interim DIP Order at ¶ 28.  The Interim DIP Order also provided that, to the extent the sale proceeds were less than the Existing Obligations, certain amounts, including the Chapter 11 Expenses and the Wind-Down Costs (each as defined in the Interim DIP Order), were to be deducted from any distribution on account of the Existing Obligations.  Id.

9.      After the entry of the Interim DIP Order, the United States Trustee for the District of Nevada appointed the Committee.  The Committee and their legal and financial advisors immediately commenced diligence regarding the Debtors, their business and assets, and their prepetition secured indebtedness.  The Committee also engaged in extensive negotiations with the Debtors and the Agent regarding the sale process and the ultimate resolution of these Chapter 11 Cases.

10.     As a result of the foregoing negotiations, the Debtors, the Agent, and the Committee agreed to the Final DIP Order, which incorporated the settlement between the Agent and the Committee under which, among other things, the Agent agreed to the establishment of the GUC Trust Fund from the proceeds of the Agent's collateral.  Final DIP Order at ¶ 29(a).  The settlement further provided for certain potential increases to the GUC Trust Fund (including an adjustment based on essential vendor payments) and for the sharing of proceeds of the Debtors' causes of action.  Id. at ¶ 29(b).  As part of the settlement, the Agent received broad releases from the Committee.  See id. at ¶ 24.  The Court entered the Final DIP Order on April 8, 2013 [Docket No. 342].

11.     The Final DIP Order modified the waterfall set forth in the Interim DIP Order to incorporate the settlement with the Committee.[2]  Specifically, the Waterfall provided that the sale proceeds are to be distributed in the following order of priority:

(i) as required to fund

(A)  any amounts payable pursuant to the Carve-Out,

(B)  any accrued and unpaid administrative expenses other than those included in the Carve-Out and the Committee Settlement Funding Obligations, and

(C)  any completion fee owed under the engagement letter between CIBC and the Debtors approved by the Court on March 28, 2013 (all of the foregoing, the "Chapter 11 Expenses");

(ii) as required to fund the Committee Settlement Funding Obligations; and

(iii) to the following identified parties:

(A)  the DIP Agent to pay in full the DIP Obligations;

(B)  the Existing Hollister Agent to pay in full the Hollister Adequate Protection Obligations;

(C)  the Existing Hollister Agent to pay in full the Existing Hollister Obligations;

(D)  the Canadian DIP Agent to pay in full the Canadian DIP Adequate Protection Payments;

(E)  the Canadian DIP Agent to pay in full the obligations under that certain Intra-Group Loan Agreement, dated as of October 3, 2012 between the DIP Borrowers and GBGL; and

(F)  GBGL to pay in full the obligations under the promissory note, dated as of January 23, 2013, issued by Rodeo in favor of GBG Rusaf Gold Ltd. . . . .

Final DIP Order at ¶ 28.[3]

---

[2]  The Final DIP Order separately provided for the distribution of proceeds in the event of either a successful third-party bid or a credit bid by the Agent.  See Final DIP Order at ¶¶ 28-29.  Only the third-party bid provisions are relevant for purposes of this Motion.

[3]  Any capitalized term used but not defined in this paragraph has the meaning ascribed to such term in the Final DIP Order.

12.    The Final DIP Order also provided that the Debtors would file a Chapter 11 plan of liquidation (the "Plan") and a related disclosure statement on or before April 22, 2013.  Final DIP Order at ¶ 29.  After obtaining an extension of time to file such documents [Docket No. 387], the Debtors filed the Plan and disclosure statement on April 28, 2013 [Docket Nos. 425 and 431].  The Plan provided for a distribution of sale proceeds that mirrored the Waterfall.  See Plan at III.D.

13.    On April 23 and 24, 2013, while the Plan was being prepared, the Debtors conducted an auction for the sale of their assets.  At the conclusion of the auction, the Debtors selected Waterton Global Mining Company, LLC ("Waterton") as the successful bidder.  The Waterton bid was comprised of (a) $15 million in cash and (b) a certain "net profits interest" (the "NPI") entitling the Debtors to 15% of the net profits from all products that originate from the assets acquired by Waterton over a period of nine (9) years (subject to certain adjustments, calculations, and early termination).  The full terms of the NPI are set forth in that certain Net Profits Royalty Agreement attached hereto as Exhibit A.

14.    On May 3, 2013, the Court entered an order approving the sale to Waterton (the "Sale Order") [Docket No. 475].  The Debtors successfully closed the sale to Waterton on May 20, 2013.

15.    As a result of the closing, the Debtors have ceased all operations and anticipate that, as of the date of the hearing on this Motion, they will hold approximately $19,782,507 in cash, all of which constitutes the cash collateral of the Agent.  This amount is significantly lower than the Existing Obligations.  In fact, with the Chapter 11 Expenses and the anticipated Wind-Down Costs, the sale proceeds are likely to be insufficient to satisfy any material portion of the DIP Obligations.

16.    Because the Debtors have sold all of their assets, there is no business left to reorganize or liquidate.  Additionally, because the sale proceeds are less than the amount of the secured debt, there are no proceeds to distribute to unsecured creditors except to the extent the Agent has agreed, by means of the GUC Trust Fund, to share the proceeds of its collateral.  These proceeds of the Agent's collateral can easily be distributed, in accordance with the

6

Waterfall, outside of the Chapter 11 plan process without the attendant costs and delay of such process. Any additional administrative expenses would only directly reduce creditor recoveries without providing any benefits to the Debtors' estates or their creditors. The Debtors have consulted with both the Agent and the Committee, which concur that the dismissal of these cases as set forth herein is the most efficient and effective method to resolve these cases.

### IV.    Relief Requested

17.    By this Motion, the Debtors seek the entry of an order substantially in the form attached hereto, pursuant to Bankruptcy Code §§ 105(a), 305(a), and 1112(b) and Bankruptcy Rule 1017(a), dismissing these cases and, in connection therewith, among other things, approving the Trust Agreement (as defined below) and authorizing the distribution of the sale proceeds in accordance with the Waterfall. Specifically, the Debtors propose to

> (i)    Pay the $11,661,117 of administrative claims in full as set forth on the attached Exhibit B;
>
> (ii)    Transfer that portion of the proceeds of the Agent's collateral necessary to establish the GUC Trust Fund and any and all causes of action held by the Debtors' estates to a liquidation trust for the benefit of general unsecured creditors and the Agent (the "Trust"); and
>
> (iii)    Transfer the NPI and any remaining cash to the Agent for distribution in accordance with the Waterfall.

18.    Exhibit B lists all known administrative claimants — including trade vendors, employees, and professionals — and the amounts the Debtors submit are owed to each claimant, which amounts include section 503(b)(9) claims. The payments of the amounts listed on Exhibit B shall be in full and final satisfaction of all such administrative claims. The only amounts not listed on Exhibit B are the estimated fees and expenses of professionals for the period from June 1, 2013 through the date of the anticipated dismissal of these cases (no such estimated amounts are necessary for trade or employee claims as the Debtors ceased operations upon the closing on May 20, 2013). The order approving the dismissal of these cases will identify and provide for the payment of (i) remaining professional fees and expenses from June 1, 2013 through the date of dismissal and (ii) all fees of the United States Trustee from June 1, 2013 through the date of dismissal.

19.     In order to implement the Committee's settlement with the Agent, the Debtors will transfer the following amounts from the proceeds of the Agent's collateral to the Trust:

       (i)    $1,000,000 to establish the GUC Trust Fund; and

      (ii)    $293,500 on account of the essential vendor adjustment.

All of the estates' causes of action will also be assigned to the Trust.

20.     The liquidation trustee is to be selected by the Committee, and its actions will be governed by a trust agreement (the "<u>Trust Agreement</u>"), which will be filed no later than fourteen (14) days prior the hearing on the Motion.  The Trust Agreement will provide that the $1,293,500 of the proceeds of the Agent's collateral transferred to the Trust will be distributed exclusively to the holders of general unsecured claims (excluding any intercompany claims and priority tax claims) pursuant to the terms of, and as set forth in, the Trust Agreement.  The proceeds of the transferred causes of action will be allocated among the holders of general unsecured claims and the Agent in accordance with the Trust Agreement.

21.     The Trust Agreement will establish procedures by which the liquidation trustee may object to any general unsecured claim and provide for binding mediation to resolve all such disputed claims.  Any holder of a general unsecured claim, in order to receive its pro rata share of distributions from the GUC Trust Fund, must agree to participate in and be bound by such claims-resolution procedures.

22.     The Trust Agreement will also provide that the liquidation trustee will effect the corporate wind-down of the Debtors, including the filing of any necessary tax returns and dissolving the Debtors under Nevada law.  In order to fund such wind-down, the Debtors will transfer $175,000 from the proceeds of the Agent's collateral to the Trust.

23.     All cash remaining after the satisfaction of the administrative claims and the funding of the Trust will be disbursed to the Agent as the proceeds of its collateral.  The Debtors will also designate the Agent as their designee (as contemplated by the Net Profits Royalty Agreement) and transfer the NPI to the Agent.  The Agent will distribute both any cash received from the Debtors and any monies received pursuant to the NPI in accordance with the Waterfall.

24.     The Debtors further request that, notwithstanding Bankruptcy Code § 349, all orders entered in these cases prior to the date of dismissal — including, without limitation, the Final DIP Order, the Sale Order, the order setting the May 10, 2013 bar date (the "Bar Date Order"), and the order rejecting all executory contracts and unexpired leases (the "Rejection Order") — will survive and remain effective after the date of dismissal, and the Court will retain jurisdiction to enforce and support any and all such orders.  The Debtors also request that the dismissal order contain standard and customary exculpation and release provisions.

25.     Finally, the Debtors note that the Sale Order permitted San Juan Drilling, Inc. ("San Juan") to file a notice of lien on or before 45 days after the entry of the Sale Order and thereby perfect an alleged mechanics lien on the sale proceeds in excess of $1.9 million.  To date, however, San Juan has not made any such filing and thus has not perfected any such lien.  The Debtors, moreover, have learned that San Juan was not properly licensed under Nevada law to provide the services that it provided to the Debtors.  Specifically, San Juan unlawfully engaged in business with the Debtors far in excess of the $750,000 license (which is the monetary limit on its contractor license).  See NSCB Webpgage, Lic. No. 0068151; N.R.S. § 108.222(2).  Under Nevada law, this makes any contractual obligations between the Debtors and San Juan void.  See N.R.S. § 624.640(1); see also Nev. Construction Law § 2:16  It also limits the ability of San Juan to record and perfect any lien, and it is a punishable violation of its license.  See N.R.S. § 624.3015(2).  As a result, the Debtors do not intend to distribute any portion of the sale proceeds to San Juan, and the Debtors reserve all rights to recover all amounts paid to date to San Juan.

## V.     Basis for Relief Requested

26.     As set forth below, the Debtors have determined, in their business judgment, that the dismissal of these Chapter 11 Cases — predicated upon the distribution of the sale proceeds as set forth above — will produce the most efficient resolution of these cases and will best maximize value for stakeholders.

## A.     Dismissal of These Cases is Warranted Under Bankruptcy Code § 1112(b)

27.    Bankruptcy Code § 1112(b) provides that, "on request of a party in interest, and after notice and a hearing, the court shall . . . dismiss a case under [Chapter 11 of the Bankruptcy Code] . . . for cause . . . ." 11 U.S.C. § 1112(b)(1). Bankruptcy Code § 105(a), moreover, provides, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

28.    The determination of whether "cause" exists to dismiss a Chapter 11 case pursuant to § 1112(b) rests within the bankruptcy court's "broad discretion." Rand v. Porsche Fin. Servs. (In re Rand), No. 10-1160, 2010 Bankr. LEXIS 5076, at *10 (B.A.P. 9th Cir. Dec. 7, 2010) (citing Pioneer Liquidating Corp. v. United States Tr. (In re Consol. Pioneer Mortg. Entities), 248 B.R. 368, 375 (B.A.P. 9th Cir. 2000)). Section 1112(b)(4) identifies certain examples of factors constituting "cause" for dismissal, including "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4). The factors enumerated in section 1112(b)(4) are not exhaustive, however, and "the Court has latitude to consider other factors in determining whether dismissal is appropriate." In re Kent, No. 07-03238, 2008 Bankr. LEXIS 4332, at *11 (Bankr. D. Ariz. Sept. 23, 2008); see also H.R. Rep. No. 595, 95th Cong., 2d Sess. 405-06 (1978) (noting that, under § 1112, a bankruptcy court "will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases); ECV Dev., LLC v. Emerald Bay Fin., Inc. (In re ECV Dev., LLC), No. 06-1453, 2007 Bankr. LEXIS 4863, at *26 (B.A.P. 9th Cir. June 25, 2007) ("Section 1112(b)(4) provides a nonexclusive listing of events and circumstances constituting cause for dismissal.").

29.    The Debtors submit that cause exists to dismiss these Chapter 11 Cases. The Debtors have ceased operations and completely liquidated their assets. As a result, there is no "likelihood of rehabilitation," as there is no business to reorganize or assets to liquidate. There are also no sale proceeds in excess of the amount of the secured debt to allocate and/or distribute among unsecured creditors (except that portion of the proceeds of the Agent's collateral that the Agent has agreed to share with administrative and general unsecured creditors). Remaining in

bankruptcy, moreover, would result in "continuing losses" in the form of additional administrative expenses (attributable primarily, if not solely, to additional professional fees), which would directly reduce creditor recoveries.

30.     Effectuating a Chapter 11 plan is simply not practical in light of the status of these cases and especially given the results of the auction. As noted above, because the Debtors have sold all of their assets, there is no business left to reorganize or liquidate. Additionally, because the sale proceeds are less than the amount of the secured debt, there are no proceeds to distribute to unsecured creditors except that portion of the proceeds of the Agent's collateral that will fund the GUC Trust Fund. The Agent and the liquidation trustee can distribute their respective portions of the proceeds of the Agent's collateral outside of the bankruptcy process without the attendant costs and delay of a Chapter 11 plan process. Moving forward with a Chapter 11 plan at this stage would unnecessarily risk incurring additional administrative expenses which would directly reduce creditor recoveries and may be beyond the Debtors' ability to pay.

31.     Conversion of these cases to Chapter 7 would likewise be impractical and inefficient. There are no remaining assets for a Chapter 7 trustee to administer or liquidate, nor are there any unencumbered assets to fund an investigation or litigation against any third parties. As noted above, the Committee has already conducted an investigation in connection with the Final DIP Order and the settlement with the Agent embodied therein. The appointment of a Chapter 7 trustee to distribute the proceeds of the Agent's collateral in accordance with the Waterfall would only work to impose additional administrative costs on the Debtors' estates and thereby diminish creditor recoveries.

32.     Bankruptcy courts in the District of Nevada and other districts have authorized distributions to creditors and dismissed Chapter 11 cases on similar grounds. See, e.g., In re Hi-Five Enters., LLC, No. 10-54013 (GWZ) (Bankr. D. Nev. Sept. 19, 2012) [Docket No. 378] (authorizing payment of administrative claims and dismissing Chapter 11 cases where the estates had liquidated all of their assets); In re Alt. Distrib. Sys., No. 09-13099 (Bankr. D. Del. Dec. 1, 2009) [Docket No. 213] (dismissing Chapter 11 cases where no assets remained to administer); In re Bag Liquidation, Ltd., No. 08-32096 (Bankr. N.D. Tex. Sept. 30, 2009) [Docket No. 688]

(authorizing payment of administrative claims and dismissing Chapter 11 cases where the estates had liquidated all of their assets); In re Wickes Holdings, LLC, No. 08-10212 (Bankr. D. Del. May 12, 2009) [Docket No. 1418] (authorizing the debtors and unsecured creditors' committee to enter into a GUC trust agreement and dismissing Chapter 11 cases where the estates had liquidated all of their assets); In re Princeton Ski Shop, Inc., No. 07-26206 (Bankr. D.N.J. Dec. 23, 2008) [Docket No. 546] (authorizing payment of administrative claims and dismissing Chapter 11 cases where the estates had liquidated all of their assets); In re CSI Inc., No. 01-12923 (Bankr. S.D.N.Y. July 24, 2006) [Docket No. 284] (authorizing a distribution agent to make distributions to unsecured creditors and dismissing Chapter 11 cases); In re New Weathervane Retail Corp., No. 04-11649 (Bankr. D. Del. Sept. 2, 2005) [Docket No. 566] (authorizing distributions to administrative claimants and unsecured creditors and dismissing Chapter 11 cases where the estates had liquidated all of their assets). Accordingly, the Debtors submit that sufficient cause exists to dismiss these Chapter 11 Cases.

**B.    Dismissal of These Cases is Warranted Under Section 305(a) of the Bankruptcy Code**

33.    Alternatively, cause exists to dismiss these Chapter 11 Cases pursuant to Bankruptcy Code § 305(a) which provides, in pertinent part, that "[t]he court, after notice and a hearing, may dismiss a case under [Chapter 11], or may suspend all proceedings in a case under [Chapter 11] at any time if . . . the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a). In applying § 305(a), courts have considered a wide range of factors, including but not limited to the following:

>    (i)  the economy and efficiency of administration;
>
>    (ii) whether federal proceedings are necessary to reach a just and
>         equitable solution;
>
>    (iii) whether there is an alternative means of achieving an
>          equitable distribution of assets; and
>
>    (iv) whether the debtor and the creditors are able to work out a
>         less expensive out-of-court arrangement which better serves
>         all interests in the case.

See, e.g., Marciano v. Fahs (In re Marciano), 459 B.R. 27, 46-47 (B.A.P. 9th Cir. 2011). "[T]he exact factors to be considered and the weight to be given to each of them is highly sensitive to the facts of each individual case." In re Mazzocone, 200 B.R. 568, 575 (E.D. Pa. 1996).

34.    Dismissal of these Chapter 11 Cases is warranted under § 305(a) for the same reasons that cause exists to dismiss these cases pursuant to § 1112(b). As set forth above, dismissal of these cases in connection with the distribution of the proceeds of the Agent's collateral in accordance with the Court-approved Waterfall is the most efficient resolution of these cases. Accordingly, dismissal of these cases would best serve the interests of creditors and the Debtors.

### VI.    Request for Relief Pursuant to Bankruptcy Rule 6004

35.    Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). The Debtors respectfully submit that, in light of the circumstances described above, waiver of the stay under Bankruptcy Rule 6004(h), if applicable to the proposed order, is appropriate and justified.

### VII.    Notice

36.    Notice of this Motion has been provided to: (i) the Office of the United States Trustee for the District of Nevada, (ii) the United States Securities and Exchange Commission, (iii) the Office of the United States Attorney for the District of Nevada, (iv) the Internal Revenue Service, (v) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis, (vi) counsel to the agent for the Debtors' pre-petition credit facilities and (vii) counsel to the agent for the Debtors' post-petition credit facility.

37.    Notice of this Motion has also been provided to (A) all known administrative claimants, (B) all creditors who have filed proofs of claim prior to the bar date, and (C) all other parties in the Debtors' consolidated mailing matrix. Administrative claimants who do not object to the Motion or the amounts set forth on Exhibit B shall be deemed to have consented to the claim amounts set forth on Exhibit B.

### VIII.    No Prior Request

38.    The Debtors have not previously sought the relief requested herein from this or any other Court.

### IX.    Conclusion

39.    All that remains to be done in these Chapter 11 Cases is to distribute the proceeds of the Agent's collateral. The Debtors respectfully submit, after consulting with the Agent and the Committee, that distributing those proceeds in accordance with the Waterfall in connection with the dismissal of these cases represents the most efficient resolution of these Chapter 11 Cases.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

1

2     WHEREFORE, the Debtors respectfully request that the Court enter an order

3 substantially in the form attached hereto dismissing these Chapter 11 Cases and, in connection

4 therewith, authorizing the distributions as set forth herein and in such order.

Dated:  June 12, 2013                    Respectfully submitted,

5

6                              By    /s/ Christopher D. Jaime
                                     Donald A. Lattin, NV State Bar #693
7                                    Christopher D. Jaime, NV State Bar #4640
                                     MAUPIN, COX & LEGOY, P.C.
8                                    4785 Caughlin Parkway
                                     Reno, Nevada 89519
9

10                                   Local Counsel for Debtors and Debtors in
                                     Possession
11
                                     Jessica C.K. Boelter, IL State Bar #6277801
12                                   Thomas A. Labuda, Jr., IL State Bar #6225401
                                     Matthew E. Linder, IL State Bar #6309552
13                                   SIDLEY AUSTIN LLP
                                     One South Dearborn Street
14                                   Chicago, Illinois 60603

15                                   Counsel for Debtors and Debtors in Possession

16

17

18

19

20

21

22

23

24

25

26

27

28

**<u>Proposed Order</u>**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Jessica C.K. Boelter (IL SBN 6277801)
Thomas A. Labuda, Jr. (IL SBN 6225401)
Matthew E. Linder (IL SBN 6309552)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

Counsel for Debtors and Debtors in Possession

Donald A. Lattin (NV SBN 693)
Christopher D. Jaime (NV SBN 4640)
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
Telephone: (775) 827-2000
Facsimile: (775) 827-2185
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Local Counsel for Debtors and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Chapter 11 |
| RODEO CREEK GOLD INC. | Case No. BK-13-50301 (MKN) |
| ☐ Affects this Debtor<br>☒ Affects all Debtors<br>☐ Affects Antler Peak Gold Inc.<br>☐ Affects Hollister Venture Corporation<br>☐ Affects Touchstone Resources Company | Jointly Administered<br><br>**ORDER GRANTING DEBTORS'<br>MOTION TO DISMISS CHAPTER 11<br>CASE AND GRANTING RELATED<br>RELIEF**<br><br>Hearing Date: July 11, 2013<br>Hearing Time: 1:30 p.m. (PT)<br>Place:    300 Las Vegas Blvd.<br>    Las Vegas, NV 89101 |

Upon the motion of the Debtors,[1] pursuant to Bankruptcy Code sections 105(c), 305(a), 1112(b) and Bankruptcy Rule 1017(a), for the entry of an order authorizing the Debtors to

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed thereto in the Motion

dismiss these Chapter 11 Cases and, in connection therewith, authorizing the distribution of the sale proceeds in accordance with the Waterfall set forth in the Final DIP Order (the "Motion"); and the Court having reviewed the Motion and having conducted a hearing on the Motion, at which time the Debtors and all parties in interest were given an opportunity to be heard; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having determined that notice of the Motion as provided therein was good and sufficient and no other notice need be given; and the Court having determined that (i) the legal and factual bases set forth in the Motion constitute sufficient cause for the relief granted herein and (ii) the relief requested in the Motion best serves the interests of creditors and the Debtors; and after due deliberation, it is therefore

ORDERED that the Motion is granted as set forth herein; and it is further

ORDERED that pursuant to Bankruptcy Code sections 305(a) and 1112(b), the Debtors' Chapter 11 Cases are hereby dismissed;

ORDERED that the Debtors are authorized to pay (i) the administrative claims listed on Exhibit B to the Motion in full and final satisfaction of all such administrative claims, (ii) all professional fees from June 1, 2013 through the date of entry of this Order, and (iii) all fees of the United States Trustee from June 1, 2013 through the date of entry of this Order; and it is further

ORDERED that the form of trust agreement, dated [____], by and among [____] (the "Trust Agreement"), with [____] as trustee (the "Trustee") is hereby approved; and it is further

ORDERED that the Debtors are authorized to enter into the Trust Agreement and to take all actions necessary to effectuate the terms of the Trust Agreement; and it is further

ORDERED that the Debtors are authorized to transfer the following amounts from the proceeds of the Agent's collateral to a certain liquidation trust (the "Trust") free and clear of all liens, claims, and encumbrances, as contemplated by the Trust Agreement:

(i)   $1,000,000 to establish the GUC Trust Fund;

2

(ii) $293,500 on account of the essential vendor adjustment; and

(iii) $175,000 to fund the corporate wind-down of the Debtors, including but not limited to the filing of any necessary tax returns and dissolving the Debtors under Nevada law; and it is further

ORDERED that the funds authorized to be transferred to the Trust from the proceeds of the Agent's collateral shall be distributed exclusively to the holders of general unsecured claims and that no portion of such funds shall be paid to intercompany claimants or priority tax claimants; and it is further

ORDERED that the Trustee shall have the sole authority to prosecute and settle the estates' causes of action, any proceeds of which the Trustee shall allocate among the holders of general unsecured claims and the Agent in accordance with the Trust Agreement; and it is further

ORDERED that any holder of a general unsecured claim, in order to receive its pro rata share of distributions from the GUC Trust Fund, must agree to participate in and be bound by the claims-resolution procedures set forth in the Trust Agreement; and it is further

ORDERED that all cash remaining after the satisfaction of administrative claims and the funding of the Trust shall be transferred to the Agent as the proceeds of its collateral; and it is further

ORDERED that, as contemplated by the Net Profits Royalty Agreement, the Debtors are authorized to deem the Agent the designee of the Debtors and transfer the NPI to the Agent; and it is further

ORDERED that the Agent shall distribute both any cash received from the Debtors and any monies received pursuant to the NPI in accordance with the Waterfall; and it is further

ORDERED that the Debtors and their estates, to the fullest extent permissible under applicable law, shall be deemed to completely and forever release, waive, void, extinguish and discharge unconditionally, each and all of (a) each of the lenders under the Debtors' prepetition credit facilities and postpetition credit facilities (the "Lenders"), (b) the Committee, (c) the

Agent, (d) those persons retained pursuant to an order of the Bankruptcy Court in accordance with Bankruptcy Code §§ 327, 328, 363, or 1103, and (e) with respect to each of (a) through (d), each of their directors, officers, direct and indirect shareholders and equityholders, partners, members, employees, managers, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants, and other professionals or representatives when acting in any such capacities, and any person or entity claiming by or through any of them, of and from any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action and liabilities of any nature whatsoever, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are or may be based in whole or part on any act, omission, transaction, event, or other circumstance taking place or existing on or prior to the date of this Order in connection with or related to any of the Debtors or their respective assets, property and estates, or the Chapter 11 Cases; and it is further

ORDERED that neither (a) the Debtors and the directors and officers of the Debtors solely in their capacity as such as of the Petition Date, (b) the Committee and its members in their capacity as Committee members, (c) the Agent and the Lenders, nor, (d) with respect to each of (a) through (c), any of their directors, officers, direct and indirect shareholders and equityholders, partners, members, employees, managers, agents, affiliates, parents, subsidiaries, predecessors, successors, heirs, executors and assignees, attorneys, financial advisors, investment bankers, accountants, consultants, and other professionals or representatives when acting in any such capacities, and any person or entity claiming by or through any of them (each an "Exculpated Party"), shall have or incur any liability to any person or entity, from (x) any and all claims and causes of action arising on or after the Petition Date and (y) any and all claims and

causes of action relating to any act taken or omitted to be taken in connection with or related to the formation, preparation, dissemination, implementation, confirmation, or consummation of the Motion (other than an action in contravention of the Motion or implementation of this Order), the Sale, or any other contract or instrument, release, or other agreement or document created or entered into in connection with the dismissal of these Chapter 11 Cases, and each Exculpated Party in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to its duties and responsibilities under this Order; and it is further

ORDERED that (i) the 14-day stay under Bankruptcy Rule 6004(h) is hereby waived with respect to this Order and (ii) the terms and conditions of this Order shall be effective and enforceable immediately upon its entry; and it is further

ORDERED that notwithstanding Bankruptcy Code section 349, all orders entered in these cases prior to the date of dismissal — including, without limitation, the Final DIP Order, the Sale Order, the Bar Date Order, and the Rejection Order — shall survive and remain effective after the date of this Order, and the Court shall retain jurisdiction to enforce and support any and all such orders and with respect to any matters, claims, rights, or disputes arising from or relating to the implementation of any order of this Court.


SUBMITTED BY:

Donald A. Lattin, NV State Bar #693
Christopher D. Jaime, NV State Bar #4640
MAUPIN, COX & LEGOY, P.C.
4785 Caughlin Parkway
Reno, Nevada 89519
dlattin@mclrenolaw.com
cjaime@mclrenolaw.com

Local Counsel for Debtors and Debtors in Possession

Jessica C.K. Boelter, IL State Bar #6277801
Thomas A. Labuda, Jr., IL State Bar #6225401
Matthew E. Linder, IL State Bar #6309552
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603

Counsel for Debtors and Debtors in Possession

In accordance with Local Rule 9021, counsel submitting this document certifies as follows (check one):

_____ The court has waived the requirement set forth in Local Rule 9021(b)(1)

_____ No party appeared at the hearing or filed an objection to the Motion.

_____ I have delivered a copy of this proposed order to all counsel who appeared at the hearing, and each has approved or disapproved the order, or failed to respond, as indicated below [list each party and whether the party has approved, disapproved, or failed to respond to the document]:

_____ I certify that this is a case under chapter 7 or 13, that I have served a copy of this order with the motion pursuant to Local Rule 9014(g), and that no party has objected to the form or content of the order.

### ###

**Exhibit A**

**Net Profits Royalty Agreement**

APN #: N/A (royalty payments)

RECORDED AT THE REQUEST OF, AND
WHEN RECORDED, RETURN TO:

Waterton Global Mining Company, LLC
Attn: Richard J. Wells, Manager
7485 Meadow Parkway, Suite A9#299
Reno, Nevada 89521

Mail Tax Statement to: N/A

Space above for County Recorder's Use

*Affirmation Statement*: The undersigned affirms that this document does not contain any social security numbers or other personal information of any person (Per NRS 239B.030).

## NET PROFITS ROYALTY AGREEMENT

This NET PROFITS ROYALTY AGREEMENT (this "**Agreement**") is made and entered into as of May 20, 2013, by and between WATERTON GLOBAL MINING COMPANY, LLC, a Nevada limited liability company, as the grantor (the "**Company**") and RODEO CREEK GOLD INC., ANTLER PEAK GOLD INC., HOLLISTER VENTURE CORP., and TOUCHSTONE RESOURCES COMPANY, as the grantees (collectively, the "**Royalty Holders**"). The Company and the Royalty Holders are each referred to herein as a "**Party**" and, collectively, as the "**Parties**".

Recitals

A.    The Company and the Royalty Holders have entered into that certain Asset Purchase Agreement dated as of April 26, 2013 and amended on May 20, 2013 (the "**APA**"). The APA provides that the Parties will enter into this Agreement as a condition to Closing (as defined in the APA). Capitalized terms used but not defined herein shall have the meanings ascribed to them in the APA.

B.    The Company has agreed to grant to the Royalty Holders a fifteen percent (15%) net profits royalty on all development and production ores and minerals extracted, milled, and sold from the Acquired Assets (including in the event of a Disposition (as defined below)) on the terms and conditions set forth herein.

-1-

<u>Agreement</u>

NOW, THEREFORE, in consideration of the promises and covenants herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby confirmed, the Parties agree as follows:

1.    <u>Royalty Grant</u>.  The Company hereby grants, bargains, sells, transfers, assigns and conveys, and agrees to pay, to the Royalty Holders a royalty equal to fifteen percent (15%) of the Net Profits from all Products (as defined below) that are mined or produced from, or that otherwise originate from, the Acquired Assets (the "Royalty", and payments thereunder, **"Royalty Payments"**) as computed herein and subject to the terms hereof.  No Royalty shall be due upon bulk samples extracted by the Company for metallurgical testing purposes during the Company's exploration or development work on the Acquired Assets, provided that the extraction of such samples results in *de minimis* revenues.  "**Products**" shall mean any and all ores, metals, minerals, mineral rights and other materials, of whatever kind and nature, howsoever characterized or defined, that are in, on, under or upon the surface or subsurface of the Acquired Assets (or any part thereof) and all doré, concentrates and other mineral containing material, metals or minerals which are derived therefrom.

2.    <u>Royalty Calculation and Defined Terms</u>.

(i)    The Company shall not be obligated to make any Royalty Payments until it realizes Net Profits from its ownership of the Acquired Assets.  After the Company has realized Net Profits, the Company shall, subject to the terms and conditions contained herein, make Royalty Payments hereunder in cash.

(ii)    After Closing, the Company shall each Quarter determine Net Profits derived from the Acquired Assets on a cumulative basis from Closing.  On each date that is thirty (30) Business Days after the end of each Quarter (each such date, a **"Calculation Date"**), the Company shall calculate Net Profits in respect of the period from Closing through the end of each such applicable immediately preceding Quarter (each such period, a **"Calculation Period"**). In the event the Company determines on a particular Calculation Date that there were Net Profits realized in respect of the applicable Calculation Period and a Royalty Payment is therefore due in respect of such Calculation Period, the Company shall pay such Royalty Payment on the date that is two (2) Business Days after such Calculation Date (subject to the application of any credits or deductions set forth herein).

(iii)    The Company shall deduct from Royalty Payments up to 25% of the amount, if any, that is payable to the Company pursuant to Section 6.14 of the APA.

-2-

(iv)    In connection with the determination of Net Profits on a cumulative basis from Closing, the Company shall as part of its calculations on each Calculation Date determine if there had been any prior overpayment of Royalty Payments by the Company (the **"Excess Payments"**).  The Company shall track the balance of the Excess Payments.  On each Calculation Date on which the Company determines that a Royalty Payment is due, the Company shall deduct from such amount payable the amount of the balance of the Excess Payments (or portion thereof if such balance is greater, with the remainder carried forward as the new balance), and pay the difference (if any) as the Royalty Payment on the applicable payment date following such Calculation Date.

(v)    In the event that the Company has made Royalty Payments in excess of the amount due hereunder as a result of an error, misstatement or inaccuracy in its financial statements that is the subject of a year-end adjustment in accordance with GAAP, then such excess amount shall be applied as a credit on a one-time basis against the next Royalty Payment (or Royalty Payments, if such next Royalty Payment is less than the amount of such credit) that becomes payable hereunder including upon a Disposition.

(vi)    As used herein, **"Net Profits"** shall have the following meaning:  Net Sales accrued for a Calculation Period less the sum of: (a) Operating Expenditures incurred or accrued for that Calculation Period, (b) the Exploration and Development Charge as defined in Section 2(xiii), (c) the Purchase Price (other than that portion of the Purchase Price represented by the Company having entered into this Agreement), (d) the Franco Purchase Price (defined as the Purchase Price in the letter agreement dated May 3, 2013 between the Company and Franco-Nevada Corporation), (e) Assumed Liabilities (without duplication of any other component of this calculation), and (f) Other Liabilities.

(vii)    As used herein, **"Net Sales"** for any Calculation Period shall be equal to the amount of earned revenues paid to the Company by any smelter, refiner or other purchaser of any Products extracted and produced from the Acquired Assets.  All treatment charges, penalties, assaying charges, demurrage charges, freight charges and sampling charges, to the extent that they were actually incurred and were not deducted by the purchaser shall be deducted from earned revenues.  The Company shall have the right (but not the obligation) to market and sell or refrain from selling Products mined from the Acquired Assets in any manner it may elect.

(viii)    As used herein, **"Operating Expenditures"** for any Calculation Period shall mean the sum of Mining Costs, Milling and Processing Costs, General

-3-

and Administrative Costs, and Taxes.    Operating Expenditures shall be determined in accordance with GAAP.

(ix)    As used herein, **"Mining Costs"** for any Calculation Period shall mean costs incurred by the Company in exploring for, mining, extracting, removing and transporting to a mill ores and minerals produced from the Acquired Assets. Such costs shall include those incurred for labor, machinery operation, fuel, explosives and other materials, exploration drilling, developmental or ore delineation drilling, allowance for depreciation, cost depletion, and depreciation of mining equipment, machinery, and other items, including development, that have been capitalized in accordance with GAAP, acquired after the Closing.  Mining Costs shall not include income taxes.

(x)    As used herein, **"Milling and Processing Costs"** for any Calculation Period shall mean costs incurred in milling or processing ores and minerals produced from the Acquired Assets at a mill, custom milling operation, or central processing facility utilized to process ores and minerals produced from the Acquired Assets.

(xi)    As used herein, **"General and Administrative Costs"** for any Calculation Period shall mean costs and fees incurred as a direct result of the administration of the Business, and the production of ores and minerals therefrom, including costs incurred in connection with the marketing, selling, and collection of proceeds from sale of ores and minerals produced from the Acquired Assets.  The amount of any indirect general and administrative costs, incurred or booked at the corporate parent level or any other affiliated party that can be included in such costs, shall be subject to an annual cap (for purposes of the Royalty calculation hereunder) of $500,000.

(xii)    As used herein, **"Taxes"** for any Calculation Period shall mean all taxes levied against the Company, due to the operation of the Business, excluding income taxes but including mining and property taxes and royalties applicable in respect of the Acquired Assets.

(xiii)    As used herein, **"Exploration and Development Charge"** shall mean for any Calculation Period that portion of total Exploration and Development Expenditures incurred or accrued prior to the end of such Calculation Period that is determined, by amortization on a unit of production basis, to be an appropriate period charge according to GAAP.

(xiv)    As used herein, **"Exploration and Development Expenditures"** shall mean the following: (a) all costs incurred with respect to exploring and developing the Acquired Assets and all matters connected therewith including costs relating to geological, geochemical and geophysical studies, exploration

-4-

and developmental or ore delineation drilling, sampling and assaying, mine design and development, acquisition of mining or processing equipment or machinery, direct expenses of making application for and obtaining environmental and regulatory permits from government agencies necessary in connection with any of the foregoing activities, (b) any other costs which would customarily be included within mining costs, and (c) any milling and processing costs if such costs were incurred after the commencement of commercial production. Exploration and Development Expenditures shall be determined in accordance with GAAP.

(xv)    As used herein, **"Other Liabilities"** for any Calculation Period shall mean any cost, damage, loss or other liability incurred by the Company or any of its Affiliates (other than Assumed Liabilities, if any) related to the ownership and/or operation of the Acquired Assets by the Sellers or any of their respective Affiliates prior to the Closing, including with respect to any Claims involving Environmental Law, Benefit Plans, or COBRA.

(xvi)    As used herein, **"GAAP"** shall mean generally accepted accounting principles for metallic mining ventures within the United States applied on a consistent basis.

(xvii)    As used herein, **"Quarter"** or **"Quarters"** shall mean a fiscal quarter ending in each year on March 31, June 30, September 30, and December 31.

(xviii) For the avoidance of doubt, nothing included in the foregoing definitions relating to the calculation of Net Profits shall be deemed to permit the deduction of any specific expense or liability from Net Sales more than one time in respect of a particular Calculation Period.

3.    Duration of Royalty and Procedures for Payment.

(i)    The Company's obligation to make Royalty Payments will terminate on the earlier to occur of (a) the ninth anniversary of the Closing, (b) the Company making a total of $90,000,000 in Royalty Payments to the Royalty Holders and/or the Designee (c) a material breach of any covenant or agreement by, or a material inaccuracy of any representation or warranty of, any Seller or the Designee under the APA, and (d) any subsequent disposition of all or substantially all of the Acquired Assets (a **"Disposition"**) by the Company to any third-party purchaser (the **"Purchaser"**). For the avoidance of doubt, in the event the Royalty obligation is still in place at the time of any Disposition, the Royalty shall apply to the Purchaser (and not the Company) in accordance with the terms of this Agreement. Notwithstanding the foregoing, the Company or the Purchaser, as the case may be, may, at its option and in its

-5-

sole discretion, elect to terminate its obligations to make Royalty Payments hereunder at any time on or after the fifth anniversary of the Closing.

(ii)    All Royalty Payments shall be accompanied by a statement showing in a format and at a level of detail acceptable to the Royalty Holders and the Designee (each acting reasonably) the Company's Royalty calculation for each Calculation Date.

(iii)    All Royalty Payments shall be considered final and in full satisfaction of all obligations of the Company with respect thereto, unless the Royalty Holders or the Designee gives the Company written notice describing and setting forth a specific objection to the determination thereof within three (3) months of receipt by the Royalty Holders or the Designee of a Royalty statement.  During such three (3) month period the Company shall cooperate with the Royalty Holders and the Designee in the review of such Royalty statement and the calculation of the items or amounts therein.

(iv)    If the Royalty Holders or the Designee object to a particular statement as herein provided, the Royalty Holders or the Designee shall, for a period of 30 days after the Company's receipt of notice of such objection, have the right, upon reasonable notice and at reasonable time, to have the Company's accounts and records relating to the calculation of the Royalty in question audited by a representative or agent of the Royalty Holders or the Designee.  If such audit determines that there has been a deficiency or an excess in the payment made to the Royalty Holders or the Designee such deficiency or excess shall be resolved by adjusting the next Royalty Payment or credit due hereunder.  The Royalty Holders and the Designee shall pay all costs of such audit unless a deficiency of 5% or more of the amount determined by the Company to be due to the Royalty Holders or the Designee is determined to exist.  The Company shall pay the costs of such audit if a deficiency of 5% or more of the amount due is determined to exist.  All books and records used by the Company to calculate Royalty due hereunder shall be kept in accordance with GAAP.  Failure on the part of the Royalty Holders or the Designee to make a claim on the Company for adjustment in such three (3) month period shall establish the correctness and preclude the filing of exceptions thereto or making of claims for adjustment thereon.

(v)    The Royalty shall be in addition to any other royalty due to a third party.

4.    No Implied Covenants.    The timing, nature, manner and extent of any exploration, development, mining, production and sale of Products, if any, shall be at the sole discretion of the Company.  No implied covenants or conditions whatsoever shall be read into this Agreement, including any covenants or conditions relating to exploration, development,

-6-

prospecting, mining, production or sale of Products, except for the covenants of good faith and fair dealing.

5.    <u>Buy Back of Royalty</u>.  The Company shall have the right, exercisable at any time after the date hereof, to seek to repurchase the Royalty Holders' interest in the Royalty, which shall be at a purchase price and pursuant to the terms and conditions of a purchase agreement to be mutually agreed by the Royalty Holders or the Designee and the Company at the time of any such purchase or sale; provided, however, that if the Royalty Holders or the Designee and the Company cannot mutually agree on the purchase price or the terms and conditions of a purchase agreement, then no repurchase shall take place.  The Company shall request its right to buy back the Royalty by providing written notice thereof to the Royalty Holders or the Designee.

6.    <u>Disposition</u>.  The Company will not effect a Disposition without transferring the Royalty obligations under this Agreement to the Purchaser and the Purchaser expressly agreeing in writing to assume such Royalty obligations if such obligations had not already been terminated in accordance with the terms hereof at the time of such Disposition.  Upon a Disposition, the Company shall calculate Net Profits one final time treating the date that is thirty (30) Business Days after the closing of such Disposition as another Calculation Date (subject to the terms hereof applicable to Calculation Dates) with the applicable Calculation Period running from the Closing (under the APA) through and until the closing of such Disposition; provided, however, that for purposes of such calculation, Net Sales shall include the net proceeds to the Company from such Disposition.  Any amounts that may become payable by the Company as a result of such calculation shall be a Royalty Payment made hereunder (and hereinafter referred to as the **"Disposition Royalty Payment"**).  If the Royalty obligations hereunder had not already been terminated in accordance with the terms hereof at the time of such Disposition, this Agreement shall remain in effect with respect to the Purchaser on the same terms and conditions (taking into account the period of time the Agreement was in effect with the Company as a Party and the amount of all Royalty Payments made by the Company hereunder including in respect of such Disposition) and Royalty Payments, to the extent still payable under this Agreement, shall be made by the Purchaser, except to the extent the Purchaser and the Royalty Holders (and/or the Designee) shall have otherwise agreed.  Upon a Disposition and the making of the Disposition Royalty Payment (if any), the Company shall be released from all liabilities and obligations hereunder.

7.    <u>Designee</u>.  It is understood by the Parties that the Royalty Holders intend to appoint as their designee for the receipt of Royalty Payments hereunder Credit Suisse AG as agent under certain credit facilities of the Royalty Holders (the **"Designee"**) after the satisfaction in full of the obligations set forth in paragraph 28(c)(i) and (ii) of that certain Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 522 and Fed. R. Bankr. P. Rule 4001(b) and (c) (I) Authorizing Debtors to (A) Obtain Postpetition Financing; and (B) Use Cash Collateral; (II) Granting Liens, Including Priming Liens and Superpriority Claims; (III) Granting Adequate Protection and (IV) Granting Related Relief.  The Parties agree that the Designee may not appoint another designee or assignee of Royalty Payments without the

prior written consent of the Company, which consent shall not be unreasonably withheld; provided, however, that such consent shall not be required in order for the Designee to assign or otherwise direct Royalty Payments to creditors of the Royalty Holders in connection with the disposition of the Royalty Holders' chapter 11 cases (as long as the Designee provides prior written notice thereof to the Company).

8.     Treatment of Product.  The Company may, but shall not be obligated to, treat, mill, heap leach, sort, concentrate, refine, smelt, or otherwise process, beneficiate or upgrade the ores, concentrates, and other mineral product produced from the Acquired Assets, at sites located on or off the Properties, prior to sale, transfer, or conveyance to a purchaser, user or other consumer.  The Company shall not be liable for mineral values lost in processing under sound practices and procedures, and no Royalty shall be due on any such lost mineral values.

9.     Tailing and Residues.  All tailing, residues, waste rock, spoiled leach materials, and other materials resulting from the Company's operations and activities on the Acquired Assets shall be the sole property of the Company, but shall remain subject to the obligation to pay the Royalty should the same be processed or reprocessed, as the case may be, in the future and result in the production of Products.

10.     Covenant.  The Company agrees not to undertake any partial non-ordinary course sale of any portion of the Acquired Assets (other than, for the avoidance of doubt, a Disposition) without the prior written consent of the Royalty Holders or the Designee, which consent may be withheld by either the Royalty Holders or the Designee in their sole and absolute discretion.

11.     Representations and Warranties.  The Company represents and warrants to the Royalty Holders that as of the date hereof:

(a)     The Company is a limited liability company organized and existing under the laws of  the State of Nevada and is in good standing in the State of Nevada.  The Company has full power, authority and legal right (i) to own or lease its assets and properties and to conduct its business, (ii) to enter into its obligations under this Agreement and to perform the terms hereof  applicable to it, and (iii) to grant the Royalty.

(b)     The consummation of the transactions contemplated herein will not violate, nor be in conflict with, the governing documents of the Company.

(c)     This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of Company enforceable against the Company in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization and other laws of general application limiting enforcement of creditors' rights generally.

-8-

12.   <u>Interpretation</u>.   Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".   All references to "$" and dollars shall be deemed to refer to United States currency.   Except as otherwise provided herein, the application of credits and deductions hereunder shall be on a dollar-for-dollar basis.

13.   <u>Notices</u>.   All notices and deliveries of information hereunder shall be deemed to have been duly given if actually delivered or mailed by registered or certified mail, postage prepaid, addressed to the Parties hereto at the addresses set forth below.   Each Party may, by written notice so delivered to the other, change the address to which delivery shall thereafter be made.

| | |
|---|---|
| If to the Royalty Holders: | Rodeo Creek Gold Inc.<br>P.O. Box 2610<br>Winnemucca, NV  89466<br>Attention:  Chief Executive Officer |
| With a copy to: | Sidley Austin LLP<br>One South Dearborn<br>Chicago, IL 60603<br>Attention:  Jessica C.K. Boelter<br>          Matthew G. McQueen<br>Email:    jboelter@sidley.com<br>          mmcqueen@sidley.com |
| If to the Company: | Buyer c/o Waterton Global Resource Management, Inc.<br>199 Bay Street, Suite 5050<br>Toronto, Ontario<br>M5L 1E2 Canada<br>Attention:  Richard J. Wells<br>Email:    rwells@watertonglobal.com<br><br>Tel: +1 416 504 3505<br>Fax: 416 504 3200 |

With a copy to:          Allen & Overy LLP
                        1221 Avenue of the Americas

                        New York, NY 10020
                        Attention: Ken Coleman
                                   Richard D. Smith
                        Email:     ken.coleman@allenovery.com
                                      richard.d.smith@allenovery.com

14.    <u>Additional Documents; Further Assurances</u>.  The Parties shall from time to time execute and deliver all such further instruments, certificates and documents and do all such further actions and things as may be necessary or appropriate to fully perform, effectuate and carry out the purposes of this Agreement.

15.    <u>Amendments</u>.  This Agreement may not be amended, modified or changed, nor shall any waiver of any provision hereof be effective, except by means of a written instrument that has been executed by the Party or Parties to be bound.

16.    <u>No Partnership</u>.  Nothing in this Agreement shall create or be construed to create, expressly or by implication, a joint venture, mining partnership, commercial partnership, or other partnership relationship between the Parties or the Designee. In addition, the Parties acknowledge and agree that nothing in this Agreement shall create or be deemed to create any fiduciary relationship between the Company and the Royalty Holders or the Designee, or to create any right or obligation on the part of any of them to act as the agent for or otherwise on behalf of the other.

17.    <u>Property Operations</u>.  As between the Company and the Royalty Holders and the Designee, the Company shall have exclusive control and authority over all matters relating to the Acquired Assets, including all business, operations and activities thereon.

18.    <u>Assignment</u>.  This Agreement shall inure to the benefit of and will be binding upon the Parties and their respective successors and permitted assigns.  The Royalty Holders shall not, without the prior written consent of the Company, transfer or assign all or any part of this Agreement to any person other than the Designee; <u>provided</u>, <u>however</u>, that the Royalty Holders may, after providing prior written notice to the Company, transfer or assign this Agreement, on a partial basis, to creditors of the Royalty Holders in connection with the disposition of the Royalty Holders' chapter 11 cases.

19.    <u>Joint Preparation</u>.  Each provision of this Agreement shall be construed as though the Parties participated equally in the drafting of the same.  Consequently, the Parties acknowledge and agree that any rule of construction that a document is to be construed against the drafting party shall not be applicable to this Agreement.

20.    <u>Severance of Invalid Provisions</u>.  If and for so long as any provision of this Agreement shall be determined to be invalid for any reason whatsoever, such invalidity shall not affect the validity or operation of any other provision of this Agreement except only so far as shall be necessary to give effect to the construction of such invalidity, and any such invalid provision shall be deemed severed from this Agreement without affecting the validity of the balance of this Agreement.

21.    <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Nevada, without giving effect to those principles of conflicts of laws that might otherwise require application of the laws of any other jurisdiction.

22.    <u>Arbitration</u>.

(a)    Any dispute, controversy or claim arising out of or relating to this Agreement or the subject matter hereof, or the breach, termination, or invalidity of this Agreement, shall be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association ("AAA") in effect on the Effective Date, except as otherwise provided by this Section 22.  Arbitration shall be the sole and exclusive forum for resolution of the dispute, controversy or claim, and the arbitrator's award shall be final and binding to the extent permitted by law.  Judgment thereon may be entered by any court having jurisdiction.

(b)    There shall be one arbitrator appointed by the Parties.  If the Parties fail to agree on a single arbitrator within 20 days after arbitration is initiated, there shall be a single arbitrator appointed by AAA.  The arbitrator shall be disinterested in the dispute, controversy or claim and shall have no connection with any Party and shall, in the judgment of AAA, be qualified by education and experience to hear and determine the matter submitted to arbitration.  Time is of the essence of the appointment of an arbitrator.

(c)    The arbitration need not be administered, but should the services of an appointing or administering authority be necessary, the appointing or administering authority shall be the AAA.

(d)    The place of arbitration shall be Reno, Nevada, unless otherwise agreed by the parties.  The arbitration shall be conducted in the English language and any foreign language documents presented at such arbitration shall be accompanied by an English translation thereof.  The arbitrator shall apply the law as made applicable by the Agreement.

(e)    For purposes of arbitration only, the parties consent that the United States District Court for the District of Nevada and the courts of record of the County of Washoe and the State of Nevada shall have jurisdiction and venue with respect to all aspects of the enforcement of the arbitration provisions of this Agreement.

-11-

(f)     Unless the procedure for discovery is otherwise agreed to by the Parties, the arbitrator, at the request of a Party, may establish rules for pre-hearing discovery which shall comport with due process, expeditious determination of the issues and fairness.  Unless otherwise agreed by the Parties, the depositions of no more than four witnesses on each side may be taken without the consent of the arbitrator(s).  The Federal Rules of Civil Procedure and the Federal Rules of Evidence shall govern all aspects of the depositions, including admissibility.

(g)     The decision in the arbitration shall be rendered, unless otherwise agreed by the Parties, no later than 30 days after the date the hearings were closed.  The decision of the arbitrator shall be in writing, shall be a reasoned decision that states the basis for the award, shall be signed by the arbitrator, and shall be final and binding on the Parties.  If the Parties settle the dispute in the course of arbitration, such settlement shall be approved by the arbitrator on request of either Party and become the award.  The arbitrator shall have authority to award any remedy or relief that a court of the State of Nevada could order or grant, including awarding attorneys' fees to the prevailing Party in the arbitration proceeding.  In making monetary awards, the arbitrator is empowered to award only compensatory damages.  Each Party hereby irrevocably waives any damages in excess of compensatory damages, including a waiver of any punitive, consequential, indirect, special, exemplary, incidental or multiple damages.  The arbitrator may, in his or her discretion, grant pre-award interest, and if so, such interest may be at commercial rates during the relevant periods.  The arbitrator may, in the course of proceedings, order any provisional remedy or conservatory measure, including but not limited to attachment, specific performance, preliminary injunction or the deposit of specified security, considered to be necessary, just and equitable.  The failure of a Party to comply with such an interim order, after due notice and opportunity to cure such noncompliance, may be treated by the arbitrator as a default and all or some of the claims or defenses of the defaulting Party may be stricken and partial or final award entered against such Party, or the arbitrator may award such lesser sanctions deemed appropriate.  A request for interim or provisional relief to a court shall not be deemed incompatible with the agreement to arbitrate or as a waiver of that agreement.

(h)     Prior to rendering a final award, the arbitrator shall submit to the Parties an unsigned draft of the proposed award (exclusive of any award of costs and attorneys fees) and each Party within three (3) Business Days after receipt of such draft award, may serve on the other Parties to the arbitration and file with the arbitrator:  (i) a written statement outlining any claimed errors of fact, law computation or otherwise; and (ii) a certification by the Party's counsel of the costs and attorneys' fees directly expended in the arbitration. Within three (3) Business Days after receipt of the written statement of each Party to the arbitration, the arbitrator shall render a final award.  The award shall briefly state the reasoning on which it rests.

-12-

(i)     All deadlines specified in this Section 22 may be extended by mutual written agreement of the Parties.

(j)     Each Party is required to continue to perform its obligations under this Agreement pending final resolution of any dispute.

(k)     The procedures specified in this Section 22 will be the sole and exclusive procedures for the resolution of disputes between the Parties arising out of or relating to this Agreement; provided, however, that, prior to the appointment of the arbitrator, a Party may seek a preliminary injunction or other preliminary judicial relief in the courts of the State of Nevada if in the judgment of that Party such action is necessary to avoid irreparable damage or to preserve the status quo.  Despite the initiation of any such judicial proceedings, the Parties will continue to participate in good faith in the procedures specified in this Section 22.

(l)     Before accepting the position of arbitrator, the individual appointed shall set forth the basis for establishing his or her fees for the arbitration.  Such basis shall be according to reasonable rates for hourly fees charged by such individual in the normal exercise of his or her profession.  Except as otherwise awarded by the arbitrator, the Parties shall each bear their own attorneys' fees and costs and one-half of the administrative costs and arbitrator's fees of any arbitration proceeding.

23.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.

*(remainder of this page intentionally blank)*

-13-

IN WITNESS WHEREOF, the Parties to this Agreement have duly executed and delivered this Agreement effective as of the date first above written.

The Company:

**WATERTON GLOBAL MINING COMPANY, LLC**

By: _____
Name: Richard J. Wells
Title: Manager


The Royalty Holders:

RODEO CREEK GOLD INC.

By: _____
    Name: Raymond E. Dombrowski Jr.
    Title: Chief Executive Officer

ANTLER PEAK GOLD INC.

By: _____
    Name: Raymond E. Dombrowski Jr.
    Title: Chief Executive Officer

HOLLISTER VENTURE CORP.

By: _____
    Name: Raymond E. Dombrowski Jr.
    Title: Chief Executive Officer

TOUCHSTONE RESOURCES COMPANY

By: _____
    Name: Raymond E. Dombrowski Jr.
    Title: Chief Executive Officer

Province
~~STATE~~ OF Ontario _____ )
                              )
COUNTY OF Canada _____ )    ss.
                              )
CITY OF: TORONTO

The foregoing instrument was acknowledged before me on this 17 day of May, 2013, by Richard J. Wells as Manager of Waterton Global Mining Company, LLC, a Nevada limited liability company.

Witness my hand and official seal.

_____
Notary Public MEMBER IN GOOD STANDING OF THE LAW SOCIETY OF UPPER CANADA
My Commission expires: NA

_____


STATE OF _____ )
                          )
COUNTY OF _____ )    ss.


The foregoing instrument was acknowledged before me on this _____ day of May, 2013, by _____ as _____ of Rodeo Creek Gold Inc.

Witness my hand and official seal.

_____
Notary Public

My Commission expires:

_____

[SEAL]

-2-

IN WITNESS WHEREOF, the Parties to this Agreement have duly executed and delivered this Agreement effective as of the date first above written.

The Company:

**WATERTON GLOBAL MINING COMPANY, LLC**

By: _____
Name: Richard J. Wells
Title: Manager

The Royalty Holders:

RODEO CREEK GOLD INC.

By: _____
Name: Raymond E. Dombrowski Jr.
Title: Chief Executive Officer

ANTLER PEAK GOLD INC.

By: _____
Name: Raymond E. Dombrowski Jr.
Title: Chief Executive Officer

HOLLISTER VENTURE CORP.

By: _____
Name: Raymond E. Dombrowski Jr.
Title: Chief Executive Officer

TOUCHSTONE RESOURCES COMPANY

By: _____
Name: Raymond E. Dombrowski Jr.
Title: Chief Executive Officer

*[Signature Page to Rodeo Creek Net Profits Royalty Agreement]*

STATE OF _ILL_ )
                       )
COUNTY OF _COOK_ ) ss.

    The foregoing instrument was acknowledged before me on this _16_ day of May, 2013, by Raymond E. Dombrowski Jr. as Chief Executive Officer of RODEO CREEK GOLD INC., ANTLER PEAK GOLD INC., HOLLISTER VENTURE CORP., and TOUCHSTONE RESOURCES COMPANY.

    Witness my hand and official seal.

_Crystal Sharpe_
Notary Public

My Commission expires:

_7/8/2014_

[SEAL]

```
"OFFICIAL SEAL"
CRYSTAL SHARPE
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 7/8/2014
```

*[Notarization Page to Rodeo Creek Net Profits Royalty Agreement]*

The Designee:

**CREDIT SUISSE AG**

By: _____

Name: _____Flavia R. Sennhauser_____

Title: _____Director_____


By: _____

Name: _____Stephanie Amstutz_____

Title: _____Vice President_____

*[Signature Page to Rodeo Creek Net Profits Royalty Agreement]*

**<u>Exhibit B</u>**

**Administrative Claims**

| Ref. | Claimant Name | Amount | Claimant Description |
|------|---------------|--------|----------------------|
| 1 | 3D Concrete | $ 417,974 | Vendor |
| 2 | Aecom | - | Vendor |
| 3 | Aggreko | 76,667 | Vendor |
| 4 | Airgas Ncn | 1,596 | Vendor |
| 5 | Al Park | 156,860 | Vendor |
| 6 | Alex Stewart (Assayers) Inc. | 685 | Vendor |
| 7 | Alfred H Knight | 356 | Vendor |
| 8 | Allied Washoe Petroleum | 10,208 | Vendor |
| 9 | Amerigas | 18,580 | Vendor |
| 10 | At&T | 546 | Vendor |
| 11 | Barco Rent a Truck | 2,754 | Vendor |
| 12 | Best Inn & Suites | 202 | Vendor |
| 13 | Bodies At Work Fitness | 539 | Vendor |
| 14 | Bosch Motors | - | Vendor |
| 15 | Bott Enterprises | 1,870 | Vendor |
| 16 | Brown And Caldwell | 5,133 | Vendor |
| 17 | Bsl Electric Corporation | 85 | Vendor |
| 18 | Bw Fabrication | 9,217 | Vendor |
| 19 | Cannon Environmental Assistance | 7,618 | Vendor |
| 20 | Carpenter Drilling Llc | - | Vendor |
| 21 | Cashman Equipment Company | 104,625 | Vendor |
| 22 | Cemen Tech, Inc. | 1,543 | Vendor |
| 23 | Charles Stringham | 2,560 | Vendor |
| 24 | City Of Elko | 27 | Vendor |
| 25 | Crescent Electric | 7,745 | Vendor |
| 26 | Crimecheck.Com | 111 | Vendor |
| 27 | Deloitte & Touche | 6,130 | Vendor |
| 28 | Desert Disposal | 11,865 | Vendor |
| 29 | Direct Tv | 109 | Vendor |
| 30 | Don Prather | 1,250 | Vendor |
| 31 | Drug & Alcohol Testing | 480 | Vendor |
| 32 | Dsi Underground Systems, Inc. | 13,839 | Vendor |
| 33 | Elko, Inc. (Coach USA) | 89,304 | Vendor |
| 34 | Energy Laboratories, Inc | 2,860 | Vendor |
| 35 | Enterprise | 814 | Vendor |
| 36 | Environscientists, Inc. | 2,184 | Vendor |
| 37 | Exec-u-Care | 2,314 | Vendor |
| 38 | F&H Mine Supply | 155,073 | Vendor |
| 39 | Finley River | 38,444 | Vendor |

2

| 40 | Force Field Technologies Inc | 346 | Vendor |
|----|------------------------------|-----|--------|
| 41 | Franco Nevada | 175,711 | Vendor |
| 42 | Gamma Electric | 136 | Vendor |
| 43 | Ghx Industrial, Llc | 709 | Vendor |
| 44 | Grainger | 4,572 | Vendor |
| 45 | Grand Sierra Resort | 452 | Vendor |
| 46 | Guardsmark, Llc | 70,930 | Vendor |
| 47 | H&E Equipment Services | 6,540 | Vendor |
| 48 | Hilcrest Mining | 38,444 | Vendor |
| 49 | Humboldt County Landfill | 896 | Vendor |
| 50 | Humboldt Lawn & Landscape Llc | 375 | Vendor |
| 51 | Inland Supply Co. | 179 | Vendor |
| 52 | Inspectorate | 2,382 | Vendor |
| 53 | Integro Insurance Brokers | 1,013 | Vendor |
| 54 | Isom Crane | 5,000 | Vendor |
| 55 | Janitorial Nia | 2,055 | Vendor |
| 56 | Johnson Matthey | 3,981 | Vendor |
| 57 | Loomis Armored Us Inc | 8,792 | Vendor |
| 58 | Manpower | 3,367 | Vendor |
| 59 | Mcdonald-Carano-Wilson Llp | 4,834 | Vendor |
| 60 | Mcmaster-Carr Supply Co. | 2,627 | Vendor |
| 61 | Micon International Ltd | 3,067 | Vendor |
| 62 | Micro-Design | 37 | Vendor |
| 63 | Milliman | 5,551 | Vendor |
| 64 | Minemax | 15,400 | Vendor |
| 65 | Mining Outerwear Mfg & Supply | 2,440 | Vendor |
| 66 | Mobile Mini, Inc. | 443 | Vendor |
| 67 | Modular Space Corporation | 501 | Vendor |
| 68 | Mt Grant General Hospital | 35 | Vendor |
| 69 | Mw Bagnall Company | 1,548 | Vendor |
| 70 | Nalco Company Nw176 | 3,796 | Vendor |
| 71 | Newmont Usa Ltd. | 18,463 | Vendor |
| 72 | Norco | 1,165 | Vendor |
| 73 | Northern Nevada Eyecare | 500 | Vendor |
| 74 | NV Energy | - | Vendor |
| 75 | Office Products Inc (OPI) | 163 | Vendor |
| 76 | Open Loop Energy | 856 | Vendor |
| 77 | Pac Machine Co, Inc | 41,357 | Vendor |
| 78 | Pac Van, Inc. | 1,635 | Vendor |
| 79 | Palmer Johnson Power Systems | 1,481 | Vendor |
| 80 | Phoenix Process Equipment | 3,559 | Vendor |
| 81 | Prometheus Energy Group Inc | 64,357 | Vendor |

| 82  | Psc Environmental Services Llc Dba | -         | Vendor |
|-----|-----------------------------------|-----------|--------|
| 83  | Quality Transportation Inc        | 1,577,741 | Vendor |
| 84  | Quill Corporation                 | 962       | Vendor |
| 85  | Rackspace Us Inc                  | 837       | Vendor |
| 86  | Ray Morgan                        | 5,086     | Vendor |
| 87  | Redburn Tire Company              | 59,562    | Vendor |
| 88  | Robbie Grant D.O.                 | 3,228     | Vendor |
| 89  | Robert W Story                    | 56        | Vendor |
| 90  | Royal Car Wash Llc                | 790       | Vendor |
| 91  | Ruby Mountain Springs             | 88        | Vendor |
| 92  | Sandvik Mining & Const. Usa, Llc  | 742,043   | Vendor |
| 93  | Satellite Phones Direct           | 110       | Vendor |
| 94  | Sharolyn P. Wilson                | 5,120     | Vendor |
| 95  | Sierra Nevada Excavation Llc      | 72,450    | Vendor |
| 96  | Sierra Scales                     | 826       | Vendor |
| 97  | Sos Employment Group              | 6,646     | Vendor |
| 98  | Sweeney Enterprises               | 13,386    | Vendor |
| 99  | Tallman Lumber Co.                | 1,938     | Vendor |
| 100 | Taurus Drilling                   | 231,203   | Vendor |
| 101 | Thatcher Co. Of Nv                | 51,587    | Vendor |
| 102 | Thiessen Team Usa, Inc.           | 35,217    | Vendor |
| 103 | Thomas Petroleum                  | 7,950     | Vendor |
| 104 | Tifco Industries Inc              | 324       | Vendor |
| 105 | Unique Solutions For Industry     | 5,797     | Vendor |
| 106 | United Parcel Service             | 2,065     | Vendor |
| 107 | UPS Freight                       | 2,731     | Vendor |
| 108 | Us Department Of Treasury         | 10,381    | Vendor |
| 109 | Verizon Wireless                  | 6,556     | Vendor |
| 110 | VSP                               | 2,993     | Vendor |
| 111 | Wage Works                        | 891       | Vendor |
| 112 | Wagner Ace Hardware               | 283       | Vendor |
| 113 | Wesco Distribution                | 422       | Vendor |
| 114 | Western Central Petroleum Inc     | 21,802    | Vendor |
| 115 | Western Nv Supply Co.             | 28,301    | Vendor |
| 116 | Winnemucca Tire Factory           | 344       | Vendor |
| 117 | Alarcon, Byron                    | 7,265     | KERP   |
| 118 | Bourland, Nicole                  | 5,247     | KERP   |
| 119 | Conner, Teresa                    | 10,043    | KERP   |
| 120 | Crawford, Douglas                 | 12,593    | KERP   |
| 121 | Defoe, William                    | 7,725     | KERP   |
| 122 | Driscoll, Joseph                  | 20,182    | KERP   |
| 123 | Dunyon, Dennis                    | 10,197    | KERP   |

| 124 | Eklund, Earl | 9,826 | KERP |
|-----|--------------|-------|------|
| 125 | Evans, Tricia | 6,489 | KERP |
| 126 | Hamilton, James | 7,669 | KERP |
| 127 | Holcomb, Tom | 11,047 | KERP |
| 128 | Hutchings, Kenneth | 8,396 | KERP |
| 129 | Johnson, Shane | 6,875 | KERP |
| 130 | Keller, Charles | 7,064 | KERP |
| 131 | Sabey, Jennifer | 5,639 | KERP |
| 132 | Solt, Robin | 6,489 | KERP |
| 133 | Stringham, Carrie | 10,274 | KERP |
| 134 | Thurman, Ward | 10,815 | KERP |
| 135 | Wigglesworth, Brad | 7,650 | KERP |
| 136 | Wrede, Duane | 9,474 | KERP |
| 137 | KERP - Employer taxes (estimate) | 18,096 | KERP |
| 138 | Alvarez & Marsal | 942,667 | Professional |
| 139 | CIBC World Markets Inc. | 1,445,637 | Professional |
| 140 | Creditor Committee Professionals | 600,000 | Professional |
| 141 | Davis Graham & Stubbs | 88,057 | Professional |
| 142 | Downey Brand Attorneys LLP | 14,000 | Professional |
| 143 | Ernst & Young | 73,444 | Professional |
| 144 | FTI Consulting Inc. | 336,037 | Professional |
| 145 | Harris & Thompson | 37,801 | Professional |
| 146 | Holland & Hart LLP | 16,521 | Professional |
| 147 | Maupin, Cox & Legoy | 132,362 | Professional |
| 148 | Milbank, Tweed, Hadley & McCloy | 968,064 | Professional |
| 149 | Patton Boggs | 37,319 | Professional |
| 150 | Sidley Austin LLP | 1,831,256 | Professional |
| 151 | The Garden City Group | 357,000 | Professional |
| 152 | United States Trustee | 30,325 | Professional |

$ 11,661,117